1  JONATHAN WEISSGLASS (SBN 185008)
   LINDA LYE (SBN 215584)
2  ALTSHULER BERZON LLP
   177 Post Street, Suite 300
3  San Francisco, California  94108
   Telephone: (415) 421-7151
4  Facsimile: (415) 362-8064
   E-Mail: jweissglass@altshulerberzon.com
5  E-Mail: llye@altshulerberzon.com

6  Attorneys for Respondent

7              UNITED STATES DISTRICT COURT

8            NORTHERN DISTRICT OF CALIFORNIA

9          SAN FRANCISCO/OAKLAND DIVISION

10

11 NEW UNITED MOTOR                )   **Case No. CV-08-0976 TEH**
   MANUFACTURING, INC.,            )
12                                 )   **DECLARATION OF LINDA LYE IN**
                Movant/Petitioner, )   **SUPPORT OF OPPOSITION TO**
13                                 )   **PETITION & MOTION TO VACATE**
        v.                         )   **LABOR ARBITRATION AWARD**
14                                 )
   UNITED AUTO WORKERS LOCAL 2244, )
15                                 )
                Respondent.        )
16 _____)

17

18

19

20

21

22

23

24

25

26

27

28

1    I, Linda Lye, declare as follows:

2        1.    I am a member of this Court and counsel for Respondent in this action.  I represented

3    Respondent in the underlying arbitration proceedings that resulted in the arbitration awards that

4    Movant/Petitioner seeks to vacate in this action.

5        2.    Attached as Exhibit A to this declaration is a true and correct copy of excerpts of the

6    transcript of the arbitration proceedings held on August 14, 2006.

7        3.    Attached as Exhibit B to this declaration is a true and correct copy of excerpts of the

8    transcript of the arbitration proceedings held on August 15, 2006.

9        4.    Attached as Exhibit C to this declaration is a true and correct copy of excerpts of the

10   transcript of the arbitration proceedings held on June 6, 2007.

11       5.    Attached as Exhibit D to this declaration is a true and correct copy of the Union's

12   opening brief in the first arbitration held in the merits phase of the arbitration.

13       6.    Attached as Exhibit E to this declaration is a true and correct copy of the Union's

14   reply brief in the first arbitration held in the merits phase of the arbitration.

15       7.    Attached as Exhibit F to this declaration is a true and correct copy of the Company's

16   opening brief in the first arbitration held in the merits phase of the arbitration.

17       8.    Attached as Exhibit G to this declaration is a true and correct copy of the Company's

18   reply brief in the first arbitration held in the merits phase of the arbitration.

19       9.    Attached as Exhibit H to this declaration is a true and correct copy of the Union's

20   reply brief in the second arbitration held in the merits phase of the arbitration.

21

22       I declare under penalty of perjury that the foregoing is true and correct.  Executed on March

23   20, 2008 at San Francisco, California.

24                                    /s/  Linda Lye
                                      LINDA LYE

25

26

27

28

# EXHIBIT A

IN ARBITRATION PROCEEDINGS

BEFORE CHARLES ASKIN, ARBITRATOR

In the Matter of an Arbitration

between                         CERTIFIED COPY

UNITED AUTO WORKERS UNION,
LOCAL 2244, AFL-CIO,

            and

NEW UNITED MOTOR MANUFACTURING,
INC.,


(Policy Grievance, No. 10277)
——————————————————————————/

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Volume I, Pages 1 - 199

Monday, August 14, 2006


Held at
Woodlin Suites Hotel
39150 Cedar Boulevard
Newark, California


Reported by:
JUDITH DeAlba, RPR, CRP, CSR No. 5709
Job No.:   194 CMR



41 Aptos Avenue  San Francisco, CA 94127-2518
Ph: [415] 587-2000  Fx [415] 587-2140
Email: Info@baycityreporting.com

```
 1                          APPEARANCES

 2      Arbitrator:

 3
            CHARLES A. ASKIN, Esq.
 4          31 Loma Vista
            Walnut Creek, California  94597
 5          (925) 934-1929

 6

 7      For the Union:

 8          ALTSHULER, BERZON, NUSSBAUM, RUBIN & DEMAIN
            By:  LINDA LYE, Esq.
 9               PETER NUSSBAUM, Esq.
            177 Post Street, Suite 300
10          San Francisco, California  94108
            (415) 421-7151
11

12

13      For the Employer:

14          SEYFARTH SHAW, LLP
            By:  NICK C. GEANNACOPULOS, Esq.
15          560 Mission Street, Suite 3100
            San Francisco, CA  94105
16          (415) 387-2823

17

18

19

20

21

22

23

24

25

                                                    2
```

1                              APPEARANCES (cont'd)

2

3      Also Present:

4

5           Julie Collins Nelson
            -and-
            Kelley McKenzie
6           Assistant General Counsel
            New United Motor Manufacturing, Inc.
7           45500 Fremont Boulevard
            Fremont, CA  94538-6368
8           (510) 498-5675

9           Debra Johnson
            Terry Bolte
10          Javier Contreras
            Christina Velasco
11          Victor Quesada
            George Nano
12          David Burtch
            Rodney Wood (a.m. only)
13          Daniel Cota (a.m. only)
            Deanna Mayberry (a.m. only)
14          Imran Husanali (p.m. only)
            Gabriel Sanchez (p.m. only)
15

16
                            --o0o--
17

18

19

20

21

22

23

24

25

                                                              3

1    NEWARK, CALIFORNIA                    AUGUST 14, 2006

2                          9:19 a.m.

3                          --oOo--

4                        PROCEEDINGS

5                          --oOo--

6        ARBITRATOR ASKIN:  On the record.

7        This is an arbitration arising out of a

8    dispute between New United Motor Manufacturing, Inc.

9    and United Automobile Aerospace and Agricultural

10   Implement Workers of America, Local 2244.

11       Pursuant to the provisions of their Collective

12   Bargaining Agreement, the parties have selected

13   Charles A. Askin to serve as the impartial Arbitrator

14   in this matter.

15       May I have the appearances for the record,

16   please?

17       MR. GEANNACOPULOS:  Nick Geannacopulos on

18   behalf of the Employer, New United Motor

19   Manufacturing, Inc.

20       MS. LYE:  Linda Lye and Peter Nussbaum on

21   behalf of the Union.

22       There are two Union parties to this

23   arbitration; that would be Local 2244, United

24   Automobile Workers, as well as the International.

25       So just to clarify that, the Union does

                                                        13

1    have -- both entities are a party.

2        ARBITRATOR ASKIN:  So amend when I said that

3    at the outset.  We should add International Union as

4    a party as well.

5        It's my understanding that the parties have

6    previously stipulated to the issue to be submitted to

7    the Arbitrator in this matter, and that that issue,

8    which actually consists of two issues, is

9    memorialized in a document marked as Joint Exhibit 7.

10        I just want to formally solicit the agreement

11    of both parties that those are the issues which are

12    being submitted to the Arbitrator in this matter.

13        MR. GEANNACOPULOS:  That is correct.

14        MS. LYE:  So stipulated.

15        ARBITRATOR ASKIN:  It is my understanding that

16    the parties have prepared to stipulate that all

17    requirements of the grievance procedure have either

18    been met or waived, and this matter is properly

19    before me for a final binding arbitration.

20        Is that correct?

21        MR. GEANNACOPULOS:  That's correct.

22        MS. LYE:  So stipulated.

23        ARBITRATOR ASKIN:  All right.

24        Do the parties wish the Arbitrator to retain

25    jurisdiction of the remedy, if any, arising in this

                                                    14

1    dispute?

2         MS. LYE:  Yes.

3         MR. GEANNACOPULOS:  Yes.

4         ARBITRATOR ASKIN:  Any objection to service of

5    my decision by First-Class Mail?

6         MR. GEANNACOPULOS:  None.

7         MS. LYE:  None.

8         ARBITRATOR ASKIN:  Thank you.

9         We have marked certain Joint exhibits which

10   have been put together in a binder.  The Joint

11   exhibits consist of seven Joint exhibits:

12        Joint Exhibit 1 is a copy of the 2005

13   Collective Bargaining Agreement.

14        Joint Exhibit 2 is the 2001 Collective

15   Bargaining Agreement.

16        Joint Exhibit 3 is the 1988 Collective

17   Bargaining Agreement.

18        Joint Exhibit 4 is the Problem Notice.

19        Joint Exhibit 5 is the Union statement,

20   including the grievance in this matter.

21        MS. LYE:  I'm sorry.  That should actually be

22   "including attachments."

23        ARBITRATOR ASKIN:  Okay.

24        Joint Exhibit 6 is the Company statement,

25   including attachments.

                                                      15

1    first since this is a contract case.

2          Our position is that it is a contract case

3    regarding the Collective Bargaining Agreement and the

4    proper interpretation and all formal notes and

5    choices of interpretation are proposed, including the

6    plan language, prior arbitration decisions, past

7    practice, industry practice, standard canons of

8    construction for contract interpretation.

9          ARBITRATOR ASKIN:  Okay.  Given this is a

10   contract arbitration dispute, we'll give you the

11   opportunity to give an opening statement first.

12         MS. LYE:  Can I get some water?

13         ARBITRATOR ASKIN:  Sure.

14   (Discussion off the record.)

15         ARBITRATOR ASKIN:  Whenever you're ready.

16         MS. LYE:  Good morning, Arbitrator Askin.

17         This case involves the right of NUMMI

18   employees or Team Members, as we call them, to sick

19   leave, and the obligation of NUMMI to comply with its

20   longstanding contractual commitments in the absence

21   of an agreement from the Union to change those

22   commitments.

23         The case centers in particular on a sick leave

24   provision in the contract known as, quote,

25   time-for-time.

                                                    19

1           This is found at Article XXIII, Paragraph 9.3,

2    of the current Collective Bargaining Agreement.  It's

3    Page 65 of the black copy, which is the -- that's the

4    prior -- the black copy is the current 2005

5    agreement.

6           The time-for-time provision allows an employee

7    to remain on a sick leave of absence for a period of

8    time equal to his or her seniority.  The one caveat

9    is that there is a slightly different, more generous

10   formula for calculating the length of sick leave for

11   Team Members with less than three years of seniority.

12          The evidence will show that the party's

13   consistent practice for at least the last decade has

14   been to allow all Team Members, including those who

15   are on sick leave for industrial injuries, and

16   including those who are on sick leave for personal

17   non-industrial medical conditions, to remain on sick

18   leave for as long as their time-for-time clock

19   permits.

20          In the fall of last year, the Company

21   instituted a new policy on sick leave, and it is now

22   terminating the sick leave absence of Team Members if

23   their medical condition is, quote, permanent and

24   stationary, but even if these Team Members have not

25   used up their full allotment of time-for-time leave.

                                                    20

1         The Company now contends that NUMMI Team

2    Members have no right to time-for-time leave once

3    their injuries become permanent and stationary.

4    Pursuant to this new policy, NUMMI has terminated the

5    employment of dozens of Team Members who are sick and

6    have been injured in the plant.

7         The Union filed this grievance, this policy

8    grievance, to challenge the Company's new policy of

9    prematurely ending sick leave and terminating Team

10   Members' employment.

11        Under the clear language of the contract, as

12   confirmed by the party's past practice, Team Members

13   have the right to remain on a sick leave of absence

14   for as long as their time-for-time clock permits,

15   regardless of whether the medical condition is

16   personal or industrial, and regardless of whether the

17   medical condition is temporary or permanent.

18        Since this is a contract interpretation case,

19   the place to start is with the language of the

20   contract.  So I'd like to draw your attention to

21   Page 61, this is of the current CBA, which addresses

22   leaves of absence.  It's Article XXIII.

23        I have Post-it notes, if that will help.

24        ARBITRATOR ASKIN:  It will help.

25        MS. LYE:  Paragraph 1 defines a leave of

                                                      21

1    absence as, quote:

2         "Approved time off from work with or without

3    pay for a specific period of time for serious or

4    compelling reasons as described below."

5         Paragraph 2 next goes on to define

6    eligibility, quote:

7         "Employees who have not completed their

8    initial evaluation period are not eligible for leave

9    of absence, except where such leave is legally

10    required."

11         Article XI of the contract, incidentally,

12    defines the initial evaluation period as 90 days.  So

13    this means that according to Paragraph 2.1, employees

14    who have completed their initial evaluation period,

15    that is, have completed their 90-day period, are

16    eligible for a leave of absence.

17         Article XXIII then goes on to describe

18    different types of leave.  We have bereavement leave

19    in Paragraph 3; jury duty leave in Paragraph 4; and

20    so on, until we get to Paragraph 9, sick leave.

21         Paragraph 9.1 defines those employees who are

22    eligible for sick leave as follows, quote:

23         "Employees who become ill or disabled are

24    eligible for an unpaid leave of absence after an

25    absence of five consecutive working days."

                                                    22

1          Incidentally, the first five days are

2    authorized to be taken as paid days.  Team Members

3    are allowed to use their personal allowance and

4    receive pay during those first five days.  That's not

5    before you, but I want you to know what the five days

6    is.  And that's found at Article XXII.

7          Returning, then, to Paragraph 9.1, after it

8    defines the employees eligible for sick leave as

9    those who become ill or disabled, it then goes on to

10   address the required documentation that a Team Member

11   must provide to the Company in order to get sick

12   leave.

13         9.2 then addresses the special circumstances

14   of sick leave in pregnancy situations.

15         And then 9.3 addresses the length of a sick

16   leave, quote:

17         "A sick leave for preg- -- sorry.

18         "A sick leave of absence may not exceed the

19   employee's length of seniority as of the date of the

20   illness or disability, or 18 months for an employee

21   with less than one year of seniority, or 36 months

22   for an employee with more than one year of seniority,

23   whichever is greater."

24         This is known as the time-for-time provision.

25   The permissible length of a sick leave of absence is

23

1    measured by the Team Member's seniority for Team

2    Members with more than three years of seniority.  It

3    is 18 months for Team Members with less than one year

4    of seniority, and three years for those between one

5    and three years of seniority.

6         The time-for-time provision in 9.3 applies to

7    all employees who are ill or disabled.  This is so

8    because 9.3 addresses the length of a, quote, sick

9    leave of absence, which, as set forth in 9.1, applies

10   to all employees who, quote, become ill or disabled.

11        In addition, 9.3 states that seniority for the

12   purposes of measuring the time-for-time clock is

13   measured as of the date of illness or disability.

14   This necessarily means that the provision is intended

15   to apply to all Team Members who are ill or disabled.

16        While 9.3 applies to all Team Members who are

17   ill or disabled, 9.4 contains certain rules that are

18   especially applicable in industrial injury

19   situations.  It provides that in such cases, sick

20   leave will be granted automatically.  It also

21   provided that, quote:

22        "... seniority will accumulate for the full

23   period of legal temporary disability."

24        This latter provision of 9.4 helps define how

25   to measure seniority for the purposes of calculating

                                                    24

1   the length of a leave when a Team Member is injured

2   on the job.

3         The length of a sick leave as set forth in 9.3

4   is based on seniority as of the date of illness or

5   disability.  9.4 then goes on to explain that in

6   industrial injury situations when the Team Member

7   goes out on leave, seniority shall accumulate for the

8   full period of legal temporary disability.

9         So in industrial leave situations, seniority

10  for the purposes of calculating the length of the

11  sick leave must take account of the full period of

12  legal temporary disability; that is, the full period

13  prior to the point in time at which the injury

14  becomes, as we say in Workers' Compensation terms,

15  permanent and stationary.  This is what the contract

16  language clearly provides.

17        Consistent with this plain language, the

18  evidence will show that the party's longstanding past

19  practice has been to allow all Team Members who are

20  ill or disabled, including those with industrial

21  injuries, including those with non-industrial

22  personal medical conditions, including those whose

23  medical conditions are permanent or permanent and

24  stationary, to remain out on sick leave until the

25  expiration of their time-for-time clock.

                                                    25

1          The party's practice has never been to

2     terminate the sick leave of absence of a Team Member

3     as soon as the injury becomes permanent and

4     stationary.

5          About five years after NUMMI opened its doors

6     in the mid-1980s, the parties arbitrated a policy

7     grievance on the question of whether the Company had

8     the right ever to terminate the employment of a Team

9     Member who is injured in the plant.

10         That case was decided by Arbitrator Paul

11    Staudohar in 1990, and is a case you will hear a

12    great deal about today, because the Company's recent

13    effort to avoid its contractual obligation to provide

14    sick -- time-for-time sick leave to Team Members is

15    allegedly, though very improperly based, on this

16    decision.

17         The policy grievance in the Staudohar case was

18    brought on behalf of three Team Members who were

19    injured in the plant.  They were all permanent and

20    stationary.  The Company gave the reason for the

21    termination as the fact that these Team Members were

22    physically unable to perform any work in the plant.

23         The Union contended that the Company had no

24    right to terminate a Team Member on the ground that

25    the Team Member was physically unable to perform

                                                    26

1    work. The Union's position was that Article XI of

2    the contract enumerates the specific circumstances

3    under which seniority can be broken and employment

4    terminated, and that physical inability to perform

5    work in the plant is not one of the enumerated

6    circumstances in Article XI.

7        The Union also contended that under

8    Article XXIII, Paragraph 9.4, which we already

9    alluded to, there is an automatic right to sick leave

10   in industrial injury situations.

11       In short, the Union was arguing that Team

12   Members injured in the plant have the right to sick

13   leave in perpetuity, and that the employment of such

14   Team Members can never be terminated.

15       The policy grievance in the case before

16   Arbitrator Staudohar did not contend, however, that

17   the Company had failed to grant Team Members the full

18   length of their time-for-time leave, or that the

19   Company had granted the Team Members additional leave

20   after the point in time at which the injuries became

21   permanent and stationary.

22       The Union, in the case before

23   Arbitrator Staudohar, did not raise the issue of how

24   long Team Members injured in the plant could remain

25   out on sick leave before they faced termination

                                                    27

1  because the Union's contention in that case was that

2  such Team Members could never be terminated.

3          The Arbitrator rejected the Union's argument

4  based on Paragraph 9.4, that employees with

5  industrial injuries have the right to permanent sick

6  leave.  Arbitrator Staudohar emphasized that the

7  language of 9.4 focuses on the period of legal

8  temporary disability, which must mean that the

9  provision does not provide a right to permanent sick

10  leave.

11          But Arbitrator Staudohar also ruled partially

12  in favor of the Union and held that before the

13  Company may terminate the employment of a Team Member

14  on sick leave, it must provide certain procedural

15  protection.

16          Article XI, Paragraph 3(e) of the contract

17  governing termination of seniority in employment at

18  the time provided that seniority is broken if an

19  employee fails to return to work within three days

20  after the expiration of an approved leave of absence,

21  unless unusual circumstances or conditions exist.

22  The parallel provision of the current CBA is still at

23  Article XI 3(e), but now provides for a slightly

24  longer window within which to return to work.

25          Arbitrator Staudohar ruled that in light of

28

1    this provision, the Company was required to give Team

2    Members the opportunity to return to work after the

3    expiration of their leave and before the Company

4    could terminate the Team Member's employment.  He

5    ruled that the Company had to look to see if there

6    were any jobs in the plant that the Team Member could

7    perform within his or her physical restrictions.  And

8    if there was no such work available that the Team

9    Member could perform, then, and only then, could the

10   Company take the step of terminating the Team

11   Member's employment.

12        Following the issuance of this decision in

13   1990, the three Team Members covered by the policy

14   grievance each returned to NUMMI, and the Company

15   undertook the process of looking to see if there was

16   any work that they could perform.

17        In each case, the Company decided that there

18   was no work available and each of the three Team

19   Members then were terminated.  Grievances were filed

20   on behalf of each Team Member and then each case then

21   went to arbitration.

22        Each case went to arbitration on the factual

23   question of whether there was or was not any work in

24   the plant that the Team Members could perform.  In

25   two cases, the Arbitrator agreed with the Company.

                                                      29

1    In one case, the Arbitrator said that the Team Member

2    should be allowed the opportunity to go back and

3    perform work in a particular position.

4         Interestingly, in one of the cases involving

5    Miss Renee Adeola-Morrison, A-d-e-o-l-a, dash,

6    Morrison, the Company claimed that the termination

7    was justified on two grounds:

8         First, there was no work in the plant that

9    Miss Adeola-Morrison could perform, given her

10   permanent and stationary physical restrictions.

11        Second, Miss Adeola-Morrison's right to

12   time-for-time leave, the Company said, had already

13   expired.

14        Miss Adeola-Morrison at this point had long

15   since become permanent and stationary.  That was

16   already established at the time of the Staudohar

17   decision.

18        The Company stated in 1991, just after

19   Staudohar and in justifying Miss Adeola-Morrison's

20   termination, quote:

21        "Following the normal procedure of applying

22   the language of Article XXIII, Section 9, the Company

23   is obligated to continue a leave not to exceed the

24   employee's length of seniority.  In cases that are

25   due to legal occupational disease, an employee

                                                      30

1    accumulates seniority for the full period of their

2    legal temporary disability.

3        "Because Miss Adeola has, A, been on a sick

4    leave exceeding her seniority; B, has been deemed

5    permanently disabled, the Company's no longer

6    obligated to Miss Adeola after her contractual

7    time-for-time date."

8        In 1991, immediately following the Staudohar

9    decision, the Company itself expressly acknowledged

10    that it remained contractually obligated to provide

11    time-for-time leave to Team Members with permanent

12    and stationary industrial injuries.

13        In the years following the Staudohar decision,

14    the parties then confirmed this mutual understanding

15    of the contract, and NUMMI consistently followed the

16    practice of allowing all Team Members, including

17    those with industrial injuries, and including those

18    with industrial injuries that were permanent and

19    stationary, to remain on the sick leave of absence

20    until their contractual time-for-time date expired.

21        For example, NUMMI used to terminate Team

22    Members -- terminate the employment of Team Members

23    when they had remained on leave for a period of time

24    in excess of their time-for-time clock.  The logical

25    predicate of such terminations is that Team Members

                                                    31

1    do not face termination prior to the -- when they

2    have been out on leave for a period of time less than

3    or equal to their time-for-time clock.

4         In light of the clear language of the

5    contract, and the long and consistent intentions

6    given to it by the parties through their actions, you

7    may be wondering why we are here today and how the

8    Company can justify terminating the leave of Team

9    Members before their contractual time-for-time dates.

10   And the Union, frankly, wonders that, too.

11        NUMMI now contends, 15 years after the

12   Staudohar decision, that the Arbitrator decided that

13   it has the right to terminate the leave of Team

14   Members as soon as their injuries become permanent

15   and stationary, and that such Team Members do not

16   have the right to time-for-time leave.

17        But as I have already explained, and as

18   Arbitrator Staudohar's opinion itself demonstrates,

19   that was not the issue in the policy grievance before

20   Arbitrator Staudohar.  That was not what

21   Arbitrator Staudohar decided and that was not what

22   the Company said, in 1991, Arbitrator Staudohar held.

23        What's really going on here is the Company's

24   new policy is a backdoor effort to obtain cost

25   savings that it failed to achieve at the bargaining

                                                    32

1    table.  The party's Collective Bargaining Agreement

2    was renegotiated last summer.  Well in advance of

3    that, the Company raised its growing concerns about

4    costs associated with Workers' Compensation and Team

5    Members on leave of absence.

6         During negotiations -- prior to negotiations,

7    the Company repeatedly raised those cost concerns and

8    proposed, among other things, to eliminate benefits

9    for Team Members on a leave of absence.

10        The Union did not agree to that proposal.

11        NUMMI could not obtain the Union's agreement

12   to terminate benefits for Team Members on a sick

13   leave, so instead it has unilaterally terminated

14   their employments entirely, thereby ending their

15   benefits and achieving the very cost savings that

16   NUMMI failed to obtain at the bargaining table.

17        Since its inception, NUMMI has committed

18   itself to creating a unique manufacturing environment

19   based on principles of mutual trust, cooperation,

20   respect.

21        The Collective Bargaining Agreement

22   recognizes, quote, the axiom that people are the most

23   important resource of the company.  A company that

24   recognizes its workforce as its most important

25   resource takes care of its ill and injured Team

                                                    33

1   Members, especially those employees who have
2   dedicated years of service to the company and those
3   who have been injured in the plant.  And that is what
4   this case is fundamentally about.  The time-for-time
5   provision gives employees something back in exchange
6   for their years of service.
7        But it should be stressed that terminating
8   the -- terminating the employment of Team Members
9   before their contractual time-for-time clock has run
10  does more than just prematurely deprive them of
11  benefits while they are on sick leave.
12       The Company acknowledges that it has an
13  obligation to help place in the plant back -- place
14  back in jobs in the plant disabled Team Members in
15  any available position that fits the Team Member's
16  physical restrictions.
17       NUMMI has a huge range of different jobs with
18  widely varying physical requirements.  Openings come
19  up when other Team Members transfer, retire, or leave
20  NUMMI for some other reason.  Thus, the process of
21  matching a Team Member who is currently out on sick
22  leave with physical restrictions and an available
23  opening in the plant is something of a waiting game.
24  And from the Team Member's prospective, it's really
25  just a matter of luck.  By increasing the waiting

                                                    34

1    period window, the Team Member's chances of being

2    successfully placed in the plant also increase.

3          And indeed, many Team Members have

4    successfully been placed in jobs in the plant after

5    their injuries become permanent and stationary.  This

6    could not have happened if NUMMI had terminated the

7    employment of these Team Members shortly after they

8    became permanent and stationary, and it will not

9    happen in the future if the Company is allowed to

10   implement its new policy and prematurely terminate

11   the sick leave of Team Members before their

12   time-for-time clock runs.

13         Before turning to some of the remedial issues,

14   I want to address the scope of the Company's policy.

15   Since the Company first announced its intention to

16   implement this new policy, it has consistently

17   invoked the Staudohar decision which involved Team

18   Members with industrial injuries.  As a result, it

19   had initially been the Union's understanding that the

20   Company's new policy was to deny time-for-time leave

21   to Team Members with industrial injuries that had

22   become permanent and stationary.

23         It appears, however, that NUMMI's current

24   policy is actually broader than that.  Some of the

25   Team Members that the Company has terminated pursuant

                                              35

1    to its new policy were actually out on non-industrial

2    sick leave and had never been industrially injured.

3    Thus, it appears that the Company actually believes

4    that it has the right to deny all Team Members,

5    whether they have industrial or non-industrial

6    medical conditions, the right to remain out on sick

7    leave for the whole duration of the time-for-time

8    clock.

9         If this is the Company's policy, indeed this

10   broader policy violates the Collective Bargaining

11   Agreement because it completely leaves the

12   time-for-time provision out of the contract.  It's

13   inconsistent, irreconcilable with the Company's past

14   practice, and the Company cannot even make the

15   pretense of relying on the Staudohar decision which

16   involved the right of Team Members with industrial

17   injuries to remain on the sick leave of absence.

18        I'd like now to turn to the issues of remedy.

19        The Union contends that the policy violates

20   the Collective Bargaining Agreement, and employees

21   who have been adversely affected should obtain

22   make-whole relief.

23        MR. GEANNACOPULOS:  I have one objection.  In

24   terms of remedy process, we were going to save that

25   for another day which is the usual process, so I

                                                    36

1   just -- that's my objection.

2        MS. LYE:  We'd like to finish this arbitration

3   within the time allotted.  And for the remedy, we'd

4   like to address conceptual issues, and hopefully

5   implementation can be handled by the parties.

6        MR. GEANNACOPULOS:  My only objection to that

7   is we agreed on the issues up front.  If there's a

8   remedy, we come back and handle the remedy aspect of

9   the case, which is typical.

10        And we're not really prepared to deal with a

11   remedy case here.  We're prepared to deal with a

12   substantive case here.

13        That's it.

14        MS. LYE:  Why don't you let me finish my

15   opening statement --

16        MR. GEANNACOPULOS:  I apologize if I

17   interrupted you, but that's my objection.

18        MS. LYE:  Remedy is one of the issues

19   addressed in the stipulated issues, "What is the

20   proper remedy?"  We will address conceptual contract

21   interpretation issues.  We're not going to get into a

22   case-by-case basis here, are the people on the

23   attached list -- we may have to get into some cases.

24   That's also a stipulated issue.  But why don't I

25   finish my opening statement first and then we can go

37

1    on from there.

2         The basic premise would be the employees who

3    are adversely affected by the Company's new policy

4    should obtain make-whole relief, so I'd like to

5    address the two broad categories of the employees who

6    have been adversely affected.

7         First, the employment of dozens of Team

8    Members has been -- dozens and dozens of Team Members

9    has been terminated pursuant to the Company's new

10   policy.  Team Members who have been terminated should

11   be reinstated and compensated for lost benefits, plus

12   interest, and they should be allowed to remain on

13   sick leave and receive all benefits normally due to

14   Team Members.  They should be permitted to remain on

15   sick leave for the remainder of their time-for-time

16   clocks.

17        This, conceptually, is hardly a controversial

18   proposition, but the critical question arises of how

19   long their time-for-time clocks are.

20        Prior to the Company's implementation of this

21   new policy, the party's practice was to allow Team

22   Members with industrial injuries to remain on sick

23   leave under the time-for-time provision.  In

24   calculating the Team Member's time-for-time relief,

25   the Company looked to the Team Member's seniority as

                                                        38

1    measured from the date of hire to the last day

2    worked.

3        In many instances, however, a Team Member's

4    injury does not become permanent and stationary until

5    some date after the Team Member's last day of work.

6        As I previously mentioned in Paragraph 9.4,

7    seniority shall accrue, quote:

8        "...for the full period of temporary legal

9    disability."

10       In other words, for the full period prior to

11   the injury becoming permanent and stationary.  As a

12   result, in order to give effect to the clear language

13   of the contract, seniority for purposes of

14   calculating time-for-time leave for Team Members with

15   industrial injuries must take account for the full

16   period of temporary legal disability, for the full

17   period prior to the point in time at which the injury

18   becomes permanent and stationary.

19       If seniority stops accruing at the last day

20   worked, and even if the injury has not yet become

21   permanent and stationary, then Paragraph 9.4, which

22   provides that seniority shall accrue for the full

23   period of temporary legal disability is simply read

24   out of the contract.

25       I'd like -- I don't have a fancy PowerPoint

39

1    presentation, but I have a little diagram that may

2    help illustrate --

3            MR. GEANNACOPULOS:  I should take a look at

4    that before you submit it.

5            (Document dropped on the floor.)

6            MR. GEANNACOPULOS:  Watch me go under.  That's

7    what happens when you've got young kids.  I've got a

8    five-year old and a six-year old.  I'm used to this,

9    except when I do this, my five-year old jumps on my

10   back.  It's true.

11           Okay.  This is part of your argument?

12           MS. LYE:  This is an illustration to help

13   visualize dates and timing.

14           MR. GEANNACOPULOS:  I can't agree to

15   everything, but I understand it's part of your

16   argument.

17           You take it for what it's worth.  We don't

18   agree to it.

19           MS. LYE:  I want to take a hypothetical so we

20   can illustrate some of these points.  Let's assume a

21   Team Member was hired in January of 2000, becomes

22   injured in the plant at some point, and their last

23   day worked is January 2004.  A year later, on

24   January 2005, this Team Member becomes permanent and

25   stationary.

                                                    40

1          Under the Company's current policy, it has --

2    it believes that it has the right to terminate the

3    leave of the Team Member as soon as their condition

4    becomes permanent and stationary, and so that means

5    that relief could end at January '05.

6          The Union's position is that such Team Members

7    have the right to time-for-time leave, which would

8    extend their time on leave a considerable amount of

9    time after the point in time at which the injury

10   becomes permanent and stationary.

11         This issue on remedy that I was addressing

12   raises the question of how long exactly, how long is

13   that time-for-time leave?

14         If seniority for the purposes of calculating

15   the length of the time-for-time leave is calculated

16   based on date of hire to last day worked, then the

17   Team Member in this hypothetical would have four

18   years of seniority for time-for-time purposes.  Date

19   of hire is January 2000; last day worked is

20   January 2004.  Under this theory with this

21   calculation of seniority, the Team Member would have

22   four years of time-for-time leave, would be

23   authorized to remain out on leave through

24   January '08.

25         If seniority for the purposes of calculating

                                                     41

1    time-for-time leave takes account as provided in 9.4

2    for the, quote, full period of temporary legal

3    disability, then the Team Member here would have five

4    years of seniority; date of hire January '00, to

5    permanent and stationary January '05.  So this would

6    account for an additional year between January '04

7    and January '05 after the Team Member's last day of

8    work, but before the Team Member became permanent and

9    stationary.

10          MR. GEANNACOPULOS:  I just have another

11   interjection.

12          MS. LYE:  Can you please reserve your

13   objections until the end?

14          MR. GEANNACOPULOS:  Can I be heard?

15          ARBITRATOR ASKIN:  Generally, I think

16   objections in an opening statement are not

17   appropriate, unless somebody is making outrageous

18   ethnic remarks or --

19          MR. GEANNACOPULOS:  I won't say a word then.

20          ARBITRATOR ASKIN:  Pardon?

21          MR. GEANNACOPULOS:  I won't say anything.

22          ARBITRATOR ASKIN:  Okay.

23          MS. LYE:  So if seniority for the purposes of

24   calculating the time-for-time clock takes account as

25   provided in 9.4 for the full period of temporary

                                                    42

1    legal disability, then the year in between when the

2    Team Member last worked and before the Team Member

3    became permanent and stationary, between January '04

4    and January '05, must also be accounted for in the

5    Team Member's seniority for the purposes of

6    calculating time-for-time leave.

7         As a result, the Team Member should have five

8    years of seniority credit for time-for-time leave,

9    and thus, be entitled to five years of time-for-time

10   leave.

11        So the issue on remedy we want to address is

12   how to calculate the time-for-time clock, and how to

13   properly give effect to the provision in 9.4 that

14   seniority shall accrue for the full period of legal

15   temporary disability.

16        In the summer of '05, the Union gave notice to

17   the Company that the parties had not previously been

18   giving effect to the plain language of Paragraph 9.4

19   that -- for the purposes of calculating the

20   employee's length of seniority for time-for-time

21   purposes.

22        The Union and the Company at the time were

23   attempting to settle a package of grievances that

24   involved a group of termination cases for Team

25   Members with industrial injuries that had been on

                                                    43

1   leave for a length of time in excess of their

2   time-for-time clock.

3         The Union's position was that in light of

4   Paragraph 9.4, the Company had actually miscalculated

5   the length of the time-for-time leave by failing to

6   account for the full period of time prior to which

7   the injury became permanent and stationary.  The

8   specific group of cases was settled without

9   precedent, so the contract issue on that question was

10  never resolved in a binding manner.  But the

11  Company's response in the fall of 2005 was not to

12  begin calculating time-for-time leave correctly and

13  giving effect to Paragraph 9.4, but instead to do

14  away with time-for-time leave entirely, which is what

15  brings us before you today.

16        The Union therefore seeks as part of the

17  remedy in this case reinstatement of all Team Members

18  who have been terminated pursuant to this policy,

19  including restoration of lost benefits, plus

20  interest.

21        In addition, these Team Members should be

22  allowed to remain on sick leave for the full

23  remainder of their time-for-time clocks, properly

24  accounting for the full period of legal temporary

25  disability.

44

REPORTER'S CERTIFICATE

1

2

3

4          I certify that the foregoing proceedings

5    In the within-entitled cause were reported at the

6    time and place therein named; that said proceedings

7    were reported by me, a duly Certified Shorthand

8    Reporter of the State of California, and were

9    thereafter transcribed into typewriting.

10          I further certify that I am not of counsel or

11   attorney for either or any of the parties to said

12   cause of action, nor in any way interested in the

13   outcome of the cause named in said cause of action.

14          IN WITNESS WHEREOF, I have hereunto set my hand

15   this 30th day of August, 2006.

16

17

18

19   JUDITH DeALBA
     CERTIFIED SHORTHAND REPORTER, RPR, CRP
20   State of California
     Certificate No. 5709

21

22

23

24

25

                                                    199

# EXHIBIT B

IN ARBITRATION PROCEEDINGS

BEFORE CHARLES ASKIN, ARBITRATOR

In the Matter of an Arbitration

between

**CERTIFIED COPY**

UNITED AUTO WORKERS UNION,
LOCAL 2244, AFL-CIO,

and

NEW UNITED MOTOR MANUFACTURING,
INC.,

(Policy Grievance, No. 10277)
_____/


REPORTER'S TRANSCRIPT OF PROCEEDINGS

Volume II, Pages 200 - 279

Tuesday, August 15, 2006


Held at
Woodlin Suites Hotel
39150 Cedar Boulevard
Newark, California


Reported by:
JUDITH DeAlba, RPR, CRP, CSR No. 5709
Job No.:   197 CMR



Bay City Reporting
41 Altos Avenue, San Francisco, CA 94127-2518
Ph. (415) 587-2000  Fx. (415) 587-2110
Email: Info@baycityreporting.com

```
 1                    APPEARANCES

 2    Arbitrator:

 3
           CHARLES A. ASKIN, Esq.
 4         31 Loma Vista
           Walnut Creek, California  94597
 5         (925) 934-1929

 6

 7    For the Union:

 8         ALTSHULER, BERZON, NUSSBAUM, RUBIN & DEMAIN
           By:  LINDA LYE, Esq.
 9             PETER NUSSBAUM, Esq.
           177 Post Street, Suite 300
10         San Francisco, California  94108
           (415) 421-7151
11

12

13    For the Employer:

14         SEYFARTH SHAW, LLP
           By:  NICK GEANNACOPULOS, Esq.
15         560 Mission Street, Suite 3100
           San Francisco, CA  94105
16         (415) 397-2823

17

18

19

20

21

22

23

24

25
                                                   201
```

1                    APPEARANCES (cont'd)

2

3   Also Present:

4

            Julie Collins Nelson
5           -and-
            Kelley McKenzie
6           Assistant General Counsel
            New United Motor Manufacturing, Inc.
7           45500 Fremont Boulevard
            Fremont, CA  94538-6368
8           (510) 498-5675

9           Debra Johnson
            Terry Bolte
10          Javier Contreras

11

12                      --oOo--

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                    202

1    (NUMMI Exhibits 27 through 29 were received in

2    evidence.)

3         ARBITRATOR ASKIN:  This is 29 (indicating).

4         Twenty-eight is the chart flow.

5         MR. GEANNACOPULOS:  With that, we're done.

6    That's it.

7         MS. LYE:  Okay.

8         ARBITRATOR ASKIN:  Any rebuttal?

9         MR. NUSSBAUM:  You missed something.

10         ARBITRATOR ASKIN:  No rebuttal?

11         MR. NUSSBAUM:  Give us a couple of minutes,

12    we'll let you know.

13         ARBITRATOR ASKIN:  Okay.

14         MR. NUSSBAUM:  We need to talk about

15    something.

16         MR. GEANNACOPULOS:  When we're done?

17         MR. NUSSBAUM:  No, now.

18         (Recess taken.)

19         ARBITRATOR ASKIN:  On the record.

20         No rebuttal?

21         MR. NUSSBAUM:  No rebuttal.

22         ARBITRATOR ASKIN:  Off the record.

23         (Discussion off the record.)

24         ARBITRATOR ASKIN:  On the record.

25         MR. NUSSBAUM:  I just wanted to clarify

271

1    something with regard to this remedy issue.

2         As Linda had indicated in her opening

3    statement, there is an aspect of the remedy issue

4    which we would like the Arbitrator to address, and

5    we'll address in our brief and Linda had explained

6    it, because we feel that that's an overarching issue

7    that if we were successful, it affects everyone in

8    terms of the duration of the time-to-time that we

9    have.

10        If we were successful, there also will be

11   individual issues that will come up about remedy.

12   And I agree with what Nick said, I mean, that issues

13   like that are issues that generally are left to the

14   parties to try to go and work it out, and we're not

15   going to try to deal with those issues in the brief.

16   If we were successful, the parties would try and work

17   it out and you would reserve jurisdiction in case

18   there were disputes about the remedies in individual

19   situations.

20        We raised that one issue because we just felt

21   it was a legal issue.  It wasn't fact specific to any

22   individuals and it affected everybody, and so we

23   thought it was important to address.

24        ARBITRATOR ASKIN:  All right.  Let me make one

25   brief comment and then we're going to go off the

                                                        272

1    record and talk about it, it's a matter of arguing

2    this and what I'm about to say may have some bearing

3    on those discussions, and we can address that off the

4    record and then put our understanding on the record

5    when we're done.

6         When this first came up, Company Counsel

7    objected to going into that and I didn't make any

8    comment at the time.  As a general proposition, I

9    agree with what Counsel said in terms of deferring

10   remedy, backpay kinds of issues ordinarily are done

11   at a later time, but not completely.

12        In a classic case taking a discharge case, for

13   example, classically, most arbitrators, including

14   this arbitrator, if I were to find that there was a

15   violation of the just cause clause in a discharge

16   case, traditionally I would issues a remedy which

17   would provide for reinstatement and backpay.  Or if I

18   thought that some other remedy in the particular case

19   was warranted, I would say what that remedy was.  And

20   I would put that in the original decision.  And that,

21   in my view, is part of the determination that I'm

22   asked to make in a case like that which contemplates

23   what is the appropriate remedy.  And the parties have

24   given me that issue to address, at least in part, in

25   the issue statement which was presented in this case.

273

1        To the extent that there are backpay issues or

2   whether somebody didn't mitigate their damages, or

3   there are all kinds of issues that can arise in a

4   backpay case, and those matters in my view are not

5   appropriate in a discharge case because it may well

6   be that the Arbitrator will find that there was just

7   cause, and so there's no reason to get into all the

8   issues during the merits of the case.

9        So where I'm going with all of this is that I

10  do understand why the Union made the argument that it

11  did, and I hear what they're saying.  And they want

12  me to hear and rule upon, if I were to find in the

13  Union's favor, in terms of generally what kind of a

14  remedy would be appropriate.

15       I think it is important that the issues be

16  joined and that that -- so that, for example, if the

17  Employer has specific arguments with regard to that

18  remedy or any remedy, I want that to be joined.  And

19  we can talk about that off the record in a moment.

20       But I want the record to reflect that because

21  I haven't said anything at this point, I am not

22  necessarily, not at this point, inclined -- if I were

23  to find that there was a violation and that I should

24  be looking at the remedy issue, I'm not in agreement

25  that I shouldn't be reaching the arguments that the

                                              274

1    Union is advancing.

2         Okay?

3         MS. LYE:  I'm sorry.

4         MR. NUSSBAUM:  We had -- we had

5    specifically -- I mean, just to be clear about it, we

6    raised the issue specifically because we didn't want

7    to have the Company feel we sandbagged them by going

8    ahead and addressing it in our brief, without them

9    having an opportunity to know what our position was

10   and being able to respond to it.  That's the reason

11   we did it.

12        One other thing I forgot to mention.  We had

13   an off-the-record discussion in which the Company

14   indicated to us that it is not raising an issue with

15   regard to the timeliness of the grievance in this

16   case.

17        ARBITRATOR ASKIN:  Is that accurate?

18        MR. GEANNACOPULOS:  We don't have an issue

19   with that.  We're not raising an issue with respect

20   to the timeliness, with respect to the procedures

21   under the Collective Bargaining Agreement.

22        ARBITRATOR ASKIN:  All right.  Off the record.

23        (Discussion off the record.)

24        ARBITRATOR ASKIN:  During an off-the-record

25   discussion, the parties and the Arbitrator have

                                                      275

REPORTER'S CERTIFICATE

          I certify that the foregoing proceedings
In the within-entitled cause were reported at the
time and place therein named; that said proceedings
were reported by me, a duly Certified Shorthand
Reporter of the State of California, and were
thereafter transcribed into typewriting.

          I further certify that I am not of counsel or
attorney for either or any of the parties to said
cause of action, nor in any way interested in the
outcome of the cause named in said cause of action.

          IN WITNESS WHEREOF, I have hereunto set my hand
this 1st day of September, 2006.

_____
JUDITH DeALBA
CERTIFIED SHORTHAND REPORTER, RPR, CRP
State of California
Certificate No. 5709

279

# EXHIBIT C

IN ARBITRATION PROCEEDINGS

BEFORE CHARLES ASKIN, ARBITRATOR

--oOo--

In the Matter of an Arbitration        CERTIFIED COPY

between

UNITED AUTO WORKERS UNION
LOCAL 2244, AFL-CIO,

and

NEW UNITED MOTOR MANUFACTURING,
INC.,

(Policy Grievance, No. 10277
_____/

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Volume III, Pages 280 - 400

Wednesday, June 6, 2007

Held at
Residence Inn
5400 Farwell Place
Fremont, California

Reported by:
COLLEEN M. REDAMONTI
CRP, CSR No. 7012
Job No.:  507CMR



41 Apos Avenue, San Francisco, CA 94127-2618
Ph: (415) 587-7800 Fax (415) 587-2490
Email: Info@baycityreporting.com

```
 1                        A P P E A R A N C E S

 2    Arbitrator:

 3
           CHARLES A. ASKIN, Esq.
 4         31 Loma Vista
           Walnut Creek, California  94597
 5         (925) 925-1929

 6

 7    For the Union:

 8         ALTSHULER, BERZON, NUSSBAUM, RUBIN & DEMAIN
           By:  LINDA LYE, Esq.
 9              JONATHAN WEISSGLASS, Esq.
           177 Post Street, Suite 300
10         San Francisco, California  94108
           (415) 421-7151
11

12
      For the Employer:
13
           SEYFARTH SHAW, LLP
14         By:  NICK GEANNACOPULOS, Esq.
                CHRISTIAN J. ROWLEY, Esq.
15         560 Mission Street, Suite 3100
           San Francisco, CA  94105
16         (415) 387-2823

17

18

19

20

21

22

23

24

25

                                                          281
```

1                        APPEARANCES (cont'd)

2

3    Also Present:

4

5          Julie Collins Nelson
           Assistant General Counsel
6          New United Motor Manufacturing, Inc.
           45500 Fremont Boulevard
7          Fremont, CA  94538-6368
           (510) 498-5675

8          Debra Johnson

9          Tony M. Camello, UAW

10         Victor J. Quesada, UAW

11         George Nano, UAW

12         Gabriel Sanchez, UAW

13         Javier Contreras

14                           --oOo--

15

16

17

18

19

20

21

22

23

24

25

                                                        282

1                          I N D E X
    Union Witnesses:                              Page
2
      TONY CAMILLO
3

4       Direct Examination By Ms. Lye            348
        Cross-Examination By Mr. Geannacopulos   369
5

6
                        --oOo--
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                  283

```
 1                    E X H I B I T S

 2

      JOINT                                   EVID
 3
         A        Opinion and Award, 21 pages.      288
 4

 5

 6

 7                      --oOo--

 8

      NUMMI                              ID  EVID
 9
         A        Doctor's note dated July 14,   378   398
10                2003, one page.

11       B        Stone Chiropractic Disability  380   398
                  Slip dated December 29, 2003,
12                one page.

13       C        Tracy Orthopedics & Sport      383   398
                  Medical Center Disability
14                Certificate for Patricia Lee,
                  dated 1-29-04, one page.
15
         D        Doctor's note from the SpineCare   384   398
16                Medical Group, Inc. For Vonnie
                  Alejo, one page.
17
         E        Document on the letterhead of  385   398
18                Clyde Burch, Ph.D., Patient:
                  Alan Price, one page.
19

20

21

22                      --oOo--

23

24

25
                                              284
```

1    MR. GEANNACOPULOS:  No.

2    MS. LYE:  No.

3    ARBITRATOR ASKIN:  All right.  It's received.

4    (Joint Exhibit A was received in evidence.)

5    ARBITRATOR ASKIN:  Parties have had an

6    extensive discussion off the record this morning

7    before we went on the record with regard to the issue

8    or the issues to be submitted to the Arbitrator in

9    this proceeding.

10    It is my understanding that the parties have

11    not been able to reach a mutual agreement of the

12    issue or issues to be submitted to the Arbitrator, so

13    I will ask the parties at this time to state their

14    respective positions.

15    MS. LYE:  It is a contract interpretation

16    case, and under these circumstances, as we did in the

17    last proceeding, the Union will go first.

18    The Union's position is that the question in

19    the arbitration proceeding today is as follows:

20    Does the contract require NUMMI to allow Team

21    Members to remain on sick leave for up to the full

22    period of time set forth in Article 23, Section 9.3

23    of the Collective Bargaining Agreement after the

24    condition has become permanent.

25    If so, for how long, and is NUMMI's new sick

288

1   leave policy invalid.

2          And just briefly, the question we have here is

3   a total interpretation of the contract, and it

4   addresses the liability question, the scope of the

5   Company's obligation to provide sick leave as

6   provided for in the contract.

7          What we want is a clarification -- a question

8   presented in the Union's grievance was:

9          Is the Company's current sick leave policy,

10  which denies Team Members direct time for time leave,

11  invalid.

12         We believe that we need a resolution of the

13  legitimacy, the validity of the Company's sick leave

14  policy.  And also, it would behoove all parties to

15  reach the question of what is the proper method for

16  calculating the length of the time for time leave.

17         That will greatly expedite resolution of the

18  issues, will help facilitate remedy discussions

19  between the parties, and we hope eliminate the need

20  for multiple proceedings before you to decide issues

21  that are fundamentally legal, that are intricately

22  intertwined, and that can be all resolved now and

23  give the parties finality and resolution.

24         That's why we wish to address not only the

25  question of whether the Company's sick leave policy

                                                      289

1    is invalid under the contract, but also how one

2    calculates what is the proper method for calculating

3    the length of the time for time leave to which Team

4    Members are entitled.

5            MR. GEANNACOPULOS:  Thank you.

6            The issue that we will propose is as follows:

7            Must NUMMI automatically extend sick leave

8    under Article 23, Section 9 of the Collective

9    Bargaining Agreement to Team Members who cannot

10   return to work in an available position after their

11   condition becomes permanent.

12           If so, for how long?

13           I mean, obviously the big phrase there is

14   "automatic."  And as the case develops, you'll see

15   that the word "automatic" appears, I think you

16   already know, in 9.4, and doesn't appear in 9.3.

17           I do want to touch on what opposing counsel

18   said, just so you're clear about this whole issue of

19   remedy.

20           It appears, as much as I can tell, that the

21   Union wants not only to say that the Company sick

22   leave policy is against the contract, but in effect,

23   some type of dec relief, and want you to interpret

24   what the -- according to them, the clear language of

25   the contract requires.

                                                    290

1          And as I understand it -- and counsel can

2     correct me if I'm wrong, I know because we've had

3     discussions, all of us had discussions about this I

4     think ad nauseam -- is that they want to view it as

5     you get leave while you're permanent and stationary.

6     And then in addition to that, you get an automatic or

7     guaranteed or maximum, whatever word you want to use,

8     leave after you're permanent and stationary for the

9     period of time for time.

10         So they're really asking you for some type of

11    dec relief as to what the -- correct me if I'm wrong.

12         MS. LYE:  That's not an accurate

13    representation.

14         MR. GEANNACOPULOS:  Okay, then I apologize.

15         Tell us -- that's why I'm a little confused.

16         ARBITRATOR ASKIN:  Just so that we're clear,

17    you're using an abbreviation.  You're referring to

18    declaratory relief?

19         MR. GEANNACOPULOS:  Yeah, dec relief.  Thank

20    you.

21         I apologize, Linda.  Go ahead.

22         MS. LYE:  The position that we're taking on

23    what line -- of the length of time which Team Members

24    are entitled under time for time is clearly set forth

25    in all of the briefing that we've already filed, set

                                                    291

1    forth in my opening statement previously.

2          Everyone is entitled to time for time leave.

3    Everyone is covered by the time for time position.

4    It's already agreed to by the Company.

5          The question is how long is the length -- or

6    everyone is covered by the time for time.  I know you

7    think -- the Company thinks time for time means one

8    thing, we think time for time means another thing.

9    But there is no dispute time for time covers both

10   industrial and personal, Team Members with both

11   personal and industrial medical conditions.

12         There is a question of how long the time for

13   time leave is, how you calculate the length of the

14   time for time leave for industrially injured Team

15   Members.

16         We can get into it further in the opening

17   statements and in the briefs.  At this point we've

18   both stated our positions.  The reason why -- in the

19   Union, the reason why we weren't able to stipulate to

20   the issue is that we believe the Company's framing of

21   the issues includes a lot of rhetoric that is

22   unnecessary and isn't focused on the legal questions,

23   but --

24         MR. GEANNACOPULOS:  I know.  I just want to

25   make sure, though, that everybody understands the

                                                    292

1    issues.  The last time there was a debate about what

2    the precise issue was.  And that's why I'm asking

3    you, are you asking the Arbitrator to determine

4    something that has no basis in past practice for the

5    contract.

6          And if so, that -- I'm talking about the --

7    what I call the consecutive lease of time for time or

8    whatever, the consecutive part of it.  And if so, are

9    you asking him to decide that issue, in addition to

10   whether or not we allegedly breached the contract?

11         ARBITRATOR ASKIN:  Let me see if I can cut

12   through this.

13         You explained at the outset of the prior

14   hearing in your opening statement what I'm going to

15   call the secondary issue, that you are clearly

16   including in your issue today.

17         Is that the same issue?

18         MS. LYE:  Yes.

19         ARBITRATOR ASKIN:  You're asking for -- an

20   argumentative question for her to -- by asking

21   whether it's rooted in past practice.

22         MR. GEANNACOPULOS:  You're right.  I withdraw

23   that question.

24         ARBITRATOR ASKIN:  They're making the same

25   argument that they raised in their opening statement

                                                    293

1    at the prior hearing.  That's what they're proposing

2    to include in their issue.

3        MR. GEANNACOPULOS:  But that seems more like a

4    remedy issue as opposed to a contractual issue, I

5    would think.

6        MS. LYE:  So let's brief -- let's let the

7    Arbitrator decide what the appropriate scope of the

8    issue is before him today.

9        And, again, I want to emphasize that this is

10   the -- we are presenting before you the scope of the

11   issues in the current proceeding.  The parties have

12   already stipulated that you will -- that you're going

13   to retain jurisdiction over remedy if further

14   proceeding -- if further proceedings are necessary.

15       MR. GEANNACOPULOS:  I don't dispute that.  The

16   question is, is it a remedy.  Do you have

17   jurisdiction over the remedy, over the remedy, over

18   the remedy.  It just keeps going.

19       But I think you're generally correct on that.

20   We're here today, and the remedy was set forth in

21   Joint Exhibit A, which is another hearing.

22       MS. LYE:  Are you trying to say that the

23   Arbitrator -- that you have not stipulated to the

24   Arbitrator retaining jurisdiction?

25       MR. GEANNACOPULOS:  No, he has jurisdiction.

294

1          MS. LYE:  Over this matter, over the Union's

2   grievance?

3          MR. GEANNACOPULOS:  Yes.

4          MS. LYE:  And to the extent further

5   proceedings over remedy are necessary, which we all

6   hope they are not, the Arbitrator has jurisdiction

7   because we have previously so stipulated.

8          MR. GEANNACOPULOS:  Yes.

9          For instance, if he were to find against the

10  Company, then the question would be, you know, what

11  is the remedy?  He finds what the remedy is.  And

12  then we'd have to deal with individuals, if that's

13  the case.  He would retain jurisdiction to determine

14  what, if any, remedy existed for the -- I think

15  there's 99 of them out there.  I think we generally

16  agreed on that number who were terminated.

17         MS. LYE:  We can reach these stipulations

18  outside of the proceeding here today.  The idea is to

19  reach a resolution on what the contractual

20  obligations are.

21         There are lots of factual details involving

22  many Teams Members that we can deal with in

23  stipulation and don't need to take up time with the

24  Arbitrator and all the parties here.

25         MR. GEANNACOPULOS:  I'm not disagreeing.  What

                                                    295

1  I'm saying is, after this is over, if there's

2  individual remedy issues, it will be for the

3  Arbitrator.

4      MS. LYE:  Absolutely, if the parties are not

5  able to resolve it.

6      ARBITRATOR ASKIN:  All right.  I want to

7  formally solicit a stipulation from the parties that

8  the issues over which they have not been able to

9  agree -- strike that.

10      I want to solicit a stipulation that the

11  parties, in view of the fact they are not able to

12  reach an agreement concerning the issue or issues to

13  be submitted, are authorizing the Arbitrator to frame

14  the issue in this proceeding.

15      MS. LYE:  So stipulated.

16      MR. GEANNACOPULOS:  Agreed.  So stipulated.

17      ARBITRATOR ASKIN:  All right.

18      The parties have also had a discussion off the

19  record, and we, I believe, have an understanding that

20  all of the exhibits that were received in the hearing

21  before this Arbitrator on August 14 and 15, 2006,

22  upon which the Arbitrator issued his decision as set

23  forth in Joint Exhibit Number A, will be considered

24  part of the record in this proceeding.

25      The Arbitrator has proposed, and I think the

296

1    parties are in agreement, that we will retain the

2    markings of those exhibits which are all numerical

3    exhibit numbers either in the form of the Joint

4    Exhibits, Employer -- Company exhibits or Union

5    exhibits.  And that for this proceeding, in order to

6    distinguish the exhibits in the two proceedings, we

7    will mark the exhibits as either Joint Exhibit A, B,

8    C, etc., Company A, B, C, etc., and Union A, B, etc.

9            Is that acceptable?

10           MR. GEANNACOPULOS:  Yes.

11           MS. LYE:  Yes.

12           May I make one clarification?  Is the

13   transcript of the proceedings on August 14th and 15th

14   of last year also entered into the record?

15           ARBITRATOR ASKIN:  Yes.

16           MR. GEANNACOPULOS:  Yes.

17           MS. LYE:  Yes.  Agreed.

18           MR. GEANNACOPULOS:  As I recall, they even had

19   the Staudohar transcript in there.

20           There's a word you might hear.  Staudohar.

21   S-t-a-u-d-o-h-r.

22           MS. LYE:  H-a-r.

23           MR. GEANNACOPULOS:  H-a-r.  Thank you for

24   that.

25           ARBITRATOR ASKIN:  All right.

                                                      297

1          In view of the statements that the parties
2     have made, although this is unusual in my experience,
3     in view of the manner in which this case has
4     proceeded thus far, and in the interest of providing
5     some order to this hearing, I'm going to make certain
6     observations with regard to my view of what the
7     appropriate issue is likely to be in this proceeding.
8          As a general proposition, before going into
9     any hearing where there has been a dispute over the
10    issue to be submitted to an Arbitrator, it is this
11    Arbitrator's philosophy that I don't have the
12    authority to proceed until I have some stipulation
13    from the parties as to what the issue is, or until I
14    have been given, as I have been in this case, the
15    authority to frame the issue.
16         The premise of my general view that I do not
17    have the authority to proceed without such
18    authorization is that until the parties give me some
19    authority to proceed, I do not have such authority.
20    Accordingly, when there is a dispute about the scope
21    of the authority that the parties are willing to give
22    me, my philosophy is the same.
23         For example, in this proceeding, there was a
24    dispute over the interpretation of what the issue was
25    that was presented at the arbitration on October 14th

298

1    and 15th.  For simplicity sake, I will describe the

2    dispute as follows:

3          The Employer had what I'm going to

4    characterize as a narrow interpretation of the issue

5    that was stipulated to by the parties.  And the Union

6    had what I'm going to characterize as a broad view of

7    the interpretation of the issue that the parties

8    stipulated to.

9          Since it became apparent to the Arbitrator

10   upon my receipt of the parties' briefs that there was

11   a disagreement, something which I was not aware of at

12   the time the case was litigated, I adopted the

13   philosophy that I have just described when I issued

14   the decision.

15         That is, I focused on that area that both

16   parties had agreed upon, which in my view represented

17   a mutual delegation of authority to decide that

18   particular issue.  And as to the broader part of the

19   issue, which one party had not apparently agreed to,

20   I refrained from issuing a decision with regard to

21   that because I viewed it as being beyond the scope of

22   the authority that both parties had given me.

23         And I did so, quite frankly, as I think I

24   implied in my decision, I thought the Union's

25   interpretation of the decision was the common sense

299

1    interpretation of that statement of the issue.  When

2    I heard the case, I thought, in agreement with the

3    Union, that it was the broader issue that I was being

4    asked to decide.

5         But despite the fact that that's what I

6    thought, because it was apparent to me that the

7    Employer did not agree with that, my decision was

8    limited.  And I will do so in this case most likely

9    as well.

10        We have, once again, a situation in which the

11   Employer's version of the issue -- insofar as I'm

12   talking now specifically about what I'm going to call

13   the substantive issue and the liability issue.  The

14   liability issue being this issue which the Union

15   seeks to have the Arbitrator decide relating to the

16   appropriate method of calculating employees' time for

17   time policy.  It is apparent to me that in the event

18   that I find a violation of the agreement with regard

19   to the Employer's implementation of its policy that

20   triggered this grievance, that in calculating and

21   determining, or more specifically in applying any

22   remedy that would be appropriate, it's clearly going

23   to be necessary to determine if there's a dispute

24   between the parties what the proper method of

25   calculating employees' time for time entitlement is,

300

1    because some of the employees who have been affected

2    by this decision, if it's concluded that there was a

3    violation of the agreement, it's going to be

4    necessary to determine what their rights are.   And

5    that will necessarily involve a proper interpretation

6    of the method of calculating employees' time for time

7    rights.

8         In view of that, I understand why the Union is

9    seeking to have this litigated in this proceeding.

10   It frankly makes sense to litigate the meaning of the

11   contract once, talking about the same section of the

12   contract.   That makes sense.   But that's not the

13   position I'm in.   The Employer has not elected to

14   give me the authority to do that.

15        So it is highly likely that in this

16   proceeding, this time, I'm going to decide what I'm

17   calling the substantive issue.   It is unlikely that

18   I'm going to phrase it in the manner that the

19   Employer has suggested, which in my view does what

20   the Union complains; it seeks to phrase the issue

21   rather than putting it in what I'm going to call a

22   neutral way, such as did the Employer's action

23   violate the agreement, which is a neutral way of

24   phrasing a particular dispute, but rather seeks in a

25   very specific way to limit the scope of the issue.

1          What's in issue in this case is what the Union

2    grieved.  And what the Union grieved as stated in its

3    problem notice and in its grievance is as follows,

4    quote:

5          "This grievance seeks a decision by an

6    Arbitrator prohibiting the Company from implementing

7    its new policy regarding long-term leaves of absence,

8    and a clarification that Team Members have a right to

9    leave pursuant to Article 23, Section 9.3, and

10   Section 9.3 and Section 9.4, and their employment may

11   not be terminated unless their Section 9.3 and 9.4

12   leaves have elapsed."

13         Now, the last part of that sentence is clearly

14   the focus of what the Union is grieving in this case.

15   That is to say, whether in those circumstances when

16   an employee's right -- excuse me.  When an employee

17   has been determined to be subject to termination,

18   subject because their 9.4 leave has expired pursuant

19   to the Staudohar decision, the Union contends that

20   that does not preclude the application of the

21   employee's rights to leave under Section 9.3.  That

22   is that employees are entitled to both Section 9.3

23   and 9.4 leaves, and that the termination of one of

24   those leaves does not preclude the exercise of the

25   employee's other leave.

302

1         That's what the Union alleged in its

2    grievance.  That's what they alleged in the problem

3    notice.  That's what they argued in this last case in

4    their brief.  And that's what they've presented in

5    their issue statement, and it's encompassed by a part

6    of what the Employer has proposed.

7         It is clear to me that that issue is properly

8    before me, based on the history of this grievance and

9    in the manner in which both parties have raised the

10   issue.

11        Now I'm making this statement in part because

12   I do not want -- necessarily because there is a

13   different view of the parties' view of the scope of

14   the issue.  At some point there's going to be an

15   objection from one side when evidence is presented by

16   the Union with regard to what they're seeking to

17   litigate in this proceeding as being beyond the

18   issue.  And it is my view that that issue should be

19   handled in what I'm going to call the remedy or

20   liability issue, because the Employer hasn't granted

21   me the authority to do that.

22        I agree with the Union that it would make

23   a lot more sense to do this all in one hearing

24   because it doesn't involve a lot more evidence,

25   doesn't make any sense to me to delay it.  But they

                                                    303

1    have the right to decide that.  That's not -- that

2    issue was not raised by the Union specifically in its

3    grievance, the liability issue.

4         I think it necessarily is included in the

5    remedy in the liability portion of this proceeding,

6    and if we need to, we'll deal with it there.  If the

7    Employer prevails, then obviously we won't get there.

8         MS. LYE:  May I make one comment?

9         ARBITRATOR ASKIN:  Yes.

10        MS. LYE:  I believe it is encompassed within

11   the grievance and the statement of unresolved problem

12   where the Union sought clarification that Team

13   Members have a right to leave pursuant to Article 23,

14   Section 9.3 -- Section 9.3 and Section 9.4.  And

15   their employment may not be terminated unless their

16   Section 9.3 and 9.4 leaves have elapsed.

17        Clarification of that necessarily requires an

18   explanation of what -- how long Section 9.3 and 9.4

19   leaves last, because they cannot be terminated until

20   those leaves have elapsed.  So we believe it is

21   fairly encompassed within the grievance.

22        ARBITRATOR ASKIN:  That's an argument, and I

23   considered that carefully before I ever got here,

24   before I heard what you had to say in your opening

25   statement because I anticipated this argument.

304

1          I've read it, and it's not clearly stated in

2    this -- I heard what the argument was at the outset

3    of the prior hearing with regard to the Union's

4    interpretation of the length of the leave and how it

5    should be calculated, and the Union's position with

6    regard to how that's been done before and what the

7    contract language calls for.  I understand the

8    Union's argument.

9          It's not expressly stated in either the

10   grievance or in this problem notice, which is a

11   two-page, single-spaced outline which the parties

12   have generally obviously designed to expand and

13   provide ample notice of various arguments that are

14   being made.  And that particular argument is not

15   expressly stated in either the grievance or the

16   grievance notice.

17         So for that reason in my view, it's not

18   appropriate for me to expand it.  I think it's

19   subject to that interpretation, but it's not

20   expressly stated.

21         More importantly, as I stated earlier, it is

22   my fundamental arbitration policy where there's been

23   a dispute between the parties with regard to what the

24   issue is that is before me, I frame the issue in

25   accordance with the mutual scope that -- based on the

                                                    305

1    parties' positions.

2        I mean, it's clear to me that both parties

3    recognize that I need to decide whether employees

4    retain Section 9.3 rights after it has been concluded

5    in accordance with the Staudohar decision that their

6    9.4 rights have been expired.  That's fundamentally

7    obvious from this grievance, from the problem notice,

8    from the arguments of both sides, and I will address

9    that issue.

10        Again, I understand why the Union is raising

11    this.  I think that there are good reasons, both

12    legally as well as practically, for the Union arguing

13    that we should do that now.  I don't disagree with

14    those at all.  I think that makes a lot of sense.

15        We spent two hours this morning with the

16    parties discussing this, and the Employer obviously

17    disagrees.  So I don't have any authority to tell

18    them what to do at this point.

19        MS. LYE:  Even though they stipulated to

20    submitting to you the authority to frame the issue?

21        ARBITRATOR ASKIN:  And I'm going to decide it

22    on the basis of the arbitration philosophy that I've

23    followed for 21 years, and which I followed in this

24    case in the outset of the hearing, because I believe

25    that that is the proper exercise of my arbitration

1    authority.

2         I'm explaining it in some detail, and I'm

3    giving both sides notice now so they can understand

4    that, and so that we can conduct this hearing in

5    accordance with what I am likely to do.

6         And I hope that that's helpful.

7         MS. LYE:  Understood.

8         ARBITRATOR ASKIN:  If either side wants to

9    reconsider based on the comments that I've made, they

10   can do so.  But in the meantime, that's how we'll

11   proceed.

12        MR. GEANNACOPULOS:  Can we have a discussion

13   with the client?

14        ARBITRATOR ASKIN:  Sure.

15                    (Break.)

16        ARBITRATOR ASKIN:  Back on the record.

17        MR. GEANNACOPULOS:  We're unable to agree to

18   that right now.

19        ARBITRATOR ASKIN:  Okay.  The Union want to

20   make an opening statement at this time?

21        MS. LYE:  Yes, Mr. Arbitrator.

22        Mr. Arbitrator, you are already very familiar

23   with the background facts and legal issues in the

24   case.  The Union seeks a swift ruling to end what

25   should never have been a dispute.  The Company has

                                                      307

1                    REPORTER'S CERTIFICATE

2

3

4          I certify that the foregoing proceedings

5     In the within-entitled cause were reported at the

6     time and place therein named; that said proceedings

7     were reported by me, a duly Certified Shorthand

8     Reporter of the State of California, and were

9     thereafter transcribed into typewriting.

10         I further certify that I am not of counsel or

11    attorney for either or any of the parties to said

12    cause of action, nor in any way interested in the

13    outcome of the cause named in said cause of action.

14         IN WITNESS WHEREOF, I have hereunto set my hand

15    this 14th day of June, 2007.

16

17

18    _____

19    COLLEEN M. REDAMONTI
      Certified Shorthand Reporter
20    State of California
      Certificate No. 7012

21

22

23

24

25

                                                      400

# EXHIBIT D

IN ARBITRATION PROCEEDINGS

BEFORE CHARLES ASKIN, ARBITRATOR

| | |
|---|---|
| In the Matter of an Arbitration )<br><br>between )<br><br>UNITED AUTO WORKERS UNION, )<br>LOCAL 2244, AFL-CIO, )<br><br>and )<br><br>NEW UNITED MOTOR )<br>MANUFACTURING, INC. )<br><br>(Policy grievance, No. 10277) ) | **UNION'S OPENING BRIEF** |

PETER D. NUSSBAUM (#49682)
LINDA LYE (#215584)
Altshuler, Berzon, Nussbaum, Rubin & Demain
177 Post Street, Suite 300
San Francisco, California 94108
Telephone:    (415) 421-7151
Facsimile:    (415) 362-8064

Attorneys for the Union

## TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    I.     The Contract Grants All Team Members Who Become Ill Or Disabled
        The Right To Remain On Sick Leave Until They Exceed Their Time
        for Time Clock . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        A.    Employees Have a Right to Sick Leave When They Become
              "Ill or Disabled." . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

        B.    Employees Have The Right To Remain On Sick Leave Until
              They Exceed Their "Time for Time" Clock . . . . . . . . . . . . . . . . . . . . . 16

        C.    The Time For Time Provision Applies To All Employees
              Who Are "Ill Or Disabled." . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

    II.    Arbitrator Staudohar Did Not Interpret The Time For Time Provision . . . . . . . 24

    III.   The Parties Have Always Interpreted The Contract To Grant Team
        Members The Right To Remain On Sick Leave Until They Exceed
        Their Time For Time Clock . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

    IV.   Without An Agreement From The Union, The Company Cannot Alter
        Its Contractual Obligations By Providing The Union With Notice Of
        Its Intent To Abandon Those Obligations . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

    V.    Remedy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

        A.    Seniority For The Purposes Of Calculating Team Members'
              Time For Time Leave Must Take Account Of The Full Period
              Of Legal Temporary Disability . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

        B.    Team Members Who Were Otherwise Eligible To Exercise
              The Early Retirement Option Should Be Allowed To Do So Now . . . . . 38

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

**INTRODUCTION**

This arbitration between United Auto Workers Local Union No. 2244, AFL-CIO ("Union"), and New United Motor Manufacturing Inc. ("NUMMI" or "Company") arises from the Company's unilateral implementation of a sick leave policy that conflicts with the language of the parties' collective bargaining agreement and the parties' mutual understanding of the meaning of that language based on the Company's own statements and 15 years of practice.

The parties' contract, at Article XXIII, Section 9.1, provides for sick leave to employees – or "team members" as they are called at NUMMI – who become "ill or disabled." Section 9.3 describes the length of a sick leave and states that a "sick leave of absence may not exceed the employee's length of seniority as of the date of the illness or disability, or eighteen (18) months for an employee with less than one (1) year of seniority, or thirty-six (36) months for an employee with more than one (1) year of seniority, whichever is greater." This clause of the contract, known as the "time for time" provision, allows an employee to remain on sick leave for a period of time equal to her seniority, except where the employee has less than three years of seniority, in which case the employee may remain on sick leave for a period of time greater than her seniority. This language has appeared in the contract since NUMMI opened its doors in the mid-1980s.

The Company now contends for the first time that the time for time clause does not describe the time period during which team members have a *right* to remain on sick leave but instead sets forth only an "allowable maximum" length of sick leave. The Company contends that it has a right to terminate sick leave as soon as a team member's medical condition becomes permanent, and that it has a right to do so regardless of whether the team member's condition is

1

personal or industrial and regardless of the amount of seniority that the team member has accrued.

The Company's position is contrary to the contract language and the longstanding practice of the parties. The sole basis for the Company's disavowal of the parties' accepted meaning of Section 9.3 is a decision by Arbitrator Paul Staudohar 16 years ago that did not actually interpret Section 9.3. In 1989, the Company terminated the employment of three team members who had been injured in the plant, whose conditions were permanent and stationary, and who, the Company contended, were not able to perform any work in the plant. The Union took the position that industrially injured team members could *never* be terminated and that they had a right to remain on sick leave *indefinitely*. The Union relied on several contract provisions for this argument, including the article of the contract that governs seniority (Article XI) and a provision on sick leave – Article XXIII, Section 9.4 – that describes the sick leave rights of industrially injured employees. Neither the Union's grievance nor the notice of appeal to arbitration cited Article XXIII, Section 9.3.

The Company contended that "when the work injuries of the employees were deemed to be permanent, their rights to industrial leaves of absence were extinguished under the terms of Article XXIII, *Section 9.4*." Joint Exhibit ("Jt. Exh.") 6 at 13 ("Staudohar decision") (emphasis added). Arbitrator Staudohar agreed that sick leave for industrially injured employees does not last "into perpetuity," because although Section 9.4 grants sick leave automatically in industrial injury cases, it expressly provides that "seniority is to accumulate for the full period of the legal temporary disability. It does not seem correct to conclude that a 'legal temporary disability' period would last into perpetuity." *Id.* at 11. Arbitrator Staudohar did not go on to hold, however, that when an employee's condition changes from temporary to permanent, that her right

2

to leave of absence is *also* extinguished under the *separate* provision of Article XXIII, *Section 9.3*. It is not surprising that he did not so hold because the grievance did not place before him the question of team members' rights under Section 9.3.

Arbitrator Staudohar's opinion did not interpret Section 9.3 to set forth only an "allowable maximum" as the Company now contends because Arbitrator Staudohar never interpreted Section 9.3 at all. Indeed, the Company itself expressly acknowledged, shortly after the Staudohar decision, that it remained contractually obligated to continue the sick leave of team members with permanent industrial injuries until their time on leave exceeds their time for time clock. Union Exhibit ("Un. Exh.") 26 at 2.

In the decade and a half that followed the Staudohar decision, the Company continued to treat Section 9.3 as setting forth the period during which team members are *entitled* to remain on leave and terminated team members' sick leave, not at the point at which their conditions became permanent, but instead only when they had been on sick leave for the maximum period set forth in Section 9.3. Un. Exh. 15 at 2; Transcript of Proceedings ("Tr.") at 67:23-68:11. The parties, as demonstrated through their statements and actions, have always understood Section 9.3 to represent the amount of time during which a team member has a *right* to remain on leave, and not merely an upper limit on leave that the Company has the discretion to terminate at will.

In approximately 2004, the Company suddenly informed the Union that – despite the longstanding and mutually accepted interpretation of Section 9.3 – NUMMI suddenly believed it had the authority under the Staudohar decision to terminate the sick leave of industrially injured team members once their conditions become permanent and stationary and even if their time for time clock has not yet run. The Company did not at the time contend that its authority under the Staudohar decision to terminate sick leave extended to team members with permanent *personal*

3

medical conditions. NUMMI's announcement came at the same time that NUMMI's management was tasked with achieving cost savings of $110 million annually, which the Company contends are necessary for it to remain competitive.

During the parties' most recent contract negotiations, in Summer 2005, the Company proposed to achieve some of these cost savings by eliminating health care benefits for team members on sick leave. The Union did not agree to the proposal. Despite negotiations and the parties' agreement on a new contract, the Company now contends that it has the authority under the Staudohar decision to terminate the sick leave, not just of team members with permanent *industrial* conditions, but also of team members with permanent *personal* medical conditions.

The Company's current effort to expand its policy to team members with personal medical conditions is overreaching because Arbitrator Staudohar analyzed only the sick leave rights of team members with *industrial* injuries. The right of team members with *personal* medical conditions to remain on sick leave was not before him.

The Company has volunteered no explanation as to why it waited a decade and a half to implement an interpretation of the contract that it now contends to be clear and ambiguous, or why, if its current interpretation of team members' sick leave rights is clear and ambiguous, it has offered two separate interpretations (one affecting team members with industrial injuries only, the other affecting all team members) at odds with each other and its own prior, longstanding interpretation. But the reason for the Company's belated, inconsistent, and erroneous invocation of the Staudohar decision is clear. The Company failed during bargaining to obtain the Union's agreement to terminate benefits for team members on sick leave, so instead the Company has terminated their employment entirely, thereby ending their benefits and achieving the cost savings it failed to obtain the bargaining table. The grievance should be sustained.

4

## ISSUES

The parties have stipulated to the following issues:

1.  Is the Company's policy regarding long-term leaves of absence consistent with Article XI,

    Section 3 and Article XXIII, Sections 9.3 and 9.4 of the collective bargaining agreement

    as interpreted by, among other things, the Staudohar arbitration decision, and if it is not

    consistent, what is the proper remedy?

2.  Are the people on the attached list eligible to participate in the Company's 2006 Early

    Retirement Program?

Jt. Exh. 7. The parties stipulated that the Arbitrator should retain jurisdiction over the remedy.

Tr. at 14:24-15:3.

## BACKGROUND

NUMMI opened its doors in the mid-1980s. The plant had formerly been a General

Motors facility and then reopened as a joint venture between General Motors and Toyota. Tr. at

156:18-24. NUMMI hired former General Motors employees and NUMMI's collective

bargaining agreement with the Union has wages and benefits comparable to those in the Union's

contract with General Motors. Tr. at 156:23-157:7.

Article XXIII of the contract governs leaves of absence, including sick leave. The

contract provides that "employees who become ill or disabled are eligible for" sick leave. Jt.

Exh. 1 (2005 CBA), Art. XXIII, Sec. 9.1 at p. 65. Section 9.3 of Article XXIII, known as the

"time for time" provision, defines the length of a sick leave as follows:

> A sick leave of absence may not exceed the employee's length of seniority as of
> the date of the illness or disability, or eighteen (18) months for an employee with
> less than one (1) year of seniority, or thirty-six (36) months for an employee with
> more than one (1) year of seniority, whichever is greater.

5

The next section, Section 9.4, provides a special rule applicable to team members with industrial injuries:

> In compensable injury and legal occupational disease cases, sick leave will be granted automatically and seniority will accumulate for the full period of legal temporary disability. Employees disabled during evaluation period by compensable injury or legal occupational disease shall be given credit for the period of such disability toward acquiring seniority.

The language of Sections 9.3 and 9.4 was negotiated in the parties' first collective bargaining agreement in 1985, and has remained unchanged since. Jt. Exh. 2 (2001 CBA) at p. 69-70; Jt. Exh. 3 (1988 CBA) at p. 42; Company Exhibit ("Co. Exh.") 1 at 102:4-12.

In 1989, the Union filed a policy grievance challenging the Company's right to terminate the employment of team members who had been injured in the plant. Un. Exh. 24. That grievance was resolved in a decision by Arbitrator Paul Staudohar issued in 1990. Jt. Exh. 6, Exhibit 2. That decision contains two holdings.

The Union in that case argued that industrially injured employees can *never* be terminated. "The Company," on the other hand, "argued that when the work injuries of the employees were deemed to be permanent, their rights to industrial leaves of absence were extinguished under the terms of Article XXIII, *Section 9.4*." *Id.* at 6-7, 13 (emphasis added). On this issue, Arbitrator Staudohar agreed with the Company and held that employees with industrial injuries do not have the right to remain on sick leave "indefinitely." *Id.* at 11. He explained that although "[i]t is true that [under Section 9.4] . . . seniority is to accumulate for the full period of the legal temporary disability," "[i]t does not seem correct to conclude that a 'legal temporary disability' period would last into perpetuity." *Id.* The analysis was based on Section 9.4. At no point in his decision did Arbitrator Staudohar discuss or analyze the point at which the rights of

6

team members with industrial injuries (or of any other team members) are extinguished under the terms of Article XXIII, *Section 9.3.*

Interpreting Article XI of the contract, which governs seniority, Arbitrator Staudohar also held that employees whose sick leave has expired are entitled to certain procedural protections before their seniority may be broken and employment terminated. Specifically, NUMMI must give them notice of the expiration of their leave and an opportunity to return to work. If the Company is unable to find any available work appropriate to a team member's restrictions, then, and only then, can the Company terminate the team member's employment. *Id.* at 13.

Following the issuance of the Staudohar decision, NUMMI afforded each of the three affected team members an opportunity to return to work so that the Company could determine if there was work available that the team member could perform within his or her physical restrictions. Co. Exh. 17, 18. In each case, the Company concluded that no such work was available and terminated the employee. Each of those cases then went to arbitration on the factual question of whether there was any job that the particular employee could perform within his or her medical restrictions. Co. Exh. 21 at 1-2 (Tiwana Grievance by Arbitrator Winograd: "The Company maintains that at the time the grievant applied to return to work, there was no job available that fit her work restrictions."); Co. Exh. 23 at 4 (Gutierrez Grievance by Arbitrator Rader: "[G]iven his medical restrictions, the Company claims there is no permanent work he can perform."); Co. Exh. 25 at 10 (Adeola-Morrison Grievance by Arbitrator Cohn: Company claimed that "[t]here was no such job available at the plant which Grievant could perform given these restrictions"). Each decision made factual findings specific to the grievant at issue and did not involve any issue of contract interpretation. Co. Exh. 21 at 15-16 (sustaining in part, denying in part Tiwana grievance: although Company ultimately had sufficient medical documentation to

7

support conclusion that grievant could not perform any available work and termination therefore ultimately justified, Company lacked sufficient documentation at time of termination, warranting pay and benefits for interim period); Co. Exh. 23 at 6-7 (sustaining Gutierrez grievance: work was available in "Final 4 Group" and appropriate given grievant's rotator cuff injury, but Company failed to offer grievant Final 4 Group position; grievant reinstated with backpay); Co. Exh. 25 at 12 (denying Adeola-Morrison grievance: no work available that could accommodate grievant's medical restrictions).

In defending the termination of one of the team members, Ms. Renee Adeola-Morrison, NUMMI acknowledged that even though her condition was already permanent and stationary, it remained "obligated" to allow her to remain on leave until she exceeded her time for time clock. Un. Exh. 26 at 2 ("Following the normal procedure of applying the language of Article XX[]III, Section 9, the Company is obligated to continue a leave not to exceed the employee's length of seniority."). Because, NUMMI explained, Ms. Adeola-Morrison had "been on a sick leave exceeding her seniority" and "been deemed permanently disabled," the Company "is no longer obligated to Ms. Adeola after her contractual time for time date." *Id.*

Consistent with the Company's position in Ms. Adeola-Morrison's case and as stipulated by the parties in the present case, "[a]fter the Staudohar decision [and] until negotiations ended in 2005, the leave of absence of Team Members who had personal or industrial injuries . . . was not terminated at the time the medical condition became permanent, but rather Team Members remained on leave of absence for the maximum period of time set forth under Article XXIII, Section 9.3, with seniority measured from date of hire to last day worked." Tr. at 67:23-68:11.

Under this longstanding practice, the Company terminated the employment of team members only after they had remained on sick leave for a period of time that *exceeded* their leave

8

rights under Section 9.3. *See, e.g.,* Un. Exh. 14 (sample termination letter: "your leave of absence has exceeded your seniority rights. I regret to inform you that it is necessary for us to remove your name from our current seniority list."). In defending such terminations, the Company referred to the amount of leave set forth in Section 9.3 as an "entitlement," but took the position that once that "entitlement was exhausted," termination was justified. *See, e.g.,* Un. Exh. 20 at 2 (sample Management Statement of Unresolved Problem Notice).

Although the Staudohar decision was issued in 1990, the Company suddenly announced in 2004 a new interpretation of its rights under that decision. Tr. at 153:18-22, 216:15-25, 257:22-258:4. Under the Company's new 2004 interpretation, NUMMI has the right to terminate *industrially injured* team members *as soon as* their medical restrictions become permanent, and even if team members have not yet exceeded their full "time for time" leave. Tr. at 56:23-57:4, 154:1-7, 258:4-9. In the many discussions between the parties over this issue since the Company first raised that interpretation, the Union expressed its disagreement, emphasizing that team members with permanent injuries have a right to remain on leave pursuant to the "time for time" provision of the contract. Tr. at 152:2-6, 153:18-154:7, 155:18-156:4. In the course of discussions over the meaning of the Staudohar decision, the Union asked the Company why, if it believed that the Staudohar decision gave it the right to terminate team members as soon as their medical restrictions became permanent, it "waited so long to implement it." Tr. at 152:10. The response offered by Bob McCullough, Vice-President of NUMMI's Legal and Human Resource Departments, was: "I don't know why we didn't." Tr. at 152:12, 207:16-17.

The parties' current collective bargaining agreement was negotiated in Summer 2005. Tr. at 140:12-14. In the year and a half leading up to negotiations, and during the same period when the Company first raised its new interpretation of the Staudohar decision, NUMMI repeatedly

9

drew to the Union's attention its growing concern with rising workers' compensation costs and the increasing cost of providing health care for team members on a leave of absence. Tr. at 140:14-25, 142:13-143:5; Un. Exh. 46 at 12-15. (Team members on a leave of absence receive the same benefits as team members not on leave; benefits terminate, however, at midnight on the date of termination. Tr. at 184:23-185:7.) NUMMI management had been tasked with reducing costs by $110 million annually – cost reductions that the Company claims were necessary for it to remain competitive. Tr. at 212:11-214:8.

During the 2005 negotiations, the Company reiterated its cost concerns virtually every day and proposed, among other things, to eliminate health care for team members on a leave of absence. Tr. at 143:6-8, 22-24. This proposal took the form of a proposed side letter to the contract and was presented to the Union in a package of proposals at negotiations by Company Vice-President Bob McCullough. Un. Exh. 21 at 5; Tr. at 144:6-18.

In the UAW-NUMMI relationship, the Company is free to propose side letters but, like any other bargaining proposal, both parties must sign off on the side letter and, if they do, it is formally incorporated into the collective bargaining agreement. Tr. at 144:23-145:5. The Company included four proposed side letters in its bargaining proposals. Un. Exh. 21 at 2-5. The Union agreed to two of them; those agreements were memorialized by the parties physically signing off on the side letters, which were then incorporated into the current contract. Un. Exhs. 47, 48; Tr. at 145:23-149:19.

The Company's proposed side letter regarding the elimination of health care benefits stated the Company's view that it was not required under the collective bargaining agreement to provide benefits to team members on certain types of leave and purported to give the Union notice that effective August 7, 2005 (the first day after the expiration of the prior contract),

10

NUMMI would cease providing benefits to team members on certain medical leaves. Un. Exh. 21 at 5; Tr. at 219:17-21. The Union did not agree to this proposed side letter. Tr. at 149:21-150:11. The letter was never incorporated into the collective bargaining agreement. Tr. at 150:12-15. And the Company continues under the current contract to provide health care benefits to all team members on leave. Tr. at 184:23-25.

The Company also included in the package of proposals it presented to the Union a fourth proposed side letter. Un. Exh. 21 at 4.[1] This proposed side letter stated the Company's view that it had the authority under the CBA to terminate a team member's leave once the medical condition became permanent and stationary. *Id.* The proposed side letter also purported to give the Union notice that NUMMI would implement the interpretation of the contract that it set forth in the letter effective August 7, 2005. *Id.* The Union did not agree to this proposed side letter, and it was never incorporated into the collective bargaining agreement. Tr. at 150:16-151:8.

During the 2005 negotiations, no change was made to the language of the CBA governing sick leave. Tr. at 152:14-153:17; Un. Exh. 49 (only changes to Article XXIII (leaves of absence) pertained to educational leave and return from leave).

After negotiations, the Company began implementing its current policy on sick leave. The Company has instructed employees who are on sick leave and who have permanent restrictions to return to the Company for an interview. The Company instructs the employees to

---

[1] Although James Potts, the head of NUMMI Human Resources and the individual who was second in charge for the Company during the 2005 negotiations, Tr. at 207:18-20, 217:21-23, initially testified that this document was not "meant to be a proposal or a side letter," Tr. at 219:22-24, he subsequently acknowledged that the Company "read this letter at the big table" during negotiations and the document "went across the table with a number of documents, [including] documents [that] were proposals that contained changes to the language in the Collective Bargaining Agreement" and "proposed side letters to be incorporated into the Collective Bargaining Agreement." Tr. at 233:18-19, 235:5-8, 235:24-236:12.

bring to the interview updated medical information. At the meeting, NUMMI informs the

employees that it will look for any available work that fits their seniority and physical restrictions

over the 30-day period following the interview. If no such work is available, then NUMMI

reserves the right to terminate employment, even if the employee has not yet used up her full

time for time leave. Tr. at 88:20-90:22, 228:5-229:5. The Company is applying this policy to *all*

team members with permanent restrictions, regardless of whether the medical condition is

industrial or non-industrial. Tr. at 94:14-25, 258:10-13. The Company has thus far implemented

its policy in five "waves," affecting 301 employees. Un. Exhs. 1-6.

<div align="center">*      *      *</div>

NUMMI has a Return to Work Department that is responsible for finding permanent

positions in the plant for team members who are on leave and who have medical restrictions. Tr.

at 88:4-8. When a job opening arises in the plant, the Return to Work Department conducts an

evaluation of the job's physical requirements. The Department then reviews the listing of team

members who are on leave and who have medical restrictions to identify a match, based on

restrictions and seniority, between the job opening and a team member. Tr. 101:24-102:12.

Arbitrator Staudohar found in 1990 that opportunities for light-duty or modified work at

NUMMI were "limited." Staudohar decision at 9. In the years since the Staudohar decision was

issued, however, NUMMI has kept pace with cutting-edge technology so that the plant now has a

wider variety of jobs and the jobs are more ergonomic. For example, NUMMI has increased the

use of hoists and robotics to lift heavy parts. Tr. at 87:23-24, 99:21-100:19, 254:2-16.[2] As a

---

[2] Although Mr. Potts initially testified that there have been no changes in how NUMMI
produces an automobile since the Staudohar decision was issued, Tr. at 223:17-19, he
subsequently admitted that he had no knowledge regarding NUMMI's use of robotics or other
automated functions, and he also acknowledged that NUMMI had adopted ergonomic

<div align="right">(continued...)</div>

result, there are now many jobs in which a team member with physical restrictions can be placed. Tr. at 101:13-14. Although there is technically only one classification for all production workers at NUMMI – they are all called "team members," Tr. at 122:14-24, 130:2-1 – this classification encompasses a broad range of jobs with varying physical requirements. Tr. at 134:3-23. Some jobs involve very minimal physical requirements – such as visual quality inspection or driving vehicles off of the line; other jobs are much more demanding and require lifting 35 to 38 pounds for much of the day. Tr. at 99:17-20, 101:8-12. Although the team concept at NUMMI requires team members to rotate through different tasks, Tr. at 221:14-17, many departments at NUMMI have rotations in which each task within the rotation is a task that can be performed by a team member with permanent physical restrictions. Tr. at 130:15-133:24.

As a result of these technological advances, the chances of finding an appropriate job for a team member on sick leave with physical restrictions have markedly improved. Since November 2001, approximately 340 team members with restrictions have successfully been placed in positions in the plant through the return to work process. Tr. 102:23-103:10. From the period August 2005 through August 2006, Return to Work placed 64 team members with restrictions. Tr. at 108:8-16; Un. Exh. 45. Fifty-seven of these 64 team members had restrictions that were permanent. Un. Exh. 45 at 7. Placements occurred anywhere between several days and several years after the team member's restrictions became permanent. Tr. at 109:1-16. Samuel Montes, for example, commenced his leave in June 2000, became permanent and stationary in January 2002, but was placed in a job in May 2005, over three years after his condition became

---

[2] (...continued)
innovations in the past decade. Tr. at 254:9-24.

permanent and almost five years after he began his leave.  Un. Exh. 45 at 1.  He is still working

in the plant.  *Id.*

## ARGUMENT

I.    **The Contract Grants All Team Members Who Become Ill Or Disabled The Right To Remain On Sick Leave Until They Exceed Their Time for Time Clock.**

The Company belatedly contends that it has the right to terminate team members as soon

as their medical conditions have become permanent and even if the team members have not yet

used up their full time for time leave.  The crux of the Company's argument is that the "time for

time provision" represents only the maximum amount of sick leave a team member *may* take, but

does not establish any *right* on the part on team members to take leave for such a period.  The

Company's current policy is flatly at odds with the language of the contract, which makes plain

that all team members, whether their medical conditions are temporary or permanent, industrial

or personal, have a right to remain on sick leave for the full duration of their "time for time"

clocks.[3]

---

[3] The Company contends that the *only* appropriate source to discern the parties' intent is the Staudohar decision.  Tr. at 96:1-8; Company Opp. to Subpoena Duces Tecum at 2:9-11.  But the issue, as stipulated by the parties, is whether the Company's policy is "consistent with Article XI, Section 3 and Article XXIII, Sections 9.3 and 9.4 of the collective bargaining agreement as interpreted by, *among other things*, the Staudohar arbitration decision."  Jt. Exh. 7 (emphasis added).  This case thus presents a matter of contract interpretation, as to which ordinary canons of construction apply.  Under these canons, the contract's meaning is discerned from sources such as the contract's plain language, the parties' practice, and industry norms.  *See generally* Elkouri & Elkouri, How Arbitration Works at 427-84 (6th ed. 2003).  Although the parties have stipulated to consideration of a prior arbitral decision, they have not stipulated to *exclude* consideration of otherwise appropriate sources of meaning.

A.     **Employees Have a Right to Sick Leave When They Become "Ill or Disabled."**

Article XXIII of the contract addresses leaves of absence. To be eligible for any type of a leave of absence, an employee must have completed her 90-day initial evaluation period. Art. XXIII, Sec. 2.1; *see also* Art. XI, Sec. 2.1.

Article XXIII then goes on to provide for various types of leave, with sick leave addressed in Section 9. Employees who become "ill or disabled" and who provide appropriate medical documentation have a *right* to sick leave. Section 9.1, which sets forth eligibility requirements for sick leave, states: "Employees who become ill or disabled are eligible for an unpaid leave of absence after an absence of five (5) consecutive working days."[4] Section 9.1 also describes the required medical documentation that a team member must provide to the Company and specifies when it must be provided.

Although Section 9.1 uses the language of "eligibility," under Article XXIII, when a team member meets the eligibility requirements for a particular type of leave, she is entitled to the leave at issue. For instance, the contract provides for other types of leave, such as bereavement leave (Section 3), jury duty leave (Section 4), military leave (Sections 5 and 6), and public office leave (Section 7). Like the section on sick leave, each of these other sections also contains an "eligibility" requirement. Art. XXIII, Sec. 3.1 ("eligible" for bereavement leave "[i]n case of a death in the immediate family"), Sec. 4.1 ("eligible" for jury duty leave if "legally summoned for jury duty" and "upon providing the Company with a copy of the[] summons"), Sec. 5.1 ("eligible" for short-term military leave if member of U.S. Armed Forces Reserve or National Guard and "called to short-term military duty"), Sec. 6.1 ("eligible" for long-term military leave

---

[4] The first five days may be taken as *paid* leave, using an employee's personal absence allowance. Art. XXII, Sec. 2.7.

15

if employee "leave[s] work to enter the U.S. Armed Forces"), Sec. 7.1 ("eligible" for public office leave if evaluation period completed and employee is "elected or appointed to full-time public office"). But there is no dispute that employees have a *right* to leave for jury duty, military service, and public office once they satisfy the eligibility requirements for such leave. The contract provisions dealing with these leaves would be illusory if NUMMI could deny leave to team members who meet their eligibility requirements.

In contrast, where the parties intended that the Company retain discretion over the decision whether to grant a particular type of leave, they expressly accorded the Company such authority. Thus, unlike sick leave and the other types of leave discussed above, there is no absolute right to personal leave or educational leave; only a right to apply for such leave once the employee satisfies threshold requirements. *See* Art. XXIII, Secs. 8.1-8.2 ("Employees who have completed the evaluation period are eligible *to request* an unpaid leave of absence for legitimate personal reasons . . . . Personal leaves are granted *at the discretion of the Company* and are not intended to be used for vacation purposes.") (emphases added), Secs. 11.1-11.2 ("Employees with one or more years of seniority *may make application* for a leave of absence for any full-time further education. . . . [L]eave of absence of such education will be granted without pay to eligible employees . . . *subject to Company approval*.") (emphases added).

In short, once an employee satisfies the eligibility requirements for sick leave by becoming ill or disabled and meeting the procedural prerequisites of submitting timely documentation, she has a right to sick leave.

**B.      Employees Have The Right To Remain On Sick Leave Until They Exceed Their "Time for Time" Clock.**

Section 9.3 describes the period during which team members have a right to remain on sick leave:

16

> A sick leave of absence may not exceed the employee's length of seniority as of the date of the illness or disability, or eighteen (18) months for an employee with less than one (1) year of seniority, or thirty-six (36) months for an employee with more than one (1) year of seniority, whichever is greater.

Thus, the length of the sick leave is measured by the employee's seniority for employees with three or more years of seniority; is three years for employees with between one and three years of seniority; and is 18 months for employees with less than one year of seniority.

Article XI, Section 3(g) of the contract enumerates the circumstances under which seniority can be broken and employment terminated, including "[b]eing on a sick leave *beyond* the leave period set forth in Paragraphs 9.3 and 9.4, Article XXIII, of this Agreement." (Emphasis added.) Thus, Article XXIII, Section 9.3 and Article XI, Section 3(g) together authorize the Company to terminate an employee's sick leave and employment after the team member's leave has *exceeded* the time for time clock (and the leave provided in Section 9.4).[5] Because the contract expressly provides that seniority can be broken and employment terminated when these leave periods are exceeded, the Company does not have the right to terminate an employee's sick leave or employment before they are exceeded. Any other conclusion would require construing Article XI, Section 3(g) to mean the opposite of its plain language, effectively rewriting the provision to read that the Company may break seniority and terminate employment when a team member has been "on a sick leave ~~beyond~~ *for less than* the leave period set forth in Paragraphs 9.3 and 9.4, Article XXIII, of this Agreement."

---

[5] Arbitrator Staudohar also held that the Company must follow certain procedural prerequisites after termination of sick leave and before termination of employment. Staudohar decision at 12-13. Discussion in this brief of NUMMI's right to terminate employment after a team member has exceeded her time for time clock assumes that NUMMI complies with these procedural requirements.

Relying on the phrase "may not exceed" in Section 9.3, the Company now contends that the time for time provision does not establish any right on the part of team members to remain on sick leave for a specified period of time, but instead merely "sets the allowable maximum" leave period that the Company retains the discretion to terminate, even before that maximum period is reached. Tr. at 49:20-21, 266:3-4. The significance of the phrase "may not exceed" is not that NUMMI has discretion to terminate the sick leave *before* the period set forth in Section 9.3 – discretion which is foreclosed by Article XI, Section 3(g) – but that an employee faces potential termination of employment for remaining on leave *beyond* that period and does not face termination prior to that point. This interpretation provides a harmonious, logical construction of Article XXIII, Section 9.3 and Article XI, Section 3(g). *See* Elkouri & Elkouri at 462 ("disputed portions 'must be read in light of the entire agreement'").

NUMMI's construction, by contrast, is at odds with basic principles of contract interpretation. First, provisions are to be construed in light of their purpose. Elkouri & Elkouri at 461 ("an interpretation in tune with the purpose of a provision is to be favored over one that conflicts with it"). The purpose of Section 9, as discussed above, is to grant team members the right to sick leave, not to grant management discretion to deny or terminate leave. When the parties intended to grant the Company discretion with respect to team members' leave rights, they expressed that intent in straightforward contract language. *See, e.g.*, Art. XXIII, Secs. 8.1-8.2, 11.1-11.2.

Second, the Company's reading of Section 9.3 would render the clause meaningless. *See* Elkouri & Elkouri at 463 (given alternative interpretations of clause, reading that renders provision "meaningless or ineffective" must be rejected over "interpretation that would give effect to all provisions"). To serve some purpose, the clause must either grant rights to

18

employees or discretion to management. The Company's reading does neither. It certainly does

not grant employees rights. But absent a contractual clause guaranteeing employees a minimum

leave period, management would retain the discretion to terminate sick leave, thus rendering an

upper limit on sick leave entirely unnecessary. In any event, no purpose is served whatsoever by

setting an upper limit on sick leave if, as the Company contends, it also retains full discretion to

terminate leave before that limit is reached.

Moreover, the section on its face looks to seniority and thus was intended to tailor the

length of sick leave to seniority. But the Company concedes that under its interpretation, a team

member's seniority has no bearing on the minimum amount of leave to which she is entitled. Tr.

at 266:11-22. The Company's interpretation gives a team member with 20 years of seniority no

greater leave rights than a team member with six months of seniority.

Third, the Company's interpretation would also lead to harsh, unjust results. *See* Elkouri

& Elkouri at 470 (interpretation that leads to "just and reasonable results" to be adopted over one

that leads to "harsh, absurd, or nonsensical results"). Given the process for placing team

members with restrictions, wide-ranging discretion on the part of the Company to terminate sick

leave would result in termination of team members who would otherwise have successfully

returned to work and also open the door to favoritism and abuse.

A team member who is on leave with restrictions must await a job opening that matches

her restrictions and seniority. Tr. 101:24-102:12. The likelihood that such an opening will arise

necessarily increases the longer the team member is allowed to remain on leave. Although

opportunities for placing team members with permanent restrictions at the time of the Staudohar

decision were "limited," Staudohar decision at 9, technology improvements over the last 16 years

have resulted in jobs that are now more ergonomic and a wide variation in the physical

requirements of team member jobs. At present, many departments at NUMMI have rotations in which each task within the rotation is a task that can be performed by a team member with permanent physical restrictions. Tr. at 87:23-24, 99:15-101:18, 130:6-133:24, 254:2-16. Given the current availability of jobs that can be performed by team members with permanent restrictions, approximately 340 team members with restrictions have successfully been placed in positions in the plant through the return to work process since November 2001. Tr. 102:23-103:10. In the last year alone, the Return to Work Department has placed 64 team members with restrictions, 57 of whom had *permanent* restrictions. Tr. at 108:8-16; Un. Exh. 45. Placements of these team members occurred anywhere up to *several years* after the team member's restrictions became permanent. Tr. at 109:1-16.

Under the Company's current policy, however, these team members, who have been successfully placed, would instead have faced termination because the Company could have terminated their sick leave immediately afer their injury became permanent and stationary. Moreover, during the period when a team member's medical condition is temporary, the condition is by its nature not yet stable and so the team member's physical restrictions will necessarily be in flux. *Cf. Barns v. Workers Compensation Appeals Board*, 216 Cal.App.3d 524, 536 (1989) ("In order to *reasonably* believe that a worker is permanently barred from resuming employment, the employer must have some evidence that the injury itself is sufficiently permanent and stable to permit a prognosis with reasonable medical certainty. A physician's opinion that the injury is likely to preclude the resumption of preinjury duties cannot carry or supply such certainty when it is evidence that the patient is continuing to improve and the injury has not stabilized."). As a result, the type of job that will suit the team member on a permanent basis only becomes apparent at the point when the injury itself becomes permanent. To terminate

sick leave as soon as the injury becomes permanent leaves no window within which a job, appropriate to the team member's permanent restrictions, might arise and a successful placement made. The Company's interpretation thus forecloses potential placement opportunities for team members who have provided years of service to the Company.

In addition, the Company's discretionary approach to termination of sick leave would allow it to pick and choose those team members whom it wished to accommodate. The Company contends that it may terminate sick leave at any point after an injury becomes permanent and stationary. The Company could, however, choose to continue sick leave for some employees, after their conditions have become permanent, and until they reach the "allowable maximum" of their time for time clock. Under this entirely discretionary approach, the Company could continue the sick leave of favored team members, and by doing so increase the likelihood that they will be placed. At the same time, the Company could rid itself of disfavored employees by terminating their sick leave immediately upon their injury becoming permanent, even if those employees were injured on the job after years of dedicated service. Such a broad grant of discretion to the Company to continue or terminate sick leave invites abuse and favoritism.

By contrast, allowing team members to remain on leave until they exceed their time for time clock gives team members something back, commensurate with their years of service to the Company. And because the likelihood of a placement increases the longer the team member is allowed to remain on leave, team members with higher seniority are thus given more of a chance to return to work. Relying on seniority to determine the length of sick leave provides a neutral criterion that can fairly and uniformly be applied to the bargaining unit. This more just and reasonable interpretation of the time for time provision must prevail over the Company's.

21

C.    The Time For Time Provision Applies To All Employees Who Are "Ill Or Disabled."

Section 9.3 applies to all employees who become "ill or disabled," regardless of whether their medical condition is industrial or personal. Section 9.3 contains no limiting language that excludes its application to any subset of employees. By its terms, Section 9.3 addresses the length of a "sick leave of absence," which, as set forth in Section 9.1, applies to all employees who "become ill or disabled" (and who have provided appropriate medical documentation). In addition, Section 9.3 states that seniority for the purposes of measuring the time for time clock is measured "as of the date of the illness or disability," reinforcing the conclusion that the provision is necessarily intended to apply to all team members who are "ill or disabled," regardless of whether the medical condition is industrial or personal.

The Company contended in 2004 that it had a right to terminate the sick leave of industrially injured team members as soon as their injuries became permanent and stationary, even if that occurred prior to the expiration of their time for time clocks. Tr. at 153:18-154:7; 258:4-9. The Company's 2004 interpretation was limited exclusively to industrially injured team members, however, and the Company did not then contend what it does now – that it can also terminate the sick leave of team members with *personal* medical conditions at the time those conditions became permanent and prior to the expiration of their time for time clock.

Under the Company's 2004 position, team members with personal, but not industrial, medical conditions had a right to time for time leave. But if team members with personal medical conditions have a right to remain on sick leave until they exceed their time for time clock, then Section 9.3 must set forth the amount of sick leave to which team members have a right. That view is consistent with contract language, *see supra* at Part I-B, and negates the Company's current position that Section 9.3 "sets the allowable maximum, but not the required

22

maximum." Tr. at 266:3-4. And if Section 9.3 sets forth a "required maximum," then there is no basis for excluding team members with industrial injuries from its scope. Section 9.3 on its face contains no such exception and, as discussed above, instead applies to *all* team members who "become ill or disabled." Indeed the Company now concedes that "[t]he time-for-time provision applies to all Team Members who are permanent and stationary, whether industrially injured or not." Tr. at 265:23-25.

It would be particularly illogical to imply an exception to the time for time provision for *industrially injured* team members because such an interpretation of the contract would have the perverse effect of giving team members with industrial injuries *less* generous sick leave rights than team members with personal medical conditions – a result completely at odds with ordinary custom and practice in the automotive industry. *See* Elkouri & Elkouri at 460 ("Evidence of the custom and practice of the industry in which the parties operate may shed light on the intended meaning of an ambiguous provision."); *id.* at 470 (interpretation with absurd or nonsensical results to be avoided). The custom and practice in the industry is to provide more generous sick leave benefits, in particular, longer sick leaves, to employees who are injured in the plant than to those with non-work related injuries. Tr. at 164:14-165:3. The rationale for this is that industrially injured employees "were hurt on the Company's premises and the Company usually gives them a better benefit." Tr. at 164:23-25.

Moreover, if the Company could terminate sick leave for industrially injured team members as soon as they become permanent and stationary, then team members would have no greater rights under the contract than they already have under California law, which prohibits employers from terminating industrially injured employees on the ground that they are unable to return to their former job, if the injury is not yet permanent. *E.g., Barns*, 216 Cal.App.3d at 535-

6 (citing, *inter alia, Martin Marietta Alum. Co v. Workers' Comp. Appeals Bd.* 50 Cal. Comp.

Cases 243 (1985); *Kirkman v. Workers' Comp. Appeals Bd.* 48 Cal. Comp. Cases 805 (1983);

*Webster v. Workers' Comp. Appeals Bd.* 47 Cal. Comp. Case 660 (1982); *Kottke v. Int'l Rectifier*

8 Cal. Workers' Comp. Rptr 105 (1980)).  But where the parties intended that team members

have only those sick leave rights that are required by law, they expressly said so.  *See, e.g.,* Art.

XXIII, Sec. 6.2 ("Employees returning from a military leave of absence will be eligible for

reinstatement in accordance with applicable law.").  Nothing in Article XXIII restricts the sick

leave rights of industrially injured team members to what is legally required, and it would be

illogical to construe the contract to afford these team members only the sick leave to which they

are independently entitled under California workers' compensation law, and no more.

<div align="center">*     *     *</div>

In sum, the contract grants all team members who become ill or disabled, regardless of

whether their medical conditions are industrial or personal, temporary or permanent, the right to

remain on a sick leave of absence until they exceed the period set forth in Section 9.3.

**II.     Arbitrator Staudohar Did Not Interpret The Time For Time Provision.**

The Company's sole justification for its current policy is its interpretation of the

Staudohar decision.  Tr. at 258:14-24.  That reliance is misplaced.  The parties' dispute turns on

the question of whether the time for time provision found at Article XXIII, Section 9.3

represents, as the Company contends, merely an allowable maximum or, as the Union contends,

the amount of time to which team members have a right to remain on sick leave.  But Arbitrator

Staudohar did not interpret Section 9.3, or any other provision of the contract, to mean that team

members with permanent and stationary medical conditions lack a right to remain on sick leave

for the full duration of their time for time clock.

<div align="center">24</div>

The question before Arbitrator Staudohar was whether team members who were injured in the plant can *ever* be terminated and whether they have the right to indefinite sick leave. Arbitrator Staudohar concluded that they have no right to sick leave in perpetuity, but that, to terminate such employees, NUMMI must first afford them certain procedural protections. Arbitrator Staudohar simply did not rule on the question whether industrially injured employees (or any other employees) with permanent and stationary medical conditions have a right to remain on leave until they exceed their time for time clock. That being so, Arbitrator Staudohar did not interpret the contract with regard to the issue presented in this case – the scope of employees' rights under the time for time provision – and that issue must therefore be determined by reference to ordinary canons of construction, such as the contract language and the meaning the parties have given that language through their practice. *See supra* Part I; *infra* Part III.

The policy grievance decided by Arbitrator Staudohar affected the termination of three team members, each of whom had permanent and stationary industrial injuries. Staudohar decision at 2. Although the Union had also filed individual grievances on behalf of each of the three team members, Co. Exh. 8 (Gutierrez); Un. Exh. 28 (Adeola); Un. Exh. 30 (Tiwana), the parties chose to arbitrate the policy grievance. Co. Exh. 1 at 4:20-6:12.

In the grievance before Arbitrator Staudohar, the Union contended that team members who were "industrially injured and unable to work at their usual occupation" could *never* be terminated because Article XI of the contract enumerated the specific grounds under which seniority could be broken, and an industrial injury and resulting inability to work was not among the enumerated bases. Un. Exh 25; *see also* Un. Exh. 24. The Union also relied on Article

25

XXIII, Section 9.4 to support the argument that employees with industrial injuries may remain on sick leave in "perpetuity." Un. Exh. 25; Staudohar decision at 11.[6]

In the policy grievance before Arbitrator Staudohar, the Union did *not* argue that if industrially injured employees lack the right to sick leave in perpetuity, they have the right to remain on leave for the full length of their time for time clock. The Union's Notice of Appeal to Arbitration identified the contractual provisions on which its grievance rested and cited, among other provisions, Article XXIII, Section 9.4, but did *not* cite Section 9.3, the "time for time" provision. Un. Exh. 25. As framed by the Union in its post-hearing brief, "[t]he question is <u>not</u> 'at what time can the employer terminate the employment of the grievants? . . . But, the salient question is, 'Under the terms of the Agreement, does the Employer have the right to terminate the employment of the grievants?' The Union says 'No' . . . ." Co. Exh. 15 at 2. (emphasis in original; other emphasis omitted). The issue in this case is precisely the issue that was *not* before Arbitrator Staudohar: At what time can the employer terminate the employment of team members.[7]

---

[6] The Union also argued that the team members had been subject to disparate treatment. Co. Exh. 14.

[7] Given the close connection between NUMMI and General Motors, it makes sense that the Union in the policy grievance did not make an alternative argument regarding time for time leave. NUMMI opened as a joint venture between Toyota and General Motors, re-opening what had previously been a General Motors facility, and the collective bargaining agreement with the Union has provisions parallel to the General Motors Contract. Tr. at 156:18-157:7. George Nano, the Chairman of the Union at the time the policy grievance was arbitrated before Arbitrator Staudohar, had formerly been Chairman of the Union with General Motors. Co. Exh. 1 at 91:20-25. Section 9.4 – one of the main provisions relied upon by the Union in the Staudohar case to support the sick leave in perpetuity argument – is essentially identical to Paragraph 108 of the General Motors Contract. *Compare also* Art. XXIII, Sec. 9.3, *with* Un. Exh. 51 at ¶ 108 (page 93). The official position of the International Union on Paragraph 108 of the General Motors Contract is that "an employee continues on sick leave under Paragraph (108) and does not break seniority under Paragraph 64(e) even though the disability is changed from
(continued...)

26

Arbitrator Staudohar read Article XI in conjunction with Article XXIII, Section 9.4 to mean that the Company had no obligation to continue seniority "into perpetuity" because Section 9.4 requires only that in industrial injury cases, seniority accrues for the "full period of legal temporary disability." Staudohar decision at 11 ("It does not seem correct to conclude that a 'legal temporary disability' period would last into perpetuity."). But he did not venture any interpretation of the interplay between Article XI and Article XXIII, Section 9.3, or hold that the Company has a right to terminate seniority and employment when a team member has not yet been "on a sick leave beyond the leave period set forth in Paragraph[] 9.3 . . . ." Art. XI, Sec. 3(g).

Construing the contract language, Arbitrator Staudohar agreed with "[t]he Company['s] argu[ment] that when the work injuries of the employees were deemed to be permanent, their rights to industrial leaves of absence were extinguished under the terms of Article XXIII, *Section 9.4*." Staudohar decision at 13 (emphasis added). He did not, however, hold that when the work injuries of employees were deemed permanent, their rights to leaves of absence were *also* extinguished under a *separate* provision of the contract, Article XXIII, *Section 9.3*. Arbitrator Staudohar's ruling as to the expiration of leave rights under Section 9.4 is tied to the language of the contract, which references the "full period of legal temporary disability." *Id.* at 11. There is simply no basis, in either the contract language or Arbitrator Staudohar's decision interpreting that language, to support the Company's view that it may terminate leave rights that arise under

---

[7] (...continued)
temporary to permanent." Un. Exh. 50 at §G-3-a; Tr. at 161:14-17. Thus, unsurprisingly, the Union took the same position in the case before Arbitrator Staudohar as on the parallel language in Section 9.4.

the separate provision of Section 9.3 at the time an industrial injury becomes permanent because the length of the leave under Section 9.3 is tied to seniority, not medical status.

Moreover, the Company now contends that it may terminate the sick leave of all team members, including those with personal medical conditions, once their conditions become permanent and even if they have not yet exceeded their time for time clock. But the Staudohar decision involved only industrially injured team members. Staudohar decision at 3-4; Co. Exh. 4. Whatever the legal significance of Arbitrator Staudohar's holding with respect to termination of team members' sick leave, his holding rested on Section 9.4. Staudohar decision at 11 (rejecting argument that industrially injured employees have a right to sick leave "into perpetuity" because Section 9.4 refers to the automatic granting of sick leave and accumulation of seniority "for the full period of legal temporary disability"). And because Section 9.4 only applies to industrially injured employees, Art. XXIII, Sec. 9.4 ("compensable injury and legal occupational disease cases"), there is no basis for extending that holding beyond the scope of Section 9.4 to team members who are on leave for *personal* medical conditions.[8]

Nowhere in the text of his decision did Arbitrator Staudohar discuss or analyze Section 9.3.[9] Because he did not interpret team members' rights under the time for time provision at all,

---

[8] Arbitrator Staudohar also held that after a team member's sick leave has expired but before the Company may terminate the team member's *employment*, the Company must first follow certain procedural prerequisites. This holding turned on Article XI, Section 3, which governs the circumstances under which seniority may be broken and employment terminated. Staudohar decision at 12. Because this provision of the contract applies to *all* team members, whether their injuries are personal or industrial, the portion of the Staudohar decision relating to team members' procedural rights – unlike the portion that interprets Section 9.4 – does apply to all team members.

[9] Although Arbitrator Staudohar quotes Section 9.3 in the portion of his opinion that reprints excerpts of the collective bargaining agreement, he also quotes other provisions of the contract that he does not discuss or analyze – such as the provision authorizing the Company to

(continued...)

he did not interpret the contract to mean that the Company has a right to terminate team members' sick leave before their time for time clock has expired.

Similarly, none of the three arbitration decisions that followed Staudohar interpreted the scope of team members' rights under the time for time provision. Following the issuance of the Staudohar decision, the three affected team members returned to NUMMI and NUMMI again terminated each one. Each of those cases went to arbitration on the purely *factual* question of whether there was any job that the particular employee could perform within his or her medical restrictions. *See supra* at 7-8. Because none of these cases involved any question of contract interpretation, none of the post-Staudohar arbitration decisions interpreted the scope of team members' rights under the time for time provision.

**III.    The Parties Have Always Interpreted The Contract To Grant Team Members The Right To Remain On Sick Leave Until They Exceed Their Time For Time Clock.**

Not only does the text of Arbitrator Staudohar's decision demonstrate that he did not interpret the scope of team members' time for time rights, but the Company's statements and conduct over the decade and a half that followed the decision confirm that the parties never understood Arbitrator Staudohar to have eliminated the right to time for time leave and that the parties have always interpreted Section 9.3 as setting forth the period during which employees have a *right* to remain on sick leave.

Tellingly, the Company's own statements reflect its understanding that the Staudohar decision did not interpret the contract to mean that the Company has a right to terminate team members with permanent medical conditions before their time for time clocks have expired. As

---

[9] (...continued)
break seniority and terminate employment for "just cause." Staudohar decision at 5. But there is no argument that Arbitrator Staudohar interpreted the just cause provision simply by having quoted it, when he offered no analysis or discussion of the clause.

noted above, after Arbitrator Staudohar found procedural defects with the terminations at issue in that case, the Company again terminated each team member.  In defending its post-Staudohar termination of Ms. Adeola-Morrison, the Company acknowledged that it remained contractually obligated to allow team members, including team members like Ms. Adeola-Morrison whose industrial injuries had become permanent, to remain on sick leave for the full length of their time for time clock:

> Ms. Adeola failed to present herself in an improved condition and, therefore, was found to be unfit to resume her duties in her normal job classification.  As was clearly outlined to her, unless her medical condition showed improvement, her sick leave would be cancelled resulting in her termination.  Following the normal procedure of applying the language of Article XXXIII [sic], Section 9, *the Company is obligated to continue a leave not to exceed the employee's length of seniority.*  In cases of leaves that are due to 'legal occupational disease' cases, an employee accumulates seniority for the full period of their legal temporary disability.  Because Ms. Adeola has
>
> a)    been on a sick leave exceeding her seniority;
> b)    has been deemed permanently disabled.
>
> *the Company is no longer obligated to Ms. Adeola after her contractual time for time date.*

Un. Exh. 26 at 2 (emphasis added).[10]

---

[10] The General Motors contract contains provisions parallel to Sections 9.3 and 9.4. *Compare* Art. XXIII, Sec. 9.4, *with* Un. Exh. 51 ¶108 at p. 93; *compare also* Art. XXIII, Sec. 9.3, *with* Un. Exh. 51 at ¶¶64(e) at p. 55 and 106 at p. 92.  Although the UAW's position regarding the General Motors contract is that industrially injured employees continue to accrue seniority and remain on sick leave under Paragraph 108 (the equivalent of Section 9.4) even after the injury becomes permanent, "one of the local managements took the position that when the period of temporary disability ended and the disability became permanent, Paragraph (108) no longer applied and the time-for-time provisions were triggered.  When the time on sick leave because of permanent disability equaled the amount of seniority the employee had accumulated, management canceled his seniority." Un. Exh. 50 at §G-3.  Thus, a local General Motors facility – construing provisions in the General Motors contract parallel to Sections 9.3 and 9.4 – took the same, logical position as NUMMI did in connection with Ms. Adeola-Morrison's post-Staudohar termination:  If there is no right to permanent sick leave for industrially injured employees under

(continued...)

Consistent with this express acknowledgment, the Company's practice for the 15 years following Staudohar was not to terminate team members' leave "at the time the medical condition became permanent, but rather Team Members remained on leave of absence for the maximum period of time set forth under Article XXIII, Section 9.3." Tr. at 67:23-68:11. Under this practice, the Company terminated team members when they *exceeded* their leave rights under Section 9.3, *see, e.g.*, Un. Exh. 14, but did not terminate team members before that point because it acknowledged that the right to remain on leave for the full period set forth in that section was an "entitlement." Un. Exh. 20 at 2.

The Company's consistent statements and conduct over the decade and a half after the Staudohar decision cannot be reconciled with its belated interpretations of that decision. Indeed, the Company's own inconsistent interpretations of the Staudohar decision (as applying only to team members with industrial injuries and later as applying also to those with personal medical conditions) belie its claim that the decision "made it plain and ambiguous," Tr. at 64:22, that the Company may contractually implement its current sick leave policy.[11]

Notably, the Company has provided *no* explanation as to why, if the parties' intent was otherwise, it did not implement years ago its current policy of terminating team members' sick

---

[10] (...continued)
Section 9.3/Paragraph 108, then such employees with permanent medical restrictions must at least have a right to remain on leave until the expiration of their time for time leave under Section 9.3/Paragraph 106/64. Un. Exh. 26 at 2. The local General Motors facility did not take the position NUMMI now takes, that employees with permanent medical restrictions can be terminated even before their time for time leave has expired.

[11] *Compare* Tr. 257:17-20 (testimony of James Potts disavowing any contractual obligation "to continue a leave of absence not to exceed the Team Member's length of seniority"), *with* Un. Exh. 26 at 2 (Company Statement of Unresolved Problem Notice 971: Under Article XXIII, Section 9, "the Company is obligated to continue a leave not to exceed the employee's length of seniority").

31

leave before they have exceeded their time for time clocks. Tr. at 152:12 (Vice-President McCullough: "I don't know why we didn't implement it [earlier]."). The Company's conduct does make apparent, however, why the Company has chosen to implement its policy now. In an effort to achieve cost savings of $110 million annually, and having failed to obtain the Union's agreement during bargaining to terminate benefits for team members on sick leave, Tr. at 185:23-25, 212:11-214:8, the Company is instead terminating team members' sick leave entirely and thereby achieving the very cost savings it could not obtain at the bargaining table.

NUMMI's statements and actions demonstrate that, after the Staudohar decision, the parties intended all team members, whether their medical conditions were industrial or non-industrial, temporary or permanent, to have the right to remain on sick leave for the full length of their the time for time clock.

IV.   **Without An Agreement From The Union, The Company Cannot Alter Its Contractual Obligations By Providing The Union With Notice Of Its Intent To Abandon Those Obligations.**

It is undisputed that the parties did not agree to change the relevant sick leave provisions of the contract during their most recent negotiations. The Company instead relies on a letter from those negotiations, in which it stated its current interpretation of the Staudohar decision and its intent to abandon the parties' accepted interpretation of the contract as granting team members a right to remain on leave until they exceed their time for time clocks. Un. Exh. 21 at 4. This letter, however, did not suffice to free the Company of its contractual obligations.

The Company contends that once it provided the Union with notice of its intent to repudiate the parties' longstanding practice, the burden shifted to the Union to negotiate a change in the contract language. Tr. at 62:15-20. The Company presumably relies on the rule that "[i]n [the] face of a timely repudiation of a practice by one party, the other must have the practice

32

written into the agreement if it is to continue to be binding." Elkouri & Elkouri at 619 (citation and quotation marks omitted). This rule is wholly inapplicable, however, to obligations grounded in clear contract language and instead only applies to practices that lack "any basis in the agreement." *Id.*; *see also id.* at 605 (distinguishing past practices that "provide the basis of rules governing matters not included in the written contract" from those that "indicate the proper interpretation of contract language" or that "support allegations that the clear language of the written contract has been amended by mutual agreement").

The Company's obligation to continue sick leave for the full period set forth in Section 9.3 derives squarely from the language of the contract. There is no support for the argument that contractual commitments may be unilaterally repudiated.

Because the contract expressly provides for sick leave and contains a provision – Section 9.3 – regarding the length of a sick leave, the Company's practice over the 15 years after the Staudohar decision of allowing team members to remain on sick leave for the full period set forth in Section 9.3 is not one that lacks a basis in the agreement. Rather, this longstanding practice shows "the proper interpretation of contract language." *Id.* Even if the contract language could be construed as ambiguous, the type of past practice at issue in this case cannot be altered or terminated through unilateral repudiation. *Id.* at 619 n. 71 ("Repudiation of a practice that gives meaning to ambiguous language in the written agreement would not be significant – the effect of this kind of practice can be terminated only by rewriting the language."). The burden therefore fell on the Company to obtain a change in the language of the contract, and the Company failed to do so.

In any event, whatever the ordinary rules regarding the adequacy of mere notification of an intent to repudiate, such notification without an agreement from the Union is insufficient in

33

this case given the parties' practice regarding proposed side letters to the contract. The letter in which NUMMI allegedly provided notification to the Union actually took the form of a proposed side letter to the contract. In the NUMMI-UAW bargaining relationship, proposed side letters, like any other bargaining proposals, require the Union's agreement to become effective. *See supra* at 10-11 & n.1. The Union did not agree to the proposed side letter regarding time for time leave. Tr. at 150:16-151:8. As a result, the Company's proposal to eliminate team members' rights to remain on sick leave for the full duration of their time for time clocks did not become effective.

Although the Company disputes that the letter was a proposed side letter, Tr. at 219:22-24, it acknowledged that the letter was presented during negotiations "at the big table" and presented to the Union in a package of documents containing proposals to change contract language. Tr. at 233:18-19, 235:5-8, 235:24-236:12. The letter also takes the same format as two other undisputedly proposed side letters, as to which the Company obtained the Union's agreement and that were incorporated into the current contract. *Compare* Un. Exh. 21 at 4, *with id.* at 2, 3; *see also* Un. Exhs. 47, 48; Tr. at 145:23-149:19. There is no basis to conclude that the letter was not a proposed side letter.

## V.    Remedy

Because the Company's current sick leave policy violates team members' contractual right to remain on sick leave until they exceed their time for time clocks, the Company must restore team members to the position they would have been in had the Company not implemented its policy. The Union does not seek a ruling from the arbitrator on individualized remedy issues at this juncture, but there are two overarching remedial issues which, if the grievance is sustained, should be resolved at this juncture.

34

A.    **Seniority For The Purposes Of Calculating Team Members' Time For Time Leave Must Take Account Of The Full Period Of Legal Temporary Disability.**

Team members who have been terminated prior to the expiration of their time for time clocks should be reinstated, compensated for all lost benefits plus interest, and allowed to remain on sick leave for the remainder of their time for time entitlement. The Union seeks a ruling from the Arbitrator clarifying the proper method for calculating the length of their time for time leave, specifically, that seniority for the purposes of determining time for time leave must take account of the full period of a team member's legal temporary disability.[12]

Article XXIII, Section 9.3 sets forth the time period during which a team member has a right to remain on sick leave, with seniority determining the length of the leave. The Company's practice in calculating team members' leave under Section 9.3 has been to measure seniority "from date of hire to last day worked." Tr. at 68:10-11. In most instances, however, a team member's industrial injury does not become permanent and stationary until after the team member's last day of work. Although the Company's practice properly accounts for the period through the team members' last day of work, it fails to take account of time periods after an industrially injured team member has commenced sick leave but before the injury has become permanent and stationary. The failure to account for such periods violates the plain language of the contract.

The contract provides that, for the purpose of calculating the length of a sick leave, the parties will look to the team member's "seniority as of the date of the illness or disability." Art. XXIII, Sec. 9.3. The next section of the contract, Section 9.4 defines "disability" and explains

---

[12] The Arbitrator indicated that if the Company's policy violates the collective bargaining agreement, it would be proper to reach this remedy issue. Tr. at 274:9-275:1.

35

that, in industrial leave cases, "seniority will accumulate for the full period of legal temporary disability." Reading Sections 9.3 and 9.4 together, seniority for the purpose of calculating the length of a sick leave must take account of the "full period of legal temporary disability," that is, the entire period prior to which the industrial injury becomes permanent and stationary. *See* Elkouri & Elkouri at 462 ("disputed portions 'must be read in light of the entire agreement'"). Article XI makes plain that Sections 9.3 and 9.4 must be read together because it authorizes seniority to be broken and employment terminated only when a team member has "be[en] on a sick leave beyond the leave period set forth in Paragraphs 9.3 *and* 9.4, Article XXIII, of this Agreement." (Emphasis added.) The Company has failed to give effect to this plain contract language, which demonstrates that seniority in industrial injury situations does not cease accruing upon the last day of work.

Indeed, the Company itself has acknowledged that Sections 9.3 and 9.4 must be read together in calculating the length of an industrially injured team member's sick leave. In defending the termination of Ms. Adeola-Morrison, the Company explained the sick leave rights of an industrially injured team member as follows:

> As was clearly outlined to her, unless her medical condition showed improvement, her sick leave would be cancelled resulting in her termination. Following the normal procedure of applying the language of Article XX[]III, Section 9, *the Company is obligated to continue a leave not to exceed the employee's length of seniority. In cases of leave that are due to 'legal occupational disease' cases, an employee accumulates seniority for the full period of their legal temporary disability.*

Un. Exh. 26 at 2 (emphasis added).

An illustrative example is a team member who was hired on January 1, 2000, suffered an industrial injury, worked until January 1, 2004, and became permanent and stationary on January 1, 2005. If seniority for the purpose of calculating the length of the sick leave were measured

36

from date of hire to last day worked, then the team member would have four years of seniority (January 1, 2000 to January 1, 2004) and thus be entitled to four years of sick leave. If seniority for the purpose of calculating the length of the sick leave accounts for the "full period of legal temporary disability," then the team member would have five years of seniority (January 1, 2000 to January 1, 2005) and thus be entitled to five years of sick leave. In this hypothetical, the team member should be granted five years of sick leave. To cut off seniority on the last day of work – as the Company has done – is to deny industrially injured team members' the right to continue to accumulate seniority "for the full period of legal temporary disability."

In short, although the Company's practice in measuring seniority for the purpose of calculating the length of a sick leave correctly accounts for all periods prior to the team members' last day of work in the plant, it improperly ceases seniority accrual at that point. The plain language of the contract requires that industrially injured team members also continue to accrue seniority for the full period of legal temporary disability, that is, the full period prior to which the injury becomes permanent and stationary. Industrially injured team members are thus entitled to remain on a sick leave of absence for the full period set forth in section 9.3, with seniority measured from date of hire to last day of work, or the date on which the injury becomes permanent and stationary, whichever occurs later.

To be sure, the Union has not previously grieved the Company's practice of measuring seniority, which fails to account for the full period of legal temporary disability. But a party's failure to grieve violations of clear contract language only bars retrospective relief and does not preclude a party from seeking prospective enforcement of the contract. *See, e.g., Unistrut Corp.,* 114 LA 495, 498 (Mackraz 2000) ("a party's failure to file grievances or to protest past violations of a clear contract rule does not bar that party, after notice to the violator, from

37

insisting upon compliance with the clear contract requirement in future cases"). The Union

provided the Company with notice at least a year ago, during Summer 2005, that "the Company

has not been properly calculating the amount of leave to which employees are entitled." Un.

Exh. 24 at 1. Having provided this notice, the Union is now free to insist on prospective

enforcement of the contract language through this policy grievance for employees whose sick

leave was terminated within 15 working days of the filing of the grievance in this case (the

contractual grievance filing period, Art. X, Sec. 9.1) or anytime thereafter.

**B.    Team Members Who Were Otherwise Eligible To Exercise The Early Retirement Option Should Be Allowed To Do So Now.**

The Company has prevented 21 individuals, whose employment it contends it had the

authority to terminate pursuant to its current sick leave policy, from retiring pursuant to the

contract's "early retirement window." These employees would have been eligible to retire

pursuant to this window, but for the Company's conduct in connection with its current sick leave

policy. If the grievance is sustained, these employees should now be permitted to participate in

the early retirement program.[13]

The current contract (at Appendix B at p. 120-121) provides retirement benefits to team

members who, among other things, are 62 years old. The contract also provides for an "early

retirement window." *Id.* at p. 122. To be eligible for the early retirement window, a team

member must satisfy four requirements: (1) "[a]ttain the age of 57 on or before February 28,

2006," (2) have "ten (10) or more years of vested service," (3) "submit an application, on or after

February 1, 2006 and on or before February 28, 2006, for early unreduced normal retirement

---

[13] The parties have stipulated to resolution of this issue by the Arbitrator. Jt. Exh. 7.

benefits," and (4) "[t]he employee's actual date of retirement must be no earlier than May 1, 2006 and no later than July 28, 2006." *Id.*; Tr. at 186:4-187:1.

The 21 individuals at issue all satisfied the first three requirements. Jt. Exh. 7; Un. Exh. 52; Tr. at 190:8-191:21. The Company, however, did not permit any of these 21 team members actually to retire between May 1, 2006 and July 28, 2006. Tr. at 191:23-192:5. Instead, the Company took the position that it could have terminated the employment of these individuals under its current sick leave policy and thus "put [them] in abeyance, depending on the arbitration." Tr. at 196:7-197:4. Thus, although the 21 team members did not actually retire during the early retirement window, the Company has conceded that it prevented them from doing so based on its current sick leave policy. As a result, if the grievance is sustained, the 21 team members should be permitted to participate in the contractual early retirement program, notwithstanding that the early retirement window has now closed.

## CONCLUSION

For the foregoing reasons, the grievance should be sustained. The Company's sick leave policy violates the collective bargaining agreement. Team members who have been terminated pursuant to that policy should be reinstated, receive make-whole relief, and be allowed to remain on sick leave for the remainder of their time for time clocks, with seniority measured for industrially injured employees from the date of hire to the last day worked or the date on which the injury became permanent and stationary, whichever occurred later. In addition, the 21 individuals listed in Joint Exhibit 7 should be permitted to participate in the early retirement program. The Arbitrator should retain jurisdiction over further remedy issues.

Dated:   September 28, 2006

Peter D. Nussbaum
Linda Lye
ALTSHULER, BERZON, NUSSBAUM,
   RUBIN & DEMAIN

by:  _Linda Lye/jlv_
     Linda Lye

Attorneys for the Union

40

# EXHIBIT E

IN ARBITRATION PROCEEDINGS

BEFORE CHARLES ASKIN, ARBITRATOR

|  |  |
|---|---|
| In the Matter of an Arbitration )<br><br>between )<br><br>UNITED AUTO WORKERS UNION, )<br>LOCAL 2244, AFL-CIO, )<br><br>and )<br><br>NEW UNITED MOTOR )<br>MANUFACTURING, INC. )<br><br>(Policy grievance, No. 10277) ) | **UNION'S CLOSING BRIEF** |

PETER D. NUSSBAUM (#49682)
LINDA LYE (#215584)
Altshuler, Berzon, Nussbaum,
    Rubin & Demain
177 Post Street, Suite 300
San Francisco, California 94108
Telephone:    (415) 421-7151
Facsimile:    (415) 362-8064

Attorneys for the Union

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................... 1

I.    The Staudohar Decision Does Not Bar The Union's Grievance Because
      Arbitrator Staudohar Did Not Interpret The Contractual Provisions at Issue
      In This Case .................................................................................................... 1

      A.    The Staudohar Decision Bears On This Case Only To The Extent
            It Actually Interpreted The Provisions Now At Issue .................................... 1

      B.    The Text Of The Decision Shows That Arbitrator Staudohar Only
            Interpreted Article XXIII, Section 9.4 and Article XI, Section 3(e) .............. 3

      C.    The Record Further Demonstrates That Arbitrator Staudohar Did Not
            Interpret Article XXIII, Section 9.3 or Article XI, Section 3(g) ................... 6

            1.    Before the policy grievance at issue in Staudohar was filed, the
                  Company effectively provided indefinite sick leave .......................... 6

            2.    The Union argued that industrially injured employees have the
                  right to sick leave indefinitely .......................................................... 6

            3.    The Company made no argument regarding the scope of
                  Section 9.3 .......................................................................................... 8

            4.    Given the stipulated facts and issue, Arbitrator Staudohar
                  lacked jurisdiction to rule on the scope of team members'
                  time for time rights ............................................................................ 9

            5.    The stray references to Section 9.3 in the record do not alter the
                  issues before Arbitrator Staudohar or the scope of his ruling .......... 11

II.   Even if Arbitrator Staudohar Interpreted The Contract Not To Provide Time
      For Time Rights, The Company Cannot Invoke That Decision To Bar This
      Grievance ...................................................................................................... 12

      A.    The Parties Have Modified The Contract To Grant Time for Time
            Rights ............................................................................................................ 13

      B.    The Company Has Waived The Right To Terminate Sick Leave
            Before A Team Member Exceeds Her Time for Time Clock ...................... 13

      C.    The Company Is Equitably Estopped From Implementing Its Policy .......... 14

CONCLUSION ..................................................................................................... 15

## INTRODUCTION

The Company contends that it is entitled to terminate sick leave before a team member exceeds her time for time clock. The Company can only prevail if Article XXIII, Section 9.3 merely sets forth an "allowable maximum," rather than the period of time during which team members have a right to remain on sick leave. As set forth in the Union's opening brief, team members do have such a right, pursuant to Article XXIII, Section 9.3 and Article XI, Section 3(g) of the contract. Arbitrator Staudohar's decision does not bar the Union's grievance because he did not interpret these provisions, and instead interpreted Article XXIII, Section 9.4 and Article XI, Section 3(e). In any event, even if the Staudohar decision could be construed to have interpreted the contract as the Company contends, NUMMI's own statements and conduct over the decade and a half after the decision bar any belated reliance upon it because the parties have modified any such contract interpretation, the Company has waived any right to invoke that decision, and the Company is equitably estopped from implementing its current policy.

**I.    The Staudohar Decision Does Not Bar The Union's Grievance Because Arbitrator Staudohar Did Not Interpret The Contractual Provisions at Issue In This Case**

The Company's policy violates team members' right, pursuant to Article XXIII, Section 9.3 and Article XI, Section 3(g), to remain on sick leave until they exceed their time for time for clock. Un. Brf. at 14-24. The Staudohar decision was limited to an interpretation of Article XXIII, Section 9.4 and Article XI, Section 3(e), which are different contract provisions. Thus, there is simply no prior construction to bind the parties.

**A.    The Staudohar Decision Bears On This Case Only To The Extent It Actually Interpreted The Provisions Now At Issue**

The Company repeatedly emphasizes the doctrines of "claims preclusion" and incorporation of prior awards and that the stipulated issue references the Staudohar decision, to argue that the grievance is barred by that decision. Co. Brf. at 17 n.3, 19, 23. The Company correctly describes

the doctrine of "claims preclusion" to set forth the principle that "a prior decision involv[ing] the *interpretation* of the *same* contract provisions between the same company and union" can be binding on the parties in future cases. *Id.* at 19 (emphases added). This is simply another way of stating the principle, also invoked by the Company, that "a prior arbitration award *interpreting language* in a contract is generally considered incorporated as part of the contract." *Id.* at 23 (emphasis added). The Union does not dispute these principles, merely their application here. Arbitrator Staudohar's decision is binding only as to those portions of the contract that he actually interpreted. As explained by *Trailways Lines v. Trailways, Inc.*, 807 F.2d 1415, 1419-20 (8th Cir. 1986), cited by the Company, "where . . . an arbitrator . . . has *definitively construed a provision of the collective bargaining agreement,* such construction becomes part of the existing labor agreement." (Emphasis added.) These doctrines do not mean that the result in the Staudohar decision is determinative of claims arising under contract provisions that Arbitrator Staudohar did *not* definitively construe.[1]

Because the issues in this case were not before Arbitrator Staudohar, his decision does not bar this grievance. Elkouri & Elkouri at 578 (Before applying a prior arbitration to bar a later grievance, "the second arbitrator must first be satisfied that the issue he is required to decide is *identical* to that presented in the previous case.") (emphasis added).

---

[1]Similarly, the stipulated issue reaffirms the principles discussed above. The question presented is whether the Company's policy "is consistent with Article XI, Section 3 and Article XXIII, Section 9.3 and 9.4 of the collective bargaining agreement, as *interpreted* by, among other things, the Staudohar arbitration decision . . . ." Jt. Exh. 7 (emphasis added). The stipulation's reference to the Staudohar decision merely eliminates any argument that the parties did not intend to be bound by the contract interpretation rendered therein. *See* Elkouri & Elkouri at 576 ("some arbitrators take the position that they . . . need not necessarily follow a prior award"). It does not represent any agreement that the parties are bound by the result in that case, even as to claims arising under contract provisions it did not definitively construe, or that this Arbitrator is barred from relying on ordinary canons of contract interpretation -- such as reference to past practice -- in construing contract provisions not previously interpreted.

**B.** **The Text Of The Decision Shows That Arbitrator Staudohar Only Interpreted Article XXIII, Section 9.4 and Article XI, Section 3(e)**

The Company asserts that "[t]he fundamental holding in Staudohar is clearly that employment 'ceases' and seniority breaks if an employee becomes permanent and stationary provided notice is given and a good faith attempt is made to find a job for the employee." Co. Brf. at 18. The Company's overbroad reading of that decision fails to acknowledge that the result in that case is tied to the specific provisions interpreted by Arbitrator Staudohar.

Arbitrator Staudohar held that once a team member's industrial injury becomes permanent and stationary, the right to sick leave *under Article XXIII, Section 9.4* expires because "[i]t does not seem correct to conclude that a 'legal temporary disability' period would last into perpetuity." Staudohar decision at 11. He found permanent and stationary status significant, not based on his own brand of industrial justice that *all* rights to sick leave should terminate at this point, but based on his interpretation of the specific language of Section 9.4, which references "legal temporary disability." That being so, his interpretation was necessarily confined to the specific contractual provision before him: He interpreted Section 9.4 to mean that industrially injured team members have a right to sick leave for the full period of their "legal temporary disability" but that their right to sick leave *under Section 9.4* expires once that injury transforms from temporary to permanent. Contrary to the Company's contention, he did not hold that once a team member's medical condition becomes permanent and stationary, *all* other rights to leave, including sick leave under the separate provision set forth in Article XXIII, Section 9.3, also expire. Any such holding would have had no basis in the contract language, for no other provision of the contract refers to "legal temporary disability" in determining leave rights.

Arbitrator Staudohar went on to hold that under Article XI, Section 3(e) – which authorized the Company to break seniority where a team member fails to "return to work within three (3) days after the expiration of a leave of absence unless unusual conditions or circumstances exist" – the

3

Company has the obligation to provide team members with procedural protections before it may terminate employment. *Id.* at 12-13. The requirement that the Company provide procedural protections turns on Arbitrator Staudohar's interpretation of the phrase "return to work" in Section 3(e). *Id.* at 12. ("it may not have been possible for the employees to return to work at that time, but the fact is that they had no chance to do so").

The language of Article XI, Section 3(e) also provides that seniority may only be broken if the employee fails to return to work "*after* the expiration of a leave of absence." (Emphasis added.) Arbitrator Staudohar interpreted this latter phrase to mean that "[a]s long as they were on approved leave they could not lose seniority." *Id.* He thus held that, to break seniority under Article XI, Section 3(e), the Company must give the employee an opportunity to "return to work" *and* the team member must no longer be on an "approved leave." His interpretation of Section 3(e) necessarily requires an inquiry into *when* the approved leave of absence expires.

The Company's contention – that the Staudohar decision stands for the broad proposition that "an individual who becomes permanent and stationary could have his or her seniority 'broken' [under Article XI, Section 3(e)] provided the company makes a good faith effort to accommodate the person," Co. Brf. at 22, 24 – conflates Arbitrator Staudohar's interpretation of two separate contract provisions. One of the prerequisites to breaking seniority under Article XI, Section 3(e) is that the team member no longer be on approved leave. As noted above, Arbitrator Staudohar did not hold that *all* forms of leave automatically expire when a team member becomes permanent and stationary; only that leave rights under Article XXIII, Section 9.4 expire at that juncture. Thus, after expiration of Section 9.4 leave, the team member may still have *other* leave rights and continue to be on an "approved leave." Arbitrator Staudohar did not interpret Article XI, Section 3(e) to mean that the prerequisite to breaking seniority, contained in the phrase "after the expiration of a leave of absence," is necessarily satisfied whenever leave rights under Article XXIII, Section

9.4 have expired *and even if* other leave rights have not yet expired. Nor would such a holding have had any basis in the contract language because Article XI, Section 3(e) expressly references leaves of absence generally and is not limited to Article XXIII, Section 9.4 leaves. The Company's position would require rewriting (or rather, assumes Arbitrator Staudohar rewrote) Article XI, Section 3(e) to read that the Company may break seniority where an employee fails to return to work "after the expiration of a leave of absence *under Article XXIII, Section 9.4*."[2]

In short, Arbitrator Staudohar interpreted Article XXIII, Section 9.4 to mean that leave rights *under that provision* expire when a team member's industrial injury becomes permanent and stationary. He also construed Article XI, Section 3(e) to mean that, after leave rights have expired, and if NUMMI provides the employee with the opportunity to return to work, then seniority may be broken under this provision. By interpreting Section 3(e) to mean that seniority cannot be broken as long as an employee is on an "approved leave," he did not foreclose, but instead invited, an analysis of when an approved leave of absence expires under any leave provision other than Section 9.4 (the only leave provision that he actually interpreted). Because Arbitrator Staudohar did not interpret either Article XXIII, Section 9.3 or Article XI, Section 3(g), there is no prior interpretation of these provisions to bind this Arbitrator.

---

[2]The Company acknowledges that Arbitrator Staudohar interpreted Article XXIII, Section 9.4. Co. Brf. at 24 & n.4. Team members with *personal* medical conditions do not fall under the ambit of that provision, which applies to "compensable injury and legal occupational disease cases." Thus, there is no basis to terminate their sick leave when their conditions become permanent. Un. Brf. at 28. The Company asserts, without any reference to contract language, that its interpretation of the Staudohar decision must apply equally to team members on industrial and non-industrial leave, for to do otherwise would violate state workers' compensation law. Co. Brf. at 32. State law cannot be invoked to expand the scope of the Staudohar decision beyond the specific contract provisions interpreted in that case. The state law prohibition against providing inferior sick leave to industrially injured employees does, however, reinforce the conclusion that Article XXIII, Section 9.3 applies equally to team members with industrial and non-industrial injuries. Un. Brf. at 22-24.

C.    **The Record Further Demonstrates That Arbitrator Staudohar Did Not Interpret Article XXIII, Section 9.3 or Article XI, Section 3(g)**

Although Arbitrator Staudohar's decision speaks for itself, the Company relies on stray statements in the record to create the illusion that Arbitrator Staudohar decided the scope of team members' rights under the time for time provision. A review of the record dispels that illusion.

*1.    Before the policy grievance at issue in* **Staudohar** *was filed, the Company effectively provided indefinite sick leave.* In April 1989, the Company terminated three team members on industrial leave. Staudohar decision at 2. The Company had never previously terminated any team member on industrial leave. Co. Exh. 1 at 165:19-166:1.

At the time of these terminations in 1989, the Company's general practice was to maintain team members on personal and industrial sick leave for what was effectively at the time an indefinite period, and certainly one that extended well beyond any team member's time for time date. The evidence before Arbitrator Staudohar showed that NUMMI kept a list of team members on leave, indicating the type of leave and the "return to work date." Co. Exh. 1 at 153:10-24. The Company's witness testified that until Spring 1990, NUMMI entered a default "return to work date" of "12/31/99" for team members with both personal and industrial injuries where "it was not anticipated the person was going to come back to work." *Id.* at 50:12-18, 155:14-156:14, 157:6-10. As of Spring 1990, a leave expiration date of 1999 would have been well *beyond* any team member's time for time date because the highest seniority that any NUMMI team member could have had was five years (the plant opened in 1985).

The Company maintained this practice until Spring 1990, when it eliminated leave expiration dates coded "12/31/99." Except where the Company knew of a specific return date, it replaced those dates with time for time dates. *Id.* at 155:23-25, 156:23-157:5.

*2.    The Union argued that industrially injured employees have the right to sick leave indefinitely.* "[T]he Parties requested that . . . Arbitrator [Staudohar] rule only on the specific issues

6

presented in the Union's policy grievance." Staudohar decision at 13. Team members' right to time for time leave was not one of the specific issues presented in that grievance.

The termination letter sent to the affected team members cited as the reason for the termination that "it has been medically determined that you can no longer perform the work available at NUMMI" "[a]s a result of your industrial injury." Co. Exh. 4. The Union filed a policy grievance challenging the terminations under Article XI. Un. Exh. 24. The Union contended that Article XI specifies the circumstances under which seniority may be broken and employment terminated, but the stated reason for the termination – that the team members were "industrially injured and unable to work at their usual occupation" – was not one of the enumerated reasons. Un. Exh. 25.[3] The Union also relied in its Notice of Appeal to Arbitration on Article XXIII, Section 9.4, governing industrial sick leaves. *Id.* Neither the policy grievance nor the Notice of Appeal to Arbitration cited Article XXIII, Section 9.3. Un Exhs. 24, 25.

The parties chose to arbitrate the policy grievance even though the Union had also filed individual grievances on behalf of team members discussed in the Staudohar decision. As Company counsel indicated, the purpose of pursuing the policy grievance was "to consolidate a number of grievances on the *same* issue." Co. Exh. 1 at 5:9-13 (emphasis added); *see also id.* at 5:25-6:2 (Union counsel: "The cases are photocopies of each other."). The parties thus sought

---

[3]Contrary to the Company's assertion, the Union's Article XI argument in the policy grievance before Arbitrator Staudohar is entirely distinct from the Article XI, Section 3(g) issue in this case. *See* Co. Brf. at 21-22. In this case, the issue is that because "being on a sick leave *beyond* the leave period set forth in Paragraphs 9.3 and 9.4, Article XXIII," is one of the express circumstances under which the Company may break seniority, the Company may not break seniority when a team member has been on a sick leave *before* the leave period set forth in Paragraphs 9.3 and 9.4, Article XXIII has expired. Although the Union's argument to Arbitrator Staudohar was that the Company could not *add* to a list of enumerated terms (circumstances under which seniority may be broken), the Union's argument here is that the Company may not *negate* an express term. Un. Brf. at 17-18. Arbitrator Staudohar did not authorize the Company to terminate team members under an unenumerated circumstance, but found termination under Article XI, Section 3(e) appropriate where a team member is no longer on an approved leave and is given an opportunity to return to work. Staudohar decision at 12-13. And he could not have rejected the contention made here, as it was not made to him.

7

from Arbitrator Staudohar an interpretation only on the contract issue(s) that unified the employees. The parties expressly chose not to place before him any individualized arguments.

All of the team members had in common that they had permanent industrial injuries. Accordingly, the Union made the argument that such team members had a right to remain on sick leave indefinitely and that being industrially injured and unable to work was not a contractual basis for terminating seniority and employment.[4] The Union did so in the underlying grievance documents, *see* Un. Exh. 24; Un. Exh. 25, and throughout the hearing, *see* Co. Exh. 1 at 89:20-90:3 ("you don't have in this contract any place that says that when it becomes permanent that you can terminate the employment of the worker"), 100:11-102:3, 112:8-113:12, 127:10-128:24, 145:10-146:21, 151:6-152:15 ("as long as the employee is injured, can no longer perform his regular work, and is out on leave of absence, this contract protects his seniority . . . [i]n perpetuity, forever."). Had the Union sought a ruling on the time for time issue, the question before Arbitrator Staudohar would have been *when* the Company could terminate sick leave, rather than *whether* it could do so. Yet the Union's brief urged that the issue in the case was *not* "at what time can the Employer terminate the employment of the grievants." Co. Exh. 15 at 2. As Arbitrator Staudohar summarized the issue: "Does the company have an obligation to keep them on the rolls indefinitely, to maintain their seniority indefinitely." Co. Exh. 1 at 120:10-12.

*3. The Company made no argument regarding the scope of Section 9.3.* Despite the Company's current efforts to portray the Staudohar decision as having held that *all* rights to sick leave are immediately extinguished once a team member becomes permanently disabled, Co. Brf. at

---

[4]Given the Company's practice for the first five years of its existence of allowing team members, whom it did not anticipate returning to work, to remain on sick leave for effectively an indefinite period, *supra* at Part I-C-1, it is not surprising that the Union challenged the terminations on the broad ground that team members with industrial injuries had a right to indefinite sick leave and could never be terminated. There was no need for the Union to seek from Arbitrator Staudohar an interpretation of the scope of team members' rights to time for time leave under Article XXIII, Section 9.3 because the Company's practice at the time of the Staudohar arbitration was to provide time for time leave. *Supra* at Part I-C-1.

8

18, its contemporaneous statements confirm its own understanding that the case presented the much-narrower issue of team members' sick leave rights only under Article XXIII, Section 9.4.

In its opening statement, the Company made clear the limited scope of its own argument:

> Article XXIII, *Section 9.4* specifically states that industrial sick leave of absence shall continue until the end of the employee's period of legal temporary disability. In other words, when they become permanently disabled, *that* leave of absence ceases.
> When a leave of absence ceases *and no other provisions being applicable*, the company believes that it has the right to break the seniority of the employees under Article XI, Section 3 of the contract which provides for loss of seniority.

Co. Exh. 1 at 16:16-20 (emphases added). The Company did *not* argue what it now attempts to assert was argued at the time – that when a team member becomes permanently disabled, the right to sick leave under Section 9.3 *also* ceases. Indeed, the Company conceded that when a Section 9.4 sick leave ceased, other provisions for sick leave may well be applicable, and the Company could only terminate employment if indeed no such *other* provisions applied.

Similarly, the Company's post-hearing brief does not even cite Section 9.3. NUMMI understood the Union to be asserting that industrially injured employees "have an unqualified, perpetual right to Company leave of absence." Co. Exh. 16 at 5. The Company did not describe the Union as arguing that industrially injured employees have a right to time for time leave after they become permanent and stationary. *Id.* As a result, the Company only argued that the right to leave under *Section 9.4* expires once the team member becomes permanently disabled. *Id.* at 6. The Company did not contend the right to sick leave under Section 9.3 *also* expires at that point.

*4. Given the stipulated facts and issue, Arbitrator Staudohar lacked jurisdiction to rule on the scope of team members' time for time rights.* Having agreed to arbitrate the policy grievance rather than any individual grievance, the parties sought a ruling from Arbitrator Staudohar only on the issue(s) as to which all the affected team members were "photocopies" of each other. Co. Exh. 1 at 6:1-2. Because the stipulated factual record before Arbitrator Staudohar

9

demonstrates that the team members in the case did not all have time for time claims, he lacked

jurisdiction to rule on the scope of team members' right to time for time leave.

*Renee Adeola.*  Under the stipulated facts and Arbitrator Staudohar's resulting findings, Ms.

Adeola was hired on October 14, 1985, her last day worked was May 29, 1986, and she was

discharged on April 6, 1989.  Co. Exh. 1 at 8:7-14, 16 at 2; Staudohar decision at 2-3; *accord* Co.

Brf. at 4.  She had seven and one-half months of seniority from hire date to last day worked.  Team

members with less than one year of seniority are entitled to 18 months of sick leave.  Art. XXIII,

Sec. 9.3.  Because Ms. Adeola actually received almost three years of leave, she did not have a

Section 9.3 claim, where seniority is calculated from date of hire to last day worked.[5]

*Rafael Gutierrez.*  Similarly, the facts as stipulated and found by Arbitrator Staudohar

indicate that Mr. Gutierrez did not have a time for time claim, where seniority is calculated from

date of hire to last day worked.  Mr. Gutierrez was hired in October 1985, his last day worked was

April 1, 1986, and he was terminated on April 6, 1989.  Staudohar decision at 2, 4; Co. Exh. 16 at

3-4.[6]  He had six months of seniority between his date of hire and last day worked.  Employees with

less than one year of seniority are entitled to 18 months of time for time leave.  Art. XXIII, Sec. 9.3.

Mr. Gutierrez received slightly over three years of leave.[7]

---

[5]Relying on a document filed by the *Company*, the Company now contends that the Union raised the Section 9.3 issue as to Ms. Adeola. Co. Brf. at 5 (citing Co. Exh. 13). But the grievance documents themselves show that the Union did not raise the issue in her individual grievance. Un. Exhs. 28, 29. In any event, her individual grievance (Problem Notice 613) was ultimately withdrawn without precedent and thus never went to arbitration. Un. Exh. 27.

[6]The Company's current effort to assert that Mr. Gutierrez's last day of work was November 5, 1988, Co. Brf. at 4, is at odds with the parties' stipulation before Arbitrator Staudohar, the representation the Company made in its post-hearing brief, and Arbitrator Staudohar's resulting finding. Co. Exh. 1 at 8:7-14; Co. Exh. 16 at 3; Staudohar decision at 4.

[7]Mr. Gutierrez's *individual* grievance did raise a time for time argument, citing Article XXIII, Section 9.3. Co. Exh. 8; Co. Exh. 6. But his *individual* grievance (Problem Notice 608) was never arbitrated, Un. Exh. 27, and the *policy* grievance before Arbitrator Staudohar raised no such claim. Un. Exhs 24, 25. To be sure, under the facts in Mr. Gutierrez's *individual* grievance

(continued...)

Because the parties agreed to arbitrate only those issues that the team members all shared in common and because the team members did *not* all have time for time claims, Arbitrator Staudohar lacked jurisdiction to rule on the scope of team members' time for time rights.

**5. The stray references to Section 9.3 in the record do not alter the issues before Arbitrator Staudohar or the scope of his ruling.** The Company wrenches out of context a few statements from the record to assert that the time for time provision was an "important issue" before Arbitrator Staudohar. Co. Brf. at 26.

The Company repeatedly cites the following question posed at the arbitration by the Union representative, but omits the response of the Company witness:

> Q.   Now, if one were to apply the interpretation that the company is *now* using, a worker could suffer an injury; he could have, let's say, six years of seniority, the maximum that is here, six years of seniority; could suffer any injury which became permanent and ratable, okay, permanent and ratable, within a 90-day period or a four-month period or whatever it is; he'd be well inside or she'd be well inside, of their total length of employment, and became they had now arrived at that point in time, the company could terminate their employment, simply saying that there is no work that they can find for them; is that right?
>
> A:   *All I can say is that 9.4 says for the period of legal temporary disability.* So when it is permanent and stationary and temporary disability is no longer payable, 9.4, *that's the limit, the 9.4 leave* for a period of legal temporary disability.

Co. Exh. 1 at 86:5-21 (emphases added). The Union's question was aimed at teasing out an inconsistency in the Company's position. NUMMI asserted at the arbitration that Section 9.3 only applied to personal sick leave. Co. Exh. 1 at 85:14-15. But its general practice at the time was to allow team members with both personal and industrial injuries to remain on sick leave until their time for time dates. *Supra* at Part I-C-1. Given this practice, the Union naturally sought

---

[7](...continued)
documents – which indicate his last day worked was May 11, 1988 – he would have had a time for time claim. *Id.* at 1. But after the Union filed the Statement of Unadjusted Problem Notice in his individual grievance, Co. Exh. 6 at 1, the parties stipulated before Arbitrator Staudohar that his last day of work was April 1, 1986, Co. Exh. 1 at 8:7-14; Co. Exh. 16 at 3; Staudohar decision at 4, thus eliminating Mr. Gutierrez's time for time claim.

clarification whether the Company was "now" asserting – contrary to practice – that industrially injured team members could be terminated before their time for time clocks expired.  Significantly, NUMMI carefully limited its answer, asserting only that the right to leave under Section 9.4 expired once the injury became permanent; it did not respond that the right to leave under Section 9.3 also expired once the industrial (or any other) condition became permanent.

NUMMI also emphasizes a passing reference in the transcript and a parenthetical comment in the Union's post-hearing brief that one of the team members (Mr. Gutierrez) had a time for time claim.  Co. Exhs. 1 at 116:15-20, 15 at 4.  The context of the discussion at the hearing illustrates that the Union made this point to show lack of "equity" in the treatment of Mr. Gutierrez.  Co. Exh. 1 at 117:6-8.  One of the stipulated issues in the case was whether the employees had been subjected to "[d]isparate treatment and unequal application of the Agreement."  Co. Exh. 14.  If – as the record indicated – the Company had been allowing team members with both personal and industrial injuries to remain on leave until their time for time dates, Co. Exh. 1 at 155:14-25, 157:6-10, then the Company had to apply that right uniformly to all employees, including Mr. Gutierrez.  The Union thus raised the issue to show disparate treatment, *i.e.*, denial of a leave right that other team members were receiving; the Union did not raise the issue to establish that team members had a right to time for time leave because the Company's practice confirmed that they did.[8]

**II.    Even if Arbitrator Staudohar Interpreted The Contract Not To Provide Time For Time Rights, The Company Cannot Invoke That Decision To Bar This Grievance**

The Company's statements and conduct over the fifteen years following the Staudohar decision bar implementation of its current sick leave policy.

---

[8]Moreover, the lone parenthetical reference in the Union's brief to the time for time issue is made only as to Mr. Gutierrez.  Individualized arguments were beyond the scope of Arbitrator Staudohar's agreed upon jurisdiction.  *See supra* at Part I-C-4.  In any event, Mr. Gutierrez did not have a time for time claim under the stipulated facts and thus Arbitrator Staudohar did not have facts before him that implicated the scope of Section 9.3, *see supra* note 7, further precluding him from reaching that issue.

12

**A.    The Parties Have Modified The Contract To Grant Time for Time Rights**

Even if the Staudohar decision could be construed to have interpreted Article XXIII, Section 9.3 or Article XI, Section 3(g) *not* to provide a right to time for time leave, the decade and a half long practice and the Company's statements discussed in the Union's opening brief, Un. Brf. at 29-32, show that the parties agreed to modify any such holding and treat Section 9.3 as setting forth the time period during which the Company is contractually obligated to allow team members to remain on sick leave. The Company is bound by that modification.

Past practice can evidence an agreement between the parties to modify the contract, even if the modification is not in writing and the practice is at odds with the contract language, where there has been a clear practice over an extended period of time and the practice has been mutually accepted by the parties.[9] The parties have stipulated as to the clear practice over the extensive 15-year period that followed the Staudohar decision. Tr. at 67:23-68:11. Nor is mutuality contested: The Union has never denied that team members have a right to time for time leave. And the Company by its conduct and statements has similarly embraced this right. Un. Brf. at 29-32. As a result, "[t]hat past practice just as surely modified the written agreement as if the parties had executed a signed written document." *Hercules Prods., Inc.*, 81 LA at 193.

**B.    The Company Has Waived The Right To Terminate Sick Leave Before A Team Member Exceeds Her Time for Time Clock**

Whatever implications the Staudohar decision had for time for time rights immediately after it was issued, the Company has now waived any right to assert its current position.

---

[9]*See, e.g., Hercules Prods., Inc.*, 81 LA 191, 193 (1983) (where 13 years of practice at odds with plain language, arbitrator found that "parties by their actions effectively modified the written agreement by their actions in a binding past practice"); *Reed Tool Co.*, 115 LA 1057, 1061 (2001) (past practice can be used to show modification of plain language where it can be "shown as the understood and accepted way of doing things over an extended period of time" and there is "mutuality between the parties"); *City of New Haven*, 100 LA 22, 24 (1992) (finding a "mutual binding Past Practice" that "overrode the Contract language" where practice in effect for over 10 years, union was fully aware of practice, and during that period raised no objections to it).

13

As labor arbitrators have acknowledged, a waiver is an ·

intentional or voluntary relinquishment of a known right . . . or such conduct as warrants an inference of the relinquishment of such right . . . or when one dispenses with the performance of something he is entitled to exact or when one in possession of any right, whether conferred by law or contract, with full knowledge of the material facts, does or forbears to do something of which or the failure of forbearance to do which is consistent with the right.

*Crittenton Hosp.*, 85 LA 177, 182 (1985) (internal quotation marks, citations omitted).

NUMMI cannot contend that it was not aware of the Staudohar decision. Nor did NUMMI merely remain silent as to the scope of team members' time for time rights.[10] Rather, the Company expressly stated in defending Ms. Adeola's post-Staudohar termination that it remained contractually obligated to allow team members to remain on leave until they exceed their time for time clocks. Un. Exh. 26 at 2. NUMMI has explicitly referred to the amount of leave set forth in Section 9.3 as an "entitlement." *See, e.g.*, Un. Exh. 20 at 2. And with full knowledge of the Staudohar decision, NUMMI intentionally terminated sick leave "not . . . at the time the medical condition became permanent, but rather [allowed] Team Members [to] remain[] on leave of absence for the maximum period of time set forth under Article XXIII, Section 9.3." Tr. at 68:6-9. Through its express statements and voluntary conduct over a fifteen year period, and its failure over that fifteen year period to implement a policy it now contends to be "consistent with" the Staudohar decision, Tr. 64:24-25, NUMMI has waived the right to terminate team members' sick leave before they exceed their time for time clocks.

**C.     The Company Is Equitably Estopped From Implementing Its Policy**

The Company contends that its longstanding practice of providing time for time leave was subject to unilateral repudiation. Co. Brf. at 27-30. The type of past practice at issue here may not

---

[10]Citing *Ryan v. Union Pac.*, 286 F.3d 456 (7th Cir. 2002), NUMMI asserts that its failure to "exercise a contractual right does not mean it was abrogated." Co. Brf. at 27 n.6. *Ryan* actually holds that "failure to enforce a contractual term does not abrogate the term *unless the conditions for waiver or estoppel* are established." *Ryan*, 286 F.3d at 460 (emphasis added). The conditions for *both* waiver and estoppel are satisfied here. *See also infra* at Part II-C.

14

be unilaterally repudiated. Un. Brf. at 32-34. If, however, the Arbitrator were to find the practice

in this case subject to unilateral repudiation, then the Company is equitably estopped from

implementing its new sick leave policy. "Estoppel is an equitable doctrine invoked to avoid

injustice in particular cases." *Heckler v. Community Health Servs. Of Crawford County, Inc.*, 467

U.S. 51, 59 (1984) ("[T]he party claiming the estoppel must have relied on its adversary's conduct

in such a manner as to change his position for the worse and that reliance must have been

reasonable in that the party claiming the estoppel did not know nor should it have known that its

adversary's conduct was misleading." *Id.* (internal quotation marks, citation, and footnote omitted);

*Crittenton Hosp.*, 85 LA at 183 (stating elements of equitable estoppel).

      In light of the Company's express statements and intentional conduct over the fifteen years

that followed the Staudohar decision, the Union reasonably understood team members to have a

right to remain on leave until they exceed their time for time clocks. Detrimentally relying on this

reasonable understanding, the Union did not make any effort to obtain in the many contract

negotiations before 2005 a language change that would have confirmed this right. Had the Union

understood that a language change might be necessary to confirm team members' time for time

rights, it could have made such a proposal in earlier, pre-2005 negotiations, and would likely have

obtained such a change, as the Company was already providing such leave at the time. Tr. at 67:23-

68:11. During the 2005 negotiations, however, when NUMMI management was tasked with

achieving cost savings of $110 million annually, Tr. at 212:11-16, no such agreement on the

Company's part would have been forthcoming. Thus, if the practice at issue here were subject to

unilateral repudiation, NUMMI is now equitably estopped from terminating team members' sick

leave before they exceed their time for time clocks.

## CONCLUSION

      For the foregoing reasons, the grievance should be sustained.

15

Dated:   October 20, 2006

Peter D. Nussbaum
Linda Lye
ALTSHULER, BERZON, NUSSBAUM,
    RUBIN & DEMAIN

by: _____
    Linda Lye

Attorneys for the Union

# PROOF OF SERVICE

### Code of Civil Procedure §1013

**CASE:**   *In the Matter of an Arbitration between United Auto Workers Union,*
*Local 2244, AFL-CIO, and New United Motor Manufacturing, Inc.,*
Policy grievance, No. 10277

I am employed in the City and County of San Francisco, California. I am over the age of eighteen years and not a party to the within action; my business address is 177 Post Street, Suite 300, San Francisco, California 94108. On October 20, 2006, I served the following document(s):

### Union's Closing Brief

on the parties, through their attorneys of record, by placing true copies thereof in sealed envelopes addressed as shown below for service as designated below:

<u>By First Class Mail</u>: I am readily familiar with the practice of Altshuler, Berzon for the collection and processing of correspondence for mailing with the United States Postal Service. I caused each such envelope, with first-class postage thereon fully prepaid, to be deposited in a recognized place of deposit of the U.S. Mail in San Francisco, California, for collection and mailing to the office of the addressee on the date shown herein.

| TYPE OF SERVICE | ADDRESSEE | PARTY |
|---|---|---|
| | Nick C. Geannacopulos, Esq.<br>Seyfarth Shaw<br>560 Mission Street, Suite 3100<br>San Francisco, CA 94105 | |

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed this October 20, 2006, at San Francisco, California.

_____
Jean Perley

1

# EXHIBIT F

AMERICAN ARBITRATION ASSOCIATION

BEFORE ARBITRATOR CHARLES A. ASKIN

| | | |
|---|---|---|
| UAW Local 2244,<br>(Policy Grievance) | ) | |
| | ) | |
| | ) | |
| Complainants, | ) | |
| | ) | |
| vs. | ) | File No. 10277 |
| | ) | |
| New United Motor Manufacturing, Inc. | ) | |
| | ) | |
| Respondent<br>(or Company). | ) | |
| | ) | |
| | ) | |
| | ) | |

---

**NEW UNITED MOTOR MANUFACTURING, INC.'S
POST-HEARING BRIEF**

---

Dated: September 28, 2006

Nick C. Geannacopulos
SEYFARTH SHAW LLP
560 Mission Street, Suite 3100
San Francisco, California 94105
Telephone: (415) 397-2823
Facsimile: (415) 397-8549

Counsel for Respondent New United
Motor Manufacturing, Inc.

# TABLE OF CONTENTS

Page

INTRODUCTION ............................................................................... 1

ISSUES PRESENTED .......................................................................... 3

STATEMENT OF FACTS ..................................................................... 3

    I.     NUMMI and the UAW ......................................................... 3

    II.    The Staudohar Arbitration Decision ..................................... 4

        A.    The Events Leading Up to the Staudohar Decision ...... 4

        B.    The Staudohar Arbitration ........................................... 6

        C.    Post Staudohar Arbitrations ........................................ 9

        D.    Events After Staudohar and its Progeny ..................... 10

    III.   2005 Collective Bargaining Negotiations ............................ 12

    IV.   Events after the 2005 CBA negotiations .............................. 13

    V.    Neither the Work Nor the Classification System has Changed at NUMMI ........................................................... 14

RELEVANT CONTRACT PROVISIONS ............................................. 15

ARGUMENT ...................................................................................... 17

    I.     The Policy is "Consistent" with the Staudohar Decision ..... 17

    II.    The Grievance is Barred by Claims Preclusion ................... 18

    III.   The Staudohar Decision has Become Part of the CBA Making the Language in Section 9.4 Clear and Unambiguous ...... 22

    IV.   Union Failed to Meet its Burden of Proof ........................... 24

        A.    The "Time For Time" Issue was an Issue in Staudohar ... 24

        B.    The Union's Past Practice Argument Fails ................... 26

C.    The Union's Argument Concerning Extrinsic Evidence and the UAW/General Motors Contract Fails..........................................29

D.    Staudohar Applies Equally to Industrial and Personal Leaves.31

E.    Staudohar Was Right .....................................................................32

V.    Remedy Issue .............................................................................34

CONCLUSION..............................................................................................35

Pursuant to the provisions of the August 4, 2001 to August 6, 2005 collective bargaining agreement (hereinafter the "Agreement" or NUMMI/UAW Agreement") between New United Motor Manufacturing, Inc. ("NUMMI" or the "Company") and UAW Local 2244 ("Local 2244" or the "Union"), the parties submitted this matter to Arbitrator Charles Askin (the "Arbitrator") for final and binding arbitration. The Arbitrator held an evidentiary hearing on the merits of the case in Fremont, California, on Monday, August 14, 2006 and Tuesday, August 15, 2006, and Certified Shorthand Reporter Judith DeAlba made a record of the proceedings. At the end of the hearing, the parties agreed to submit post-hearing briefs in lieu of closing arguments, and the Arbitrator granted them leave to do so. The Arbitrator also requested and it was agreed that reply briefs would also be filed by the parties after the post-hearing briefs were filed.

This is NUMMI's post-hearing brief. Throughout this brief, NUMMI refers to the record as follows: to the transcript of the hearing (Tr. ____); to the Company's exhibits (Er. Ex. ____); to the Union's exhibits (Un. Ex. ____); and, to joint exhibits (Jt. Ex. ____).

## INTRODUCTION

The parties have litigated the key issue in this case before – in an earlier arbitration decision decided by Arbitrator Paul Staudohar ("Staudohar" or "Staudohar decision"). The Staudohar decision was in favor of NUMMI with respect to that issue. Three subsequent arbitrators upheld the holding in Staudohar. The result should be the same in the present case.

More specifically, the key issue in this case is whether NUMMI has the right to break the seniority of a team member on leave once that team member's medical condition becomes permanent and stationary (he has reached his maximum level of recovery), provided NUMMI gives the team member proper notice and makes a good faith effort to accommodate the team member (hereinafter referred to as the

1

"Policy"). The Company chiefly relies upon the Staudohar hearing transcript, the parties' post-hearing briefs in Staudohar and three subsequent arbitration decisions to show that the Policy is not only "consistent" with Staudohar, but the legal doctrine of claims preclusion or res judicata applies to the present case. This follows since Staudohar addressed and refuted the same arguments that the Union attempted to make in the present case. Indeed, the policy being reviewed in Staudohar and found to be permissible under the Agreement and the Policy at issue in this case are essentially the same except for the extra procedural and notice protections that Arbitrator Staudohar recommended in his opinion.

Although the Union wants to take the position that Staudohar did not address the issue of whether NUMMI could break the seniority of team members once they became permanent and stationary and before they receive the maximum amount of leave allowed by the Agreement (the so called "time for time" leave), a fair review of the Staudohar record refutes that argument. Both at the hearing and in its post hearing brief, the Union specifically put Arbitrator Staudohar on notice that by finding the Company's leave policy permissible under the Agreement, it would allow the Company to terminate a team member prior to their alleged "time for time" being extinguished under Section 9.3 of the Agreement. Although being on notice of these arguments, Arbitrator Staudohar (and the three subsequent arbitrators applying his decision) made it clear that seniority "could" in fact be "broken" if a team member became permanent and stationary and no jobs were open.

Past practice is not an issue in this case. To the extent past practice has been raised as an issue in this case, it is not controlling. Past practice should not be examined in a case like the present one where the doctrine of claims preclusion applies or alternatively the terms of the Agreement are clear. In any event, the record clearly establishes that any alleged past practice was extinguished prior to

the 2005 negotiations. There is no dispute that NUMMI made its intentions clear, both before and at the start of the 2005 negotiations, that it would apply the Policy as soon as the 2005 Agreement expired. The Union was put on notice and elected not to negotiate any changes to the leave provisions in the Agreement. Whatever took place prior to that time is irrelevant. Accordingly, under well established arbitral authority, any alleged past practice terminated with the 2005 negotiations.

## ISSUES PRESENTED

On April 26, 2006, four months before the hearing in this case, the Union and NUMMI agreed to a signed written submission of the issues. According to that submission the sole issues to be decided by the Arbitrator on problem notice #10277 are:

1.    Is the Company's policy regarding long-term leaves of absence consistent with Article XXXIII Sections 9.3 and 9.4 of the collective bargaining agreement as interpreted, by among other things, the Staudohar decision, and if not what is the remedy?

2.    Are the people on the attached list eligible to participate in the Company's 2006 Early Retirement Program?

(Jt. Ex. 7.)

## STATEMENT OF FACTS

I.    <u>NUMMI and the UAW</u>

NUMMI is the last surviving auto manufacturing company west of the Rocky Mountains. (Tr. 209-210, Er. Ex. 27.) At one time there were ten auto manufacturers west of the Rockies. (Tr. 210.) NUMMI's contribution to the economy of the state of California is an important one. Specifically, NUMMI employs about 5,000 unionized production workers in their labor force, and it helps create nearly 20,000 jobs in the state of California. (Tr. 209, Er. Ex. 27.) NUMMI production workers are paid on average $65,000 a year in salary alone.

(Tr. 209, Er. Ex. 27.)  As the lone auto manufacturing plant on the West Coast, NUMMI has to compete with both national auto makers and global manufacturers. (Tr. 210.)  In order to compete, NUMMI must look at all facets of costs including logistics, machinery, the business environment and labor costs.  (Tr. 212)  From a business standpoint NUMMI faces many external challenges (Er. Ex. 27), as do the other national auto manufacturers.  Indeed, the auto manufacturing industry in the United States is in a financial crisis.  See Wall Street Journal September 15, 2006, p. 1 ("Ford Aims to Cut Union Workforce through Buyouts" attached to Appendix).

## II.    The Staudohar Arbitration Decision

### A.    The Events Leading Up to the Staudohar Decision

On April 6, 1989, four NUMMI production line employees, Renee Adeola Morrison, Lorelei Tiwana, Rafael Gutierrez and Janet DeSnoo McCarthy ("Staudohar grievants"), were terminated from NUMMI when it was determined they had permanent medical restrictions that did not allow them to return to their jobs.  (Er. Ex. 1-Staudohar transcript, at p. 118, Jt. Ex 6 attachment 2 –the Staudohar decision.)  Adeola-Morrison worked for NUMMI from October 1985 through May 29, 1986.  (Er. Ex. 3.)  Tiwana worked for NUMMI from February 18, 1985 through July 6, 1986.  (Er. Exs. 3, 21.)  Gutierrez worked for NUMMI from October 1985 through November 5, 1988.  (Ex. Er. 3.)  McCarthy worked for NUMMI from October 14, 1985 through August 26, 1988.  (Er. Ex. 3, 16.)  Each of the Staudohar grievants filed a grievance challenging his or her termination.

With respect to Gutierrez, the Union took the position that the discharge was in violation of Article X, Section 11.2 and Article XXXIII, Sections 9.3 and 9.4 of the Agreement.  (Er. Exs. 6, 8.)  The Company denied the grievance taking the position that Gutierrez was "by definition unable to return to his former job at

NUMMI and that Sections 9.3 and 9.4 did not apply since Gutierrez was no longer "temporary[ily]" disabled [his condition was now permanent.]"  (Er. Exs. 5, 7.)

With respect to the Tiwana termination, the Union and Tiwana charged NUMMI with unjustly "breaking" her seniority.  (Er. Ex. 9.)  NUMMI, similar to the position it took in the Gutierrez grievance, asserted that grievant Tiwana (due to her permanent status) was "by definition…not capable of performing work in the Plant."  (Er. Ex. 10.)

Similar to the Tiwana grievance, in the Morrison-Adeola grievance, the Union asserted the Company had violated of Article X, Section 11.2 and Article XXIII, Sections 9.3 and 9.4 of the Agreement.  (Er. Ex. 13)  Once again NUMMI took the position that the grievance lacked merit since the grievant was no longer temporarily disabled and was "by definition unable to return to her former job at NUMMI." (Er. Ex. 13)

No one disputes that all of the Staudohar grievants were terminated prior to receiving their so called "time for time" seniority under Article XXIII, Section 9.3 of the Agreement. (Tr. 168.)  As Union witness Bolte testified:

> Q.    So in the Staudohar grievance he (Gutierrez) did not receive his so called time for time, did he?
>
> A.    No
>
> Q.    It's also true for everyone of these individuals (they did not get time for time); isn't that true?
>
> A.    Yes

(Tr. 168, see also Er. Ex. 3.)[1]

---

[1]     As a factual matter, the record reveals all of the Staudohar grievants were terminated prior to their so-called "time for time" expiring. In Staudohar, the Union specifically argued that one of the grievants – grievant Guiterrez was terminated prior to his so-called "time for time" expiring. (Er. Ex. 1-Staudohar transcript at 116, Er. Ex. 15 at p. 4)

The Staudohar grievances were then consolidated into a single grievance. (Er. Ex. 14.) Prior to the arbitration, the parties agreed that the arbitration would be deemed a "policy" arbitration and (similar to the present case) defined the issues in a Joint Pre-Hearing Statement of Facts and Issues (Jt. Ex. 7.) The parties agreed the following issues were to be decided:

> 1.    Did the Company violate Article XI, Section 3, of the Contract when it terminated the Employees?
>
> 2.    Did the Company violate Article XXIII, Section 9 of the Contract when it terminated the Employees?
>
> 3.    Were the Employees, under the circumstances of this case, subjected to disparate treatment due to unequal application of the Contract by the Company?
>
> If so, what is the remedy?

B.    The Staudohar Arbitration

The Arbitration was heard by Arbitrator Paul Staudohar on October 11, 1990. At the hearing the parties agreed that the purpose of the parties was to obtain from the arbitrator an interpretation of the contract which could be used for future termination cases unless the bargaining agreement was "otherwise amended." (Er. Ex. 1 - Staudohar transcript at pp. 5, 10.) At the arbitration both sides were allowed to put on witnesses and make arguments. (Er. Ex. 1.) Both sides were also allowed to file post-hearing briefs. (Er. Exs. 15, 16.)

During its opening argument, the Company argued that under Article XXIII, Section 9 of the Agreement, once an employee becomes "permanent" and stationary he or she is no longer "temporary[ily]" disabled and thus he or she he may be terminated provided no job exists that the person can perform. (Er. Ex. 1 at p. 16.) Thus, according to the Company, a team member's seniority could be "broken" (irrespective of how long he or she had been at the plant) under Article XI, Section 3 once that team member was unable to return to work and his or her restrictions were deemed "permanent." (Er. Ex. 1, pp. 16-17.)

6

In its opening argument, the Union argued that: (1) under a clear reading of the Agreement, the Staudohar grievants' seniority should not have been broken since nothing in Article XI, Section 3 of the Agreement provides for a break in seniority if an employee's medical restrictions become permanent and stationary, and (2) other provisions in the Agreement protected team members from termination once they became permanent and stationary including provisions that provide seniority is based on time worked. (Er. Ex. 2, at p. 20.)

The Arbitrator summarized his view of each parties' position as follows:

> The company reached the conclusion that these people could not be used any further in either their old jobs or in any new jobs in this plant; and therefore it was "game over." They wrote them a termination letter. And the union has challenged this. They've said, now under the contract here, we've got some seniority provisions that say the company can't do that, and besides they've done it in the past (not terminated employees).

(Er. Ex. 2, p. 115.) (emphasis added)

During the hearing the Union addressed and framed its key arguments during cross examination. With respect to the breaking of seniority, the Union argued that the Company policy at issue would eliminate "time for time" seniority protections. (Er. Ex. 1, p. 86)

During the Staudohar hearing, the Union stated to the arbitrator that one of the "issues" it wanted Arbitrator Staudohar to understand in the case was that one of the grievants had in fact been terminated before his or her "time for time" leave had expired. (Er. Ex. 2, p. 116.)

In its post-hearing brief the Union once again took the position that at least one of the grievants was denied his "time for time" rights under Section 9.3, "Time For Time:"

> [A]s a matter of fact, grievant Gutierrez was terminated short of time for time and was, thereby, denied the right to accumulate seniority to which he was entitled under

7

Article XXIII, Section 9.3, page 42 of the Collective
bargaining agreement

(Er. Ex. 15 – Union's post-hearing brief at p. 4.)

In its post hearing brief the Company took the position that once an
employee becomes permanently disabled, his "temporary legal disability" ends and
his seniority can be extinguished – "game over." (Er. Ex. 16, p. 6.)

In addition to arguing that nothing in Article XI, Section 3 of the Agreement
permitted the Company to "break" the seniority of team members who became
permanent and stationary and that the Company's policy would eliminate so called
"time for time" seniority, the Union made several additional arguments in the
Staudohar case. Both at the Staudohar hearing and in its post-hearing brief, the
Union argued that Article XXIII, Sections 9.3 and 9.4 of the NUMMI Agreement
related directly to paragraphs 106 and 108 of the collective bargaining agreement
entered into between the UAW and General Motors ("UAW/GM Contract") and
therefore, the interpretation of those provisions and history of the UAW/GM
Contract provisions were relevant to the case. (Er. Ex. 15 at pp 9-11 citing
liberally from the Staudohar record.) In its post-hearing brief the Union argued
that any "luck" element in placing employees within their medical restrictions was
too arbitrary and "the Union cannot accept the luck of the draw attitude where
people's employment is at stake." (Er. Ex. 15 at p. 13.) The Union further argued
during the hearing and in its post hearing brief that: (1) NUMMI could not achieve
in arbitration what they failed to achieve in collective bargaining (Er. Ex. 15 at pp.
5, 18, 19); (2) Article XXIII Sections 9.3 and 9.4 must be read together and the
bargaining history of both of these provisions supported the Union's position (Er.
Ex. 15); and (3) certain individuals had been placed despite their medical status.
(Er. Ex. 15 at p. 4.)

In December 1990, Arbitrator Staudohar issued his ruling. (Jt. Ex. 6, Ex. or
attachment 2.) Arbitrator Staudohar ruled that once it is determined that an

8

employee's injuries are permanent and preclude him or her from coming back to work and the company has made a good faith effort to accommodate the employee then the employee may be terminated and his seniority maybe "broken." In essence a leave is "automatic" for industrial injuries only until the employee becomes permanent and stationary. A leave is not perpetual and ends once the restrictions that the leave was based on becomes permanent. As the Arbitrator stated: "It seems appropriate to conclude that a leave of absence could be ended by the company in cases like those we have considered here." (Staudohar decision at p. 11.) The decision relied in part on the single job classification system type of jobs at NUMMI, and the differences between the UAW/GM Contract and the NUMMI Agreement. (Staudohar at p. 12) As Arbitrator Staudohar noted the language in the UAW/GM Contract "creates a greater obligation to place injured workers. But this language is not found in the agreement between the Union and the company (NUMMI)." (Staudohar decision at p. 12) Importantly, Arbitrator Staudohar noted that since seniority was being broken under Article XI, Section 3(e), notice to any terminated employees was necessary. He also noted that Article XXIII, Sections 9.3 and 9.4 were "especially relevant" to his decision. (Staudohar decision at p. 6)

    C.    <u>Post Staudohar Arbitrations</u>

On January 22, 1991, the Company sent letters to three of the Staudohar grievants explaining that their leaves ended, that they should report to work to determine if any jobs existed which they could perform within their restrictions and if no such jobs existed then their employment would be terminated pursuant to Article XI Section 3(e). (Er. Exs. 17,18, 19.) After the Company was unable to place the individuals, the Union filed three separate grievances challenging their terminations.

Similar to its arguments in Staudohar regarding Gutierrez, the Union argued that Tiwana was terminated in violation of both Article XXIII Sections 9.3 ("time for time") and 9.4. and was in a "catch 22" since if no work was found she still should have been allowed to remain on a leave of absence in accordance Article XXIII Section 9.3 ("time for time") of the Agreement. Thus, once again arguing the "time for time" issue.

The Tiwana arbitration was heard by arbitrator Barry Winograd. In his decision, Arbitrator Winograd applied the Staudohar decision and concluded that under the Agreement once an individual is permanently injured the employee can be terminated. (Er. Ex. 21 at pp. 5-6, citing Staudohar decision at p. 13.)

The Morrison arbitration was heard by arbitrator Alexander Cohn. He too confirmed the essential holding of Staudohar -- once an employee is deemed permanent and stationary his seniority may be "broken." He too followed Staudohar's reasoning that placement at NUMMI depends on many factors including whether a position is open, whether the company is hiring and whether seniority allows placement. (Er. Ex. 25, pp. 11-12)

The Gutierrez grievance was heard by Arbitrator Wilma Radar on November 14, 1991. Arbitrator Radar sustained the grievance solely on the grounds that the Company failed to accommodate the grievant in finding him a new position. However, Arbitrator Radar once again upheld the key holding of Staudohar if there was not appropriate work available, "the grievant 'could' be terminated under Article XI 3(e)." (Er. Ex. 23, p. 2.) (emphasis added)

D.    Events After Staudohar and its Progeny

    1.    For a Period of Time NUMMI Did Not Break the Seniority of Employees Rather They Allowed Them to "Exceed" Seniority Before Terminating Them Under Article XI, Section 3(g).

For a period of time after 1991 NUMMI did not break the seniority of individuals who were permanent and stationary under Article XI, Section (3)(e).

Rather, NUMMI allowed them to take the maximum amount of leave permitted under the Agreement and did not terminate them until they exceeded their seniority. (Tr. 68-69.)

More specifically, team members were allowed to remain on the payroll until their "time for time" expired and at termination were told that they had "exceeded their seniority rights" under the Agreement. (Un. Ex. 14.) No one disputes that individuals were allowed to take their maximum leave allowed under Section 9.3. (Tr. 68-69.) Nonetheless, NUMMI eventually informed the Union it could not continue this benefit – it was simply too expensive. NUMMI notified the Union of the foregoing at least a year before the 2005 collective bargaining negotiations. (Tr. 140, 177, 178.) The benefit was stopped after the 2005 negotiations. (Tr. 68-69.)

In 2003, the Company had a series of discussions concerning the need to cut costs at NUMMI. (Tr. 210-211.) NUMMI must self fund all its new model lines of vehicles on a periodic basis. (Tr. 210.) In 2003, the Company was required to eliminate 110 million dollars in costs in order to fund its next model. (Tr. 212.) In order to reach this requirement NUMMI looked at all cost factors including logistics, machinery, business environment issues and labor costs (Tr. 212.) The possibility of plant closure, if costs could not be reduced, was discussed during these meetings. (Tr. 213-214.) In order to meet these financial requirements NUMMI reduced salaries by 7% on the management payrolls. (Tr. 214.) NUMMI also undertook a salary headcount reduction. (Tr. 214.) NUMMI also put pressure on their insurance carriers to reduce premiums for management benefit programs across the board, and required salaried workers to pay more for their salaried benefits. (Tr. 215.)

In 2004, NUMMI talked to the Union concerning costs and benefits. (Tr. 216.) Up to 600 Union employees were on leave during this time. (Tr. 217.)

11

Placement efforts had been ongoing with respect to the employees. (Tr. 130, 229.)
The cost of benefits for those on leave was in the range of $12,000 annually per
employee, and in aggregate was in the millions of dollars. (Tr. 217.) At this time,
NUMMI had discussions with Union officials about the costs and how costs could
be reduced "in order to survive." (Tr. 217.) Indeed, as much as a year and one
half to two years before the 2005 negotiations, the parties met to discuss healthcare
costs. (Tr. 140, 177, 178.) As part of these pre-negotiation discussions, NUMMI
and the Union officials discussed the Staudohar decision. (Tr. 218, 155.) On
many occasions before the 2005 negotiations, NUMMI informed the Union that
under Staudohar, NUMMI believed it had the right to terminate employees who
were permanent and stationary provided the Company made a good faith effort to
place the employees. (Tr. 153, 178 216-217; Er. Ex 26)

III.    2005 Collective Bargaining Negotiations

In July 2005, negotiations for a new collective bargaining agreement began.
(Tr. 217-218.) The Union was represented by Local and International
representatives Tim Bressler and Terry Bolte at the table. (Tr. 217-218.)
NUMMI's chief representatives were Robert McCullough and Jim Potts. (Tr.
217.) On the first day of negotiations, NUMMI negotiators gave Union negotiators
several letters including a letter dated July 19th stating "Re: Interpretation of
Article XXIII, Section 9 of the CBA." (Er. Ex. 26, Tr. 219-220, 176-179.) The
letter sets forth NUMMI's position regarding the holding of Staudohar. (Er. Ex.
26.) More specifically, the letter states it was NUMMI's view that under
Staudohar and the arbitration decisions that came after Staudohar, an employee's
seniority could be "broken" once the employee's condition becomes permanent
and stationary. (Er. Ex. 26.) The letter ended with the statement "please note that
NUMMI intends to comply with this interpretation of Article XXIII, Section 9 of
the CBA effective August 7, 2005." (Er. Ex. 26.) The significance of the date of

12

August 7th was that it was the day after the 2005 Agreement was set to expire by its terms. (Tr. 219, 180.) The letter was not a proposal or a side letter for negotiations purposes, and nowhere in the letter does it suggest it was meant to be a side letter or a proposal. (Tr. 220, 181.) The Company never told the Union it was meant to be a side letter. (Tr. 182.) During negotiations neither the Company nor the Union made any proposals regarding changes to Article XXIII, Section 9. (Tr. 220.) Indeed, the language in Article XXIII, Section 9 of the Agreement has not changed since the leave provisions in the Agreement were being interpreted de-novo by Arbitrator Staudohar in 1990. (Jt. Exs. 1, 2 and 3, Tr. 194.)

IV.    Events after the 2005 CBA negotiations

In September 2005, the Company and the Union met to discuss the Company's plan to follow its interpretation of the Staudohar decision as explained in the July 19th letter. (Jt. Ex. 6, p.7.) At this meeting, the Company provided the Union with  a written plan describing the implementation and the procedures the Company would follow regarding the policy. (Jt. Ex. 6, p. 4; Er. Ex. 28; Tr. 271.) The Union requested that the Company send the names, addresses, and ages of all the team members who would be initially effected by the procedures described in the September 14th meeting. (Jt. Ex. 6, p. 3.) The Company complied with this request via a letter dated September 16, 2005. (Jt. Ex. 6, attachment 7.) The Company also sent to the Union a copy of the expiration of leave absence letters that were sent to individuals effected by the policy. (Jt. Ex., attachment 7, Er. Ex. 28., Tr. 92, 93.)

Under the plan, individuals who had been permanent and stationary for years were notified that their leave may be coming to an end. (Tr. 113, 228.) These individuals met with Company and Union representatives to confirm whether their restrictions were permanent. (Tr. 113, 228.) The Union and the Company then continued their efforts to find jobs for these individuals within their permanent

13

restrictions for an additional 30 day period. (Tr. 89, 114-115, 229.)[2] The individuals who could not be placed were then given letters explaining that their seniority had been broken under Article XI, Section 3(e). (Tr. 230, Jt., Ex. 6, attachment 10.) Significantly, a number of the initial individuals who were terminated had been out for over ten years. (Tr. 228.) As a result of the policy, members were able to return to work. (Tr. 127.) The number of individuals on the return to work list was greatly reduced, resulting in a huge cost savings for the Company.

The Union filed several grievances challenging the terminations of those employees whose seniority was broken, claiming that the Staudohar decision and the Agreement had been violated. (Jt. Ex. 6, attachments 8, 9, 10.) The Company denied the grievances relying on the Staudohar decision and its progeny. (Jt. Ex. 6.) The Union took the position that team members were entitled to their "time for time" leave beginning after they were being deemed permanent and stationary. This was the first the Union had ever taken that position. (Tr. 226.) In effect, the Union argued that employees were entitled to automatic leave prior to becoming permanent and stationary and then automatic "time for time" leave. In other words, "game not over" – rather extended extra innings just starting. (Jt. Ex. 5.)

V.   Neither the Work Nor the Classification System has Changed at NUMMI

All of following facts have remained the same since arbitrators Staudohar, Radar, Cohn and Winograd found them to be true (Tr. 222-223):

- NUMMI operates under a single classification system where there is only one production job classification called team member. (Tr. 119, 122, 221.)

---

[2]     Long before this meeting, the Company had been trying to place these individuals in jobs they could perform within their permanent restrictions. That process begins as soon as a team member is on leave. (Tr. 229, 130.)

- Team members rotate through four to six jobs in various departments. (Tr. 221.)
- 95% of the jobs at NUMMI are arduous and repetitive. (Er. Ex. 29, p. 5; Tr. 135.)
- Production jobs are all physical at NUMMI. (Er. Ex. 29.)
- Because of NUMMI's unique team operation featuring rotation among jobs, employees are required to perform a broader variety of job functions. (Tr. 222.)
- There are limited possibilities for light duty work at NUMMI. (Tr. 222-223.)
- Light duty positions at NUMMI are generally in the area of quality control. (Tr. 101; Er. Ex. 29, p. 5.)
- Quality control jobs have a seniority element and the individual is also required to pass a test in order to perform the job. (Tr. 137.)
- NUMMI does not place employees in jobs that exceed their restrictions. (Er. Ex. 29, p. 7.)

NUMMI still does not have a provision in its Agreement, similar to the provision included in the UAW/GM contract relied upon by Arbitrator Staudohar, that requires injured workers to be placed irrespective of seniority. (Compare Jt. Ex. 1, 2; Tr. 174 with the provisions cited in the Staudohar decision at p. 12.) Currently the average seniority at the plant is between 10 and 15 years.) (Tr. 136-137.)

## RELEVANT CONTRACT PROVISIONS

## X.    PROBLEM RESOLUTION PROCEDURE

### 8.    Arbitrator's Decision

All decisions within the defined authority of the Arbitrator shall be final and binding on all parties.

## XI. SENIORITY

### 3. Loss of Seniority

Seniority will be broken and lost, and <u>employment shall cease</u> for the following reasons:

* * *

      (e)    Failure to return to work within four (4) consecutive working days (excluding Saturday and Sunday) after the expiration of a leave of absence unless unusual conditions or circumstances exist;

      (g)    Being on sick leave beyond the period set forth in Paragraph 9.3 and 9.4, Article XXIII of the Agreement.  (Emphasis added)

## XXIII    LEAVES OF ABSENCE

### 1. Definition

A leave of absence means approved time off from work with or without pay for a specified period of time for serious or compelling reasons.

### 9. Sick Leave

Employees who become ill or disabled are eligible for an unpaid leave of absence after an absence of five (5) consecutive working days.  Requests for such leave will be submitted within this five (5) day period and will include medical documentation from their attending physician indicating they are unable to work and the <u>estimated duration of their absence</u>.  The Company may, at its expense, request an impartial medical opinion from a mutually agreed upon medical examiner.  (Emphasis added)

    9.3    A sick leave of absence <u>may not exceed</u> the employee's length of seniority as of the date of the illness or disability, or eighteen (18) months for an employee with less than one (1) year of seniority, or thirty-six (36) months for an employee with more than one (1) year of seniority, whichever is greater. (Emphasis added)

9.4    In compensable injury and legal occupational disease cases, sick leave will be granted <u>automatically</u> and seniority will accumulate for the full period of legal temporary disability. Employees disabled during evaluation period by compensable injury or legal occupational disease shall be given credit for the period of such disability toward acquiring seniority. (Emphasis added)·

## ARGUMENT

I.    The Policy is "Consistent" with the Staudohar Decision

The evidence establishes that the Policy is "consistent" with the holding in Staudohar:[3]

- Under Staudohar and its progeny, if a team member is deemed permanent and stationary and the Company makes a good faith, but unsuccessful effort to place the individual, that team member's seniority can be broken under Article XI, Section 3(e). The same is true for the Policy. (Tr. 167-168.) · ·

_____

[3]    It is well established that the power of an arbitrator is limited by the issue submitted by the parties, especially when the issue is set forth in writing prior to the hearing. *See, e.g., Orgill Brothers Inc.*, 68 Lab. Arb. Rep. (BNA) 797,802 (1977) (Simon, Arb.) (where the parties have signed a clear stipulation prior to the arbitration setting forth the issue, arbitrator will feel confined to decide only the issue agreed upon); *Trailways Lines, Inc. v. Trailways, Inc. Joint Council* 807 F.2d 1416, 1424 (8th Cir. 1986) (attached to appendix). Here the parties have defined the issue in a non-traditional way. The parties are not seeking a traditional de-novo contract interpretation. Rather they have elected to define the issue as whether the current Policy is consistent with two particular provisions in the Agreement "as interpreted" by an earlier arbitration decision "among other things." In the past, when the parties have desired a de-novo interpretation of Article XXIII Section 9, they have specifically argued for such an interpretation. For example, in the post Staudohar cases involving Staudohar grievants Tiwana and Adeola, the parties mutually agreed to frame the issue as follows: "Was the grievant properly terminated pursuant to Article XI Section 3 of the collective bargaining agreement; and if not what is the appropriate remedy." Thus, it seems clear that the issue for the arbitrator in the present case is not to make a de novo interpretation of the Agreement.

- Under Staudohar and its progeny, NUMMI must provide workers with at least 5 days to search for a position before seniority is broken – the Policy actually gives 30 days so it is more generous. (Tr. 89, 114-115, 229.)

- Under Staudohar and its progeny, NUMMI must attempt a good faith accommodation process to find employment – the policy does that with the added element of the Union's participation. (Tr. 113, 228.)

- Under Staudohar the individual grievants being reviewed (Tiwana, Adeola, Gutierrez), were employees whose "time for time" had not expired. The same is true under the current Policy. (Tr. 168.)

- In Staudohar, the Arbitrator found that Sections 9.3 and 9.4 were especially relevant to his decision.

- In Staudohar, the Union specifically argued that if the policy being reviewed was permissible, it would deny a team member his or her "time for time" leave under Section 9.3. The same arguments are being made with respect to the Policy which is, except for extra process designed to further accommodate the team member, the same policy. (Compare Tr. 155-156 with Er. Ex. 1, p. 86.) Indeed virtually all the arguments made in Staudohar by the Union are being made in the present case. See Argument Section II below.

The fundamental holding in Staudohar is clearly that employment "ceases" and seniority breaks if an employee becomes permanent and stationary provided notice is given and a good faith attempt is made to find a job for the employee. Because the NUMMI Agreement unlike the UAW/GM Contract does not have a contractual duty to keep individuals on the payroll hoping that something will open up or a job is created at sometime in the future, Staudohar referred to NUMMI's position as "game over" once someone became permanent and stationary. The

Union's argument in the present case directly contradicts this fundamental holding of Staudohar. The Union argues that the game is not over. (Tr. 41.) Rather we are going into protracted extra innings. (On average about 10 to 14 years worth of extra innings).

II.    The Grievance is Barred by Claims Preclusion

The issues in this case were raised in Staudohar and should therefore be barred. Where a prior decision involves the interpretation of the same contract provisions between the same company and union, every principle of common sense, policy and labor relations demands that the decision stand until the parties annul it by a newly worded contract provision. *See Pan American Ref. Co.*, 9 Lab. Arb. Rep. (BNA) 731, 732 (1948) (McCoy, Arb.). This is especially true with respect to contract interpretation cases. *See Houston Lighting and Power Co.*, 106 Lab. Arb. Rep. (BNA) 1188, 1193 (1996) (Johnson, Arb.). Indeed, courts have held that an arbitration decision that does not follow or clearly explain why it is not following a prior arbitration decision that "involves the same company, the same Union, essentially the same issue and interpretation of the same contract" in a contract that contains a "final and binding clause," does not draw its essence from the collective bargaining agreement. *See, e.g., Trailways Lines v. Trailways, Inc. Joint Council*, 807 F.2d 1416 (8th Cir. 1986) (attached to appendix).

Consistent with the foregoing, arbitrators have taken the approach that a contractual clause making an arbitral decision "final and binding" not only settles the dispute between the parties, but also causes the award to become part of the contract. This is especially true where subsequent negotiations have not changed the outcome of the award. Since each party had an opportunity to alter the effect of the arbitral decision through bargaining, but chose not to do so. *Jackson Pub. Schls.*, 67 Lab. Arb. Rep. (BNA) 315 (1976) (Roumell, Arb.).

19

Under res judicata or in contemporary terminology "claims preclusion" a claim will be barred when there is (1) identity of parties; (2) a final judgment on the merits and (3) privity between the parties. Identity of claims exists when two suits arise from the same transactional nucleus of facts. *Mauricio v. IDX Systems* 06 C.D.O.S. 8882 (9th Cir. 2006) (attached to appendix). The elements of claim preclusion are met in this case. The parties in the present case were the exact same parties in the Staudohar case. The contract provisions at issue in the present are the same contract provisions at issue in Staudohar. As Arbitrator Staudohar noted in his opinion, Article XXIII, Sections 9.3 and 9.4 were "especially relevant" to his decision. In the present case, the parties specifically cited Article XXIII, Section 9.3 and 9.4 in the submission of issues. Indeed, in both Staudohar and the present case, the parties framed the issue as a "policy" grievance that would guide future decisions.

The essential claim (and interpretation of the Agreement by the Company) is the same in this case and in the Staudohar case. The claims are derived from the same nucleus of operative facts. In Staudohar, the issue was whether the policy which allowed for termination of an employee once that employee was deemed permanent and stationary was permitted under the Agreement. With minor procedural variations, the "Policy" in the present case is the same policy at issue in the Staudohar case. To wit, the Policy being disputed in the present case allows for termination of a team member's employment once that person becomes permanent and stationary and a good faith accommodation process has been exhausted. This is true irrespective of the so called "time for time" period set forth in Section 9.3. As the Union framed the issue in its questioning of Company witness Potts in the present case:

> Q.     Okay, so in this situation (under the Policy or the Company's interpretation), a team member with two

20

years seniority and a team member with 20 years of seniority is in the same boat, correct?

* * *

A.    I think so, yes.

(Tr. 253.)

As the Union framed the issue in its questioning of Company witness Dawson in Staudohar:

> Q.    [By Mr. Jones] Now if one were to apply the interpretation that the company is now using, a worker could suffer an injury; he could have, lets say, six years of seniority, the maximum that is here (plant was six years old at time), six years of seniority; could suffer an injury which becomes permanent and ratable, okay, permanent and ratable, within a 90 day period or a four month period or whatever it is; he'd be well inside, or she'd be well inside, of their total length of employment; and because they had now arrived at their point in time, the company could terminate their employment, simply saying that there is no work that they can find for them is that right? (Tr. 86-88)

> A.    [Mr. Dawson] All I can say is that 9.4 says for the period of legal temporary disability. So when it is permanent and stationary and temporary disability is no longer payable, 9.4, that's the limit, the 9.4 leave for period of legal temporary disability.

(Er. Ex. I at p. 86.) (emphasis added)

The same arguments made against the policy in Staudohar are being made against the Policy in the present grievance.

- The Union argued in Staudohar that the "time for time" seniority provisions in Section 9.3 prevented any "break" in seniority in Staudohar and at least one grievant was denied his "time for time" under Section 9.3. The Union is making the same argument in the present case. (Compare Er. Ex. 1 p. 116, Er. Ex. 15, p. 4, with Tr. 41.)

- The Union argued in Staudohar that the only way an employee on leave can have his seniority end are the specific methods set forth in Article XI, Section 3 (including 3(g) which covers exhaustion of "time for time").

21

The Union is making the same argument in the present case. (Compare Er. Ex. 15, with Tr. 27))

- In Staudohar, the Union argued that the interpretation of UAW/GM contract supported its argument. In the present case, despite Arbitrator Staudohar's ruling that the UAW/GM did not relate to NUMMI's leave provisions, the Union pulled out the same old UAW/GM contract and argued the same provisions it argued in the Staudohar case. (Compare Er. Ex. 15, pp. 9-11 with Tr. 162-163; Un. Exs. 50 and 51.)

- In Staudohar, the Union argued that the element of "luck" with respect to placement should not be a factor in the accommodation process. The Union is making the same argument in the present case. (Compare Er. Ex. 15, p. 13 with Tr. 248.)

- In Staudohar, the Union argued that workers had come back after long leaves. (Er. Ex. 15.) The Union appears to be making the same argument in the present case.

- In Staudohar, the Company argued that once an individual becomes permanent and stationary, the leave is over and seniority is broken, since, by definition under Article XI, Section 3(e), they cannot come back to work. The Company is making that same fundamental argument in the present case. (Compare Er. Ex. 6, and Er. Ex. 1 at p. 115.)

Arbitrator Staudohar ruled that under the "facts of the case," the policy he was reviewing was permissible under the Agreement – an individual who becomes permanent and stationary could have his or her seniority "broken" provided the company makes a good faith effort to accommodate the person. According to Staudohar, seniority could be broken under Article XI, Section 3(e). Article XI, Section 3 provides that "seniority will be broken and employment shall cease." (Jt. Ex. 1 p. 26.) Under the "facts of the case" – neither grievant Gutierrez nor any of

the other Staudohar grievants received their "time for time" and the Union clearly let the Arbitrator know these "facts." Staudohar was aware of the "entire agreement." As he noted, "Article XI, Section 3 has to be read and construed in light of the entire agreement, including Article XXX, Section 9." (Staudohar decision at p. 11.)  Importantly, three subsequent arbitrators upheld the holding of Staudohar – individuals "could" have their seniority broken under Article XI, Section 3(e). It is evident that Staudohar and the present case are largely reflections of each other. Thus, claim preclusion applies to the present case, and the Union's grievance should be denied.

III.    The Staudohar Decision has Become Part of the CBA Making the Language in Section 9.4 Clear and Unambiguous

It is well established that a prior arbitration award interpreting language in a contract is generally considered incorporated as part of the contract and is binding until the parties seek modification of it during subsequent negotiations. *See Pillsbury Co.*, 75 Lab. Arb. Rep. (BNA) 523 (1980)(Firch, Arb.); *Safeway Stores*, 75 Lab. Arb. Rep. (BNA) 798 (1980)(Maddeen, Arb.). As arbitrator Valtin stated in *Alleghany Steel Corp*, 30 Lab. Arb. Rep. (BNA) 1011 (1958)(Valtin, Arb.):

> It is a generally recognized principle that the interpretation of contract language embodied in an award becomes a part of that contract language. If the parties fail to negotiate a change of the language in future contracts, but readopt the same language, that language having received an interpretation is presumed to be readopted with that interpretation.

*See also Todd Shipyards*, 69 Lab. Arb. Rep. (BNA) 27 (1977)(Jones, Arb.) (recognizing that changing a previous arbitrators interpretation would be tantamount to changing the language in the agreement -- something which is contractually prohibited). This is especially true in the present case as the Agreement contains a provision that provides that the decision of the arbitrator will be binding on the parties. (Jt. Ex. 1, Article X, Section 8. )

The parties in Staudohar asked for and received a policy opinion concerning the interpretation of Article XXIII, Section 9 and Article XI, Section 3. (Jt. Ex. 7.) Even assuming arguendo (and against logic) that the Section 9.3 argument was not conclusively decided in Staudohar there can be no doubt the meaning of the language in Section 9.4 was conclusively established – team members are granted sick leave automatically for industrial injury only until they become permanent and stationary (for however long that takes). Once that occurs, however NUMMI can terminate a team member's employment under Article XI, Section 3(e) provided NUMMI makes a good faith effort to accommodate the team member and proper notice is given. In effect Article XXIII, Section 9.4 now provides that if a team member becomes permanent and stationary and a job cannot be found his or her seniority "may" be broken under Article XXI, Section 3(e) (not 3(g)).[4]

Given the foregoing meaning given to Section 9.4 by Staudohar, the Union's latest argument that 9.3 "automatically" provides "time for time" <u>after</u> a team member becomes permanent and stationary is contrary to the clear language in Section 9.4 of the Agreement and Article XI, Section 3(e). The Union's argument is that an employee always gets 9.3 leave (irrespective of permanent status), and thus the only way a team member could have his seniority end (absent some rule violation) is by virtue of Section 3(g) (being on sick leave beyond the period set forth in 9.3 and 9.4). It cannot be disputed, however that Staudohar recognized

---

[4]      Accordingly, after Staudohar Section 9.4 should as a practical matter read as follows: "In compensable injury and legal occupational disease cases, sick leave will be granted automatically and seniority will accumulate for the full period of legal temporary disability. Employees disabled during evaluation period by compensable injury or legal occupational disease shall be given credit for the period of such disability toward acquiring seniority. If an employee becomes permanent and stationary and NUMMI makes a good faith but unsuccessful effort to place that employee then such employee's seniority may be broken and the employee may be terminated under Article XI, Section 3(e) provided proper notice is given."

that seniority "could" be "broken" under Article XI Section 3(e) and that interpretation now must be read into the Agreement. More specifically, Staudohar did not provide that seniority "ceases" only for purposes of Section 9.4, rather he held the seniority could "cease" for total "employment purposes" under Article XI section 3(e). Thus, the Union's latest interpretation of Sections 9.3 and 9.4 directly conflicts with Staudohar's binding interpretation of Section 9.4.

IV.   Union Failed to Meet its Burden of Proof

  A.   The "Time For Time" Issue was an Issue in Staudohar

The Union incorrectly takes the position that the "time for time" issue was not addressed in the Staudohar arbitration and therefore, it does not control this case. (Jt. Ex. 5, Tr. 32 – Union's opening argument.) A thorough review of the Staudohar transcript and related materials illustrates that the "time for time" provision in Section 9.3, was an important issue in that case. This is established by the following:

- The Union addressed the issue in its opening argument: "the position of the Union is that the employees should not have their seniority broken by the company under the language in the contract and, further that there is language contained within the contract that spells out some particulars with respect to limitations and 'time based on seniority' where there's a sick leave for industrial purposes or personal purposes involved there." (Er. Ex 1 at p. 20 ) (emphasis added)

- The Union put in evidence of the negotiating history of both Sections 9.3 and 9.4 (Er. Ex. 1 at pp 102-103).

- At the Staudohar hearing, the Union itself described the Company policy as breaking seniority and denying "time for time" to employees: "Now if one were to apply the interpretation that the company is now using, a worker could suffer an injury, lets say six years of seniority, the

maximum that is here, six years of seniority; could suffer and injury that is permanent and ratable, within a 90 day period or a four month period whatever it is; he'd be well inside or she'd be well inside their total length of employment; and because they now arrived at that point in time the company could terminate their employment, simply saying that there is no work they can find for them; is that right?" (Er. Ex. 1, p. 86) (emphasis added)

- The Union made it clear that "time for time" was one of the "issues" during the hearing: "But one of these individuals had not been off work for an equal amount of time with respect to his time worked. You know the provision you state time for time. That's just one of the issues. So I'd like you to understand that." (Er. Ex. 1 p. 116.) (Emphasis added)

- The Union argued in its post-hearing brief that one of grievants had been denied "time for time" under the Agreement. (Er. Ex. 15 p. 4))

- Although the parties framed the issue as whether Section 9 was violated, in his decision, the arbitrator found only two provisions in Section 9 especially relevant: Sections 9.4 and 9.3 ("Time for Time").

- During the hearing, the arbitrator summed up the Company's position by noting that once someone became permanent it was "game over" – seniority could be broken. The Company's position was clear, you could be terminated provided you could not realistically come back.

- In post-Staudohar grievants, the Union also argued "time for time" in pre-hearing statements and an arbitrator in the case once again confirmed the basic holding of Staudohar.

- Staudohar recognized that an employment could cease under Article XI, Section 3(e) not 3(g). This is consistent with the Company's position in the present case.

Based on the foregoing, it is readily apparent "time for time" was an issue in the Staudohar case. The Union clearly took a swing at the issue. It may not have been its best swing, but the Union did swing and the Union clearly missed.

B.    The Union's Past Practice Argument Fails

The Union elected not to make "past practice" an issue in this case by not raising it in the "sole" issues to be decided.[5] Moreover, if claims preclusion applies or if the Agreement is clear (as it is in this case given Staudohar's ruling), there is no need to analyze past practice. Indeed, the Agreement makes it clear that an arbitrator's decision is final and binding.

In any event, assuming arguendo, past practice does apply to this case it was clearly extinguished by NUMMI by its actions.[6] It is axiomatic that a past practice, while not subject to unilateral termination during the term of a collective bargaining agreement, is subject to termination at the end of the term by giving due notice of intent not to carry the practice over to the next agreement. After being so

---

[5]    In its pre-arbitration statements, the Union repeatedly argued that the Company violated "past practice" when implementing the policy. (Jt. Ex. 5) Thus it seems as a matter of common sense that if the Union meant to include "past practice" as part of the stipulated issue submitted for decision it should have specifically stated "past practice" in the stipulated issue. Why it elected not to is unclear, but it is axiomatic that the arbitrator's authority is limited to the issue submitted. *See e.g. International chemical Workers Union v. Mobay Chemical*, 755 F.2d 1107, 1110 (4th Cir. 1984); (see also Staudohar decision at p. 13 wherein Arbitrator Staudohar applied the doctrine to the Agreement and noted that arbitrator will rule only on specific issues set forth in the policy grievance). The term "among other things" is not "past practice." Indeed, it is so broad as to be meaningless. In this case, all roads lead to Staudohar.

[6]    Because NUMMI did not exercise a contractual right does not mean it was abrogated or a past practice existed. *T.V. Ryan v. Union Pacific Railroad Company* 286 F.3d 456, 459 (7th Cir. 2002) (attached to appendix). Here under Staudohar, NUMMI "could" break seniority under Article II, Section 3(e) or alternatively let it exhaust under Section 3(g).

notified the other party must have the practice written into the agreement to prevent its discontinuance. *See* Elkouri and Elkouri, *How Arbitration Works*, 619 (6th Edition 2003). As has been often stated by arbitrators:

> If either side should during negotiations of a later agreement, object to the continuance of this practice, it could not be inferred from the signing of a new agreement that the parties intended the practice to remain in force. Without their acquiescence, the practice would no longer be a binding condition of employment. In face of a timely repudiation of a practice by one party the other must have the practice written into the agreement if it is to continue to be binding.

*Grand Haven Stamped Products Co.,* 107 Lab. Arb. Rep. (BNA) 131, 137 (1996)(Daniel, Arb.)(quoting Mittenthal "Past Practice in the Administrative of Collective Bargaining Agreements" 56 BNA Books 1961). *See also Albertsons Inc.,* 106 Lab. Arb. Rep. (BNA) 897, 900 (1996) (Kaufman, Arb.); *Standard Oil Co.,* 79 Lab. Arb. Rep. (BNA) 1333, 1336 (1982) (Feldman, Arb.) (holding that past practice from 1956 ceased in 1982 when the Company informed the Union both before negotiations commenced and at start of negotiations new rule would go into effect as soon as contract expired). The foregoing rule is especially forceful when the contract at issue contains a zipper clause as does the NUMMI Agreement. (See Jt. Ex. 1, p. 88.) *See Grand Haven,* supra at 137.

The facts are not it dispute regarding notice to the Union of the Company's intentions regarding the policy. No one disputes that on several occasions leading up to the 2005 negotiations NUMMI made it clear to the Union that under Staudohar and its progeny it had the right to break the seniority of those individuals were deemed permanent and stationary. No one disputes that at the commencement of negotiations in 2005 NUMMI provided the Union with the July 19th letter. That letter cannot be more clear with respect to what NUMMI intended to do regarding leaves of absences and the Staudohar ruling. The letter states:

28

The purpose of this letter is to confirm that interpretation in writing and to notify you that NUMMI intends to strictly abide by that interpretation.

Pursuant to Article XXIII, Section 9 of the CBA and as interpreted by Arbitrator Paul Staudohar in his decision dated December 17, 1990, and as affirmed in subsequent arbitration decisions by Wilma Radar (November 20, 1991, Barry Winograd (December 10, 1991), and Alexander Cohn (February 27, 1992), NUMMI may terminate a team member's leave of absence once the condition becomes permanent and stationary. Upon notification to the team member of the termination of the leave he or she must return to work. If there is no appropriate work available consistent with the team member's medical restrictions (if any) and seniority, then within five days after the expiration of the leave of absence, NUMMI has the right to consider that the team member failed to return to work pursuant to Article XI, Section 3 of the CBA, and that seniority is broken and lost and the team member's employment with NUMMI is terminated.

Please note that NUMMI intends to comply with this interpretation of Article XXIII, Section 9 of the CBA effective August 7, 2005.

The Union was clearly on notice that any past practice argument was over and, if they wanted to continue with the alleged past practice, they would have to negotiate the language they desired. Thus, it is clear that to the extent the Union wants to argue past practice (based on the Company not breaking seniority of those deemed permanent and stationary and instead terminating them only when they exceeded their seniority) that practice was clearly extinguished.

Moreover, even assuming arguendo, the July 19th letter was a "proposal," as opposed to a statement of position, the result is the same. No matter how you label the July 19th letter its contents and message could not be clearer: the Company's view of Staudohar is clear and effective the day after the Agreement expired the Company was going to implement the policy. The Union admits they knew that at the time of negotiations. (Tr. 180) Indeed, by giving the July 19th letter when it did (at the start of negotiations) it met its legal obligations to discontinue any alleged past practice. At that point under well established rules of bargaining it

was the Union's burden to negotiate the terms of the Agreement – not NUMMI's. See Elkouri, *supra* at 619 fn. 70 (cases cited therein). NUMMI gave the Union a chance to change the language in Article XXIII, Section 9 and the Union chose not to.

C.    The Union's Argument Concerning Extrinsic Evidence and the UAW/General Motors Contract Fails

At the hearing, the Union argued that UAW/GM Contract was relevant to the present case. (Tr. 162-163) This evidence is not relevant to the issue. The issue in this case is whether the policy is consistent with Sections 9.3 and 9.4 as interpreted by the Staudohar decision "among other things." The UAW and General Motors have not interpreted the NUMMI/UAW Agreement, let alone Sections 9.3 and 9.4. Once again, the issue, as defined, is not a de novo interpretation of the contract. The parties elected not to seek such a review.

The specific issue of whether the UAW/GM Contract has bearing on the meaning of the contract issue has been decided before -- in Staudohar. Indeed, at the Staudohar hearing, the Union put into evidence the UAW/GM national agreement (Staudohar pp. 104-108, 126-127) and argued that Section 108 (the same provision with which the Union is now trying to supports it's case) of the National Contract was identical to the NUMMI contract and therefore the UAW interpretation was relevant. (Er. Ex. 1 at p. 11.) Arbitrator Staudohar rejected this attempt. (Staudohar decision at p. 12.)

In the present case, the Union submitted into evidence a management document from General Motors where it states that when someone becomes permanent and stationary, his seniority under the industrial provision is not broken. Staudohar ruled on that issue, holding that under the NUMMI language, it did in fact break. Moreover, in Staudohar, the Union was forced to concede that the

NUMMI Agreement and the UAW/GM Contract are dissimilar in significant ways as illustrated by the testimony from the Staudohar hearing:

> Q.    [By Mr. Satterford of NUMMI] Isn't it possible that there was a provision in the under the GM contract at that time that doesn't exist in the current NUMMI contract that might have provided for the return of an otherwise disabled injured worker to the same positions in a modified permanent position?
>
> A.    [By Mr. Nano of the Union] Sure. There's language in the contract. In the GM contract you mean?
>
> Q.    Yes.
>
> A.    Yes there was. There was language that's not in the NUMMI contract, if that's what your saying.
>
> Q    That's right. And do you have an opinion as to why such language doesn't exist in the NUMMI contract?
>
> A .   We didn't negotiate it. .

(Er. Ex. 1, pp. 134-135.)

Moreover, Staudohar emphasized the unique language in the at NUMMI Agreement: "Such language [in the UAW/GM Contract that allows modified work] creates a greater obligation to place injured workers. But this language is not found in the agreement between the Union and the Company (NUMMI)." (Staudohar Decision at p. 12.) In the present case, the Union has presented no evidence to suggest that the NUMMI contract has been amended to add the type of language that Staudohar cited and is present in the UAW/GM Contract. Thus, once again claims or issue preclusion applies.

D.    <u>Staudohar Applies Equally to Industrial and Personal Leaves</u>

At the hearing the Union appeared to argue that Staudohar was limited to industrial injured employees. (Tr. 95.) The Company does not dispute that all of the Staudohar grievants incurred industrial injuries. Nor does it appear that any of the Staudohar grievants were out on personal leave. According to the Union it then

follows that non-industrial injured employees should not be subject to the Staudohar holding. The problem with that argument is that industrial injured employees cannot be treated worse than non-industrially injured employees. To do so would likely be a violation of state law. *See Dept. of Rehab. v. WCAB (Lauher)* 30 Cal.4[th] 1281 (2003) (recognizing that those on workers' compensation leave due to industrial injuries must not be treated worse than those on non-industrial leave).

The NUMMI Policy is neutral with respect to whether the employee is or is not able to return to work. The determining factor is not whether someone is injured at work or away from work, rather it is whether they can return to work given their permanent restrictions. Once again, that is a fundamental holding of Staudohar – a leave carries with it a realistic expectation of return. NUMMI, as Staudohar noted, given its manufacturing system and its Agreement (unlike General Motors), does not have to allow people to stay on leaves until something opens up or a new job is created.

E.    Staudohar Was Right

The Union wants to turn this case into a de-novo contract interpretation case. (Tr. 160.)[7] The parties have elected not to do that. To the extent however the arbitrator looks at the underlying rationale of the Staudohar ruling, it is supported by the language of the Agreement and all the evidence the arbitrator had before him.

The various leaves under Article XXIII, Section 9 of the Agreement all specify conditions and lengths. They all contemplate a return to work at some point in time. As noted in Article XXIII, Section 1, a leave of absence is "approved time off for a specific period of time." Under Section 9.2, sick leaves

---

[7]    As argued by Union's counsel, "the key issue in what the contract means." As noted above, this is not a de novo interpretation case. The Union cannot stipulate to a submission of "sole" issues then alter that stipulation at the hearing.

require an "estimated duration of absence." Certain leaves under Section 9 provide for a specific minimum guaranteed amount of leave. (*See* military leave and pregnancy leave.) Thus, when the parties desired to set forth a minimum guaranteed leave time they clearly knew how to do so.

Under Section 9.4, leaves for industrial injuries are granted "automatically." This is the only leave provision which uses the word "automatic." Clearly the parties desired to make sure that individuals who were injured at work could not have their seniority broken while they were recovering. Provided an employee is injured at work he or she must (it is "automatic") be allowed to stay on leave until he or she becomes permanent (he or she is not getting better). Non-industrial injured employees do not have that automatic protection. If they do not become permanent and stationary within the time of their seniority they can be terminated under Article X1 Section 3 (g).

With respect to non-industrial sick leaves described in Section 9.3, the wording is very different than 9.4. Under 9.3 a sick leave "<u>may not exceed</u>" the employees length of seniority. The term "may not exceed" means it cannot be greater than. It does not mean it cannot be less than. In fact, NUMMI is unique with respect to its contract language for purposes of non-industrial injury leaves. In contrast to the NUMMI/UAW Agreement, the UAW/GM Contract provides that non-industrial injury leave are granted "automatically." (Un. Ex. 51 at p. 92 – "any employee who is known to be ill supported by satisfactory evidence, will be granted sick leave automatically for the period of continuing disability.") The absence of the "automatic" language combined with the incorporation of the "may not exceed" language, in the NUMMI Agreement, is telling.

As a matter of policy Staudohar also had it right. A leave provision by its nature is not a retirement provision. Following the Union's arguments, the average person at the plant can stay on leave for 12.5 years and continue to collect benefits,

even after they have permanent medical restrictions and are never going to get better. Moreover, under the Union's theory, if an employee came back to work for a single day, he could conceivably start the seniority clock running again. Leave provisions do not contemplate allowing workers who have permanent and stationary restrictions from staying on the payroll indefinitely, with no expected return date. What would be the purpose? That however is what the Union sought in Staudohar and is really seeking again in this case. Under the Union's latest interpretation, an employee could once again (in effect) keep his seniority practically for his whole life. For example, if an employee with between 10 and 15 years of service was injured at the job and subsequently became permanent and stationary, he would be entitled to another 10 to 15 years of seniority despite having reached maximum improvement. In effect, he would be able to wait until NUMMI created new jobs within his restrictions and in the meantime be paid his benefits for fifteen years. This is not speculation rather it is based on fact. According to the Union, "middle" seniority is currently between ten and fifteen years. (Tr. 136-137.) The result of such an interpretation would be devastating to any employer and Arbitrator Staudohar understood this.

V.    Remedy Issue

The Arbitrator requested that the parties also discuss remedy. NUMMI does so reluctantly given the arguments above. As noted above, the "sole issue" is whether the Policy is consistent with two contract provisions as previously interpreted by Staudohar "among other things." If the Arbitrator were to find that the Policy is consistent with Staudohar then the Policy is valid under the CBA as arbitration decisions are binding on the parties. If the Arbitrator were to find that the Policy is neither "consistent" nor "inconsistent" with Staudohar then there is likely no remedy. Since in that case the parties would have to arbitrate the issue de novo to determine if the Policy violated the Agreement.

34

If the Arbitrator were to rule that the Policy is "inconsistent" with Staudohar "among things" then the parties would be bound by that determination and a remedy would come into play.  The Union seeks a remedy that would allow team members to stay on leave after they become permanent and stationary (which could take years) for a time period equal to their seniority.  On average, that means another 10 to 15 years of seniority despite being permanent and stationary with realistically no hope for improvement.  It would seem obvious that if such a benefit was permitted under the contract it would state so.  No one has ever received such a leave in the history of the Company.  Staudohar does not in any way allow such a leave.  Indeed, prior to the present grievance the Union had never even raised the "extra innings" argument.  (Tr. 226.)  At most team members were allowed their maximum allowable leave under Article XI Section 3(g).  What the Union seeks is unprecedented and realistically is a recipe for bankruptcy.  Ironically, it would lead to less job security for those team members actually working.

If the Arbitrator were to rule that a remedy should be provided, it would seem that any such remedy must take into consideration the policy behind Staudohar, the realities if the workplace and the employees' seniority rights.  It seems beyond cavil that a company should not have to allow workers to stay on the payroll for over a decade collecting benefits in the hopes that someday a new job may open up that they can perform consistent with their permanent restrictions. GM or Ford may allow that, but GM and Ford may have unique contract language. Given that NUMMI is constantly attempting to place workers on leave, it would seem thirty days is enough to allow the Company to see what is in the pipeline, effectively predict if new positions are possible in the future and to allow the team member a long enough time to enjoy additional benefits.

35

## CONCLUSION

From a contractual standpoint the Company's Policy is clearly "consistent" with the interpretation of the Agreement by Arbitrator Staudohar. A fair reading of the Staudohar transcripts establishes that the issue of whether the Policy itself is consistent with Section 9 of the Agreement as interpreted by Staudohar is res judicata. Virtually every argument the Union made in Staudohar, they have made in the present case. Once the fundamental holding of Staudohar is accepted (as an arbitrator's decision must be under the Agreement) – a team member's seniority can be "broken" under Article XI, Section 3(e) if that team member is deemed to be permanent and stationary and good faith efforts have been made to place the individual, the Union's arguments are akin to fitting a square into a round hole. They just do not fit. The Union's only real argument comes down to past practice. The record establishes, however, that past practice is not at issue and even if it is any alleged past practice expired with the 2005 Agreement.

From a policy standpoint, if the grievance is granted along with the remedy the Union seeks, the result would be harsh: a worker with no estimated duration of leave could stay on personal or industrial leave on average 10 to 15 years collecting $12,000 worth of benefits a year (at present rates), and that is only if he never comes back to work. If he did return to work for a short period, he could presumably start the "time for time" clock again and receive leave until he passes on. Although that would be a generous benefit, it is not a business plan for survival. NUMMI could not and cannot afford perks the Agreement does not obligate it to provide. NUMMI made sacrifices on the salary side of the ledger and made cuts in other aspects of its operations before it applied Staudohar. NUMMI gave the Union plenty of notice with respect to the Policy. NUMMI's contract language is different from the UAW collective bargaining agreements entered into with Ford and General Motors and it does not want to end up like Ford or General

Motors – NUMMI wants to keep employees working.  A decision favoring team members who have very little realistic chance to work again would have a severe negative impact on NUMMI's ability to survive, and consequently the livelihood of thousands of active NUMMI workers.

Dated: September 28, 2006                    Respectfully submitted,

Nick C. Geannacopulos
SEYFARTH SHAW LLP
560 Mission Street, Suite 3100
San Francisco, California 94105
Telephone: (415) 397-2823
Facsimile: (415) 397-8549

Counsel for Respondent New United
Motor Manufacturing, Inc.

## PROOF OF SERVICE

I am a resident of the State of California, over the age of eighteen years, and not a party to the within action. My business address is Seyfarth Shaw LLP, 560 Mission Street, Suite 3100, San Francisco, California 94105. On September 28, 2006, I served the within documents:

## NEW UNITED MOTOR MANUFACTURING, INC.'S POST-HEARING BRIEF

☐ I sent such document from facsimile machine (415) 397-8549. I certify that said transmission was completed and that all pages were received and that a report was generated by facsimile machine (415) 397-8549 which confirms said transmission and receipt. I, thereafter, mailed a copy to the interested party(ies) in this action by placing a true copy thereof enclosed in sealed envelope(s) addressed to the parties listed below.

☐ by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at San Francisco, California addressed as set forth below.

☒ by personally delivering the document(s) listed above to the person(s) at the address(es) set forth below.

☒ by placing the document(s) listed above, together with an unsigned copy of this declaration, in a sealed Federal Express envelope with postage paid on account and deposited with Federal Express at San Francisco, California, addressed as set forth below.

| | |
|---|---|
| Counsel to UAW Local 2244<br>Linda Lye<br>Altshuler, Berzon, Nussbaum, Rubin & Demain<br>177 Post Street, Suite 300<br>San Francisco, California 94108<br>**(Via Regular Mail)** | Arbitrator<br>Charles A. Askin<br>31 Loma Vista<br>Walnut Creek, California 94596<br>**(Via Federal Express)** |

I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than on day after the date of deposit for mailing in affidavit.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on September 28, 2006, at San Francisco, California.

_Shanté K. Stitt_
Shante Stitt

# Appendix

# Ford Aims to Cut Union Work Force Through Buyouts

## As Financial Crisis Deepens, A Senior Executive Departs; Another Big Blow to UAW

By Jeffrey McCracken

Ford Motor Co. plans to offer buyouts to all 75,000 of its North American factory workers in hopes of cutting its payroll costs by nearly a third, as the nation's second-biggest auto maker tries to accelerate its restructuring to head off a deepening financial crisis.

The buyouts, to be announced today, come amid indications that Ford will post wider losses and burn through more cash this year than previously expected. They also came as Anne Stevens, the No. 3 executive behind Ford's North American turnaround effort and the industry's highest-ranking woman, joined a recent exodus of top executives from the company.

Ford's buyout plan follows a similar program offered this year by General Motors Corp., through which it shed 34,000 North American workers. Coupled with the GM buyouts, the Ford buyouts mean the once-powerful United Auto Workers union could end up losing as many as 50,000 members this year alone—nearly equivalent to the number of UAW workers now employed by DaimlerChrysler Corp.

Two senior officials say Ford has concluded its stated goal of profitability in North America by 2008 is unrealistic, though it isn't clear whether Ford will say so today. One official said Ford will "come in well under" the more than $20 billion it had previously estimated it would have in cash on hand at the end of 2006. Through the first half of the year, losses at Ford's North American operations have totaled $1.3 billion, including $326 million in the second quarter.

With new Chief Executive Alan Mulally just over a week into his job, Ford also is expected to outline plans to cut its salaried work force and related costs by



### Declining Ranks
Ford's UAW-represented employees.



Note: 2005 and 2006 figures are estimates
*As of September
Source: the company

30% and to accelerate plant closings. The company previously had said it didn't plan to offer companywide buyouts.

Meanwhile, Ford is expected to retain all its U.S. brands in the overhaul and to hang on to consumer-finance unit Ford Credit. Some Wall Street analysts had argued that junk-rated Ford should consider selling a piece of Ford Credit and phase out its struggling Mercury brand. Ford spokeswoman Becky Sanch declined to comment on the auto maker's

*Please Turn to Page A16, Column 4*

# Ford Aims to Cut Union Work Force Through Buyouts

*Continued From First Page*

plans. Details of the announcement were still being finalized late yesterday.

Ford stock had risen in recent days on anticipation of a more aggressive restructuring plan, though shares shed 10 cents, or 1.1%, yesterday to $9.09 by 4 p.m. in New York Stock Exchange composite trading. If the plan lacks definitive statements on issues such as the possible sale of luxury-car maker Jaguar, that could disappoint some investors, said John Murphy, auto analyst at Merrill Lynch. "I just think they are reluctant to pull the levers they need to," he said.

Ford's earlier overhaul, the "Way Forward" plan released in January, had proposed eliminating 30,000 hourly jobs, at the time about 35% of the company's U.S. hourly workers, and 4,000 salaried jobs by 2012. Those cuts, and more, likely will come three or four years faster under the revised plan. Ford had about 82,000 hourly workers in the U.S. at the start of the year.

Ford's buyout offers are similar to GM's in that a worker can get as much as $140,000 to leave the company and leave behind his or her retiree health-care benefits. The most-generous of Ford's eight different buyout packages is limited to workers with at least 30 years of service or those that are at least 55 years old and have at least 10 years of service.

"Ford is realizing it's time to get real. They've got to take their lumps like GM did last year," said David Cole, president of the Center for Automotive Research, an auto-analysis firm in Ann Arbor, Mich.

Mr. Cole said the ability of Ford to negotiate new local contracts with about 10 stamping and powertrain plants in the past few months, so-called Competitive Operating Agreements, may have limited its need to close many more plants. Such agreements can save the auto maker 25% to 30% on labor costs, according to a UAW official, by allowing Ford to outsource more work or eliminate job-classifications that required higher staffing levels.

For the UAW, agreeing to companywide buyouts at Ford is the latest concession to the competitive crisis that has engulfed Detroit's two biggest unionized auto makers. The UAW also agreed to cuts in retiree health benefits at GM and Ford, although it has refused to agree to matching cuts at DaimlerChrysler's Chrysler Group. With Chrysler now forecasting wide losses and struggling to reverse slumping sales, the union's resolve will be tested.

By accepting huge job cuts within the past year at GM and Ford and their respective former parts units, the UAW is gambling it can preserve its health-care and retirement benefits in national contract talks with Detroit's Big Three next year. The companies are likely to continue to press the weakened union, arguing Detroit's UAW-represented operations can't compete with nonunion factories in the U.S. run by the companies' foreign rivals.

Word of the UAW buyout deal was faxed to UAW locals yesterday afternoon. "Once again, our members are stepping up to make hard choices under difficult circumstances," the union's president, Ron Gettelfinger, wrote in the fax. "Now, it's Ford Motor Company's responsibility to lead this company in a positive direction—which means using the skills, experience and dedication to quality that UAW members demonstrate every day in order to deliver quality vehicles to customers."

Ford already had some limited, targeted buyouts operating under the "Way Forward." The latest more essentially expands those offers across the company. Offers range from $35,000 for workers with 30 or more years experience, who can leave and keep their full retiree benefits, to a flat $100,000 payment to younger workers who leave the auto maker and give up retiree health care and Ford pensions.

For workers who want to go to college or vocational school for four years, Ford will provide half their usual pay, about $27,000 on average, while they receive full medical coverage and their tuition is paid for. Workers choosing this plan could keep any accumulated pension but must leave behind any retiree medical benefits.

About 6,500 hourly workers have left Ford this year under current plans. Workers at Ford's ACH plants, comprised of the former Visteon Corp., will be able to flow back into Ford plants, much like workers at parts maker Delphi Corp. were able to return to GM plants.

GM was able to get about 34,000 workers to take early-out programs, with about 31,000 taking early-retirement plans. GM executives say the larger-than-expected exodus has put GM on track to cut annual costs by $9 billion.

Ford may not be as successful because it doesn't have as many older workers close to retirement. Ford's hourly workers on average have 7.5 fewer years on the job than GM's—with an average of about 18 years at Ford, according to a report published yesterday by Merrill Lynch.

Meanwhile, Ford's outside directors are increasingly concerned by the exodus of management talent at the auto maker and by signs that Ford's automotive operations are weakening not just in the U.S., but in other parts of the world, too, said individuals familiar with the situation.

Ford's management woes were highlighted by the abrupt departure of Ms. Stevens, a chief architect of the "Way Forward." Ford made a counteroffer to keep her, said a Ford senior official, but she decided to leave anyway. Ford said Ms. Stevens was unavailable for comment.

Ford said David Szczupak, group vice president for Americas manufacturing, also is retiring. Others who have left in the past 18 months include the head of product development, head of hybrid programs and chief financial officer of Ford Credit.

It wasn't clear whether Ford would announce more plant closures as part of its accelerated restructuring. Almost "any facility is vulnerable," said Catherine Madden, an auto industry analyst at Global Insight Inc. She said her analysis was based on conversations with Ford suppliers.

The auto maker's Michigan Truck Plant—one of the most profitable in the world in the late 1990s—could be at risk. The Wayne, Mich., plant makes Ford Expeditions and Lincoln Navigators, once-popular sport-utility vehicles that have fallen out of favor amid high gasoline prices. "You've got people in the truck plant that are scared," said Brian Quantz, vice president of UAW Local 900, which represents Michigan Truck Plant. "They're afraid they're going to shut their plant down."

The Expedition and Navigator share similar architecture with Ford's F-series trucks, meaning they could be built at the auto maker's newer Dearborn Truck Plant. "I see them as a candidate" for closure, Ms. Madden said of the Michigan Truck Plant, "because essentially what they're building there could be built at the Dearborn facility."

Ms. Madden said Ford's Wayne Assembly plant, which makes the Focus small car, also could be vulnerable, because the car's sales have tumbled fast and the auto maker has discussed building a new low-cost facility that could build a Focus-size vehicle plus another small car. Both Michigan Truck and Wayne share the same UAW local and were considered for closure with the first Way Forward plan.

*—Mike Spector contributed to this article.*

---

## Sony Corp.

Sony Corp.'s studio said it was replacing its head of home entertainment. Sony Pictures named former Metro-Goldwyn-Mayer Inc. executive David Bishop to take the reins of its DVD and video division. He succeeds Benjamin Feingold, who guided Sony's home video and DVD business for the past 12 years. The change comes at a time when DVD sales growth is waning. Sony also is preparing for a battle over the next generation of DVD. Sony is backing the Blu-ray format which is going head-to-head with a rival format led by Toshiba Corp. Mr. Bishop spent 15 years at the home-entertainment group of MGM, which is owned by an investor group that includes Sony.

---

## CA Inc.

CA Inc. said the term of the oversight by an independent examiner, put in place under a deferred-prosecution agreement, has been extended. CA, formerly known as Computer Associates, said the oversight period was extended to May 1, 2007, by the U.S. attorney's office for the Eastern District of New York. The term had been scheduled to expire tomorrow. The agreement, reached in September 2004, relates to a multibillion-dollar accounting scandal that cost senior executives their jobs. CA, Islandia, N.Y., said the U.S. attorney's office, the Securities and Exchange Commission, the independent examiner and the company all agreed the extension was appropriate.

Brown of rioting could rest on the evidence presented to the adjustment board at the prison. Thus, the prison proceedings, in my analysis, lacked due process.

I therefore dissent and would reverse the judgment.



**TRAILWAYS LINES, INC., Appellee,**

v.

**TRAILWAYS, INC. JOINT COUNCIL, Appellant.**

**No. 86–1071.**

United States Court of Appeals, Eighth Circuit.

Submitted Sept. 12, 1986.

Decided Dec. 29, 1986.

Action was instituted by employer to set aside arbitrator's award in favor of union on policy of wearing beards by employees. The United States District Court for the Eastern District of Missouri, John K. Regan, Senior District Judge, 624 F.Supp. 880, granted employer's motion for summary judgment vacating award, and employees appealed. The Court of Appeals, Magill, Circuit Judge, held that award of arbitrator that policy of bus company against wearing of beards by its employees, though based on company's concern about its image in light of intense competition in transportation industry, was an unreasonable standard of appearance did not draw its essence from collective bargaining agreement and, hence, was properly refused enforcement on judicial review where award was based on arbitrator's personal notion of industrial justice

rather than on provisions of bargaining agreement setting forth standards of appearance, continuation of past practices, and banishment prerogatives and represented a complete alteration of stipulated issue for decision.

Affirmed.

**1. Labor Relations ⬅479**

Award of arbitrator in a labor dispute will not be judicially enforced when arbitrator has failed to fulfull his contractual obligation with result that award does not draw its essence from bargaining agreement. Labor Management Relations Act, 1947, § 301, 29 U.S.C.A. § 185.

**2. Labor Relations ⬅462, 479**

Award of arbitrator to effect that policy of bus company against wearing of beards by its employees, though based on company's concern about its image in light of intense competition in transportation industry, was an unreasonable standard of appearance did not draw its essence from collective bargaining agreement and, hence, was properly refused enforcement on judicial review where award was based on arbitrator's personal notion of industrial justice rather than on provisions of bargaining agreement setting forth standards of appearance, continuation of past practices, and banishment prerogatives and represented a complete alteration of stipulated issue for decision. Labor Management Relations Act, 1947, § 301, 29 U.S.C.A. § 185.

---

Stephen R. Domesick, Boston, Mass., for appellant.

Leonard Singer, Kansas City, Mo., for appellee.

Before WOLLMAN, Circuit Judge, FLOYD R. GIBSON, Senior Circuit Judge, and MAGILL, Circuit Judge.

MAGILL, Circuit Judge.

Trailways, Inc. Joint Council appeals from the district court's[1] entry of summa-

---

1. The Honorable John K. Regan, United States Senior District Judge for the Eastern District of    Missouri.

## TRAILWAYS LINES v. TRAILWAYS, INC. JOINT COUNCIL    1417
Cite as 807 F.2d 1416 (8th Cir. 1986)

ry judgment vacating an arbitration award which had been rendered in its favor. 624 F.Supp. 880. For the reasons discussed below, we affirm.

## I. BACKGROUND.

Trailways Lines, Inc. (the "Company"), through a system of separate operating companies, is engaged in the business of interstate transportation of passengers and freight by bus. Before 1983, five locals of the Amalgamated Transit Union ("ATU") had separate collective bargaining agreements with the various operating companies, covering drivers, terminal employees and garage employees. In April of 1983, the Company and Trailways, Inc. Joint Council (the "Union"), which represented the five ATU locals, entered into a national collective bargaining agreement (the "National Agreement"). The National Agreement covered drivers, terminal employees and garage employees at fifteen operating companies of the Company, including Trailways Southeastern Lines and American Bus Lines. Employees of these two operating companies had previously been covered by their respective local agreements.

The National Agreement contained a standard arbitration provision, Section 202, which allowed the parties to submit unresolved grievances to an impartial arbitrator. Subsection (e) of this section contained a final and binding clause. Subsection (g) prohibited the arbitrator from "alter[ing] or amend[ing] the provisions of this contract in any respect."

2. Section 103, entitled "MANAGEMENT PRE-ROGATIVE," provided, in relevant part:

The Union recognizes the rights and prerogatives of the Company to manage, operate and conduct its business and agrees that it will direct its members to abide to the best of their ability and be governed by all reasonable rules, orders and regulations issued by the Company not contrary to or in conflict with this Agreement. The Company shall, insofar as it is practicable, give consideration to the welfare, comfort and convenience of its employees in the making of such rules, orders and regulations, and no change shall be made in any present rule, order or regulation,

Additionally, Section 132(b) of the National Agreement provided: "The Company shall continue to enjoy those past practices which previously were observed in individual Seniority Units." The agreement also contained a management rights provision, which delineated the rights and responsibilities of the Union and the Company in relation to the Company's rules, orders and regulations.[2]

During the first year of the National Agreement, garage employees at Trailways Southeastern Lines and American Bus Lines filed similar but separate grievances under Section 144, claiming that management's "no-beards" policy was an "unreasonable" standard of appearance under the section. Section 144 required employees to "comply with the *reasonable* standards of personal appearance regulations issued by the Company and such reasonable amendments as shall be adopted by the Company, not contrary to or in conflict with the terms of [the] Agreement." (Emphasis added.)

Although the term "reasonable" in Section 144 was not defined, a Company-issued rule book provided: "'Every employee is expected to be neat and clean in appearance * * *.'" Also, on two occasions before execution of the National Agreement, the Company issued written guidelines re-emphasizing its long-standing prohibition of beards on employees who met the public in the course of their jobs, except in cases of medical necessity.[3] The reason the Company instituted, and for at least ten years maintained, the policy was because of its concerns about Company image in light of the intense competition in its industry.[4]

which would be contrary to or in conflict with this Agreement.

3. Although all grievants involved were garage mechanics, they all had at least some contact with the public as a part of their duties.

4. As the district court noted:

The business in which [the Company] is engaged is highly competitive, with substantial competition being furnished not only from national motor carriers such as Greyhound Bus Lines and various regional bus lines but also from airlines (particularly since they were deregulated) and from the rail system. In the view of [the Company's] management

The Company ultimately denied both grievances, after which the Union submitted each grievance to arbitration. The first grievance to reach arbitration was filed by two garage employees of Trailways Southeastern Lines, who had been denied the right to grow beards. On August 8, 1984, Arbitrator David S. Lande ("Lande") denied the employees' grievance. After analyzing the parties' contentions, Lande concluded he could "not find that the [no-beards] rule or its application in the particular circumstances here relevant rises to the status of 'unreasonable'." [5] Rather than filing an action to set aside the award, the Union chose to contest Lande's reasoning in the second arbitration.

On November 7, 1984, three months after the Lande Award was issued, the second "no-beards" grievance was presented to Arbitrator Peter J. Maniscalco ("Maniscalco"). The parties stipulated that the issue to be decided by Maniscalco was whether "the Company violate[d] the Collective Bargaining Agreement when, in March, 1984, it required employees Anders and Christopher, mechanics in the St. Louis garage, to shave off their beards," and "[i]f so, what should be the remedy?" The grievants here were employees of American Bus Lines, who had been ordered to shave off their beards.[6] This grievance was similar to the prior grievance in that it

---

[5]. In reaching his conclusion, Lande found:

> The arbitrator may be inclined to disagree with the rule, and to believe that its rationale, however good-faith generated and business-related, is inaccurate in the context of present-day society. The arbitrator may believe that on balance, the employer might better serve its own interests by ascertaining that its customers are not as disturbed by the appearance of beards as it may believe and by accommodating the apparent zeal of a segment of the bargaining unit to sport beards. But the arbitrator is not an officer of Trailways, and may not substitute his own judgment, or that of the bargaining unit or the union, where, as here, he can not find that the rule or its application in the particular circumstances here relevant rises to the status of "unreasonable." In the light of the evidence that there is some indeterminate public contact by the garage employees and that the rule has been in effect for almost ten (10) years (if not longer) and was in effect at the time of adoption of Section 144 and may bear a "reasonable" relation to the employer's marketing decisions, the rule and its application here can not be deemed "unreasonable."

[6]. At the arbitration hearing, the Union argued that beards had regularly been permitted in the St. Louis garage of American Bus Lines, in contrast to the strictly-enforced no-beards rule at Trailways Southeastern Lines. Although the

not only the appearance of the equipment but the appearance of its personnel who have any contact with the public, creates an "image" which may affect its ability to attract and keep the maximum number of customers to use its facilities. For that reason it has adopted (and has for years maintained) its "no beards" policy as part of its growing [sic] standards applicable to all employees who in the course of their employment have some contact with the public.

president of Local 1133, the unit formerly representing employees of American Bus Lines, claimed that mechanics had worn beards "on and off" during the last several years, he could not give the name of any St. Louis mechanic who had done so, nor any other information regarding his assertion. The Union president also testified that he recalled seeing "half a dozen" employees wearing beards, although he could not supply any names. The Company conducted a last-minute survey of its garages across the country and offered to stipulate that 11 of its 500 mechanics wore or were attempting to wear beards. The Union did not stipulate to this finding. Although the Union asserted that the Company did nothing to change the status of the 11 employees, the Company maintained that upon discovering this "non-compliance," it immediately considered taking appropriate enforcement steps.

In contrast to the Union's testimony, the garage manager in St. Louis testified that during his fourteen-year tenure, no mechanic having public contact was allowed to wear a beard. He also testified that from time to time mechanics attempted to grow beards, but that he ordered them to shave within a few days. According to the Company, the two garage employees in the present grievance attempted to grow beards while the St. Louis garage manager was absent on sick leave for several months. One of the employees testified before Maniscalco that he knew at the time that his beard violated the Company's grooming standards. Upon the garage manager's return and after the rule violation was called to his attention, he posted new copies of the Company's standards of appearance regulations and all employees were instructed to comply with the bulletin. The two employees complied with the bulletin, but grieved the Company's enforcement of the no-beards policy, which resulted in the Maniscalco arbitration.

involved the same union, the same company, essentially the same issue, and interpretation of the same collective bargaining agreement.

On February 28, 1985, Maniscalco issued his award and accompanying opinion. Maniscalco ruled in favor of the Union, holding that the Company's absolute prohibition of beards for its garage employees was "unreasonable" under Section 144.

In his opinion, Maniscalco acknowledged the prior Lande Award in a single paragraph, finding that Lande's "conclusion that Section 144 of the [Agreement] may bear a 'reasonable' relation to the employer's marketing decision [and] that, therefore, the rule and its application here cannot be deemed reasonable[,] is in this Arbitrator's opinion a minority view."[7] Rather, Maniscalco stated:

> The real question to be answered in this case is, is an absolute prohibition of beards by garage mechanics in the Company's various facilities throughout the country, without any showing of a detrimental effect on the Company's business, and [sic] unreasonable limitation on the garage mechanics' personal appearance in their private lives?

After further analysis, Maniscalco concluded that the no-beards rule violated Section 144, "because [the rule] was unreasonable in light of the fact that the [Company] presented no proof of the public's real attitude and reaction as well as proof of any demonstrable relationship between those attitudes and the positive public image the Company wished to portray." Finally, Maniscalco found that the parties negotiated the National Agreement, and more specifically Section 144, with a view towards national standards. He concluded that this required "the Company to impose a reasonable standard nationwide in its enforce-

ment of its grooming policy," and therefore, awarded the following remedy:

> The Company should forthwith cease to enforce its grooming policy as it applies to an absolute no-beard requirement by employees covered by the National Agreement employed at garage facilities of the Company. We further find the [C]ompany has the right to require employees so [a]ffected to maintain a neat and well trimmed beard.

Three months later, the Company filed an action under section 301 of the Labor-Management Relations Act, 29 U.S.C. § 185, seeking to set aside the Maniscalco Award. The district court granted the Company's motion for summary judgment and vacated the Maniscalco Award. After discussing the parties' various contentions, the district court held:

> Arbitrator Maniscalco gave no consideration whatever to the Lande award other than to state that it represents the "minority view," nor did he even refer to or construe the "final and binding" provision of the contract. It may be speculated that he believes that no decision is final and binding unless it follows what he believes to be the "majority" view even if it draws its essence from the collective bargaining agreement. We add that the awards cited by Arbitrator Maniscalco in his opinion as representing the "majority" view (including his own decision in *Missouri Public Service Co.*, 77 L.A. 973[) ], do not involve "image" *either as affected by competition* or as affected by the type of intense competition such as Trailways faces. In our judgment, Arbitrator Maniscalco was simply dispensing his own brand of industrial justice.

> We are also of the opinion that where, as here, an arbitrator (as Lande) has

---

7. At the hearing before Maniscalco, the Lande Award was introduced into evidence. The parties took opposing views of the effect of that award upon the grievance before Maniscalco. As summarized by Maniscalco, the Union contended "that the decision of Arbitrator Lande did not resolve the contractual issues presented in this dispute. The principles of *stare decisis*

and *res judicata* do not have the same doctrinal force in arbitration proceedings as they do in judicial proceedings." In opposition, the Company argued that the Lande Award "disposes of the issues in this case because [Lande held] the Company could prohibit mechanics from wearing beards."

definitively construed a provision of the collective bargaining agreement, such construction becomes part of the existing labor agreement, and hence is subject to the provision thereof (Section 202(g)) that an arbitrator "shall have no power to alter or amend the provisions of (the) contract in any respect." Arbitrator Maniscalco wholly failed even to consider or rule [on] this issue.

We also hold that Arbitrator Maniscalco exceeded his authority in providing a "remedy" which is not warranted by the terms of the submission. The sole issue for his determination was whether Trailways was justified in ordering the two grievants to shave their beards and if not, what should be the remedy for the employer's breach of contract. In every award called to our attention, the remedy was limited to what the arbitrator reasonably believed would restore the *grievants* to the position they would have been in but for the employer's breach of contract. Here, however, Arbitrator Maniscalco completely ignored the issue *as formulated by the union* and issued a cease and desist order applicable nation-wide to all garage employees including those expressly covered by the Lande award. [Emphasis supplied by district court.]

This appeal followed.

## II. DISCUSSION.

The issue in this case—whether the district court erred in substituting its interpretation of the collective bargaining agreement for that of Arbitrator Maniscalco—is one frequently addressed by the federal courts.

Here, the Union contends that once the district court determined the parties had agreed to give Maniscalco the power to arbitrate the subject grievance, judicial review of his award should have ended. Moreover, the Union argues that Maniscalco's interpretation of the National Agreement satisfies the requirement that an arbitrator's award draw its essence from the collective bargaining agreement. Similarly, the Union argues that Maniscalco's rem-

edy fulfills this requirement, and therefore, should be accorded the same judicial deference. Further, because no provision in the National Agreement defined "final and binding," the Union maintains that it was within Maniscalco's domain, not the district court's, to evaluate the relevance and effect of the prior Lande award, which interpreted the same provision of the agreement. Because of the Union's contentions, we must take the familiar step of examining the law governing the power of a federal court to review arbitration awards.

We begin by recognizing that where parties to a collective bargaining agreement have provided that an arbitrator's award shall be final and binding, the award 'is generally non-reviewable by a court. *United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960). The Supreme Court recently re-emphasized this principle:

Under well-established standards for the review of labor arbitration awards, a federal court may not overrule an arbitrator's decision simply because the court believes its own interpretation of the contract would be a better one. [*Enterprise Wheel*, 363 U.S. at 596, 80 S.Ct. at 1360]. When the parties include an arbitration clause in their collective-bargaining agreement, they choose to have disputes concerning constructions of the contract resolved by an arbitrator. Unless the arbitral decision does not "dra[w] its essence from the collective bargaining agreement," *id.*, at 597 [80 S.Ct. at 1361], a court is bound to enforce the award and is not entitled to review the merits of the contract dispute. This remains so even when the basis for the arbitrator's decision may be ambiguous. *Id.*, at 598 [80 S.Ct. at 1361].

*W.R. Grace & Co. v. Local Union 759, International Union of United Rubber Workers*, 461 U.S. 757, 764, 103 S.Ct. 2177, 2182, 76 L.Ed.2d 298 (1983); *accord McGraw Edison, Wagner Division v. Local 1104, International Union of Electrical Workers*, 767 F.2d 485, 487 (8th Cir. 1985).

[1]. Because it is the arbitrator's decision for which the parties have bargained, see *Enterprise Wheel*, 363 U.S. at 599, 80 S.Ct. at 1362, exceptions to this general rule of non-reviewability are narrow:

> Nevertheless, an arbitrator is confined to interpretation and application of the collective bargaining agreement; *he does not sit to dispense his own brand of industrial justice*. He may of course look for guidance from many sources, *yet his award is legitimate only so long as it draws its essence from the collective bargaining agreement. When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award.*

*Id.* at 597, 80 S.Ct. at 1361 (emphasis added). Thus, where an arbitrator has failed to fulfill his contractual obligation, resulting in an award that does not draw its essence from the agreement, courts have refused to enforce the arbitrator's award. *See, e.g., International Union of Operating Engineers, Local 670 v. Kerr-McGee Refining Corp.*, 618 F.2d 657 (10th Cir. 1980); *Detroit Coil Co. v. International*

*Machinists Lodge 82*, 594 F.2d 575 (6th Cir.), *cert. denied*, 444 U.S. 840, 100 S.Ct. 79, 62 L.Ed.2d 52 (1979).

In the present case, it is beyond dispute that the National Agreement gave Maniscalco the "power to make the award he made." *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582, 80 S.Ct. 1347, 1352, 4 L.Ed.2d 1409 (1960). Section 202 clearly allowed the parties to submit unresolved grievances arising under the National Agreement to an arbitrator. Moreover, although the district court discussed the possible res judicata effects of the prior Lande Award upon Maniscalco, it did not hold that Maniscalco was without authority to render his award.[8] In fact, the district court stated: "No question of the arbitrator's *jurisdiction* is presented in the instant proceeding. So, too, there is no contention that the second arbitrator is bound by the *rationale of previous decisions or their precedential effect* (as was contended in [*McGraw Edison*, 767 F.2d 489)]." (Emphasis supplied by district court.)[9]

Instead, the court, invoking the *Enterprise Wheel* exception to non-reviewability,

---

8. The district court discussed the fact that the Eighth Circuit has not addressed "the precise issue here involved in this very sensitive area of labor arbitration law." The court noted that in *McGraw Edison, Wagner Div. v. Local 1104, Int'l Union of Elec. Workers*, 767 F.2d 485 (8th Cir. 1985), we held that a subsequent award could not be vacated on the ground that it was inconsistent with a prior award. In *McGraw Edison*, however, both arbitrations involved a different union and a different labor agreement. In contrast, the district court noted that here, the prior arbitral proceeding "necessitated the construction of the *identical* contract provision (Section 144) of the *same national labor contract* between the *same employer* and the *same* union, in deciding the merits of a grievance involving the *same* issue under essentially the *same* facts and circumstances." (Emphasis supplied by district court.) Although the court emphasized these facts, it did not hold that Maniscalco was bound by the prior determination.

9. In so concluding, the district court differentiated the res judicata implications in this case from other cases cited by the Union:

> [I]n virtually all of the cited cases one or the other of the parties sought to sidestep its obligations to submit any grievance to arbitration,

and the essential issue was either whether a court could enjoin a second arbitrator in advance from deciding the new grievance or whether the court had the authority to compel a party to submit the matter to arbitration as against to hear the grievance.

Thus, the court recognized that those cases involved different questions of the arbitrator's jurisdiction to hear grievances. *See, e.g., Dreis & Krump Mfg. Co. v. Intern. Ass'n of Machinists*, 802 F.2d 247, 251–52 (7th Cir.1986); *IBEW Local 199 v. United Tel. Co.*, 738 F.2d 1564, 1569–72 (11th Cir.1984); *Little Six Corp. v. United Mine Workers, Local Union 8332*, 701 F.2d 26, 27–9 (4th Cir.1983).

In contrast, the facts in this case are akin to the situation postulated in *Automotive Employees Union, Local 618 v. Gelco Corp.*, 581 F.Supp. 1155 (E.D.Mo.1984), where the court stated: "Gelco is free to argue to the arbitrator that the prior decision precludes Mr. Brown's present grievance. If an arbitrator rejects Gelco's contention, then Gelco may sue in this Court to set aside the arbitrator's award, [citation omitted], *if such action is warranted*." *Id.* at 1158 (emphasis added). Such action may be warranted where a party contends, as the Company did in this case, that the arbitrator's award does not draw its essence from the agreement.

vacated the Maniscalco Award based on its findings that the award did not draw its essence from the agreement. The court specifically stated that Maniscalco "was simply dispensing his own brand of industrial justice," based on the fact that Maniscalco "gave no consideration to the Lande award other than to state it represented the 'minority' view;" that he did not discuss or construe the "final and binding" language of the National Agreement; and that he cited cases representing the "majority" view, including Maniscalco's own decision in *Missouri Public Service Co.*, 77 Lab.Arb. (BNA) 973 (1981), which did not involve "image" as affected by competition.

10. The following portions of Maniscalco's opinion in *Missouri Public Serv. Co.*, 77 Lab.Arb. (BNA) 973 (1981), appear in his award in this case. The bracketed material indicates the changes apparently made to accommodate the facts in the present case:

DISCUSSION

Employees generally have a right to decide what their personal appearance will be in private life, away from their place of [business] employment, so long as no harm results to their employer.

We recognize that * * * employee's right to determine his clothing, or hair style, has been to some degree limited by arbitrators by the nature of the employee's employment. Arbitrators recognize both the "image" and the safety and health arguments of the employer [and its] right to regulate employee[s'] personal appearance for those purposes, but not for the purpose of requiring conformity to the employer's preference on such matters.

The prevailing theory is that the Company has a right to require its employees to cut their hair and shave, when long hair and beards can reasonably threaten the Company's relations with its customers or other employees, or a real question of safety is involved, and an employer should be able to expect that his employees will practice personal hygiene and will clothe themselves in a neat manner, at least where the employees meet the public.

However, there must be a showing of a reasonable relationship between the Company's image or health and safety considerations and the need to regulate employee appearance. Therefore, management's right to regulate in this area is not absolute. Its exercise in [any] specific manner may be challenged as arbitrary, capricious or inconsistent with the objective for which the right is being exercised.

The Company and the Union in this case, are asking the Arbitrator to rule on the gener-

The district court did not speculate as to why Maniscalco failed to address these relevant issues. On further analysis of Maniscalco's opinion in *Missouri*, however, the reason becomes clear.

It is indisputable that Maniscalco's analysis is in large part a verbatim copy from his award in *Missouri*, although he cited that case only once in his opinion.[10] The facts in *Missouri*, however, differ significantly from the facts in the present grievance. In *Missouri*, the issue formulated for decision was whether the company violated the labor agreement "*and any valid past practices by arbitrarily and unilaterally* im-

al principle of a no[-]beard policy standard of the * * * public image policy [of the Company.] [T]he real question to be answered in this case is, is an absolute prohibition of beards [by garage mechanics in the Company's various facilities throughout the country,] without any showing of a detrimental effect [on] the Company's business, an unreasonable limitation on the [garage mechanics' personal appearance in their private lives]?

* * * * * *

[T]he prevailing theory is that the [C]ompany has [a] right to require its employees to cut their hair and shave[,] when long hair and beards can reasonably threaten the [C]ompany's relations with its customers or other employees, or a real question of safety is involved[, and an employer should be able to expect that his employees will practice personal hygiene and will clothe themselves in a neat manner, at least where the employees meet the public.]

However, there must be a showing of a reasonable relationship between the Company's image [or] health and safety considerations and the need to regulate employee[s'] appearance. [Therefore,] management's right to regulate in this area is not absolute [and] its exercise in any specific manner may be challenged as arbitrary, capricious and inconsistent with the objective for which the right is being exercised. [*Missouri Public Service Company*, 77 L.A. 973, 976 (1981) Arbitrator Peter J. Maniscalco.]

We believe the better arbitral view is to require the employer to present proof of the public's real attitude and reaction as well as proof of a demonstrable relationship between these attitudes and the rules intended to nurture a positive public image.

We find the Company has not shown any reasonable relationship between its [absolute no-beard policy] and the real attitudes of the public it serves.

TRAILWAYS LINES v. TRAILWAYS, INC. JOINT COUNCIL    1423
Cite as 807 F.2d 1416 (8th Cir. 1986)

plementing a *new* 'Public Image Policy'?" *Id.* at 974 (emphasis added). There, the undisputed evidence showed that numerous workers wore beards, and that this had been the past practice for at least eight or nine years before the new policy was announced. *See id.* The labor agreement, however, did not contain any provisions concerning standards of personal appearance, nor were there any written policies regarding the wearing of beards. Thus, because of this silence and because the "law of the shop" was unilaterally altered, Maniscalco required the company to justify its departure from the long-standing past practice and the effect of such departure on the employees' private lives.

[2] In this grievance, although the stipulated issue did not expressly require Maniscalco to consider past practices, the issue did require Maniscalco to determine whether the Company's no-beards policy violated the *National Agreement.* In contrast to the *Missouri* agreement's silence in areas relevant to this issue, the National Agreement specifically spoke on standards of appearance. Furthermore, the National Agreement contained two other provisions that arguably had an impact on the issue: Section 103, which covered management prerogatives, with respect to Company rules; and Section 132, which provided that the Company "shall" continue to enjoy all "past practices."

Although Maniscalco laid out the above three provisions in his "Introductory Remarks," he did not discuss anywhere in his opinion the effect of the latter two provisions on the Company's long-standing no-beards policy, despite their obvious relevance to the issue.[11] Specifically, by ignoring the Company's past practice of prohibiting beards on employees who meet the public, Maniscalco ignored an extremely relevant source of common law—the law of the shop.[12] In fact, courts have vacated arbitration awards solely because of the arbitrator's failure to consider this evidentiary source. *See, e.g., Timken Co. v. Local Union No. 1123, United Steelworkers,* 482 F.2d 1012 (6th Cir.1973); *see also Norfolk Shipbuilding and Drydock Corp. v. Local No. 684 of the International Brotherhood of Boilermakers,* 671 F.2d 797 (4th Cir.1982) (remanded to district court to consider evidence of past practices proffered by union). Maniscalco, however, not only ignored the law of the shop; he failed to discuss Section 132, which seemingly codified this law in the bargained-for agreement of the parties. Unquestionably, the agreement is a more relevant source of a company's past practice and custom than is the common law, *see generally* F. Elkouri & E. Elkouri, How Arbitration Works 437–56 (BNA 4th ed. 1985), although Maniscalco discussed neither.

Moreover, Maniscalco completely altered the stipulated issue for decision by copying from his opinion in *Missouri.* Instead of focusing on whether the Company's no-beards policy violated the National Agreement, he felt the "real question" to be answered was whether the policy was an "unreasonable limitation on the garage mechanics' personal appearance in their private lives," in light of the fact that the Company did not show any "detrimental

11. According to the Company, substantial portions of the evidentiary hearing and the post-hearing briefs were devoted to this issue. As already discussed, the Union attempted to argue before Maniscalco that beards were previously worn by American Bus Lines mechanics. However, the evidence overwhelmingly supported the Company's contention that its no-beards policy was in effect and enforced for many years prior to execution of the National Agreement, as the district court acknowledged.

12. As the Supreme Court has stated, an "arbitrator's source of law is not confined to the express provisions of the contract, as the industrial com-

mon law—the practices of the industry and the shop—is equally a part of the collective bargaining agreement although not expressed in it." *United Steelworkers v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 581–82, 80 S.Ct. 1347, 1352, 4 L.Ed.2d 1409 (1960); *accord Aircraft Mechanics Fraternal Ass'n v. Ozark Air Lines, Inc.,* 597 F.2d 1155, 1157 n. 2 (8th Cir.1979); *Sterling Colorado Beef Co. v. United Food and Commercial Workers, Local Union No. 7,* 767 F.2d 718, 721 (10th Cir.1985); *Norfolk Shipbuilding and Drydock Corp. v. Local No. 684 of the Int'l Bhd. of Boilermakers,* 671 F.2d 797, 799–800 (4th Cir.1982).

effect on the Company's business." This was not the issue to which the parties stipulated, nor did the parties subsequently agree to submit it to Maniscalco.[13] Although this issue may have been appropriate for decision in *Missouri* in light of the facts in that case, it simply was not placed before Maniscalco in the present arbitration.

Further, by altering the issue for decision and failing to consider relevant provisions of the National Agreement, it is questionable whether the burden of proof placed on the Company by Maniscalco draws its essence from the agreement.[14] In copying from his opinion in *Missouri*, Maniscalco stated that "the better arbitral view is to require the employer to present proof of the public's real attitude and reaction as well as proof of a demonstrable relationship between these attitudes and the rules intended to nurture a positive public image." In *Missouri*, however, the evidence showed that the employer *unilaterally* sought to alter the long-established practice of allowing employees to wear beards. As already discussed, the agreement's silence on issues relevant to Maniscalco's determination thus required him to place some type of burden of proof on the company to justify its actions. In contrast, the agreement here specifically provided for standards of appearance, continuation of past practices and management prerogatives—provisions that clearly were relevant to the issue before Maniscalco, but provisions that he did not address.

Finally, as the district court noted, the cases cited by Maniscalco, including *Missouri*, did not involve the same "image" concerns as the Company had. In *Missouri*, for example, the employer was a public

utility company, which probably faced little, if any, competition; the company's sole reason for unilaterally instituting its new no-beards policy was its "[concern] about its image with the general public." *Missouri*, 77 Lab.Arb. at 975.

In contrast, here the Company's decision to implement the no-beards policy was not new, arbitrary or unilateral; the Company decided over ten years ago to implement and maintain the policy based on economic reasons. Moreover, it cannot be disputed that the busing industry is highly competitive. Therefore, the Company had ample reason to be concerned about its image, as personified in its employees who met the public. Rather than focusing on these facts, however, Maniscalco chose to analyze the "image" issue in the same manner as he did in *Missouri*.

By copying a substantial portion of his analysis from a completely different case rather than focusing on the facts of the grievance before him, Maniscalco ignored relevant provisions of the National Agreement and the law of the shop, altered the issue for decision, and ruled in favor of the Union based on "the prevailing theory," "the better arbitral view," and the "majority" view rather than on the intent of the parties as evidenced in the National Agreement. For these reasons, we agree with the district court that Maniscalco was dispensing his own brand of industrial justice. In fact, by copying analysis from an earlier opinion involving totally different facts and a dissimilar collective bargaining agreement, Maniscalco's words *literally* manifested an infidelity to his obligation as an interpreter of the specific collective bargaining agreement before him. Thus, the

13. Although the grievance itself was a matter properly submitted to arbitration, we have sincere doubts whether it was proper for Maniscalco to decide the issue as reformulated by him. *Cf., e.g., AT & T Technologies, Inc. v. Communications Workers of America,* —— U.S. ——, 106 S.Ct. 1415, 1418, 89 L.Ed.2d 648 (1986) (party cannot be required to submit to arbitration any dispute which he has not agreed so to submit).

14. We are cognizant of the Union's argument that a court should not review an arbitrator's placing of the burden of proof. *See Wilko v. Swan,* 346 U.S. 427, 74 S.Ct. 182, 98 L.Ed. 168 (1953). However, this court is not reviewing Maniscalco's burden of proof. Rather, we are merely noting that Maniscalco failed to account for relevant provisions of the National Agreement in analyzing the grievance before him, and instead copied the burden of proof statements from his analysis in *Missouri*.

resulting award simply did not draw its essence from the agreement.

Additionally, although not the basis of our decision, we also express grave concerns over Maniscalco's treatment of the Lande Award. As the district court noted, Maniscalco did not account for the "final and binding" clause of the National Agreement or how it applied to the Lande Award.[15] Rather, Maniscalco stated only that the Lande Award represented the "minority view," and thus refused to accord it any deference. Although an arbitrator generally has the power to determine whether a prior award is to be given preclusive effect, see, e.g., Connecticut Light & Power Co. v. Local 420, International Brotherhood of Electrical Workers, 718 F.2d 14, 20 (2d Cir.1983), courts have also recognized that the doctrine of res judicata may apply to arbitrations with strict factual identities. E.g., United Electrical Radio and Machine Workers v. Honeywell, Inc., 522 F.2d 1221, 1228 (7th Cir.1975); accord International Chemical Workers Union Local No. 189 v. Purex Corp., 427 F.Supp. 338, 339 (D.Neb.), aff'd per curiam, 566 F.2d 48 (8th Cir.1977). Maniscalco, however, did not discuss the similar nature of the two grievances and why, in light of this fact, the Lande Award was not to be given preclusive effect.

Moreover, Maniscalco did not consider whether Lande's interpretation of Section 144 effectively became a part of the National Agreement, and therefore, was not subject to alteration or amendment under Section 202(g). In fact, Maniscalco's actions were in direct contradiction to the established arbitral principle that "[a]n award interpreting a collective [bargaining] agreement usually becomes a binding part of the agreement and will be applied by arbitrators thereafter." Elkouri, supra, at 425 (citations omitted). As Elkouri notes, "where a 'prior decision involves the interpretation of the identical contract provision, between the same company and union, every principle of common sense, policy, and labor relations demands that it stand until the parties annul it by a newly worded contract provision.'" Id. at 426 (citation omitted). Of course, we recognize that there may be situations where an arbitrator will refuse to defer to a prior award involving the same issue.[16] Maniscalco, however, gave no reason for refusing to apply the Lande Award other than that it represented the "minority view."[17] This is especially puzzling in light of the fact that the Lande arbitration involved the same company, the same union, essentially the same issue, and interpretation of the same contract. If an arbitrator does not accord

---

**15.** Although the Union argues that only the stipulation submitted to Maniscalco purports to seek resolution of the "no-beards" issue with "finality," this contention is without merit. It is indisputable that the National Agreement contained a "final and binding" provision, and that this clause would apply to any grievance submitted to arbitration under the agreement.

**16.** Elkouri cites three instances where such a refusal may be justified: "(1) The previous decision was clearly an instance of bad judgment; (2) the decision was made without the benefit of some important and relevant facts or considerations; or (3) new conditions have arisen questioning the reasonableness of the continued application of the decision." F. Elkouri & E. Elkouri, How Arbitration Works 428 (BNA 4th ed. 1985) (quoting Inland Steel Co., 1 ALAA ¶ 67,248 (1944)); accord Connecticut Light & Power Co. v. Local 420, Int'l Bhd. of Elec. Workers, 718 F.2d 14, 20 (2d Cir.1983). Maniscalco, however, did not hold that Lande's decision was "an instance of bad judgment," but rather, that it

represented a "minority view." Compare Connecticut Light, 718 F.2d at 17 (second arbitrator specifically found that the first arbitrator's award was "analytically unsound," and therefore refused to defer to it); Westinghouse Elevators v. S.I.U. de Puerto Rico, 583 F.2d 1184, 1186 (1st Cir.1978) (court recognized that an arbitrator's award may be vacated where his conduct is "improper," but noted that no such challenge was made to the second arbitrator's conduct in the instant case). Moreover, the other two considerations were inapplicable to the grievance before Maniscalco.

**17.** We are aware that a "mere ambiguity" in an arbitrator's opinion is insufficient to justify refusing to enforce an award. Enterprise Wheel, 363 U.S. at 598, 80 S.Ct. at 1361. Here, however, there was no ambiguity; there was, in fact, nothing in Maniscalco's opinion explaining his refusal to depart from Lande's reasoning or result, other than that it represented the "minority view."

any precedential effect to a prior award in a case like this, or at least explain the reasons for refusing to do so, it is questionable when, if ever, a "final and binding" determination will evolve from the arbitration process.

## III. CONCLUSION.

Because Maniscalco failed to fulfill his contractual obligation, but instead based his decision on personal notions of what was proper—as evidenced by his copied analysis from a totally dissimilar case and his disregard for relevant provisions of the National Agreement—the Maniscalco Award did not draw its essence from the agreement. Accordingly, we affirm the order of the district court vacating the Maniscalco Award.[18]



---

UNITED STATES of America, Appellee,

v.

Jerome WHITE HORSE, Sr.; Carl Makes Him First and Eagle Hunter, a/k/a Vetal Chasing Hawk, Appellants.

No. 86–5136.

United States Court of Appeals,
Eighth Circuit.

Submitted Sept. 8, 1986.

Decided Dec. 30, 1986.

Defendants were convicted in the United States District Court for the District of South Dakota, Donald J. Porter, Chief Judge, of converting funds of an Indian tribal organization and they appealed. The Court of Appeals, John R. Gibson, Circuit Judge, held that: (1) determination of whether Indian telephone authority was a

tribal organization within purview of the statute was for jury, but (2) evidence was sufficient to permit jury to find that it was a tribal organization.

Reversed.

1. Indians ⚖=36

Determination of whether Indian telephone authority was a tribal organization for purposes of statute making it a crime to convert funds of an Indian tribal organization related to an essential element of the crime, so that issue was to be determined by jury, not by court.

2. Criminal Law ⚖=561(1)

Necessary aspect of right to jury trial is that every fact essential to conviction of individual must be proved beyond jury's reasonable doubt.

3. Criminal Law ⚖=763(1)

Judge commits error when he instructs jury as a matter of law that fact essential to conviction has been established by evidence, thus depriving jury of opportunity to make that finding.

4. Criminal Law ⚖=738

Trial judge's role, as it relates to determining whether elements essential to criminal conviction have been established, is extremely limited in that he instructs the jury on the law applicable to the issues raised at trial and the jury then determines the facts and applies the law to those facts.

5. Criminal Law ⚖=763(1)

When judge is no longer deciding law that applies to evidence but, rather, is applying law to facts which are determined after assessing probative value of evidence introduced at trial, judge has invaded jury's province.

6. Indians ⚖=36

Evidence that telephone authority was created as corporation wholly owned by Indian tribe when it purchased three tele-

---

18. Because we have found that Maniscalco's award does not draw its essence from the agreement, we do not address the district court's

findings that the nationwide remedy ordered by Maniscalco exceeded the bounds of his authority.

Cite as 06 C.D.O.S. 8882

**MAURICIO A. LEON, M.D., Plaintiff-Appellant,**

v.

**IDX SYSTEMS CORPORATION, a Vermont Corporation, Defendant-Appellee.**

**No. 04-35983**

**United States Court of Appeal for the Ninth Circuit**

**D.C. No. 03-01158 MJP**

**MAURICIO A. LEON, M.D., Plaintiff-Appellee,**

v.

**IDX SYSTEMS CORPORATION, a Vermont Corporation, Defendant-Appellant.**

No. 05-35426
United States Court of Appeal for the Ninth Circuit
D.C. No. 03-01158 MJP
Appeal from the United States District Court for the Western District of Washington Marsha J. Pechman, District Judge, Presiding Argued and Submitted June 9, 2006—Seattle, Washington Filed September 20, 2006 Before: David R. Thompson, A. Wallace Tashima, and Consuelo M. Callahan, Circuit Judges. Opinion by Judge Tashima
COUNSEL

Kenneth G. Kieffer, Gordon, Thomas, Honeywell, Malanca, Peterson & Daheim LLP, Tacoma, Washington, for the plaintiff-appellant/appellee.

Angelo J. Calfo, Yarmuth Wilsdon Calfo PLLC, Seattle, Washington, for the defendant-appellee/appellant.

**OPINION**

TASHIMA, Circuit Judge:
Dr. Mauricio Leon ("Leon") worked as the director of medical informatics at IDX Systems Corporation ("IDX"). After he was placed on unpaid leave, Leon sued IDX, alleging violations of the anti-retaliation provision of the False Claims Act, Title VII, the Americans with Disabilities Act ("ADA"), and Washington state law. He also filed a complaint with the United States Department of Labor ("DOL"), claiming that IDX violated the whistleblower-protection provision of the Sarbanes-Oxley Act ("SOX"). The district court dismissed all of Leon's claims with prejudice after determining that Leon despoiled evidence by deleting 2,200 files from his IDX-issued laptop computer during the pendency of the litigation. The court also imposed a $65,000 monetary spoliation sanction. Leon appeals the sanctions and IDX cross-appeals the district court's decision not to enjoin, on res judicata grounds, the DOL's proceedings against IDX. We affirm the district court's spoliation sanctions, reverse its res judicata decision, and remand the case to the district court to reassess whether it should enjoin the DOL proceedings.

The district court's jurisdiction arose under 28 U.S.C. §§ 1331 and 1367. We have jurisdiction over Leon's appeal and IDX's cross-appeal under 28 U.S.C. § 1291.

**BACKGROUND**

Leon was hired by IDX in 2001. In mid-2002, Leon began complaining of mismanagement of the "Standards-Based Interoperable Guideline System" ("SAGE") project, claiming there were irregularities in the financing and reporting of the federally-funded project. On April 25, 2003, after putting Leon on unpaid leave, IDX brought an action for declaratory relief, seeking to establish that it could terminate Leon's employment without violating the anti-retaliation provisions of the False Claims Act, SOX, and the

ADA. On May 20, 2003, Leon filed his own action, which included claims for retaliation under the False Claims Act, violations of Title VII, the ADA, and state law claims. Leon's complaint alleged that IDX fired him in retaliation for his whistle-blowing activities.

On April 30 and May 7, 2003, IDX's attorneys sent letters to Leon's attorney, requesting that Leon return the IDX-issued laptop to IDX. On May 8, 2003, Leon's attorney responded in writing by asking if Leon could keep his laptop for the duration of an audit of the SAGE project. On May 9, IDX's counsel stated that Leon could keep the laptop for the specific purpose of responding to the auditors. The April 30 and May 9 letters cautioned that Leon should take care to preserve all data; one letter specifically warned that Leon should "ensure no data on the laptop is lost or corrupted so as to avoid any possible despoliation of evidence." The audit was completed in July, and by October, counsel for both sides were negotiating the return of the laptop. IDX's computer forensics expert received the laptop on February 5, 2004.

After conducting a forensic analysis, IDX's expert reported that all data in the hard drive's unallocated space had been intentionally wiped, and also reported that the computer had been used to view and download pornography. The expert concluded that more than 2,200 files had been deleted. After receiving this information, IDX moved for dismissal of Leon's action based on Leon's intentional spoliation of evidence.

In his deposition, Leon admitted deleting entire directories of personal files after he was placed on leave by IDX in April 2003. He also stated that the week before he shipped the computer back to IDX he wrote a program to "wipe" any deleted files from the unallocated space in the hard drive. He also admitted that some of these files included pornographic material.

The district court held an evidentiary hearing on September 8, 2004, at which Leon did not appear. The court commented at the hearing that Leon's behavior was "very egregious" and, from the written documents, "appears to be without remorse." The court found Leon's written testimony "to be extremely evasive" and that Leon "can't answer a straight question that's being posed."

After considering the parties' additional video submission of Leon's deposition, the court granted IDX's motion to dismiss on September 30, 2004. The district court relied on its "wide range of inherent powers" in issuing the sanction. It first discussed Leon's duty to preserve the data on the laptop, holding that Leon "knew or should have known that he was in possession of evidence relevant to pending litigation by April 30, 2004."[1] It then discussed the extent of prejudice to IDX as a result of the spoliation, observing that "a wealth of 'personal' material . . . could be relevant to Dr. Leon's ADA and employment-related claims," such as communications with health care providers or with realtors regarding his relocation from Seattle. "[B]ecause of Dr. Leon's actions there is no way of knowing what might have been stored on the laptop's hard-drive and no reliable way of recreating what might have been there." Accordingly, the court concluded that the deletion and wiping of the files "severely prejudice[s]" IDX.

The court also found that Leon acted in bad faith. While Leon claimed that his wiping of relevant evidence was merely negligent because he meant to wipe only "personal" information, "Dr. Leon did not have the authority to make unilateral decisions about what evidence was relevant in this case." The court concluded "that the extraordinary measures to which Dr. Leon resorted to destroy evidence relevant to this litigation merit a finding of bad-faith."

Turning to the choice of sanction, the court found that dismissal was the appropriate sanction because a ruling excluding evidence would be "futile, as the most salient evidence has been destroyed," a jury presumption in favor of the defense would be ineffectual, and a fine would not "arm the Defense with evidence to counter Plaintiff's claim." Regarding the monetary sanction of $65,000, which was IDX's submitted cost of investigating and liti-

---

1. The district court's reference here to "April 30, 2004" appears to be a typographical error. The quoted sentence clearly is referring to the letter of April 30, 2003, to Leon's counsel, which is mentioned in the sentence immediately preceding the quoted sentence.

gating the spoliation issue, the court "reviewed this information and [found] the charges and costs listed therein to be reasonable."

On October 14, 2004, IDX filed its motion to enjoin, under the All Writs Act, the DOL's administrative proceeding. At that time the DOL[2] was still conducting its investigation of IDX. The district court denied this motion, finding a lack of identity or privity between Leon and the DOL; consequently, it held that res judicata did not bar the agency proceedings against IDX. The court subsequently denied IDX's motion for reconsideration of this decision, adhering to its view that privity was not satisfied and observing that SOX gives OSHA the right to petition for review of a settlement agreement, thus showing that OSHA is not a "mere proxy" for the complaining party. The court noted that the agency proceedings were still investigative, and that res judicata principles apply only to adjudicative proceedings.

On June 20, 2005, the DOL issued its findings and order, in which it concluded that "[t]here is reasonable cause to believe that [IDX] has violated the [SOX] Act." The DOL did not refer to the district court's dismissal of Leon's claims, but seemed to incorporate the spoliation findings when it limited the amount of Leon's back wages because there was "reasonable cause to believe that [IDX] would have fired [Leon] on June 11, 2004, regardless of his protected activities, based on its discovery that [Leon] had downloaded pornography on a company computer." The DOL ordered IDX to pay Leon back wages, compensatory damages, and reasonable attorneys' fees; provide a neutral employment reference for Leon and expunge negative employment records; post the "enclosed Notice to Employees in a conspicuous place;" "[c]omply with all the terms and provisions of the Notice;" and refrain from future retaliation against Leon. The enclosed Notice stated, *inter alia*, that IDX "agrees it will not discharge or in any manner discriminate against any employee" who files a complaint under SOX.[3]

Leon timely appealed the dismissal of his action and the monetary sanction. IDX timely appealed the district court's denials of the injunction and the motion for reconsideration.

## STANDARD OF REVIEW

We review the district court's imposition of spoliation sanctions for an abuse of discretion. Anheuser-Busch, Inc. v. Natural Beverage Distribs., 69 F.3d 337, 348 (9th Cir. 1995) (applying the abuse of discretion standard to sanctions levied pursuant to Fed. R. Civ. P. 37 as well as to sanctions issued pursuant to the court's "inherent power"). The district court's factual findings, including findings of bad faith and prejudice, are reviewed for clear error. *Id.*; see also *Fjelstad v. Am. Honda Motor Co.*, 762 F.2d 1334, 1337 (9th Cir. 1985). "[T]he district court's credibility determinations are entitled to special deference." *Anheuser-Busch*, 69 F.3d at 348 (citation omitted). Issues of law underlying the district court's denial of injunctive relief, including the determination that a party's claims are not barred by res judicata, are reviewed de novo. Milberg Weiss Bershad Hynes & Lerach v. Lexicon Inc. (In re Am. Cont'l Corp./Lincoln Sav. & Loan Sec. Litig.), 102 F.3d 1524, 1535 (9th Cir. 1996), *rev'd on other grounds*, 523 U.S. 26 (1998).

## DISCUSSION

### I. The Dismissal Sanction

There are two sources of authority under which a district court can sanction a party who has despoiled evidence: the inherent power of federal courts to levy sanctions in response to abusive litigation practices, and the availability of sanctions under Rule 37 against a party who "fails to obey an order to provide or permit discovery." *Fjelstad*, 762 F.2d at 1337-38; Fed. R. Civ. P. 37(b)(2)(C). In this case, the district court relied on its "in-

herent authority" in sanctioning Leon because Leon's conduct was not in violation of any discovery order governed by Rule 37.

Dismissal is an available sanction when "a party has engaged deliberately in deceptive practices that undermine the integrity of judicial proceedings" because "courts have inherent power to dismiss an action when a party has willfully deceived the court and engaged in conduct utterly inconsistent with the orderly administration of justice." *Anheuser-Busch*, 69 F.3d at 348 (internal quotation marks and citations omitted). Before imposing the "harsh sanction" of dismissal, however, the district court should consider the following factors: "(1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its dockets; (3) the risk of prejudice to the party seeking sanctions; (4) the public policy favoring disposition of cases on their merits; and (5) the availability of less drastic sanctions."[4] *Id.*

While the district court need not make explicit findings regarding each of these factors, United States ex rel. Wiltec Guam, Inc. v. Kahaluu Constr. Co., 857 F.2d 600, 603 (9th Cir. 1988), a finding of "willfulness, fault, or bad faith" is required for dismissal to be proper. *Anheuser-Busch*, 69 F.3d at 348 (citation omitted). Additionally, the district court must consider "less severe alternatives" than outright dismissal. *Wiltec-Guam*, 857 F.2d at 604. The district court here did not explicitly refer to the five-factor test articulated in *Anheuser-Busch*, but did specifically consider Leon's "level of culpability," the prejudice suffered by IDX, and the availability of lesser sanctions.[5]

### A. Bad Faith

A party's destruction of evidence qualifies as willful spoliation if the party has "some notice that the documents were *potentially* relevant to the litigation before they were destroyed." *United States v. Kitsap Physicians Serv.*, 314 F.3d 995, 1001 (9th Cir. 2002) (emphasis added) (internal quotation marks and citation omitted). Moreover, because "the relevance of . . . [destroyed] documents cannot be clearly ascertained because the documents no longer exist," a party "can hardly assert any presumption of irrelevance as to the destroyed documents." *Alexander v. Nat'l Farmers Org.*, 687 F.2d 1173, 1205 (8th Cir. 1982).

The district court concluded that Leon's behavior amounted to willful spoliation because he knew he was under a duty to preserve all data on the laptop, but intentionally deleted many files and then wrote a program to write over deleted documents. The court rejected Leon's explanation that the deleted documents were "personal," observing that "personal" documents are highly relevant to an employment discrimination claim and noting the IDX-proffered evidence that work-related documents were also deleted and written over. The district court's finding that Leon acted in bad faith is not clearly erroneous.

Leon admits that he intended to destroy information, including evidence of pornographic files, but he contends that his intent was merely to protect his privacy. Leon had ample notice, however, that the files he destroyed were not merely "private" and were potentially relevant to the litigation at hand. Leon ran the wiping program, eliminating over 2,200 files, including pornographic files, well after IDX had filed its action for declaratory judgment and he had filed his own employment discrimination action. IDX's declaratory judgment action sought to establish whether IDX could legally fire Leon for his "failure to satisfactorily perform his job duties." Therefore, Leon was on notice that files created on his employer-issued computer were relevant to a lawsuit centering on the existence of legitimate grounds for firing Leon. For example, IDX's em-

---

2. While the parties refer to the agency as the "DOL," the specific agency within the DOL responsible for the SOX investigation is the Occupational Safety and Health Administration ("OSHA").

3. Presumably because of the DOL's findings and order, summarized above, the parties do not pursue the investigative/adjudicative nature of the DOL proceeding on appeal. Because the parties have not raised it, we do not address it. See *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 919 (9th Cir. 2001) (stating that "issues which are not specifically and distinctly argued and raised in a party's opening brief are waived") (citation omitted).

4. Although this five-factor test is usually used to review the propriety of Rule 37 sanctions, this same test was applied in *Anheuser-Busch* to review sanctions granted under a court's "inherent power." *See* 69 F.3d at 348. Accordingly, we also apply the five-factor test.

5. The first two *Anheuser-Busch* factors, although not discussed by the district court, support the district court's decision to dismiss Leon's case. Leon's destruction of 2,200 files on his employer-issued computer "greatly impeded resolution of the case" by obscuring the factual predicate of the case and consuming months of sanction-related litigation. See *Malone v. U.S. Postal Serv.*, 833 F.2d 128, 131 (9th Cir. 1987) (holding, in a brief but "independent" review of the five factors, that the first two factors supported the dismissal sanction because the district court was prevented from adhering to its trial schedule). Here, there was ample evidence of the time and resources spent in investigating and resolving the spoliation issues.

ployee guide specifically forbids "access or sending of sexually oriented messages or images of any kind." Leon was on notice that files created in violation of this IDX company policy would be relevant to IDX's lawsuit against him. His deletion and "wiping" of 2,200 files, acts that were indisputably intentional, amounted to willful spoliation of relevant evidence. Accordingly, the district court's finding was not clearly erroneous.

**B. Prejudice**

The prejudice inquiry "looks to whether the [spoiling party's] actions impaired [the non-spoiling party's] ability to go to trial or threatened to interfere with the rightful decision of the case." *Wiltec Guam*, 857 F.2d at 604 (citation omitted). In *Anheuser-Busch*, we found prejudice when a party's refusal to provide certain documents "forced Anheuser to rely on incomplete and spotty evidence" at trial. 69 F.3d at 354.

The district court found that IDX would be prejudiced by Leon's deletion of the files. The district court discussed types of "personal" files that could have helped IDX with its case, including Leon's correspondence with realtors and financial institutions (relevant to the timing of his decision to resign from IDX); communications with health care providers regarding work-related illness (relevant to his ADA claim); and the timing of and efforts to find other employment. The court noted that there was no way of recreating the contents of these files, and discounted Leon's contention that IDX should have examined the laptop's contents earlier or should examine the IDX network for files relevant to Leon and the litigation.

We conclude that the district court's finding is not clearly erroneous. As the district court observed, the types of files Leon would have deleted out of privacy concerns would "likely be at the heart of IDX's defense were [the files] available." Leon's spoliation "threatened to distort the resolution" of the case, see *Wiltec Guam*, 857 F.2d at 604, because any number of the 2,200 files could have been relevant to IDX's claims or defenses, although it is impossible to identify which files and how they might have been used.[6] Because of the obvious relevance of Leon's "personal" files to the litigation and the harm to IDX caused by Leon's destruction of these files, the district court did not clearly err in its finding of prejudice.

**C. Lesser Sanctions**

In reviewing whether the district court properly considered lesser sanctions prior to dismissing Leon's case, we examine: "(1) whether the district court explicitly discussed the feasibility of less drastic sanctions and explained why such alternate sanctions would be inappropriate; (2) whether the district court implemented alternative sanctions before ordering dismissal; and (3) whether the district court warned the party of the possibility of dismissal before ordering dismissal." *Anheuser-Busch*, 69 F.3d at 352 (citation omitted).

The district court found that "less drastic sanctions are not useful" because a ruling excluding evidence would be "futile," and fashioning a jury instruction that creates a presumption in favor of IDX "would leave Defendants equally helpless to rebut any material that Plaintiff might use to overcome the presumption." The district court therefore satisfied the first criterion. The second criterion is inapplicable here because Leon erased the files and ran the wiping program before the district court had an opportunity to compel discovery or otherwise order "lesser sanctions." Likewise, the third criterion, which examines whether the district court warned the party, is inapplicable here because the destruction of the evidence occurred before the court had any opportunity to warn Leon. See *Malone*, 833 F.2d at 133 (observing that "[f]ailure to warn has frequently been a contributing factor in our decisions to reverse orders of dismissal," but also holding that an explicit warning was "unnecessary" in certain circumstances).

In sum, four of the five *Anheuser-Busch* factors support the district court's decision to dismiss. The prejudice to IDX, and the unavailability of lesser sanctions weigh heavily in favor of dismissal. Also, the need to manage the court's docket, as well as the public interest in expeditious resolution of litigation, weigh in favor of dismissal. The

only factor weighing against dismissal is "the public policy favoring disposition of cases on their merits," which, standing alone, "is not sufficient to outweigh the other four factors." See *Malone*, 833 F.2d at 133 n.2. Additionally, the bad-faith determination, which is a prerequisite to dismissing a case pursuant to a court's inherent power, see *Anheuser-Busch*, 69 F.3d at 348, was not clearly erroneous. "Although dismissal was harsh," *Yourish v. Cal. Amplifier*, 191 F.3d 983, 992 (9th Cir. 1999), we do not disturb the district court's choice of sanction unless we have a "definite and firm conviction that the district court committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors," *id.* (internal quotation marks and citation omitted). In this case, we do not have such a conviction. We therefore affirm the dismissal sanction.

**II. The Monetary Sanction**

Under its "inherent powers," a district court may also award sanctions in the form of attorneys' fees against a party or counsel, who acts "in bad faith, vexatiously, wantonly, or for oppressive reasons." *Primus Auto. Fin. Servs., Inc. v. Batarse*, 115 F.3d 644, 648 (9th Cir. 1997) (discussing a sanction against an attorney) (citation omitted). Before awarding such sanctions, the court must make an express finding that the sanctioned party's behavior "constituted or was tantamount to bad faith." *Id.* (citation omitted). A party "demonstrates bad faith by delaying or disrupting the litigation or hampering enforcement of a court order." *Id.* at 649 (internal quotation marks and citation omitted). The bad faith requirement ensures that the district court's exercise of its broad power is properly restrained, and "preserves a balance between protecting the court's integrity and encouraging meritorious arguments." *Id.* Additionally, the amount of monetary sanctions must be "reasonable." *Brown v. Baden (In re Yagman)*, 796 F.2d 1165, 1184 (9th Cir.), *as amended by* 803 F.2d 1085 (1986) (reviewing a Rule 11 sanction but announcing a standard applicable to other sanctions as well).

The district court made an explicit finding that Leon acted in bad faith, as discussed in Section I-A, *supra*, which is the primary prerequisite for sanctions issued pursuant to a court's inherent power. Leon's only argument on appeal is that the sanction was "excessive" because not all the attorneys' fees requested by IDX were attributable to the spoliation issue. The district court, however, found that IDX's accounting of fees was reasonable. Upon reviewing the record on this issue, we find no clear error in the district court's determination that the fees were related to the spoliation motion and were reasonable. We thus affirm the monetary sanction as within the district court's broad discretion.

**III. The Injunction**

The district court denied IDX's motion to enjoin the DOL's investigation and adjudication of Leon's SOX complaint, and subsequently denied IDX's motion for reconsideration of that decision.[7] The court's decision turned on its determination that there was no privity between Leon and the DOL. IDX appeals, arguing that the requirements for res judicata were satisfied because the DOL was in privity with Leon.

The All Writs Act "empowers a district court to issue injunctions to enforce judgments and to reinforce the effects of the doctrines of res judicata and collateral estoppel." *Charlton v. Estate of Charlton*, 841 F.2d 988, 989 (9th Cir. 1988) (citation omitted); *see also* 28 U.S.C. § 1651(a). Res judicata applies when the earlier suit: (1) reached a final judgment on the merits; (2) involved the same cause of action or claim; and (3) involved identical parties or privies. *Sidhu v. Flecto Co.*, 279 F.3d 896, 900 (9th Cir. 2002).

The first requirement is satisfied, because a dismissal with prejudice is a determination on the merits. See *Beard v. Sheet Metal Workers Union, Local 150*, 908 F.2d 474, 477 n.3 (9th Cir. 1990) ("Federal law dictates that a dismissal with prejudice bars a later suit under res judicata."). The second requirement, identity of the cause of action, is also satisfied, because the SOX claim involves largely the same nucleus of facts -- the time, cause, and circumstances of Leon's termination vis-a-vis his whistle-blowing activi-

---

6. For example, one of the wiped files identified in the computer forensics report was named "SAGE_assesment_Key strategic issues.doc."

7. Because we conclude that the district court erred in denying IDX's motion for an injunction, we need not address the appeal from the court's denial of reconsideration.

ties — as Leon's claim under the False Claims Act and his other whistle-blower claims. See *Burlington N. Santa Fe R.R. v. Assiniboine & Sioux Tribes of Fort Peck Reservation*, 323 F.3d 767, 770 (9th Cir. 2003) ("Identity of claims exists when two suits arise from the same transactional nucleus of facts.").[8]

Finally, we must decide whether the third requirement, which examines the identity of the parties, has also been satisfied in this case. The district court concluded that Leon and the DOL were not privies because their interests differed — the DOL represents a "broad public interest," whereas Leon was seeking only money damages. We disagree. When "[t]he Secretary [of Labor] is suing for employee-specific rights of precisely the sort [plaintiff] already pursued" then the "requisite closeness of interests for privity is present." *Chao v. A-One Med. Servs., Inc.*, 346 F.3d 908, 923 (9th Cir. 2003) (applying the remedial scheme of the Fair Labor Standards Act) (internal quotation marks omitted). The *Chao* court found determinative the fact that the Secretary sought to recoup the plaintiff's personal economic loss, "not to vindicate broader governmental interests by, for example, seeking an injunction." *Id.* Similarly, the remedies available under SOX include *only* individual compensatory remedies, including reinstatement, back pay, litigation costs, expert witness fees, and reasonable attorneys' fees. *See* 18 U.S.C. § 1514A. Injunctive and other broad remedial relief is not available under the statute.[9] *See id.*; see also 29 C.F.R. §§ 1980.105, .109 (listing the remedies that can be awarded by the agency, all of which are compensatory). We conclude that, under *Chao*, the private nature of the remedy sought by the DOL demonstrates that the agency is in privity with Leon. See also *EEOC v. U.S. Steel Corp.*, 921 F.2d 489, 496 (3d Cir. 1990) (determining that privity is satisfied when the agency "seeks individualized benefits under the ADEA for particular grievants").

Because all of the requirements of res judicata are satisfied, the district court erred in denying the injunction based on lack of privity. We therefore reverse the order denying the injunction and remand for the district court to consider whether it should, in the exercise of its discretion, enjoin the DOL's proceedings under the All Writs Act. See *Clark v. Busey*, 959 F.2d 808, 813 (9th Cir. 1992) (discussing application of the All Writs Act to injunctions of administrative proceedings); *DeNardo v. Murphy*, 781 F.2d 1345, 1348 (9th Cir. 1986) (discussing application of the All Writs Act to injunctions of adjudicative proceedings).

## CONCLUSION

The district court did not abuse its discretion when it imposed a terminating sanction dismissing with prejudice Leon's action and imposed a monetary sanction. Because, however, the court erred in concluding that the privity element of res judicata was not satisfied, we reverse and remand the case to the district court to determine whether an injunction should be issued pursuant to the All Writs Act. IDX shall recover of Leon its costs on appeal.

In No. 04-35938, the judgment is AFFIRMED.

In No. 05-35426, the order denying the injunction is REVERSED and REMANDED for further proceedings consistent with this opinion.

---

8. The fact that Leon did not actually bring a SOX claim does not preclude the satisfaction of the identity of claims requirement, because he could have amended his complaint to add the SOX claim after 180 days had passed without any action by the DOL. *See* 18 U.S.C. § 1514A (b)(1)(B) ("[I]f the Secretary has not issued a final decision within 180 days of the filing of the complaint" a litigant can "bring[ ] an action at law or equity for de novo review in the appropriate district court of the United States, which shall have jurisdiction over such an action.").

9. Leon contends that the DOL seeks broader, non-private remedies because the DOL ordered that IDX, in addition to providing back wages, compensatory damages, and attorneys' fees, was also required to "post the enclosed Notice to Employees in a conspicuous place" for 60 days. The Notice to Employees states, *inter alia*, that the employer agrees not to discharge or discriminate against any employee who files a complaint under the whistle-blower provisions of SOX. SOX and its implementing regulations, however, do not appear to authorize this type of remedy. *See* 18 U.S.C. § 1514A; 29 C.F.R. § 1980.105. It is therefore, at the least, unclear what authority supports the issuance of such an order. In any event, we are not persuaded that the mere additional requirement of posting a notice alone is sufficient to alter the private nature of the remedy sought by the DOL. We note further that, although it filed a brief in the district court, the DOL has not participated in these proceedings on appeal.

Hammer suggested that he was going to make such a request, but no request was ever submitted. Additionally, the Purzes' preliminary plat, which contained the double frontages, also failed to comply with the Subdivision Code in several other respects, for example, several lots were too small and the easements for maintenance vehicles were too small.

### III. Conclusion

For the foregoing reasons, we find that the Purzes have failed to demonstrate that similarly-situated individuals were treated more favorably, and therefore, we AFFIRM the judgment of the district court.



T.V. RYAN, et al., Plaintiffs–
Appellants,

v.

UNION PACIFIC RAILROAD COMPA-
NY and United Transportation Un-
ion, Defendants–Appellees.

No. 01–3204.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 25, 2002.

Decided April 11, 2002.

Trainmen who were members of engi-neer's union brought action seeking decla-ration that engineer's union, rather than trainmen's union, could represent trainmen during first stage of grievance proceedings under Railway Labor Act (RLA). The United States District Court for the Northern District of Illinois, Ronald A.

Guzman, J., 2001 WL 845485, dismisse suit based on lack of subject matter juri diction. Trainmen appealed. The Court Appeals, Posner, Circuit Judge, held tha (1) "usual manner" of handling first stag of grievances was through proceedings i which trainmen were represented by trai men's union, which was designated as e: clusive representative for trainmen by co lective bargaining agreement (CBA), eve though engineer's union had occasionall represented trainmen during grievance over an 11-year period; and (2) determina tion on merits rather than dismissal wa appropriate, since matter called for inte pretation of RLA, and not CBA.

Affirmed as modified.

1. Labor Relations ⚖=416.4

Railway Labor Act (RLA) establishe a system of compulsory arbitration of di putes arising out of collective bargainin agreements (CBAs) in the railroad indus try; first stage of dispute resolution con sists of grievance proceedings "on th property," that is, within the railroad it self, before committees composed of unio and management representatives, and the dispute cannot be resolved at tha level, the case proceeds to formal arbitra tion, either before a Public Law Board or National Adjustment Board. Railway La bor Act, § 3, 45 U.S.C.A. § 153.

2. Labor Relations ⚖=411

"Usual manner" of handling firs stage of grievances involving trainmen em ployed by railroad, which was method b which such disputes were to be initiall resolved under Railway Labor Act (RLA) was through proceedings in which train men were represented by trainmen's unio that had been designated as exclusive rep resentative for trainmen by collective bar gaining agreement (CBA), even throug trainmen had option to join engineer's un

ion, and engineer's union had occasionally represented trainmen during first stage grievance proceedings without objection over an 11-year period before railroad announced that it was standing on terms of CBA. Railway Labor Act, § 3, 45 U.S.C.A. § 153.

See publication Words and Phrases for other judicial constructions and definitions.

**3. Labor Relations ⊗=241**

A collective bargaining agreement (CBA) designating a railroad union as the exclusive representative in grievance proceedings takes precedence over an informal custom inconsistent with that designation.

**4. Labor Relations ⊗=241**

Where a collective bargaining agreement (CBA) is in place, representation rights must be based upon, and may be limited by, that pact.

**5. Contracts ⊗=227**

The failure to enforce a contractual term does not abrogate the term unless the conditions for a waiver or estoppel are established.

**6. Declaratory Judgment ⊗=362**

Determination on the merits, rather than dismissal for lack of jurisdiction, was appropriate step for district court following its determination, during suit in which trainmen who were employed by railroad, but were members of engineer's union, sought declaration that they could be represented by engineer's union during first stage of grievance proceedings, that Railway Labor Act (RLA) required that trainmen be represented by trainmen's union during such proceedings; trainmen were not seeking an interpretation of collective bargaining agreement (CBA), but an interpretation of RLA, which came within district court's jurisdiction. Railway Labor Act, § 1 et seq., 45 U.S.C.A. § 151 et seq.

**7. Labor Relations ⊗=257.1**

Federal courts have jurisdiction to interpret the Railway Labor Act (RLA), and lack jurisdiction only to interpret collective bargaining agreements (CBAs) made under the authority of the Act. Railway Labor Act, § 1 et seq., 45 U.S.C.A. § 151 et seq.

———

Harolid A. Ross (argued), Ross & Kraushaar, Cleveland, OH, Stephen J. Feinberg, Asher, Gittler, Greenfield, & D'Alba, Chicago, IL, for plaintiffs–appellants.

Brenda J. Council, Kutak, Rock & Campbell, Omaha, NE, Thomas W. Cushing, Union Pacific Railroad Company, Chicago, IL, Clinton J. Miller, III, Daniel R. Elliott, III (argued), United Transportation Union, Cleveland, OH, for defendant–appellee.

Before POSNER, EASTERBROOK, and WILLIAMS, Circuit Judges.

POSNER, Circuit Judge.

Five members of the Brotherhood of Locomotive Engineers who are employed by the Union Pacific Railroad as trainmen brought suit against the Union Pacific and the trainmen's union, United Transportation Union. They sought a declaration that they are entitled to be represented in grievance proceedings by their union, the BLE, rather than by the UTU, even though the collective bargaining agreement between the Union Pacific and the UTU appoints the latter as the trainmen's exclusive representative in grievance proceedings. The district court dismissed the suit for want of subject-matter jurisdiction.

[1]  The Railway Labor Act establishes a system of compulsory arbitration of disputes arising out of collective bargaining agreements in the railroad industry.  The first stage of dispute resolution consists of grievance proceedings "on the property," that is, within the railroad itself, before committees composed of union and management representatives.  45 U.S.C. § 153 First (i);  *International Ass'n of Machinists, AFL–CIO v. Central Airlines, Inc.,* 372 U.S. 682, 688–89, 83 S.Ct. 956, 10 L.Ed.2d 67 (1963);  *Kulavic v. Chicago & Illinois Midland Ry.,* 1 F.3d 507, 515 (7th Cir.1993).  If the dispute cannot be resolved at that level, the case proceeds to formal arbitration, either before a Public Law Board or a National Adjustment Board, but it is only the first stage that concerns us here.  The Act provides that at that stage the dispute "shall be handled in the usual manner."  45 U.S.C. § 153 First (i).  The meaning of the quoted language is the only issue in this appeal.

We need to paint in some background.  It used to be that engineers were represented by the BLE and other railroad workers (collectively, trainmen) by the UTU.  But as the industry shrank, jobs were consolidated and engineers often found themselves working as trainmen, and vice versa.  Nevertheless the unions did not merge.  Instead workers were allowed to elect which union to join.  So even though the BLE was the engineers' union and the UTU the trainmen's union, an engineer assigned as a trainman could continue to belong to the BLE; and by virtue of a 1951 amendment to the Act, he didn't have to pay dues to the UTU even though the UTU was his collective bargaining representative while he was doing trainman's work.  And likewise a trainman assigned as an engineer could continue to belong to the UTU and did not have to pay dues to the BLE.  *Landers v. National R.R. Passengers Corp.,* 485 U.S. 652, 657–

58, 108 S.Ct. 1440, 99 L.Ed.2d 745 (1988); *Pennsylvania R. Co. v. Rychlik,* 352 U.S. 480, 489–92, 77 S.Ct. 421, 1 L.Ed.2d 480 (1957); *Corzine v. Brotherhood of Locomotive Engineers,* 147 F.3d 651, 653–54 (7th Cir.1998); *Brotherhood of Locomotive Engineers v. Kansas City Southern Ry.,* 26 F.3d 787, 790 (8th Cir.1994).  This structure remains in effect, and so both unions have collective bargaining agreements with the Union Pacific.

A provision added to the UTU's collective bargaining agreement with the Union Pacific in 1978 designated that union the *exclusive* representative of all Union Pacific trainmen in grievance proceedings "on the property" even though some of these trainmen, such as our five plaintiffs, belong to the BLE.  We do not know whether the BLE's collective bargaining agreement with the railroad contains a parallel provision with respect to engineers who may happen to belong to the UTU.

[2]  Despite the exclusivity provision, there were occasions between 1989 and 2000 on which, apparently without objection by the UTU or the railroad, the BLE was permitted to represent its trainmen members in the first-stage ("on the property") grievance proceedings against the railroad.  But in the latter year the UTU announced that this would no longer be permitted—that it was standing on the terms of the collective bargaining agreement.  That announcement precipitated this suit, in which the plaintiffs argue that their representation by the BLE is "the usual manner" in which first-stage grievances are handled and so cannot be changed by the UTU and the railroad.

The most natural and sensible reading of the statutory term "in the usual manner" contrasts it with the provision governing the second, the arbitral, stage of resolving disputes over the meaning or in-


terpretation of the collective bargaining agreement. The procedures for that stage are set forth in the statute; the anterior proceeding, the proceeding on the property, is to be conducted in the usual manner, that is, in the manner agreed upon by the railroad and the union. *That stage is for them to design as well as to administer.* So read, in accordance with such decisions as *Pawlowski v. Northeast Illinois Regional Commuter R.R.,* 186 F.3d 997, 1000 (7th Cir.1999); *Kulavic v. Chicago & Illinois Midland Ry., supra,* 1 F.3d at 515, and *Landers v. National R.R. Passenger Corp.,* 814 F.2d 41, 46–47 (1st Cir.1987), aff'd, 485 U.S. 652, 108 S.Ct. 1440, 99 L.Ed.2d 745 (1988), the "usual manner" provision allows the railroad and the union to prescribe *in the collective bargaining agreement* the manner in which grievance proceedings shall be conducted on the property, as the Union Pacific and the UTU did in 1978. For in a unionized workplace it is in the collective bargaining agreement that one finds the provisions creating the grievance procedures.

The plaintiffs argue that "usual manner" should be read to grandfather any practice that has emerged in the conduct of grievance proceedings on the property. If between 1989 and 2000 it was usual to give a trainman who belonged to the BLE a choice between a BLE griever and a UTU griever, that practice is now cemented in and can never be changed. No reason is given for such a weird result, which would give an arbitrary subset of the railroad's employees a choice between two unions' grievers—and could the employee insist on both? (At argument the plaintiffs' lawyer was reluctant to commit himself on that question.) Even the benefit to the BLE is obscure, since the handling of its trainman members' grievances by the UTU is at the UTU's expense. But probably the BLE is worried that members pleased with the UTU's handling of their grievances might be minded to jump ship and join the UTU.

[3, 4] The plaintiffs rest their argument on a Supreme Court footnote that reads in its entirety as follows: "Of course, an employee may be entitled to be heard through the representative of his choice at company-level grievance and disciplinary proceedings if that has become the 'usual manner' of handling disputes at his workplace." *Landers v. National R.R. Passengers Corp.,* 485 U.S. 652, 657 n. 4, 108 S.Ct. 1440, 99 L.Ed.2d 745 (1988). That just repeats what the statute says; it does not tell us how to decide what is the "usual manner." The issue in *Landers* was whether the Railway Labor Act entitled a member of a railroad union that was not the member's bargaining representative nevertheless to be represented by that union in grievance proceedings on the property, and the Court held that there was no such statutory right. This is entirely consistent with the proposition, nowhere questioned in the opinion, that a collective bargaining agreement designating a railroad union as the exclusive representative in grievance proceedings takes precedence over an informal custom inconsistent with that designation. The decision the Supreme Court was affirming had asserted that very proposition: "Where, as here, a collective bargaining agreement is in place, representation rights must be based upon, and may be limited by, that pact." 814 F.2d at 47.

We did, it is true, many years ago flirt with the position urged by the plaintiffs here. See *McElroy v. Terminal R.R. Ass'n,* 392 F.2d 966, 971 (7th Cir.1968). That decision long predated both the First Circuit's decision in *Landers* and the Supreme Court's decision in that case. And in *Pawlowski v. Northeast Illinois Regional Commuter R.R., supra,* 186 F.3d at 1001 n. 4, we remarked that "the continued

validity of the precise holding of *McElroy* is in doubt after the Supreme Court's decision in *Landers*." That is an understatement; the holding cannot survive *Landers*.

[5] Should it make a difference that the railroad and the UTU did not enforce the exclusivity provision 'for some years after it was inserted into their collective bargaining agreement? We cannot see why. The failure to enforce a contractual term does not abrogate the term unless the conditions for a waiver or estoppel are established, and the plaintiffs have made no effort to do that. Anyway they are not arguing that the agreement was modified or that it should be interpreted to authorize a practice that had become customary though it was contrary to the language of the agreement; they can't argue that to us, as we're about to see.

[6, 7] It remains only to decide whether the district judge was right to dismiss the suit on jurisdictional grounds rather than on the merits. His reasoning was that since the plaintiffs have no statutory ground for using BLE grievers, they *must* be seeking an interpretation of the collective bargaining agreement as permitting them to use those grievers. Not so. They may be, in fact they are, suing for a declaration that the statute overrides the agreement and entitles them to use BLE grievers. Their interpretation of the statute is wrong; the statute confers no such right on them. But that conclusion is a determination of the merits of their claim. It has nothing to do with jurisdiction. The federal courts have jurisdiction to interpret the Railway Labor Act, *Pawlowski v. Northeast Illinois Regional Commuter R.R.*, *supra*, 186 F.3d at 1000 n. 1; *Taylor v. Missouri Pacific R.R.*, 794 F.2d 1082, 1085 (5th Cir.1986), abrogated on other grounds by *Landers v. National R.R. Passengers Corp.*, 485 U.S. 652, 108 S.Ct. 1440, 99 L.Ed.2d 745 (1988); they lack jurisdiction

only to interpret collective bargaining agreements made under the authority of the Act. *Pawlowski v. Northeast Illinois Regional Commuter R.R.*, *supra*, 186 F.3d at 1000 n. 1; *Roberts v. Lehigh & New England Ry.*, 323 F.2d 219, 222 (3d Cir. 1963). It was not, to repeat, an interpretation of the collective bargaining agreement, but an interpretation of the Railway Labor Act, that these plaintiffs were seeking from the district court.

We add for completeness that if there were no collective bargaining agreement in force, or no provision in the agreement relating to grievance proceedings on the property, the plaintiffs would be free to argue to the district court that the "usual manner" of handling such grievances was whatever practice the parties had followed. Or if the plaintiffs thought the collective bargaining agreement properly interpreted made that practice the "usual manner," they could argue that in the arbitral process. What they cannot do is appeal to the statute to supersede the "usual manner" as determined by the collective bargaining agreement.

The judgment of the district court is modified to place decision on the merits, and as thus modified is

AFFIRMED.



# EXHIBIT G

AMERICAN ARBITRATION ASSOCIATION

BEFORE ARBITRATOR CHARLES A. ASKIN

| | | |
|---|---|---|
| UAW Local 2244<br>(Policy Grievance), | ) | |
| | ) | |
| | ) | |
| Complainants, | ) | |
| | ) | |
| vs. | ) | File No. 10277 |
| | ) | |
| New United Motor Manufacturing, Inc., | ) | |
| | ) | |
| Respondent | ) | |
| (or Company). | ) | |
| | ) | |
| | ) | |

---

## NEW UNITED MOTOR MANUFACTURING, INC.'S POST-HEARING REPLY BRIEF

---

Dated: October 20, 2006

Nick C. Geannacopulos
SEYFARTH SHAW LLP
560 Mission Street, Suite 3100
San Francisco, California 94105
Telephone: (415) 397-2823
Facsimile: (415) 397-8549

Counsel for Respondent New United
Motor Manufacturing, Inc.

# TABLE OF CONTENTS

Page

INTRODUCTION ...................................................................................1

I. The Key Issue in this Case is Whether the Policy being Challenged is "Consistent" with Staudohar ..........................................................2

II. The Policy is "Consistent" with Staudohar ...................................3

    A. Staudohar Applies Regardless of Whether His Award Specifically Analyzed 9.3 ...........................................................4

III. The Agreement Supports NUMMI's Position ................................8

    A. The Union's Contract Interpretation Argument Ignores the Binding Effect of the Staudohar Decision ..................................8

    B. Irrespective of the Binding Effect of the Staudohar Decision the Language in the Agreement Supports NUMMI's Position ......10

IV. Past Practice Does Not Apply ......................................................12

V. Circumstances Have Not Changed...............................................14

VI. Remedy..........................................................................................14

i

As noted in New United Motor Manufacturing, Inc.'s ("NUMMI") opening brief, the arbitrator requested and the parties agreed to submit post-hearing reply briefs in this matter. This is NUMMI's post-hearing reply brief. Throughout this reply brief, NUMMI refers to the record as follows: (Er. Ex. __) for NUMMI's exhibits; (Union Ex. __) for the Union's exhibits; and (Jt. Ex. __) for joint exhibits. In addition, NUMMI will refer to its opening brief as (NUMMI Op. Br. at p. __) and the Union's opening brief as (Union Br. at p. __).

## INTRODUCTION

The Staudohar decision governs this case. The Policy (and the interpretation of the Policy) being challenged in this case is essentially the same policy (and Company interpretation) that was unsuccessfully challenged by the Union in Staudohar. (Er. Ex. 2 pp. 16-17, 20, 86.) Under both policies a team member's senority may be "broken" irrespective of his length of service. (Er. Ex. 1 p. 86) Under both policies a team member may be terminated under Article XI, Section 3(e) as opposed to having his leave exceed his seniority under Article XI, Section 3(g). The Union challenge to the policy in Staudohar was rejected. It should not be able to re-litigate an issue it lost. Moreover, the remedy sought by the Union would turn a leave of absence system into a de-facto retirement system.

In its opening brief the Union essentially makes two flawed arguments: (1) Section 9.3 (time for time) was not even an issue in Staudohar and is therefore not relevant to this case; and (2) NUMMI's interpretation of the Agreement is "flatly at odds with the language of the contract." (Union Br. at p. 14.) More specifically, the Union argues the Company does not have the right to "break" the seniority of employees on sick leave. Rather, they must be allowed to exhaust their leaves under Article XI, Section 3(g). (Union Br. at p. 17.) That the Union's argument, however, is directly "inconsistent" with Staudohar, which held: (1) that seniority may in fact be "broken" or "extinguished," and (2) employees may in fact be

1

"terminated" not only under 3(g) (for leave exceeding their seniority) but also under Article XI, Section 3(e) (for failing to return to work because they cannot work due to their permanent restrictions).

## ARGUMENT

I.    The Key Issue in this Case is Whether the Policy being Challenged is "Consistent" with Staudohar

The Union incorrectly argues that the arbitrator's task in this case is similar to any other contract interpretation case, and thus a de-novo review of the Agreement should be undertaken. (Union Br. at p. 14 fn. 3.) This is an important issue and one in which the two sides have different views.

It is well established that the power of an arbitrator derives from and is limited by the submission of the issue. *See, League of Voluntary Hospitals*, 67 LA 293 (Goodnick, 1976) (parties' stipulation limited issues to be decided); *Delta Lines Inc v. Int. Brotherhood of Teamsters*, 66 Cal. App. 3d 960, 966 (1977); *California Faculty Ass'n. v. Superior Court*, 63 Cal. App. 4th 935, 944-945 (1998) (citing case law). Here, the parties signed a submission of the issues to be decided weeks before the hearing. (Jt. Ex. 7.) The submission refers to the issues as the "sole" issues to be decided. The key issue is framed as follows: "Is the Company's policy regarding long term leaves of absence consistent with Article XI, Section 3 and Article XXIII, Sections 9.3 and 9.4 of the collective bargaining agreement as <u>interpreted by</u>, among other things, the Staudohar decision." (Jt. Ex. 7) (emphasis added).

The Staudohar decision is the only specifically identified interpreting factor in the submission of the issues. While the parties may have recognized that other "things" could be looked at, these things are not to take precedence over the Staudohar decision. Otherwise, the other "things" would have been specifically

identified in the issue. For example, if the Union desired a de-novo review it should have stated so.

Under the Agreement, the Staudohar decision is binding on the parties. The phrase "among other things" does not stand alone. It is also modified and limited by the phrase "as interpreted by." The only "other things" that could have "interpreted" the provisions at issue in the past are court decisions, other arbitration decisions, or conceivably the "parties" to the Agreement. Of course, the parties' interpretations differ – that is why they are in arbitration. Thus, whether the Policy is "consistent" with Staudohar's interpretation of Article XXIII, Sections 9.3 and 9.4 is really at the heart of this case.

II.    The Policy is "Consistent" with Staudohar

The Union does not directly address the issue of whether the Policy is "consistent" with Staudohar. According to the Union, Section 9.3 (time for time) was simply a non-issue in Staudohar. A reading of the Staudohar record and transcript clearly establishes otherwise. (See NUMMI Op. Br. at pp. 24-25.) For example:

- In its opening argument in Staudohar, the Union argued, "the position of the Union is that the employees should not have their seniority 'broken' by the company under the language in the contract, and further that there is language contained within the contract that spells out some particulars with respect to limitations and 'time based on seniority' where there's a sick leave provision for industrial purposes or personal purposes involved there." (Er. Ex. 2 p. 20) (emphasis added). The reference to "time based on seniority" is a clear reference to Section 9.3. The use of the word "broken" means just that – a cutoff of seniority before it exhausts. The Arbitrator understood the parties' respective positions with respect to the breaking of seniority

3

and the Company's "game over" position. (Er. Ex. 2 p. 115; see also Er. Ex. 2 pp. 16, 82.).

- The Union told Arbitrator Staudohar during the hearing that time for time was an issue ("you know the provision you state time for time" and "he still gets dropped out before time [for time]" and then reinforced this to the Arbitrator in its post hearing brief by arguing that Grievant Gutierrez was denied time for time. (Er. Ex. 2 p. 116; Er. Ex. 15 p. 4.)

- The Arbitrator, the Company, and the Union were all well aware that under the policy being challenged in Staudohar, employees could be terminated irrespective of senority if they became permanent and stationary. The Union itself noted that under the Company's interpretation of the policy, someone with six years of seniority (the maximum seniority at the time) could be terminated if that person became permanent and stationary, and no work could be found for him. (Er. Ex. 1 p. 86.) In its opening argument the Company argued that once an employee was permanent and stationary "the basis for the leave of absence, whichever leave of absence provision you look to in the contract was no longer appropriate" as the leave issue was "moot." (Er. Ex. 2 pp. 16-17.)

These facts establish that the issue of "time for time," and the breaking of seniority upon reaching permanent and stationary status, were indeed, issues in Staudohar.

A.   Staudohar Applies Regardless of Whether His Award Specifically Analyzed 9.3

In light of the evidence that establishes that time for time was an "issue," in the Staudohar arbitration, the Union is left to argue that "nowhere in the text of his

4

decision did Arbitrator Staudohar discuss or analyze Section 9.3 (Union Br. at p. 28.), and Staudohar limited his holding to extinguishing seniority solely under Section 9.4. This argument failed in Staudohar and it should fail here. (Er. Ex. 15, Union's post hearing brief in Staudohar at p. 4 (Section 9.4 " speaks to the seniority issue, not the termination issue, as the Employer would have you believe").

The doctrine of claim preclusion applies to this case irrespective of whether Staudohar specifically analyzed Section 9.3 in his award. It is the award or judgment that determines claim preclusion, not the opinion explaining the judgment. *Yamaha Corp. Of America v. U.S.*, 961 F.2d 245, 254 (D.C. Cir. 1992); *cert. den.* 508 U.S. 1078 (1993) (attached to Appendix); *Kamilche Co. v. U.S.*, 53 F.3d 1059, 1063 (9th Cir. 1995). Moreover, simply because the Union may not have made Section 9.3 their main argument or failed to make the same argument it does in the present case does not make claim preclusion inapplicable. *Yamaha Corp.*, 961 F.2d at 257 (new arguments or re-takes on old arguments do not prevent claim preclusion).

Consistent with the foregoing, Arbitrator Staudohar was aware of all the following facts (which are not in dispute) when he made his decision:

- In its opening argument the Company argued it could "break" seniority; the Union argued the Company could not "break" seniority. (Er. Ex. 2 pp. 16-17, 20.).

- The Union and the Company both agreed that under the Company's interpretation of the leave policy and termination provisions at issue (all of Article XI, Section 3 and Article XXIII, Section 9) employees could be terminated irrespective of their seniority. (Er. Ex. 2 pp. 16, 17, 20, 186.)

5

- The Union argued the "time for time" provision prevented termination at the hearing and in its post-hearing brief.

- Under the Company's view, the policy being challenged in Staudohar allowed for termination under Article XI, Section 3(e). The Union argued none of the reasons set forth in Article XI, Section 3 were applicable to the case. (Er. Ex. 15 p. 4.)

- The arbitrator knew that at least one of the grievants was being terminated prior to his time for time, and the Company policy did not take into consideration time for time.

Knowing these undisputed facts, and after noting Sections 9.3 and 9.4 and Article XI, Sections 3(e) and 3(g) were "especially relevant" to his decision,[1] Arbitrator Staudohar ruled that once the grievants' injuries became permanent their seniority was "extinguished" and they could be terminated. This was true for all the Grievants, including Grievant Gutierrez. He was terminated irrespective of his seniority and so-called time for time.

Arbitrator Staudohar found termination was permissible and final under Article XI, Section 3(e) (failure to return to work after expiration of a leave). As he stated, "If there is no work available (after 3 days), the Company could conclude there was a failure to return to work after expiration of a leave of absence, and the employee is therefore terminated." (Staudohar Decision at p. 14.) Article XI, Section 3 provides seniority is "broken" and employment shall cease if any of the reasons set forth in Section 3(a) through (g) occurred. Thus, the

---

[1] The Union in its brief mentions that in its notice of appeal in the Staudohar case it did not identify Section 9.3. (Union Br. at p. 26, Union Ex. 25.) The Union, however, in the submission of the issues to Staudohar, made it clear all of Section 9 was in play. (Jt. Ex. 7.) Moreover, the notice of appeal the Union wants to rely on did cite Article XI, Section 3(g), the provision which according to the Union provides that seniority can never be broken and can only be exhausted.

Grievants could be terminated since (as NUMMI argued in its opening argument) they were never coming back to work under "whichever leave of absence provision you look to." (Er. Ex. 2 p. 16.) Contrary to the Union's argument, the Arbitrator was not partially terminating seniority solely under Section 9.4 or telling them an exception may exist for their "final final" termination under Section 9.3. He said the entire "leave of absence" was over for purposes of Article XI, Section 3 "termination" purposes. He clearly meant "game over."

Moreover, the Union argues in the present case (just like in Staudohar) that the only way an employee can have his seniority terminate is pursuant to Article XI, Section 3(g). (Compare Union Br. at p. 17 with the Union's Staudohar post-hearing brief at p. 4 ["This language spells out the only ways that seniority can be broken and cessation of employment can occur"] [emphasis in original].) If that were true, Staudohar and all the cases that came after it would have no reason to even recognize 3(e) as a basis for "breaking" seniority. Why would they since all employees would be allowed to exceed their time for time under Section 9.3 before they could be terminated (the union's current argument)? Staudohar would have simply adopted the view that terminations can only take place if the terms of Section 3(g) are met. Seniority could never "break" or be "extinguished" – it could only be exhausted. By recognizing that seniority could be "broken" under Section 3(e) when someone is permanent and stationary, Staudohar once again necessarily rejected the Union's argument in his award.

The Union simply cannot side-step the obvious by claiming that since the Staudohar decision did not specifically analyze Section 9.3 it is not binding or relevant. Staudohar knew the grievants were not getting time for time. He knew the Company was arguing seniority could be broken for termination purposes (and the Union was arguing the opposite). He heard testimony concerning the history behind Sections 9.3 and 9.4 of the Agreement. He found the key provisions at

7

issue in this case especially important to his decision. He then ruled the employees could be terminated short of time for time. Even if claims preclusion does not apply, it is evident that the Policy is "consistent" with Staudohar's interpretation of the Agreement.

III.    The Agreement Supports NUMMI's Position

    A.    The Union's Contract Interpretation Argument Ignores the Binding Effect of the Staudohar Decision

The Union argues that time for time is automatic since unlike other leaves in Article 9 they are granted without discretion and not subject to approval. (Union Br. at p. 16.) The Union then incorrectly argues that because Article XI, Section 3(g) provides that seniority can be broken and employment terminated only when the leave periods in Sections 9.3 and 9.4 are exceeded, the Policy at issue violates the Agreement. (Union Br. at p. 17.) Accordingly, the Union argues any other conclusion would defeat the meaning of Article XI, Section 3(g) – effectively rewriting the provision to read the Company may "break" the seniority and terminate employment when a team member is on a sick leave period for less than the leave period set forth in Sections 9.3 and 9.4. (Union Br. at p. 17.)

As a general rule, an interpretation of a contract by an arbitrator is incorporated into the contract itself and becomes part of the contract. (See NUMMI's Op. Br. p. 23.) The Union may not agree on how (or if) Staudohar interpreted Section 9.3, but the Union cannot ignore what Staudohar and its progeny held with respect to "breaking" seniority. Whether or not seniority could be "broken" was an issue in Staudohar.[2] (Compare Er. Ex. 2 pp. 16-17 with Er.

_____

[2]    The Union, quoting its own post-hearing brief in Staudohar, argues that the issue in Staudohar was not when seniority may be broken. (Union Br. at p. 26.) A review of the Union's post-hearing brief in Staudohar reveals that the Union argued many issues were "not" questions for Arbitrator Staudohar ("the question is not did the Employer make a good faith effort to find work for the grievants"; the "question is not whether the disability was permanent or temporary.") (Er. Ex. 15

Ex. 2 p. 20: "the Company believes it has the right to break the seniority"; "the position of the Union is that the employees should not have had their seniority broken"). Staudohar and its progeny agreed with the Company – seniority could be broken. (Staudohar Decision at p. 13.) By doing so, Staudohar and its progeny rejected the Union's argument that Section 3(g) was the only way to terminate employees on leave. Arbitrator Staudohar held if there was no work available the grievant could be "terminated" under Article XI, Section 3(e). (Er. Ex. 23 p. 2.) Simply put, by recognizing Section 3(e) as a basis for termination and not Section 3(g), and that seniority can be broken under 3(e) – not 3(g), Staudohar directly rejected the Union's current contractual arguments. The Union's arguments and Staudohar's award are directly at odds with each other. Thus, to apply the Union's arguments in light of Staudohar's ruling leads to an illogical construction of the contract under the Agreement since prior decisions are binding on the parties. (Jt. Ex. 1 p. 23 ["All decisions within the defined authority of the arbitrator shall be final and binding"].)

The Union argues that Staudohar was of the view that leaves could not last in "perpetuity" and all they are asking for is the time until an employee becomes permanent and stationary, and then his "seniority" kicks in – meaning another 10 to 15 years of receiving, on average, $12,000 in benefits per year. (Tr. 217.) Common sense should not be left at the door. Seniority on average lasts 10 to 15 years (and growing) at the plant. Combine the 10 to 15 years with the time it may take to become permanent and stationary and the result is a short lifetime. Moreover, if the Union's argument is accepted, then anytime a person comes back to work even for a day, the clock runs again. This is true perpetuity. As a practical

---

p. 2.) As it turned out, Arbitrator Staudohar disagreed with these assertions, and found they were all issues.

9

matter and stepping back, the Union's argument would create a retirement system out of a leave system.

### B.   Irrespective of the Binding Effect of the Staudohar Decision the Language in the Agreement Supports NUMMI's Position

There is also a significant difference in terms of how the Union and the Company view the underlying purpose behind the leave provisions. (Union Br. at p. 18) The Union's view is that the purpose of the leave provisions is to provide time off irrespective of whether an employee will or will not return to work. The Company contends the purpose of the leave provisions in the Agreement is not to create the equivalent of a retirement policy or disability insurance program. There is an expectation of coming back to work when the leave is over. If someone becomes permanent and stationary, realistically that expectation is over absent the creation of a new job. As NUMMI argued in Staudohar, once an employee cannot come back to work the basis for any leave is over. (Er. Ex. 2 pp. 16-17.) The employee can either get well enough to return to work or he becomes permanently disabled and can never return to work. "In the latter case, the employees' right to a leave of absence comes to an end." (Er. Ex. 16 – NUMMI post-hearing brief in Staudohar at p. 6.) Once again, it is important to note that Arbitrator Staudohar necessarily adopted this argument when he found that the employees could be "terminated" under Section 3 (e) short of their time for time, and that the NUMMI Agreement, unlike the UAW/GM contract, did not allow for modified work.

This view is consistent with statutory leave laws as well. Under the Americans With Disabilities Act, employees are not entitled to indefinite leave. Indeed, courts have held a leave of two months was "unreasonable." *Oestringer v. Dillard Store Services*, 92 Fed. Appx. 2004 U.S. App. Lexis 2375 (7th Cir. 2004) (attached to Appendix). Here, NUMMI allows extended leaves for months and years. The 30-day period is simply the final attempt to place someone.

10

This policy argument is supported by the language in the Agreement. All the various leaves in the Agreement contemplate a leave duration and a return to work. In the 1988 Agreement that Staudohar was interpreting, the longest leave other than sick leave was Union leave, and even that was limited to a one-year duration. A leave of absence is defined as being out for a "specific period of time." (Jt. Ex. 1 p. 65, Section 9.1.) While out on sick leave the employee needs medical documentation and he must be unable "to return to work." If he cannot return to work, he must show an "estimated duration" of his leave. (Jt. Ex. 1 p. 65.) In other words, sick leave in this Agreement is about getting back to work; it is not "automatic" like the UAW/GM Agreement. Moreover, the Agreement specifically recognizes leave is only "automatic" while on "temporary" disability and Section 9.4. When the parties intended to grant "automatic" without discretion leave they expressed that intent in straightforward contract language as in Section 9.4.

Section 9.4 seeks to eliminate disputes about the need for a leave in the case of those injured at work by having the workers' compensation system handle such injuries.[3] However, as Staudohar determined (and as NUMMI argued in Staudohar), seniority ends when the individual is no longer temporary disabled. At this point the injury will not get better. The worker can either come back to work or he cannot. This is the essence of the Staudohar decision. As Staudohar recognized (and as NUMMI argued) in both cases, there are no modified positions

---

[3]    The Union's argument that the contract should be interpreted to give the employees more than workers' compensation provides (Union Br. at pp. 24-25) fails to recognize that the Company raised this issue in Staudohar as well. In Staudohar, the Company was of the view that once they became permanent and stationary the need for the leave ended, and the workers' compensation system in effect took over. (Er. Ex. 2 pp. 16-17, 81-82.)

at NUMMI and there is no provision in the NUMMI Agreement similar to the UAW/Contract disregarding senority for placement purposes.

Section 9.3 does not change this. That Section does not specify a particular length of sick leave for employees. Rather, it puts a limit on the maximum length of sick leave that an employee can take by stating that sick leave "may not exceed" certain terms. Contrary to the Union's arguments, seniority comes into play in that if the employee does not become permanent and stationary, then he has time for time to recover and get better. Industrially injured employees are treated better than non-industrial injured employees since so long as they are getting better and not permanent and stationary their seniority cannot be broken.[4]

IV.    Past Practice Does Not Apply

Past practice is not at issue in this case. The Union argues that the phrase "among other things" in the submission of issues conceivably includes anything, including past practice. That phrase, however, is so broad as to be meaningless. If the Union wanted to argue past practice was an issue they should have said so in the submission of issues, To the extent past practice is at-issue, it must take a back seat to Staudohar.

Past practice may be utilized when the contract language is unclear. As noted above, Staudohar determined that the policy at issue was permissible under the Agreement. Moreover, his interpretation of the Agreement is directly "inconsistent" with the two arguments the Union bases its contractual arguments on : (1) seniority cannot be "broken"; and (2) Article XI, Section 3(g) is the only

---

[4]    In addition, the Union argues that the Company's interpretation would lead to harsh results since the longer someone is allowed to stay out the greater the chance that a job could someday open up (placement of these team members occurred anywhere up to several years after becoming permanent). (Union Br. at p. 19.) Staudohar understood that and rejected that argument as well. He cited the differences between the GM contract and the NUMMI Agreement and the element of timing in finding an open position.

way that a worker on leave can have his seniority end.   Under Staudohar and the cases that followed it, NUMMI always had the right to implement the Policy.  It thus informed the Union of its contractual rights before the 2005 negotiations started by "stating its position."  Once it did so, any past practice obligation ceased.

The Union's argument that an employee is entitled to leave until he becomes permanent and stationary and then leave for the duration of his seniority, has no past practice to support it.  See Elkouri and Elkouri, *How Arbitration Works*, at p. 608 (6th Ed. 2003) (past practice needs to be unequivocal, clearly stated and acted upon, and fixed over time).  The Union is not arguing that the Company must provide time for time benefits.  Instead, the Union is arguing that employees are contractually entitled to leave until they become permanent, and then they are entitled to an additional leave for the length of their seniority after they became permanent and stationary (the "extra innings" argument).  (Union Br. at p. 37.) Not even the Union has interpreted the language in the Agreement this way.  This "interpretation" did not arise until NUMMI informed the Union it intended to enforce Staudohar.  (Union Br. at p. 37.)  No arbitrator has ever interpreted the Agreement this way.  The Company has certainly never interpreted the Agreement this way.

The Union argues that a Company pre-hearing statement in the Adeola case lends support to the argument that a past practice exists to support the "extra innings" argument.  This "evidence" is hardly past practice; none of the Staudohar grievants, including Grievant Adeola, received their time for time.  (Tr. 168.)  All of the Staudohar grievants including Adeola were sent a letter explaining the reason for their termination – "seniority was to be broken and their employment would cease under Section 3(e)."  (Er. Exs. 17, 18 and 19.)  There is no evidence of anyone in the history of NUMMI ever receiving the "extra innings" benefits. Finally, the Company has taken the position that the Company could provide time

for time leave under Section 3(g). Under the Company's interpretation of Staudohar, that was the maximum leave permitted. (Tr. 266.)

V.    Circumstances Have Not Changed

The Policy at issue was blessed by Staudohar and many if not most of the Union's current arguments were raised in Staudohar and rejected either expressly or implicitly. Thus, the Union is left with the argument that things have changed since Staudohar with respect to the number of modified and light duty jobs available at the plant. The Company strongly disagrees with this assertion. (NUMMI Op. Br. at pp. 14-15.) Union testimony on this issue lacks credibility and depends on the forum. When testifying before a workers compensation judge the same Union witness who testified at the arbitration was of the view that virtually all jobs at NUMMI are arduous and repetitive, and to the extent "light duty" job exist they are limited to quality control. (Er. Ex. 29, p. 5.)

VI.    Remedy

The Union seeks a monetary remedy for individuals who were terminated as a result of the Policy. However, there is no evidence that any terminated individuals have any out of pocket monetary loses. In any event, at the end of the day, the Union seeks what neither Staudohar, nor past practice, nor the Agreement supports, and what common sense dictates against – leave benefits that on average will last between 10 and 20 years, based on the hope that someday a job may open up or be created that is within a member's permanent restrictions and senority. This proposed remedy is not about a "reasonable" accommodation or returning someone to a former job. It is about allowing employees to retain expensive benefits for years without any realistic chance of coming back to work. Indeed, even a casual reading of Union Exhibit 47, which purports to list employees who were placed into jobs after becoming permanent, reveals that the vast majority of

14

these individuals were placed well within six months of becoming permanent, and not years after becoming permanent and stationary.

No one disputes that NUMMI wants workers to return to work. No one disputes that NUMMI works with the Union to try to find jobs for workers as soon as possible. It is unreasonable, however, to expect any employer, including NUMMI, to have people sit out an average of 10 to 20 years collecting benefits without any chance of returning to their former position. As Staudohar made clear, NUMMI's Agreement is not equivalent to the UAW/GM contract. Indeed, NUMMI deserves a better fate than GM.

Dated: October 20, 2006                 Respectfully submitted,


Nick C. Geannacopulos
SEYFARTH SHAW LLP
560 Mission Street, Suite 3100
San Francisco, California 94105
Telephone: (415) 397-2823
Facsimile: (415) 397-8549

Counsel for Respondent New United
Motor Manufacturing, Inc.

# PROOF OF SERVICE

I am a resident of the State of California, over the age of eighteen years, and not a party to the within action. My business address is Seyfarth Shaw LLP, 560 Mission Street, Suite 3100, San Francisco, California 94105. On October 20, 2006, I served the within documents:

## NEW UNITED MOTOR MANUFACTURING, INC.'S POST-HEARING REPLY BRIEF

☐ I sent such document from facsimile machine (415) 397-8549. I certify that said transmission was completed and that all pages were received and that a report was generated by facsimile machine (415) 397-8549 which confirms said transmission and receipt. I, thereafter, mailed a copy to the interested party(ies) in this action by placing a true copy thereof enclosed in sealed envelope(s) addressed to the parties listed below.

☒ by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at San Francisco, California addressed as set forth below.

☐ by personally delivering the document(s) listed above to the person(s) at the address(es) set forth below.

☐ by placing the document(s) listed above, together with an unsigned copy of this declaration, in a sealed Federal Express envelope with postage paid on account and deposited with Federal Express at San Francisco, California, addressed as set forth below.

Counsel to UAW Local 2244
Linda Lye
Altshuler, Berzon, Nussbaum, Rubin & Demain
177 Post Street, Suite 300
San Francisco, California 94108

Arbitrator
Charles A. Askin
31 Loma Vista
Walnut Creek, California 94596

I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than on day after the date of deposit for mailing in affidavit.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on October 20, 2006, at San Francisco, California.

*Shante R. Stitt*
Shante Stitt

SFI 28267087.1 / 33218-000032

16

# Appendix

tion itself if the FLRA finds that the SSA has violated the NTEU's statutory rights. The NTEU in fact has advised us that it has already petitioned the FLRA to extend the deadline for the election for an additional period of time equal to that for which it has been denied access to the Woodlawn grounds. The NTEU has also filed a motion to expedite the unfair labor practice proceeding; furthermore, as of now there is no indication that the FLRA has failed to employ all due diligence in resolving this dispute in a time and manner calculated to alleviate or remedy the NTEU's alleged injuries.

On the other hand, to affirm the district court's dismissal of the NTEU's complaint could leave the union with no remedy but to refile its lawsuit if the FLRA does not decide its claim in the immediate future or postpone the time for filing its election petition. If the NTEU continues to face a November 1992 deadline without access to the Woodlawn grounds throughout the summer, and assuming it has a legitimate claim to access to the complex, its ability to organize a campaign will be irreparably damaged. There appears to be merit in the NTEU's argument that its loss of organizing time on the front end cannot be made up by doubled or tripled efforts in the period immediately preceding the election. At the time of the district court's original decision, the election was still more than a year away; as of now it is only seven and a half months away. That convergence of a definite deadline for the union and no comparable deadline for the FLRA's action compels us to direct that the complaint be held in abeyance by the district court until one of several events occurs.

### III. Conclusion

We reverse the district court's order dismissing the NTEU's complaint; and order that the action be maintained on its docket, for a period of three months from the date this opinion issues, i.e., until June 30, 1992, or until the FLRA reaches a final decision in the NTEU's unfair labor practice proceeding at an earlier date. If by the June date the FLRA has not acted on the unfair labor practice, the union may renew its motions for injunctive relief in the district court. In considering any such future motions, the district court should also take account of whether the union's petition to extend the deadline for filing the election petition has been granted, denied or is still pending. Finally, if the FLRA acts to deny the union access to the Woodlawn complex, the district court should entertain its constitutional claim.

This compromise reflects our keen interest in balancing the need for the administrative proceeding to complete its course, against the possibly irreparable loss that the NTEU will suffer if its constitutional claim is ultimately vindicated but the proceeding has taken so long that the purpose for its free speech exercise has been practically eradicated. Maintaining the case in abeyance on the district court's docket for three months should protect the interests of judicial economy embodied in the exhaustion doctrine at the same time it avoids irreparable injury to the NTEU's alleged First Amendment rights.

*It is so ordered.*



### YAMAHA CORPORATION OF AMERICA, Appellant,

v.

### UNITED STATES of America, et al.

No. 90–5318.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 28, 1992.

Decided April 14, 1992.

Rehearing Denied July 16, 1992.

United States distributor and trademark holder filed challenge to legality of regulations permitting Customs Service to deny "genuine goods" exclusion order to holder of United States trademark that is

also wholly owned subsidiary of foreign-trademark holder. The United States District Court for the District of Columbia, Harold H. Greene, J., 745 F.Supp. 730, granted motion to dismiss in part, and 745 F.Supp. 734, dismissed remainder of suit on collateral estoppel grounds. United States trademark holder appealed. The Court of Appeals, Wald, Circuit Judge, held that: (1) trademark holder was precluded from relitigating issue that regulations were invalid under Tariff Act of 1930 and Lanham Act by resolution of identical issues in earlier suit against gray-market importer; (2) United States trademark holder's failure to properly introduce evidence of "physical differences" between gray-market goods and "genuine" goods precluded it from relitigating issue of its rights under Lanham Act based on allegedly new evidence; (3) regulation did not violate Treaty of Friendship or Paris Convention; (4) Customs Service's refusal to grant genuine goods exclusion order did not constitute "taking" without just compensation; and (5) regulation did not exceed Secretary's authority.

Affirmed.

### 1. Federal Courts ⟜776

Court of Appeals' review of district court's dismissal of plaintiff's claims for failure to state claim upon which relief could be granted or under summary judgment is de novo.

### 2. Judgment ⟜634

Under standards for establishing preclusive effect of prior holding, same issue must have been contested by parties and submitted for judicial determination in prior case, issue must have been actually and necessarily determined by court of competent jurisdiction, and preclusion in second case must not work basic unfairness to party bound by first determination.

### 3. Judgment ⟜634

In issue preclusion, it is prior judgment that matters, not court's opinion explicating judgment.

### 4. Judgment ⟜720

For purposes of issue preclusion, once issue is raised and determined, it is entire issue that is precluded, not just particular arguments raised in support of it in first case.

### 5. Judgment ⟜713(2)

Issue preclusion cannot be avoided simply by offering evidence in second proceeding that could have been admitted, but was not, in first.

### 6. Judgment ⟜724

United States trademark holder that was owned by foreign manufacturer was collaterally estopped from relitigating issue of whether it had rights under Tariff Act to exclusion of gray-market goods manufactured under foreign manufacturer's trademark in suit against government agency, where issue was necessarily decided in earlier suit against gray-market importer of genuine goods of foreign manufacturer; also, since it had been determined that United States trademark holder had no basic rights under Tariff Act that were being unfairly denied or discriminatorily withheld, trademark holder had no basis for arguing that regulation promulgated under Tariff Act violated its due process and equal protection rights. U.S.C.A. Const.Amend. 14; Tariff Act of 1930, § 526, as amended, 19 U.S.C.A. § 1526.

### 7. Judgment ⟜713(2)

United States trademark holder was collaterally estopped from introducing evidence of "physical differences" between goods of gray-market importer and "authorized goods" in suit seeking declaratory judgment that Lanham Act protected it from gray-market importation of goods where evidence could have been submitted in earlier suit brought directly against gray-market importer; issue of United States trademark holder's rights under Lanham Act was actually and necessarily determined where Court of Appeals noted on appeal in earlier case that federal trademark law afforded no protection for wholly owned United States subsidiary of foreign manufacturer against rival company that imported and sold goods made by foreign

## YAMAHA CORP. OF AMERICA v. U.S.     247
Cite as 961 F.2d 245 (D.C. Cir. 1992)

parent company, and trademark holder failed properly to introduce evidence to support its argument that § 42 of Lanham Act was to be interpreted differently in the case of physically different goods. Lanham Trade-Mark Act, § 42, 15 U.S.C.A. § 1124.

**8. Judgment** ⊜713(1)

Fact that substantive law may be different in two jurisdictions does not affect application of issue preclusion.

**9. Customs Duties** ⊜22

Domestic trademark owner had no cause of action under either Treaty of Friendship or Paris Convention to challenge regulation withholding protections of section of Tariff Act, which prohibits importation of foreign-manufactured goods without permission of United States trademark holder, in instances in which trademark holder is subsidiary of foreign manufacturer; there was no violation of either treaty in form of discriminatory treatment where domestic trademark holder was treated like every other domestic trademark owner that shared common ownership or control with owner of foreign trademark.

**10. Eminent Domain** ⊜2(1.1)

Customs Service's refusal to grant genuine goods exclusion order, thereby permitting gray-market importer to bring foreign manufacturer's brand goods into United States market without permission of United States trademark holder, did not constitute "taking" without just compensation in violation of Fifth Amendment; any underselling of United States trademark holder resulted from its own parent/manufacturer's choice of selling same goods abroad at lower cost, which were then purchased for importation and resale in United States. U.S.C.A. Const.Amend. 5; Tariff Act of 1930, § 526, as amended, 19 U.S.C.A. § 1526.

**11. Customs Duties** ⊜22

Regulation, under which section of Tariff Act making it unlawful to import foreign manufactured goods without permission of United States trademark holder was inapplicable in instances in which United States trademark holder was subsidiary of foreign manufacturer, did not exceed Secretary's authority under Treaty of Friendship and Paris Convention; regulation did not deprive foreign corporations of "national treatment" under United States customs and trademark laws, but applied equally to any domestic trademark owners that shared common ownership or control with owner of foreign trademark. Tariff Act of 1930, § 526, as amended, 19 U.S.C.A. § 1526.

---

Appeal from the United States District Court for the District of Columbia.

Robert E. Wagner, with whom Linda A. Kuczma and James J. Jagoda, Chicago, Ill., were on the brief, for appellant. William T. Bullinger, Washington, D.C., also entered an appearance for appellant.

Daniel J. Standish, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., John D. Bates and R. Craig Lawrence, Asst. U.S. Attys., Washington, D.C., were on the brief for appellees.

Before WALD, SENTELLE, and HENDERSON, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

WALD, Circuit Judge:

Appellant Yamaha Corporation of America ("Yamaha–America") appeals from two orders of the district court dismissing its complaint against appellees the United States of America, the Secretary of the Treasury ("Secretary"), and the Commissioner of Customs. Appellant challenged the legality of certain regulations of the United States Customs Service ("Customs") that permit Customs to deny a "genuine goods" exclusion order to the holder of a U.S. trademark that is also a wholly owned subsidiary of the foreign-trademark holder. The district court concluded that appellant was precluded from relitigating the issue that the regulations are invalid under the Tariff Act of 1930, 19 U.S.C. §§ 1202–1677k (1988) ("Tariff Act"),

and under the Trademark Act of 1946, 15 U.S.C. §§ 1051-1127 (1988) ("Lanham Act"), because these identical issues had already been litigated and resolved by the district court of the Central District of California in a different case. The district court below also dismissed appellant's claims that its rights under certain treaties guaranteeing non-discriminatory "national treatment" to foreign corporations had been violated.

Because we conclude that the district court properly determined that the doctrine of issue preclusion prevents appellant from relitigating its claims under the Tariff and Lanham Acts and that appellant has no cause of action under the treaties, we affirm.

## I. BACKGROUND

Yamaha-America is a California corporation. It is a wholly owned subsidiary of Yamaha Corporation, a Japanese company ("Yamaha-Japan"). Since 1960, Yamaha-America has been the exclusive authorized U.S. distributor of "Yamaha" brand music and sound equipment products manufactured by Yamaha-Japan. Yamaha-America is the registered owner by assignment from Yamaha-Japan of 18 separate U.S. trademarks.

Yamaha-America claims to have been unlawfully injured by so-called "gray-market," or parallel, imports. Gray-market goods are foreign-manufactured products bearing a valid U.S. trademark that are imported without the consent of the American trademark holder.[1] Gray-market goods are distinguished from counterfeit goods in that the use of the United States trademark is authorized by the holder of the foreign trademark.

### A. *The ABC Litigation*

In December 1986, Yamaha-America filed an action in the Central District of California seeking damages and injunctive relief against ABC International Traders Corporation ("ABC"), for trademark infringement and unfair competition under the Lanham Act and the laws of California. ABC is a corporation engaged in the importation, distribution, sale, and warranty of various goods including genuine Yamaha brand electronic sound equipment.[2] In November 1987, Yamaha amended its complaint to include claims under section 526 of the Tariff Act, 19 U.S.C. § 1526 (1988) ("section 526"), and section 42 of the Lanham Act, 15 U.S.C. § 1124 (1988) ("section 42"). In its five-count amended complaint, Yamaha-America alleged the following:

Count I—ABC has violated section 32(a) of the Lanham Act, 15 U.S.C. § 1114(a) (1988), by advertising and selling products made by Yamaha-Japan and bearing marks identical to marks owned by Yamaha-America in such a way that their use is likely to cause customer confusion or mistake and to deceive the public.

Count II—ABC has violated section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (1988), by falsely representing or creating the impression that Yamaha-America is associated or affiliated with ABC and that it warrants the quality or guarantees repair of such products.

Count III—ABC has violated California law by intentionally promoting its products so as to confuse and deceive and unlawfully to exploit and appropriate the valuable property rights and good will of Yamaha-America.

Count IV—ABC has violated California law by using Yamaha-America's

---

1. Gray-market imports typically increase during periods when the dollar is strong relative to other currencies. The goods are generally bought overseas by discounters, who then import and market the products in the United States at reduced prices relative to the authorized domestic retailer. *See* Comment, *Applying Grecian Formula to International Trade:* K Mart Corp. v. Cartier, Inc. *and the Legality of Gray Market Imports,* 74 Va.L.Rev. 1397, 1398 (1989).

2. "Genuine" goods are goods that are in fact manufactured by the same manufacturer that supplies the U.S. trademark holder. In other words, they are to be distinguished from goods that "copy or simulate" the genuine article; they *are* the genuine article, although they may not have been intended for distribution in the U.S. market. *See Lever Bros. Co. v. United States,* 877 F.2d 101, 105 (D.C.Cir.1989).

marks without authorization in such a way that it is likely to injure Yamaha-America's reputation and to dilute the distinctiveness of Yamaha-America's trademarks.

Count V—ABC has violated section 526 of the Tariff Act and section 42 of the Lanham Act by unlawfully importing and dealing in goods bearing the trademarks owned by Yamaha-America without its consent.

ABC counterclaimed against both Yamaha-America and Yamaha-Japan, alleging violations of the Clayton Act, 15 U.S.C. § 13 (1988), the Wilson Tariff Act, 15 U.S.C. § 8 (1988), and the Sherman Act, 15 U.S.C. §§ 1-2 (1988). ABC also alleged violations of California law, including interference with business relations, defamation, and unfair competition.

1. The District Court's Decision

On November 9, 1987, Judge Lew of the Central District of California granted ABC's motion for partial summary judgment as to Counts I and II. He made the following conclusions of law:

4. There is and can be no likelihood of confusion, or confusion as to source, origin or sponsorship, between [Yamaha-Japan]-manufactured goods sold by [Yamaha-America] and [Yamaha-Japan]-manufactured goods sold by ABC, which bear trademarks identical to the assigned trademarks.

5. As a matter of law there is and can be no violation of Lanham Act Sections 32 or 43(a) by ABC ... by virtue of the acts of ABC in importing and selling "YAMAHA" brand goods manufactured by [Yamaha-Japan].

Statement of Uncontroverted Facts and Conclusions of Law (dated Oct. 19, 1987) (citations omitted) (incorporated by reference in Judge Lew's oral ruling granting summary judgment as to Counts I and II (Nov. 9, 1987).

3. Judge Lew found that Yamaha failed to meet its burden of establishing a genuine issue of fact as to consumer confusion over the source and sponsorship of the goods or as to injury to Yamaha-America's reputation. With every genuine product it sells, ABC provides both its own warranty and a statement that the goods were

On December 23, 1988, Judge Lew granted ABC's motion for summary judgment as to the remaining counts of Yamaha-America's Amended Complaint. *See Yamaha Corp. of Am. v. ABC Int'l Traders Corp.,* 703 F.Supp. 1398 (C.D.Cal.1988), *aff'd in part, rev'd in part on other grounds,* 1991 WL 144474, 1991 U.S.App. LEXIS 17882 (9th Cir. July 30, 1991) [940 F.2d 1537 (table) ], *cert. denied,* — U.S. —, 112 S.Ct. 1177, 117 L.Ed.2d 422 (1992). As to Count III, Judge Lew concluded that Yamaha-America failed to sustain its burden of documenting a genuine issue of fact concerning customer confusion under California's unfair competition law. *Id.* at 1402. As to Count IV, Judge Lew concluded that no legally recognizable injury to reputation or dilution of the trademark "can possibly come to Yamaha-America if ABC limits its activities to the sale of genuine Yamaha products." *Id.*[3]

a. *Count V—Tariff Act*

It is Judge Lew's treatment of Count V that is most relevant to the question of issue preclusion in this case. Yamaha-America alleged in Count V that ABC's importation of genuine Yamaha products violated its rights under the Tariff Act and the Lanham Act. The relevant portion of section 526 of the Tariff Act provides that

it shall be unlawful to import in the United States any merchandise of foreign manufacture if such merchandise ... bears a trademark owned by a citizen of, or by a corporation or association created or organized within, the United States ... unless written consent of the owner of such trademark is produced at the time of making entry.

19 U.S.C. § 1526(a) (1988). Judge Lew recognized that the protection provided by section 526 "has been consistently interpreted by U.S. Customs for more than fifty years not to be available to American subsidiaries

imported by ABC and not by Yamaha-America. *ABC,* 703 F.Supp. at 1402 ("While the goods are made by Yamaha-Japan, the services provided with those goods are ABC's and thus any fallout from the lack of quality of those services reflects poorly upon ABC and not Yamaha.").

**250**        **961 FEDERAL REPORTER, 2d SERIES**

of foreign corporations." *ABC,* 703 F.Supp. at 1403.[4] After quoting directly from 19 C.F.R. § 133.21(c)(2) (the "Regulation"), Judge Lew added that the Supreme Court had recently upheld the Regulation in *K Mart Corp. v. Cartier, Inc.,* 486 U.S. 281, 108 S.Ct. 1811, 100 L.Ed.2d 313 (1988), as a permissible interpretation of section 526. *ABC,* 703 F.Supp. at 1403.

Yamaha-America had argued to the *ABC* court that it had rights under section 526 to seek damages and an injunction against a private gray-market importer even if Customs would not have issued a genuine-goods exclusion order under the Regulation. In other words, Yamaha-America had argued that the Regulation does not define the full scope of the protection provided by section 526; even if the Regulation is valid, ABC's actions violated Yamaha-America's rights under section 526. *See* Transcript of Oral Argument (D.C.Cir. filed Mar. 11, 1992) ("Transcript") at 31 (discussing argument made to *ABC* court and on appeal to Ninth Circuit). Judge Lew rejected Yamaha-America's argument, however, declining "to interpret § 526 any differently than does the Customs Service." *ABC,* 703 F.Supp. at 1403. He added that

even if this Court were to review the statute *de novo,* it would conclude that Yamaha is not entitled to relief under § 526. To allow Yamaha-America and firms like it such protection would allow any foreign manufacturer to use a wholly owned American subsidiary as a means to secure the help of American tariff law in enforcing worldwide price discrimination. This can not be seen to

have been the intent of Congress in passing § 526.

*Id.* Judge Lew's grant of summary judgment to ABC on Yamaha-America's Tariff Act claim was clearly based on two reasons: First, the Regulation—which the Supreme Court recognized to be a reasonable interpretation of section 526—withholds the protections of section 526 from a U.S. trademark holder that is a subsidiary of the foreign trademark holder; and second, section 526 itself excludes from its general protected class those U.S. trademark holders that are wholly owned American subsidiaries of the foreign trademark holders.

**b.** *Count V—Lanham Act*

Yamaha-America also claimed in Count V that its rights under section 42 of the Lanham Act were being violated by ABC's gray-market importation. The relevant portion of section 42 provides that

no article of imported merchandise . . . which shall copy or simulate a trademark registered in accordance with the provisions of this chapter or shall bear a name or mark calculated to induce the public to believe that the article is manufactured in the United States . . . shall be admitted to entry at any customhouse of the United States . . . ,

15 U.S.C. § 1124 (1988). According to Judge Lew, however, Yamaha-America had already admitted that the goods imported by ABC were genuine Yamaha items. Relying on *NEC Electronics v. CAL Circuit Abco,* 810 F.2d 1506 (9th Cir.), *cert. denied,* 484 U.S. 851, 108 S.Ct. 152, 98 L.Ed.2d 108 (1987), and *Olympus Corp. v. United States,* 792 F.2d 315 (2d Cir.1986), *cert. denied,* 486 U.S. 1042, 108 S.Ct. 2033,

---

**4.** This is not technically true. In 1936, Customs adopted a regulation exempting merchandise manufactured in a foreign country under a foreign trademark from section 526 coverage "if such foreign trade-mark or trade name and such United States trade-mark or trade name *are owned by the same person, partnership, association, or corporation.*" T.D. 48,537, 70 Treas. Dec. 336, 337 (1936) (emphasis added). In 1953, the regulations expanded that "same company" exception to include situations where the domestic trademark holder and the foreign trademark holder exercised legitimate control over one another with respect to the nature and

quality of the goods in question. *See* T.D. 53,-399, 88 Treas.Dec. 376, 384 (1953). Finally, in 1972, Customs reissued the regulations in their current form, expanding the "same company" exception to encompass situations where the foreign and domestic trademark holders are "parent and subsidiary companies or are otherwise subject to common ownership or control." 19 C.F.R. § 133.21(c)(2) (1991). *See generally Vivitar Corp. v. United States,* 761 F.2d 1552, 1566–67 (Fed.Cir.1985) (recounting history of Customs's regulation), *cert. denied,* 474 U.S. 1055, 106 S.Ct. 791, 88 L.Ed.2d 769 (1986).

100 L.Ed.2d 618 (1988), Judge Lew concluded that "the importation of genuine goods is not actionable under the Lanham Act." *ABC,* 703 F.Supp. at 1404. Judge Lew interpreted *NEC Electronics* as holding that "no cause of action arose under the Lanham Act when an American importer imported *genuine* trademarked items that had been sold overseas by the parent of the American trademark holder." *Id.* (emphasis in original). Judge Lew found this interpretation of the Lanham Act to be a reasonable one because the decision to sell goods at a lower price abroad (thereby creating conditions for a gray market) is made by the same people who control the American subsidiary; allowing that subsidiary to claim a trademark violation would effectively provide the foreign company with a means of insulating the American economy from the effects of international competition. Accordingly, he granted summary judgment against Yamaha-America on its Lanham-Act claim.

Yamaha-America moved under Rule 54(b) of the Federal Rules of Civil Procedure for the entry of final judgment as to all claims for the purposes of expediting appeal. Judge Lew denied the motion, and Yamaha-America moved for reconsideration. In its memorandum in support of its motion for reconsideration, Yamaha-America argued that the goods imported by ABC were physically different from those imported by Yamaha-America and therefore did not legitimately fall under the genuine-goods exception to Lanham Act protection. In a one-page order, Judge Lew wrote:

> [H]aving read and considered the papers filed in support of and in opposition to the motion, the Court hereby removes the motion from the Court's law and motion calendar ... and issues the following order:
>
> Plaintiffs' motion for reconsideration is DENIED. IT IS SO ORDERED.

Order (filed Mar. 28, 1989).

2. The Ninth Circuit's Opinion

After ABC's counterclaims were later dismissed, both Yamaha-America and ABC appealed to the Ninth Circuit. In July 1991, the Court of Appeals affirmed the

granting of summary judgment against Yamaha-America. See *Yamaha Corp. of Am. v. ABC Int'l Traders, Inc.,* Nos. 90–55036, –55120, 1991 WL 144474, 1991 U.S.App. LEXIS 17882 (9th Cir. July 30, 1991) [940 F.2d 1537 (table) ] (9th Cir.1991) (*"Ninth Circuit Opinion"*). In an unpublished opinion, the court determined that, with respect to its Lanham Act claims, although Yamaha-America had belatedly attempted to distinguish *NEC Electronics* by suggesting that the products imported by ABC were physically different in material ways from those imported by Yamaha-America, this argument was untimely raised in the motion for reconsideration and proffered only in the form of a lawyer's affidavit. Judge Lew "did not err in granting summary judgment against Yamaha on the trademark claims." *Id.* 1991 WL 144474 at *1, 1991 U.S.App. LEXIS 17882 at *4.

With respect to Yamaha-America's Tariff Act claims, the Court of Appeals concluded that

> [t]he district court also correctly granted summary judgment in favor of ABC on Yamaha's claims under the Tariff Act, 19 U.S.C. § 526, which prohibits the importation of foreign made goods bearing a trademark owned by a United States corporation.... We affirm the district court's determination that the regulation leaves no room for Yamaha's Tariff Act claim.

*Id.*[5]

B. *Procedural History of this Case*

On May 17, 1989 (almost five months *after* Judge Lew's decision in *ABC*), Yamaha-America filed suit against the United States, the Secretary, and the Commissioner of Customs. In its two-count complaint, Yamaha-America alleged the following:

> Count I—Yamaha-America is entitled to a declaratory judgment that Customs should issue an exclusion order prohibiting importation of genuine goods manufactured by Yamaha-Japan.
>
> Count II—Yamaha-America is entitled to a declaratory judgment that Customs

5. The Court of Appeals reversed Judge Lew's dismissal of ABC's antitrust counterclaims and

remanded for further development of the record.

regulation 19 C.F.R. § 133.21(c)(2) is invalid for the following reasons:

(1) it exceeds the authority granted to the Secretary, for he has power to promulgate only those regulations consistent with law;

(2) it discriminates against Yamaha-America by denying it rights under the Lanham Act and the Tariff Act to which other domestic corporations are entitled, merely on the basis of its Japanese ownership;

(3) it deprives Yamaha-America of its constitutional rights to due process and equal protection by denying it the protections of the Tariff Act and the Lanham Act;

(4) it directly conflicts with Article 2 of the Paris Convention for the Protection of Industrial Property which provides that all members will accord to other member owners of trademarks the same rights as enjoyed by domestic citizens;

(5) it directly conflicts with Article X of the 1953 Treaty of Friendship, Commerce and Navigation between the United States and Japan, which provides for "national treatment" of corporations owned by the other party.

*See* Complaint (filed May 17, 1989) at 8–11.

1. Yamaha I

Appellees moved to dismiss the complaint, arguing that the doctrine of issue preclusion prevented Yamaha-America from relitigating claims under the Tariff and Lanham Acts it had previously raised and lost in *ABC*. The district court agreed:

> The issues regarding the Lanham and Tariff Acts in the instant case are identical to those actually litigated and neces-

sarily decided in *ABC International Traders*. Moreover, the issues here—whether the Lanham and Tariff Acts provide plaintiff a basis to block the goods manufactured by Yamaha Japan—were actually and necessarily determined in *ABC*.

*Yamaha Corp. of Am. v. United States*, 745 F.Supp. 730, 731–32 (D.D.C.1990) ("*Yamaha I*").

Although the district court concluded that Yamaha-America's arguments as to the validity of the Regulation under the Tariff and Lanham Acts must be dismissed, it concluded that the parties had not adequately briefed the matter of whether Yamaha-America was precluded from arguing that the gray-market goods in this case were "physically different" from the authorized goods and, therefore, fell into the exception recognized in *Lever Brothers Co. v. United States*, 877 F.2d 101 (D.C.Cir. 1989).[6] It therefore denied defendants' motion to dismiss as to the physical-differences argument.

Yamaha-America's claims under the Treaty of Friendship, Commerce and Navigation, Apr. 2, 1953, U.S.–Japan, 4 U.S.T. 2063 ("Treaty of Friendship"), and under the Paris Convention for the Protection of Industrial Property of March 20, 1883, *as revised* July 14, 1967, 21 U.S.T. 1583, 1629 ("Paris Convention"), were not addressed by the court in *ABC*.[7] Article X of the Treaty of Friendship provides that nationals and companies of either party shall be accorded "national treatment and most favored nation treatment with respect to obtaining and maintaining patents of invention and with respect to rights in trade

---

6. In *Lever Brothers*, we concluded that "the natural, virtually inevitable reading of § 42 is that it bars foreign goods bearing a trademark identical to a valid US trademark *but physically different*, regardless of the trademarks' genuine character abroad or affiliation between the producing firms." *Lever Bros.*, 877 F.2d at 111 (emphasis added). To the extent that the physical differences of the gray-market good are not readily detectable, there is a risk that consumers will be confused into thinking that the gray-market good and the authorized good are identical.

7. Yamaha-America did, in fact, raise the issue of its rights under both the Paris Convention and the Treaty of Friendship in its memorandum in support of its motion for reconsideration in *ABC*. However, appellees never argued to the district court below that these issues were also precluded, and they do not make that argument on appeal. *See* Transcript at 27. The district court ruled on the merits of Yamaha-America's treaty claims, and we review the decision on the merits as well.

marks...." *Id.* art. X, 4 U.S.T. at 2071.[8] The district court concluded, however, that Yamaha–America was neither a national nor a company of Japan and that it lacked standing, as an American company in the United States, to invoke the terms of Article X. *Yamaha I,* 745 F.Supp. at 733.

Article 2(1) of the Paris Convention extends to the nationals of all countries of the "Union"—of which both the United States and Japan are part—all the advantages pertaining to the protection of industrial property that each member of the Union extends to its own nationals.[9] Furthermore, Article 2(2) prohibits the establishment of domicile requirements.[10] The district court determined that, as in the case of the Treaty of Friendship, Yamaha–America was attempting to invoke a provision of a treaty intended to protect foreign nationals doing business in the United States. The district court dismissed Yamaha–America's claim under the Paris Convention for failure to state a claim upon which relief could be granted.

### 2. Yamaha II

Additional briefing was provided on whether Yamaha–America was precluded from raising its claim under section 42 that it was entitled to a *Lever Brothers* exception to the non-applicability of the Lanham Act to the importation of genuine goods. According to Yamaha–America, the gray-market products have the following physical differences: They lack the Underwriters Laboratory Approval and electromagnetic shielding required by the FCC; they have dual voltage switches and different plugs; they are not covered by the same warranties; and they do not include the same training and educational services as those provided by Yamaha–America. Yam-

aha–America argued that these physical differences between the gray-market and authorized products mean that Yamaha–America may avail itself of the protections provided by section 42 of the Lanham Act. *See Lever Bros.,* 877 F.2d at 111.

Appellees argued that Yamaha–America had made the identical argument to the *ABC* court and that Judge Lew had rejected it. The district court agreed: "The *ABC* court could not have denied Yamaha America's motion [for reconsideration] without rejecting the contention that it failed to consider Yamaha America's arguments concerning physical differences." *Yamaha Corp. of Am. v. United States,* 745 F.Supp. 734, 736 (D.D.C.1990) ("*Yamaha II*"). According to the district court, "*ABC* resolved the legal question of whether physical differences in gray market products place them within the umbrella of the federal trademark laws, and that is the issue Yamaha America is estopped from rearguing." *Id.* at 737. The fact that the district court might have reached a different conclusion on the merits under the law of this Circuit is irrelevant, for the doctrine of issue preclusion prevents reaching the merits, even where a different view would prevail. *Id.* at 738. Concluding that Yamaha–America's efforts to relitigate the relevance of physical differences "represents nothing more than garden variety forum shopping," *id.,* the district court dismissed the complaint and entered judgment against appellant.

## II. DISCUSSION

### A. *Standard of Review*

[1] In *Yamaha I,* the district court dismissed the majority of Yamaha–America's claims under Rule 12(b)(6) of the Federal

---

8. The Treaty of Friendship defines "companies" as follows: "Companies constituted under the applicable laws and regulations within the territories of either Party shall be deemed companies thereof and shall have their juridical status recognized within the territories of the other Party." Treaty of Friendship, art. XXII(3), 4 U.S.T. at 2080.

9. "Nationals of any country of the Union shall, as regards the protection of industrial property,

enjoy in all the other countries of the Union the advantages that their respective laws now grant, or may hereafter grant, to nationals...." Paris Convention, art. 2, 21 U.S.T. at 1631.

10. "[N]o requirement as to domicile or establishment in the country where protection is claimed may be imposed upon nationals of countries of the Union for the enjoyment of any industrial property rights." *Id.* art. 2(2).

Rules of Civil Procedure, and our review of that order is *de novo*. The same is true of the decision in *Yamaha II*, in which the district court disposed of the remaining claims under Rule 56. *Shields v. Eli Lilly & Co.*, 895 F.2d 1463, 1466 (D.C.Cir.1990) ("Since pretrial summary judgment decisions are rendered exclusively on the basis of a 'paper' record, an appellate court is equally well-positioned as a trial judge to assess the evidence at issue.").

### B. Issue Preclusion

The objective of the doctrine of issue preclusion (also known as collateral estoppel) is judicial finality; it fulfills "the purpose for which civil courts had been established, the conclusive resolution of disputes within their jurisdiction.", *Kremer v. Chemical Constr. Corp.*, 456 U.S. 461, 467 n. 6, 102 S.Ct. 1883, 1890 n. 6, 72 L.Ed.2d 262 (1982). The Supreme Court has defined issue preclusion to mean that "once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case." *Allen v. McCurry*, 449 U.S. 90, 94, 101 S.Ct. 411, 414, 66 L.Ed.2d 308 (1980).

[2] The standards for establishing the preclusive effect of a prior holding are: First, the same issue now being raised must have been contested by the parties and submitted for judicial determination in the prior case. Second, the issue must have been actually and necessarily determined by a court of competent jurisdiction in that prior case. *See McLaughlin v. Bradlee*, 803 F.2d 1197, 1201 (D.C.Cir. 1986); RESTATEMENT (SECOND) OF JUDGMENTS § 27 (1982) ("[w]hen an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent

action between the parties").[11]   Third, preclusion in the second case must not work a basic unfairness to the party bound by the first determination. An example of such unfairness would be when the losing party clearly lacked any incentive to litigate the point in the first trial, but the stakes of the second trial are of a vastly greater magnitude. *See Otherson v. Department of Justice*, 711 F.2d 267, 273, (D.C.Cir.1983); *see also Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 330, 99 S.Ct. 645, 651, 58 L.Ed.2d 552 (1979) (unfairness concern is heightened when plaintiff seeks to use collateral estoppel "offensively" against defendant when plaintiff was not party to prior suit); *Blonder-Tongue Labs., Inc. v. University of Ill. Found.*, 402 U.S. 313, 333, 91 S.Ct. 1434, 1445, 28 L.Ed.2d 788 (fairness is implicated whenever there is risk that "prior proceedings were seriously defective").

[3–5] In issue preclusion, it is the prior *judgment* that matters, not the court's opinion explicating the judgment. "Even in the absence of *any* opinion a judgment bars relitigation of an issue necessary to the judgment." *American Iron & Steel Inst. v. EPA*, 886 F.2d 390, 397 (D.C.Cir. 1989) (emphasis in original), *cert. denied*, — U.S. —, 110 S.Ct. 3237, 111 L.Ed.2d 748 (1990). Furthermore, once an *issue* is raised and determined, it is the entire *issue* that is precluded, not just the particular arguments raised in support of it in the first case. *See Securities Indus. Ass'n v. Board of Governors*, 900 F.2d 360, 364 (D.C.Cir.1990) (plaintiff may not raise new argument in second proceeding even though it was never made in first proceeding; so long as argument could have been made, it is precluded); RESTATEMENT (SECOND) OF JUDGMENTS § 27 cmt. c at 253 (if previously litigated "issue was one of law, new arguments may not be presented to obtain a different determination of that issue"). Preclusion cannot be avoided sim-

---

11. Although sections 27 (the rule itself) and 28 (exceptions to the rule) of the RESTATEMENT (SECOND) apply only where the second action is between the same persons who were parties to the first action, section 29 reads as follows:

    A party precluded from relitigating an issue with an opposing party, in accordance with

§§ 27 and 28, is also precluded from doing so with another person unless the fact that he lacked full and fair opportunity to litigate the issue in the first action or other circumstances justify according him an opportunity to relitigate the issue.

RESTATEMENT (SECOND) OF JUDGMENTS § 29 (1982).

ply by offering evidence in the second proceeding that could have been admitted, but was not, in the first. CHARLES. ALAN WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE: JURISDICTION § 4426 at 141 (1981).

### 1. Section 526

[6] With respect to section 526 of the Tariff Act, Yamaha–America argues that the Regulation violates both due process and equal protection by denying it rights provided by the customs laws that are enjoyed by other domestic U.S. trademark holders. The district court concluded that Yamaha–America was precluded from litigating these issues. The court in *ABC* had held that Yamaha–America had no rights conferred upon it by section 526. The district court below reasoned that in light of this finding, "there can be no discrimination and no violation of equal protection or due process" involved in their denial. *Yamaha I*, 745 F.Supp. at 732 n. 6.

Yamaha–America argues that the validity of the Regulation was not an issue in *ABC*; indeed, its validity could not have been raised in a private action against a gray-market importer. "In fact, the *ABC* district court based it[s] grant of summary judgment against Yamaha America's § 526 claims on the Regulation. The *ABC* district court thereby simply assumed, without deciding, the Regulation's validity and applicability in denying Yamaha America's claim under the Tariff Act." Brief of Appellant (filed Dec. 18, 1991) ("Yamaha-America's Brief") at 12. This is, unfortunately for Yamaha–America's sake, not an accurate account of Judge Lew's decision. Judge Lew based his conclusion that Yamaha–America has no enforceable rights under section 526 on two separate and independent grounds: One was the Regulation, reflecting Customs's interpretation of section 526 that was held to be reasonable by the Supreme Court; the other, however, was the text of section 526 itself. *See ABC*, 703 F.Supp. at 1403. *See generally* JAMES WM. MOORE, JO DESHA LUCAS & THOMAS S. CURRIER, 1B MOORE'S FEDERAL PRACTICE ¶ 0.441[2] at 729 (1988) ("a judgment based alternatively upon two determinations, ei-

ther of which alone would be sufficient to sustain it, is an effective adjudication as to both grounds, and is collaterally conclusive as to both").

The issue that was litigated and necessarily determined by the court in *ABC* was whether or not Yamaha–America had any rights under section 526, inside or outside of the Regulation, that are violated by the gray-market importation of genuine Yamaha goods. It is precisely this issue that Yamaha–America now seeks to relitigate in this case. The district court was correct in concluding that Yamaha–America was precluded from doing so.

Yamaha–America now argues, however, that even if Judge Lew based his ruling that Yamaha–America had no rights under section 526 on grounds other than the Regulation, the unpublished Ninth Circuit opinion affirming *ABC*, which was released over ten months after *Yamaha II*, relied exclusively on the Regulation. *See* Yamaha–America's Brief at 12–13. Yamaha–America relies on *Stebbins v. Keystone Insurance Co.*, 481 F.2d 501, 507 n. 13 (D.C.Cir.1973) (Leventhal, J.), and *Martin v. Henley*, 452 F.2d 295, 300 (9th Cir.1971), for the proposition that when an appellate court affirms on only one of several grounds that served as alternative bases for the lower court decision, collateral estoppel attaches only to the issue expressly considered by the appellate court. *See also* MOORE, LUCAS & CURRIER, *supra*, ¶ 0.443[5.—2] at 790 n. 2 ("Where a case is decided alternatively by a trial court on several issues, but is disposed of on appeal on only one of these issues, only the issue considered by the appellate court is concluded.") (citing both *Stebbins and Martin*). While it is clear that the district court below properly relied on the *ABC* judgment, *Southern Pac. Communications Co. v. American Tel. & Tel. Co.*, 740 F.2d 1011, 1018 (D.C.Cir.1984) ("collateral estoppel may be applied to a trial court finding even while the judgment is pending on appeal"), in reviewing its orders, we must take into consideration the effect of the intervening *Ninth Circuit Opinion* on the matter of issue preclusion.

Yamaha–America argued on appeal to the Ninth Circuit that section 526 gave it certain rights to pursue remedies against a gray-market importer that were independent of Customs' Regulation. *See, e.g., Olympus Corp. v. United States,* 792 F.2d 315, 320 (2d Cir.1986) ("Customs' interpretation of the statute does not limit the reach of protection of section 526; it only limits Customs' obligations to enforce the section by excluding goods."), *cert. denied,* 486 U.S. 1042, 108 S.Ct. 2033, 100 L.Ed.2d 618 (1988); *Vivitar Corp. v. United States,* 761 F.2d 1552, 1568–70 (Fed.Cir.1985) (rejecting argument that section 526 must be interpreted as limited by Regulation), *cert. denied,* 474 U.S. 1055, 106 S.Ct. 791, 88 L.Ed.2d 769 (1986). The Ninth Circuit Court of Appeals concluded, however, that the district court "correctly granted summary judgment in favor of ABC on Yamaha's claims under the Tariff Act." *Ninth Circuit Opinion,* 1991 WL 144474, at *2, 1991 U.S.App. LEXIS 17882, at *4. In order to reach this conclusion, the Court of Appeals must necessarily, albeit implicitly, have rejected Yamaha–America's explicit argument that it had private rights under section 526 to exclude the gray-market goods that were greater than those encompassed by the Regulation.

The Court of Appeals did, of course, prominently mention that the Regulation, which was promulgated pursuant to section 526, states that the prohibitions against the importation of gray-market goods do not apply when the domestic trademark owner is a subsidiary of the foreign manufacturer. But notwithstanding Yamaha–America's arguments to the contrary, the appellate decision went further: The Court of Appeals explicitly affirmed the "district court's determination that the regulation leaves no room for Yamaha's Tariff Act claim." *Id.* In other words, Yamaha–America's claim that, despite the Regulation, it has independent rights under section 526 to exclude gray-market goods manufactured under Yamaha-Japan's trademark was actually and necessarily rejected by the Ninth Circuit.

Yamaha–America's allegations in this case that the Regulation is invalid because it violates the due process and equal protection rights of an American subsidiary of a foreign parent must be predicated on the assumption that Yamaha–America has some basic rights under section 526 that are being unfairly denied or discriminatorily withheld. But since the *ABC* courts have already determined that Yamaha–America has no rights under section 526 to bar the importation of the gray-market goods in this case, it is precluded from challenging the validity of the Regulation on the grounds that it violates any such rights.[12]

## 2. Section 42

Yamaha–America raises the same claims under the Lanham Act that it raises under the Tariff Act: namely, that the Regulation unconstitutionally deprives it of certain rights under the statute. Judge Lew in *ABC* concluded that section 42 does not protect Yamaha–America from the importation of goods manufactured by Yamaha-Japan. *ABC,* 703 F.Supp. at 1404. Furthermore, Judge Lew resolved the additional question of whether physical differences in these gray-market products "place them within the umbrella of the federal trademark laws" when he denied Yamaha–America's motion for reconsideration. *Yamaha II,* 745 F.Supp. at 737.

In *Yamaha II,* the district court below concluded that Yamaha–America was precluded from pursuing its "physical differences" argument in the D.C. forum because the *ABC* court rejected this argument in denying the motion for reconsideration. *Id.* at 736. At the time of its ruling, however, our district court did not have the benefit of the *Ninth Circuit Opinion.*

---

12. We agree with appellant that this case is not entirely controlled by *K Mart Corp. v. Cartier, Inc.,* 486 U.S. 281, 108 S.Ct. 1811, 100 L.Ed.2d 313 (1988). In *K Mart,* the issue was whether the Regulation was a reasonable agency interpretation of certain ambiguous phrases contained in section 526. Although the Court concluded that the Regulation was "valid," it did not address the scope of a U.S. trademark holder's rights under section 526, nor did it consider any constitutional challenges to the Regulation.

We, of course, must look to that ruling to ascertain the scope of issue preclusion.

The Ninth Circuit's opinion with respect to section 42 was straightforward: "Under *NEC*, there can be no successful trademark claim here, where the 'Yamaha' mark appearing on goods distributed by ABC was affixed by Yamaha–Japan, the manufacturer from whom ABC acquired the goods." *Ninth Circuit Opinion*, 1991 WL 144474 at *1, 1991 U.S.App. LEXIS 17882 at *2. With respect to the "physical-differences" argument, the Ninth Circuit stated only that Yamaha–America "failed to preserve this issue on appeal ... by not timely raising it in response to ABC's summary judgment motion." *Id.* 1991 WL 144474 at *1, 1991 U.S.App. LEXIS 17882 at *3.

[7] The Ninth Circuit did not rule on the merits of the "physical-differences" argument. Therefore, Judge Lew's implicit rejection of that argument in denying the motion for reconsideration no longer precludes a second suit on the merits because although the Court of Appeals affirmed the *ABC* court, it did so solely on the grounds of procedural insufficiency. *See* MOORE, LUCAS & CURRIER, *supra*, ¶ 0.416[2] at 519 (trial court's dismissal of a complaint on both procedural grounds and on the merits will not preclude second suit on the merits if appellate court affirms only on the procedural ground). However, Yamaha–America may nonetheless be precluded from pursuing its Lanham Act claims if the evidence of "physical differences" could have been submitted in the *ABC* case but, for whatever reason, was never properly presented.

In *Jones v. United States*, 466 F.2d 131 (10th Cir.1972), *cert. denied*, 409 U.S. 1125, 93 S.Ct. 938, 35 L.Ed.2d 257 (1973), the court considered whether a previous judgment that certain payments from an insurance agency to the taxpayers constituted "ordinary income" rather than "capital gains" would have preclusive effect on a second suit as to different tax years. The taxpayers sought to introduce evidence in the second trial that would "be submitted in admissible fashion ... so as to present more clearly the issues to be determined and allow them to be more fully litigated,

thus creating the distinct possibility of a different verdict." *Id.* at 136. The taxpayers argued that this "new" evidence would show that the payments received were actually deferred payments on the total purchase price of the insurance agency they had sold and were, therefore, taxable as long-term capital gains rather than as ordinary income. The court determined that the taxpayers were precluded from litigating their second suit, despite their intention to introduce evidence that was not presented in the prior trial:

> Evidence of this type is not the result of a different factual situation or changed circumstances. It is, instead, historical in nature and could have been admitted at the first trial if properly submitted. If the taxpayers' case was not effectively presented at the first trial it was their fault; affording them a second opportunity in which to litigate the matter, with the benefit of hindsight, would contravene the very principles upon which collateral estoppel is based and should not be allowed.

*Id.*

The evidence of "physical differences" between the gray-market and authorized goods was, according to the Ninth Circuit, only raised in Yamaha–America's motion for reconsideration. "There was no need for the district court to consider Yamaha's proffered evidence at the time of the reconsideration motion, particularly given that Yamaha sought to introduce it in the form of a lawyer affidavit." *Ninth Circuit Opinion*, 1991 WL 144474 at *1, 1991 U.S.App. LEXIS 17882 at *3. Yamaha–America seeks to introduce the evidence of "physical differences" in this case to support its argument that section 42 of the Lanham Act protects it from the gray-market importation of these goods. But this evidence could have been submitted to the district court in *ABC*. The doctrine of issue preclusion prohibits the relitigation of an issue actually determined and necessary to the judgment.

A new contention is not .... necessarily a new issue. If a new legal theory or factual assertion put forward in the sec-

ond action is related to the subject-matter and relevant to the issues that were litigated and adjudicated previously, so that it *could* have been raised, the judgment is conclusive on it despite the fact that it was not in fact expressly pleaded or otherwise urged.

Moore, Lucas & Currier, *supra,* ¶ 0.443[2] at 760–61 (internal quotation marks omitted) (emphasis in original).

In the *ABC* case, the issue of Yamaha-America's rights under section 42 was actually and necessarily determined. The Court of Appeals noted that, under Ninth Circuit precedent, "federal trademark law affords no protection for a wholly owned United States subsidiary of a foreign manufacturer against a rival company that imports and sells goods made by the foreign parent company." *Ninth Circuit Opinion,* 1991 WL 144474 at *1, 1991 U.S.App. LEXIS 17882 at *2. Yamaha-America failed properly to introduce evidence of "physical differences" in the *ABC* litigation, and it is precluded from relitigating the issue of its rights under section 42 based on this "new" evidence.

[8] This is so despite the fact that this Circuit has arguably interpreted section 42 differently from the Ninth Circuit to permit its application to physically-different goods. *See Lever Bros.,* 877 F.2d at 111 ("On its face [section 42] appears to aim at deceit and consumer confusion; when identical trademarks have acquired different meanings in different countries, one who imports the foreign version to sell it under that trademark will (in the absence of some specially differentiating feature) cause the confusion Congress sought to avoid."). As the district court correctly recognized in *Yamaha II,* however, the fact that the substantive law may be different in the two jurisdictions does not affect the application of issue preclusion. "The doctrine of issue preclusion counsels us against reaching the merits in this case, ... regardless of whether we would reject or accept our sister circuit's position." *National Post Office Mail Handlers v. American Postal Workers Union,* 907 F.2d 190, 194 (D.C.Cir.1990); *Yamaha II,* 745 F.Supp. at 737–38.

C. *International Treaties*

[9] Yamaha-America's claims under Article X of the Treaty of Friendship and Article 2 of the Paris Convention are based on a common assumption: that in permitting the importation of gray-market goods, appellees are unlawfully discriminating against Yamaha-America because it is owned by a foreign corporation. Yamaha-America readily concedes that it is *not,* itself, a foreign corporation and that it is not invoking either treaty as a foreign corporation. Yamaha-America's Brief at 19. Instead, Yamaha-America argues that the Regulation violates the treaties by treating it differently from other domestic companies. As the Supreme Court has stated, "national treatment" means that local subsidiaries of foreign corporations "are considered for the purposes of the Treaty [of Friendship] to be companies of the country in which they are incorporated; they are entitled to the rights, and subject to the responsibilities of other domestic corporations." *Sumitomo Shoji Am., Inc. v. Avagliano,* 457 U.S. 176, 188, 102 S.Ct. 2374, 2381, 72 L.Ed.2d 765 (1982).

The crucial question for purposes of both the Treaty of Friendship and the Paris Convention is whether appellees have treated Yamaha-America differently under the Regulation solely because it is a wholly owned subsidiary of a foreign corporation. We think not. The Regulation would apply equally to the counterpart of Yamaha-America, *i.e.,* a domestic, wholly owned subsidiary of an American corporation which produces goods abroad both for sale and for import into the United States. The Supreme Court itself has recognized just such a variation on the typical gray-market situation:

Two other variations on this theme occur when an American-based firm establishes abroad a manufacturing subsidiary corporation (case 2b) or its own unincorporated manufacturing division (case 2c) to produce its United States trademarked goods, and then imports them for domestic distribution. If the trademark holder or its foreign subsidiary sells the trademarked goods abroad, the parallel impor-

tation of the goods competes on the gray market with the holder's domestic sales. *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 286–87, 108 S.Ct. 1811, 1815, 100 L.Ed.2d 313 (1988).[13] The only relevant fact for the purposes of the Regulation is that the domestic trademark owner is subject to common ownership or control with the company which authorizes the distribution of the gray-market goods abroad.[14]

Yamaha–America has no cause of action under either the Treaty of Friendship or the Paris Convention to challenge the Regulation for discriminatory treatment. There is no violation of either treaty when Yamaha–America is treated like every other domestic trademark owner that shares common ownership or control with the owner of the foreign trademark.

D. *Remaining Issues*

Yamaha–America has raised two additional issues: First, that appellees have violated the Fifth Amendment by taking its property rights without just compensation; second, that the Secretary exceeded his authority by promulgating a Regulation that is not consistent with law in violation of 19 U.S.C. § 66.[15]

1. The "Takings" Claim

[10] Yamaha–America argues that Customs's refusal to grant a genuine goods

exclusion order, thereby permitting gray marketers to bring genuine "Yamaha" brand goods into the U.S. market, constitutes a "taking" without just compensation in violation of the Fifth Amendment. Yamaha–America's Brief at 13–14 & n. 11. Appellees respond to this argument by asserting that "Yamaha America's cryptic 'taking' argument appears to assume that the *ABC* trademark laws give it rights that *ABC* determined it did not have." Brief for Appellees (filed Jan. 15, 1992) at 23 n. 12 (citation omitted). The property rights that presumably have been "taken" without just compensation are Yamaha–America's rights to be the sole distributor of "Yamaha" brand products in the United States. But if Yamaha–America is undersold by the gray market, it is because its own parent has chosen to sell the same goods abroad at a lower cost. It is true that the decision not to issue a genuine goods exclusion order has an impact on Yamaha–America's ability completely to control the market, but *ABC* determined that Yamaha–America has no right to such control. Yamaha–America is precluded from rearguing this same issue in the guise of a takings claim.[16]

2. Consistency with Law

[11] Finally, Yamaha–America argues that the decision in *ABC* nowhere ad-

---

**13.** The Supreme Court held that the Regulation as applied to the two variations described in the text was a permissible construction of the ambiguous "merchandise of foreign manufacture" language contained in section 526 of the Tariff Act. *K Mart Corp.*, 486 U.S. at 292, 108 S.Ct. at 1818.

**14.** Yamaha–America's reliance on *Model Rectifier Corp. v. Takachiho International, Inc.*, 709 F.2d 1517 (9th Cir.1983), *aff'g* 220 U.S.P.Q. (BNA) 508 (C.D.Cal.1982), is to no avail. Yamaha–America asserts that the facts of *Model Rectifier* "are foursquare with the facts here with a single exception: Model Rectifier's shareholders were U.S. citizens." Reply Brief of Appellants (filed Jan. 31, 1992) at 15. *Model Rectifier*, however, involved the "classic" gray-market situation: A domestic U.S. company enters into an arms-length agreement with a foreign trademark holder to be its exclusive United States distributor; third parties buy the product abroad, import it into the United States, and undersell the domestic company. The district court granted Model Rectifier's motion for a

preliminary injunction enjoining the sale of the gray-market goods in the United States. The important distinction between *Model Rectifier* and Yamaha–America was not the nationality of its shareholders but the fact that it was an independent company that had bargained with the foreign trademark holder for exclusive rights to distribute the product in the United States.

**15.** "The Secretary of the Treasury shall prescribe ... rules and regulations not inconsistent with law ... and shall give such directions to customs officers and prescribe such rules and forms to observed by them as may be necessary for the proper execution of the law." 19 U.S.C. § 66 (1988).

**16.** Although it is not necessary to reach the merits of appellant's takings claim, we note that Yamaha–America has failed to cite to us a single case in which a court has recognized a takings claim when the right allegedly being deprived by governmental regulation is, itself, a right provided by statute.

dressed the scope of the Secretary's power to promulgate the Regulation. Yamaha-America's Brief at 11–12. Yamaha-America argues in its reply brief that the focus of its "exceeding authority claim here is that the Regulation is inconsistent with the Friendship Treaty and the Paris Convention which have the force of a statute and are the law of the land." Reply Brief of Appellant (filed Jan. 31, 1992) ("Reply Brief") at 7 (citation omitted). But the Regulation would exceed the Secretary's authority under the treaties only to the extent that it deprives foreign corporations of "national treatment" under United States customs and trademark laws; as we have seen, the Regulation does nothing of the kind.

To the extent that Yamaha-America's claim that the Secretary exceeded his authority in promulgating the Regulation depends on the conclusion that section 526 prohibits such an interpretation, *see* Brief of Appellant at 11–12, that issue has been definitively settled by *K Mart Corp.* Yamaha-America relies on a passing reference in *Osawa & Co. v. B & H Photo,* 589 F.Supp. 1163 (S.D.N.Y.1984), to the effect that there exists a "substantial question" about whether Customs exceeded its authority under section 526 in promulgating the Regulation, *see* Reply Brief at 7 n. 4.[17] However, not only was this dicta, but *Osawa* was decided four years before *K Mart Corp.* If the Supreme Court's opinion in *K Mart Corp.* stands for anything, it is that the Secretary's Regulation was a permissible construction of section 526.

### III.  CONCLUSION

For the reasons stated above, the judgment of the district court is affirmed.

*It is so ordered.*



---

17. The *Osawa* court noted that the "substantial question, which need not be decided here in view of Customs' grant of an exclusion order to plaintiff, is whether Customs exceeded its authority in promulgating the regulations in question." After quoting from section 526, the court

concluded that "[i]t contains no suggestion that the right of the U.S. markholder to receive its benefits depends on subtle variations in its relationship with the foreign markholder." *Osawa,* 589 F.Supp. at 1177.

---

UNITED STATES of America

v.

Marion S. BARRY, Jr., Appellant.

No. 91–3258.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 17, 1992.

Decided April 17, 1992.

Defendant, the mayor of Washington, D.C., was convicted by jury in the United States District Court for the District of Columbia, Thomas Penfield Jackson, J., of one count of possession of cocaine, and he appealed. The Court of Appeals, Wald, Circuit Judge, 938 F.2d 1327, affirmed conviction and remanded for resentencing. On remand, the District Court resentenced defendant to six months' imprisonment. Defendant appealed. The Court of Appeals, Buckley, Circuit Judge, held that: (1) judge was not required to recuse himself on resentencing based on remarks he gave at law school forum; (2) defendant was not entitled to requested supplemental presentence report or two-level reduction in base offense level under Sentencing Guidelines for acceptance of responsibility; and (3) judge did not vindictively resentence defendant in response to his successful appeal of initial sentence.

Affirmed.

**1. Judges ⟺49(2)**

Judge's remarks reflecting even strong views about defendant will not call for judge's recusal so long as those views are based on his own observations during

Service: Get by LEXSEE®
Citation: 2004 U.S. APP LEXIS 2375

*92 Fed. Appx. 339, *; 2004 U.S. App. LEXIS 2375, ***

KARLA OESTRINGER, Plaintiff-Appellant, v. DILLARD STORE SERVICES, INCORPORATED, Defendant-Appellee.

No. 03-1587

UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

92 Fed. Appx. 339; 2004 U.S. App. LEXIS 2375

February 9, 2004 *, Submitted

* The court granted appellant's motion to waive oral argument in an order dated November 18, 2003. Thus, the appeal is submitted on the briefs and the record.
February 9, 2004, Decided

**NOTICE:** [**1] RULES OF THE SEVENTH CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**PRIOR HISTORY:** Appeal from the United States District Court for the Southern District of Illinois. No. 01-CV-1206. William D. Stiehl, Judge.

**DISPOSITION:** Affirmed.

### LexisNexis(R) Headnotes ♦ Show Headnotes

**COUNSEL:** For KARLA OESTRINGER, Plaintiff - Appellant: James W. Schottel, Jr., SCHOTTEL & ASSOCIATES, St. Louis, MO USA.

For DILLARD STORE SERVICES, INCORPORATED, Defendant - Appellee: Daniel M. O'Keefe, BRYAN CAVE, St. Louis, MO USA.

**JUDGES:** Before Hon. RICHARD A POSNER, Circuit Judge, Hon. FRANK H. EASTERBROOK, Circuit Judge, Hon. ANN CLAIRE WILLIAMS, Circuit Judge.

**OPINION:** [*340] ORDER

Karla Oestringer, a former sales associate with Dillard Store Services who suffers from Ehlers-Danlos Syndrome (EDS), filed this lawsuit alleging that Dillard failed to accommodate her disability and wrongfully terminated her employment in violation of the <u>Americans with Disabilities Act</u> (ADA). The district court entered summary judgment for Dillard because Oestringer failed to establish that she could perform the duties of her employment with or without accommodation. Oestringer appeals, and we affirm. [**2]

Oestringer was diagnosed with EDS in 1998 after suffering from hip, wrist, and ankle pain for several years. EDS is an inherited disorder characterized by "hyperelasticity and fragility of the skin, hypermobility of the joints, and fragility of the cutaneous blood vessels." *Stedman's Medical Dictionary* 1753 (27th ed. 2000). Oestringer began working for Dillard in April 2000 as a sales associate--a job that required her to take merchandise off carts, fold and move

merchandise, and walk through the department greeting and servicing customers. At the time Oestringer joined Dillard, the company had an attendance policy that allowed employees who had worked less than six months to be absent for up to one week in case of an emergency.

On June 7, 2000, Oestringer visited her doctor after dislocating her ankle at work. **[*341]** Oestringer's doctor filled out a work-release form for her stating that she could not work from June 7 to June 14. Oestringer then returned to work, but soon thereafter reinjured her ankle. After this incident, Oestringer's doctor told her not to work until July 3. By that date, however, Oestringer's ankle had not healed, so her doctor filled our another work-release form **[**3]** stating that she should not work until July 18. When Oestringer did not return to work by July 27, the secretary for Dillard's Operations Manager, Suzanne Tassello, called her to find out if she was going to come in and work her scheduled shift that day. Oestringer told Tassello that she could not return to work and would need additional leave time. Tassello reminded Oestringer that she had already used her one-week emergency leave, and told her that if she did not return to work she would be discharged. Oestringer did not return to work, and she soon received a "Notice of Resignation" form from the store with the box "Due to Health" checked as the reason for voluntary resignation. Oestringer did not return the form, so Dillard administratively terminated her, effective July 31.

Upon receiving a right-to-sue letter from the EEOC, Oestringer filed this lawsuit alleging discrimination under the ADA. Oestringer claimed that she could have performed her job as a sales associate if Dillard had reasonably accommodated her disability by allowing her to take short leaves of absence, sit on a stool at work, or gradually return to her full work schedule.

The district court granted summary **[**4]** judgment to Dillard, holding that Oestringer did not establish that her request for continuous absences was reasonable or that she could have performed the essential duties of her position if she had been permitted to gradually return to work. The court also rejected Oestringer's claim that she could have performed the essential duties had she been permitted to sit on a stool because the only evidence she provided came from her own affidavit, which was contradicted by her prior deposition testimony.

On appeal Oestringer argues that the district court erred in finding there was no genuine issue as to any material fact establishing that she could have performed the duties of a sales associate with her requested accommodations. Performing the essential functions of the job with or without reasonable accommodation from the employer is one of the elements that a plaintiff must show in order to establish a claim under the ADA. 42 U.S.C. § 12111(8).

Oestringer first challenges the district court's finding that her request for continuous absences was not a reasonable accommodation. She argues that she could have returned to work had Dillard allowed her sufficient **[**5]** time off work to allow her ankle to heal. It is true that an employer's failure to accommodate reasonable requests for medical leave violates the ADA, see *Haschmann v. Time Warner Entm't Co.*, 151 F.3d 591, 601 (7th Cir. 1998) (finding leave request of two to four weeks reasonable), but a request for medical leave is reasonable only if it is for a short amount of time, see *Byrne v. Avon Prods., Inc.*, 328 F.3d 379, 381 (7th Cir. 2003) (two-month leave request not reasonable), and cannot be indefinite, see *Nowak v. St. Rita High Sch.*, 142 F.3d 999, 1004 (7th Cir. 1998) (18-month absence not reasonable). While Oestringer's doctor had authorized several short absences-- one or two weeks in length--at the time she was terminated on July 31, she had been absent from work continually for six weeks. When Oestringer spoke to Suzanne Tassello on July 27, she did not request a specific amount of time off, but rather informed Dillard simply that she continued to suffer **[*342]** from her ankle injury and could not come to work. Oestringer's extended absence--which had no definite endpoint--shows that she was not a "qualified individual" when Dillard terminated **[**6]** her employment because she could not attend work. See *EEOC v. Yellow Freight Sys., Inc.*, 253 F.3d 943, 949 (7th Cir. 2001) (en banc)

(ADA does not require employers to accommodate "unreliable attendance").

Oestringer also makes undeveloped challenges that the district court erred in finding that her requests to work while sitting on a stool or work a limited schedule was not a reasonable accommodation. In her opening brief, Oestringer claims that she requested the accommodations and repeatedly maintained that she could have performed her job if allowed these two accommodations; however, she points to no authority or relevant evidence in the record to support her argument, nor does she specify particular errors in the district court's decision. Prefunctory and undeveloped arguments are waived, especially when a litigant such as Oestringer is represented by counsel. See _330 West Hubbard Rest. Corp. v. United States,_ _203 F.3d 990, 997 (7th Cir. 2000)._

Finally, by failing to present it first to the district court, Oestringer has also waived her argument that the district court erred in granting summary judgment to Dillard on the issue of its liability [**7] for failure to engage in the interactive process.

Accordingly, we AFFIRM the decision of the district court granting summary judgment for Dillard.

Service:   Get by LEXSEE®
Citation:   2004 U.S. APP LEXIS 2375
View:   Full
Date/Time:   Wednesday, October 18, 2006 - 2:08 PM EDT

* Signal Legend:
🔴 -   Warning: Negative treatment is indicated
🅀 -   Questioned: Validity questioned by citing refs
△ -   Caution: Possible negative treatment
◆ -   Positive treatment is indicated
🅐 -   Citing Refs. With Analysis Available
🅘 -   Citation information available
* Click on any _Shepard's_ signal to _Shepardize_® that case.

 LexisNexis®   About LexisNexis  | Terms & Conditions
Copyright © 2006 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

# EXHIBIT H

IN ARBITRATION PROCEEDINGS

BEFORE CHARLES ASKIN, ARBITRATOR

| | |
|---|---|
| In the Matter of an Arbitration )<br><br>between )<br><br>UNITED AUTO WORKERS UNION, )<br>LOCAL 2244, AFL-CIO, )<br><br>and )<br><br>NEW UNITED MOTOR )<br>MANUFACTURING, INC. )<br><br>(Policy grievance, No. 10277) )<br>("Time for Time" - Arbitration Phase Two )<br>_____ ) | **UNION'S REPLY BRIEF** |

JONATHAN WEISSGLASS (#185008)
LINDA LYE (#215584)
Altshuler Berzon LLP
177 Post Street, Suite 300
San Francisco, California 94108
Telephone:     (415) 421-7151
Facsimile:     (415) 362-8064

Attorneys for the Union

# TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    I.    CONTRACTUAL OBLIGATIONS MAY ONLY BE REPUDIATED
        THROUGH MUTUAL AGREEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    II.    BECAUSE THE PAST PRACTICE IN THIS CASE PROVIDES
        EVIDENCE OF THE PARTIES' MUTUALLY AGREED UPON
        INTERPRETATION OF THE CONTRACT LANGUAGE, ANY
        ALTERATION OF THAT INTERPRETATION REQUIRES A
        MUTUALLY AGREED UPON CHANGE IN LANGUAGE . . . . . . . . . . . . . 12

        A.    THE PARTIES' LONGSTANDING PAST PRACTICE SHEDS
              LIGHT ON THEIR INTENT WHEN THEY ORIGINALLY
              ADOPTED THE LANGUAGE OF ARTICLES XI AND XXIII . . . . . . 12

        B.    NUMMI CANNOT UNILATERALLY REPUDIATE THE
              PARTIES' MUTUALLY ADOPTED INTERPRETATION OF
              THE CONTRACT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

    III.    NUMMI'S REMAINING ARGUMENTS ARE ALL MERITLESS . . . . . . . . 23

        A.    NEITHER ALLEGED "ABUSE" NOR "CHANGED
              CIRCUMSTANCES RELIEVE NUMMI OF ITS
              CONTRACTUAL OBLIGATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

        B.    THE UNION DOES NOT CONTEND THAT THE CONTRACT
              PROVIDES FOR MULTIPLE SICK LEAVES . . . . . . . . . . . . . . . . . . . 26

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

i

# TABLE OF AUTHORITIES

## CASES

*A.O. Smith Corp.,*
23 LA 27, 32 (1954) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 20

*Adjutant General of Michigan,*
77 LA 203 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 20

*Albertson's, Inc.,*
106 LA 897 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 10

*Cemex,*
120 LA 809 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

*Cerro Metal Prods. Co.,*
98 LA 867, 872 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*City of Indian Harbour Beach,*
103 LA 634 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*City of Anaheim,*
91 LA 579 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Community Mental Health Center of Linn County,*
76 LA 1236 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 20

*Crane Plumbing,*
95 LA 942 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Del Monte Foods,*
121 LA 835 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Denver Public Schools,*
98 LA 1163 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 9

*Flathead Valley Community College,*
116 LA 1659 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Furniture Mfg.,*
122 LA 986 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Grand Haven Stamped Prods. Co.*,
 107 LA 131 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

*Hydro Conduit Corp.*,
 105 LA 964 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 21

*Inland Empire Paper Co.*,
 88 LA 1096 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Martin Marietta Materials Co.*,
 115 LA 1327 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Mason and Hangersilas Mason Co., Inc.*,
 75 LA 106 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 20

*Matanuska-Susitna School Dist.*,
 123 LA 97 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Mechanical Products*,
 91 LA 977 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24

*Motor Wheel Corp.*,
 102 LA 922 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Ohio Dept. of Transp.*,
 103 LA 225 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Penn Emblem Co.*,
 101 LA 884 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*School Dist. No. 25*,
 121 LA 316 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 21

*Smith v. Hartford Ins. Group*,
 6 F.3d 131 (3d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Standard Furniture Manufacturing*,
 122 LA 986 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Standard Oil Co.,*
　　79 LA 1333 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Teledyne Monarch Rubber,*
　　89 LA 565 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*US Airways,*
　　122 LA 815 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 25

*United Salt Corp.,*
　　72 LA 534 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*United Steelworkers of America v. Warrior & Gulf Navig. Co.,*
　　363 U.S. 574 (1960) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Webster Tobacco Co.,*
　　5 LA 164 (1946) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 20

## MISCELLANEOUS

Elkouri & Elkouri, <u>How Arbitration Works</u> (6th ed. 2003) . . . . . . . . . . . . . . . . . . 4, 5, 11

National Academy of Arbitrators, *The Common Law of the Workplace* (BNA 1998) . . . . . . . 11

Richard Mittenthal, "Past Practice in Contract Administration,"
　　59 Mich. L. Rev. 1017 (1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

## INTRODUCTION

Seventy years ago, Congress enacted the National Labor Relations Act and established "the federal policy [of] promot[ing] industrial stabilization through the collective bargaining agreement." *United Steelworkers of America v. Warrior & Gulf Navig. Co.*, 363 U.S. 574, 578 (1960). Without acknowledging this fundamental principle, NUMMI now proposes a radical new theory of contract interpretation that would allow a party to repudiate unilaterally its contractual obligations – years after the parties had mutually agreed upon those obligations – simply by uttering self-serving statements later. It is axiomatic that *mutually* agreed upon contractual obligations can only be amended or terminated through *mutual* agreement. NUMMI's theory – that mutual agreements may be altered unilaterally – violates not only basic principles of contract interpretation and well-established arbitral authority, but the congressional policies underlying modern labor management relations. By rendering a nullity the contractual obligations set forth in a collective bargaining agreement, NUMMI's theory would undermine the stability and predictability in collective bargaining relationships that Congress sought to achieve decades ago.

NUMMI simplistically contends that all "past practices" may be unilaterally repudiated simply by providing notice. This argument conflates the widely-recognized distinction between a past practice that is entirely freestanding and not grounded in any written contractual agreement between the parties, and a past practice that sheds light on the parties' mutual intent in adopting contract language. Because the rationale for finding each of these kinds of "past practices" to be binding is fundamentally different, the method by which each such practice may be terminated is also fundamentally different. A freestanding past practice becomes binding based on an

1

*inference* that the parties through their silence have agreed to be bound, and unilateral repudiation with advance notice therefore suffices to free the parties of any contractual obligation in the future. This is so because a party's express statements that it does not wish to be bound negate the inference – based on that party's silence – that it intended to be bound. But where a past practice sheds light on what the parties actually intended when they agreed to contract language, it is the *actual contract language* that is significant, and which sets forth the parties' agreement to be bound. Because actions speak louder than words, the parties' past practice demonstrates what the parties actually intended when they adopted the contract language and the mutual interpretation of that language to which they subscribed.

The latter past practice is at issue in this case. Because this kind of practice is significant as evidence of what the parties agreed to when they originally adopted the contract language, arbitral authority holds that such a practice cannot be unilaterally repudiated and that the party seeking to implement a change bears the burden of securing the other party's agreement to a change in the contract language. Indeed, it does not even make sense to say that such a practice can be "repudiated," any more than it makes sense to say that a party could repudiate evidence. The evidence exists, and the evidence – including a stipulation – in this case demonstrates that NUMMI and the UAW have long interpreted the language of their collective bargaining agreement to mean that employees have a right to remain on sick leave for up to the full length of their time for time clocks, and that their sick leave may not be terminated before that point – as long as they continue to satisfy the contractual eligibility requirements for sick leave of being ill or disabled and providing timely medical documentation. Accordingly, the contract has that meaning – a meaning that can only be changed by mutual consent.

2

Equally mistaken is the Company's reliance on its statements at the bargaining table *in 2005*. The parties first entered into a collective bargaining agreement 20 years earlier. NUMMI's post-hoc, self-serving articulation of its interpretation of language – long ago adopted and with a well-settled interpretation – is completely irrelevant. Any other approach would completely undermine stability and predictability in the collective bargaining relationship and vitiate the very purpose of collective bargaining agreements, by effectively allowing either party to revise unilaterally well-established contractual obligations.

### ARGUMENT

## I.    CONTRACTUAL OBLIGATIONS MAY ONLY BE REPUDIATED THROUGH MUTUAL AGREEMENT

NUMMI contends that the parties' well-established past practice of treating time for time leave as a right may be terminated by the Company's unilateral repudiation of that practice at the bargaining table. Co. Opening Brf. at 28-31. This argument completely misconstrues the significance of past practice in this case and violates the core contract principle of mutuality.

It is well established that the generic term "past practice" is used to describe entirely distinct concepts, notwithstanding NUMMI's effort to blur the widely recognized and easily discerned distinction. As this Arbitrator explained at the conclusion of the hearing, and consistent with the article to which he referred the parties by Arbitrator Richard Mittenthal,

> [p]ast practice in the labor relations context is a term which unfortunately describes different things in different circumstances. One kind of past practice describes the situation where both parties by their conduct have created a term or condition of employment which is not expressly addressed in the Collective Bargaining Agreement, or which in some cases is contrary to what is expressed in the Collective Bargaining Agreement . . . . The term "past practice" is also used in an entirely different context . . . as external evidence . . . to determine the parties' intent with regard to language which is ambiguous.

Tr. at 499-500; *see also* Richard Mittenthal, "Past Practice in Contract Administration," 59 Mich.

L. Rev. 1017, 1022-1040 (1961) (describing distinct functions that past practice can serve,

including, *inter alia*, "Clarifying Ambiguous Language," and "As a Separate, Enforceable

Condition of Employment"); Elkouri & Elkouri, <u>How Arbitration Works</u> at 605 (6th ed. 2003)

(describing distinct purposes for which evidence of custom and past practice may be introduced,

including "to provide the basis of rules governing matters not included in the written contract"

and "to indicate the proper interpretation of contract language"). For ease of terminology, we

will use the term "freestanding past practice" to refer to practices that are not grounded in the

contract language and "interpretive past practice" to refer to practices that provide evidence of

what the parties intended when they adopted ambiguous contract language.

   Although both types of past practice can be binding on the parties, the rationale for

finding them to be so is fundamentally different. As Arbitrator Mittenthal explains, freestanding

past practices become binding "*by implication*." Mittenthal, "Past Practice in Contract

Administration," at 1034 (emphasis in original); *see also id.* ("By their silence, the parties have

given assent to 'existing modes of procedure.'"). In other words, freestanding past practices

become binding because the parties through their acquiescence in the practice are deemed to have

agreed to the practice. *Id.* at 1040 ("The inference [of agreement] is based largely on the parties'

acquiescence in the practice.").

   An interpretive past practice, by contrast, serves a fundamentally different purpose.

Because the parties' actual conduct is one of the most reliable indicators of their intent,

arbitrators use past practice as evidence, that is, as an interpretive guide to shed light on

ambiguous contract language. As Arbitrator Mittenthal explained: "To borrow a well-known

<div align="center">4</div>

adage, 'actions speak louder than words.' . . . A practice, once developed, is the best evidence of what the language meant to those who wrote it." *Id.* at 1024; *see also* Elkouri & Elkouri at 623 ("The custom and past practice of the parties is the mostly widely used standard to interpret ambiguous and unclear contract language" because "the parties' intent is most often manifested in their actions."). Thus, the significance of an interpretive past practice is the evidence it provides of what the parties actually intended when they adopted particular contract language. That being so, "[b]ecause the practice is essential to an understanding of the ambiguous provision, it becomes in effect a part of that provision." Mittenthal, "Past Practice in Contract Administration," at 1041.[1]

In short, freestanding and interpretive past practices concern fundamentally different questions. A freestanding past practice bears on the question whether – in the absence of any contract language – the parties can nevertheless be bound by the practice, *i.e.*, whether the parties intended rights and obligations to obtain at all. An interpretive past practice, by contrast, comes into play when the parties intended there to be *some* kind of right or obligation – as evidenced by the fact that they chose to adopt contract language; but because the language at issue is ambiguous, the interpretive past practice is used as evidence to flesh out the contours of the rights or obligations set forth in that contract language.

Given the fundamental conceptual differences in these two types of past practice, the method by which each type of practice is terminated or altered is also fundamentally different. A

---

[1] Although the Company attempts to dismiss Arbitrator Mittenthal's seminal paper and the principles he articulated therein as obscure and rarely cited, even the cases cited by the Company acknowledge that his paper is "now regarded as a 'classic'" and "an often cited paper analyzing the uses of past practice in arbitration." *Albertson's, Inc.*, 106 LA 897, 900 (1996).

5

freestanding past practice, as Arbitrator Mittenthal explains, can be terminated by notice and

unilateral repudiation. This makes sense because the binding nature of a freestanding past

practice derives entirely from an *inference* that the parties have agreed to be bound by the

practice – an inference that is negated once one party expressly states that it does not agree to be

bound. Mittenthal, "Past Practice in Contract Administration" at 1040 ("The inference [of

agreement] is based largely on the parties' acquiescence in the practice. If either side should,

during the negotiation of a later agreement, object to the continuance of this practice, it could not

be inferred from the signing of a new agreement that the parties intended the practice to remain

in force. Without their acquiescence, the practice would no longer be a binding condition of

employment.").

An interpretive past practice, by contrast, is evidence of the parties' mutual intent in

adopting particular contract language. *See Denver Public Schools*, 98 LA 1163, 1169 (1992)

("Paramount, of course, is the objective of effectuating the parties' intent underlying the

language."). That being so, Arbitrator Mittenthal and the overwhelming weight of arbitral

authority agree that the interpretation the parties have given a particular contract provision – as

evidenced through their practice over many years – can be changed only when both parties agree

to change the language itself:

> Consider next a well-established practice which serves to clarify some ambiguity
> in the agreement. *Because the practice is essential to an understanding of the*
> *ambiguous provision, it becomes in effect a part of that provision.* As such it will
> be binding for the life of the agreement. And the mere repudiation of the practice
> by one side during the negotiation of a new agreement, unless accompanied by a
> revision of the ambiguous language, would not be significant. *For repudiation*
> *alone would not change the meaning of the ambiguous provision and hence would*
> *not detract from the effectiveness of the practice.* It is a well-settled principle that
> where past practice has established a meaning for language that is subsequently

6

used in an agreement, the language will be presumed to have the meaning given it by practice. Thus, *this kind of practice can be terminated only by mutual agreement*, that is, by the parties rewriting the ambiguous provision to supersede the practice, by eliminating the provision entirely, etc.

Mittenthal's "Past Practice in Contract Administration" at 1041 (emphasis added).

Arbitrators consistently embrace this principle. *E.g., Adjutant General of Michigan*, 77 LA 203, 207 (1981) (finding employer to have violated contract by enforcing new interpretation of provision after new contract became effective: "After thoroughly discussing a controversial position [at the bargaining table], and understanding the divergent positions on same, the parties readopted the prior language. Such behavior can only be construed as a ratification of the status quo ante, and an agreement that the provision as previously applied would continue."); *Community Mental Health Center of Linn County*, 76 LA 1236, 1240-41 (1981) (where both parties familiar with well-established "interpretation and practice . . . with respect to payment of longevity pay to part-time employees," "[i]n the absence of there then resulting some *negotiated* provision that would specifically address and serve to change the then understood practice and procedure, such practice and procedure is deemed to be that accepted by the parties and one that is intended to continue") (emphasis added); *Mason and Hangersilas Mason Co., Inc.*, 75 LA 106, 109 (1980) (Because the "practice for many years [regarding interpretation of provision governing 'on-call period'] supported the Company's position, it was the Union's responsibility during the subsequent new contract negotiations to see that the wording of the provision was changed to make the Union's intent clear as to future assignments of this nature."); *A.O. Smith Corp.*, 23 LA 27, 32 (1954) (where each party at negotiations articulated "a different concept of how the vacation provision would be administered," but union failed to obtain language change,

7

employer's interpretation of pre-existing language prevailed because it was consistent with past practice: "In view of the fact that the practice prior to 1950 favored the Company's plant-wide interpretation, the responsibility was on the Union to change the language of the clause to make the Union's intent clear . . . . Any party desiring a change in the application or meaning must assume the responsibility of seeing to it that the wording of the provision involved is qualified or modified to make explicit the changed intent."); *Webster Tobacco Co.*, 5 LA 164, 166 (1946) ("[F]or an arbitrator to change the practice by which [a] contract provision has been interpreted in a plant over a period of several years and several contracts," "[t]here would have to be a clear and unambiguous direction in the language used to effect such a change.").

Nor is it any surprise that this principle is so universally recognized because it derives from the basic contract principle of mutuality. Where the parties have *mutually* agreed upon an interpretation of contract language – as evidenced through their past practice – that interpretation can only be changed through *mutual* agreement. *See Matanuska-Susitna School Dist.*, 123 LA 97, 100, 102 (2006) (finding agreement ambiguous but concluding "that the parties had a *mutual* understanding and established past practice" regarding interpretation of provision; where "nothing in the parties' negotiations for the current Agreement was *mutually* intended to change the previous understanding or past practice of the parties," employer "violated Article VII of the current Agreement when it *unilaterally*" implemented new interpretation once new contract period commenced) (emphasis added); *Cerro Metal Prods. Co.*, 98 LA 867, 872 (1992) ("where a plant rule is bargained between an employer and a union, the terms of the negotiated rule may not be unilaterally changed by the employer without bargaining with the union"). "Considerations of stability and certitude demand that the parties' legitimate expectations

8

regarding their rights and duties be given effect." *Denver Public Schools*, 98 LA at 1170

(employer demonstrated its interpretation of provision borne out by past practice; "Should the

Union wish to change the existing scope of this part of the agreement, it can negotiate language

[doing so.]").

It would not even make sense to say that such a practice could be "repudiated," because

the practice is evidence of what the parties intended.  Although one could dispute that a practice

existed, the parties in this case have stipulated that the practice of providing time for time leave

existed for over a decade and a half.  Tr. at 67:23-68:11.

NUMMI does not cite a single case that holds that an interpretive past practice may be

unilaterally "repudiated" – without a corresponding change in contract language – simply by

providing notice of the new interpretation at the bargaining table and waiting for the new

collective bargaining agreement to go into effect.  Indeed, arbitrators have rejected employer

efforts to conflate interpretive with freestanding past practices in precisely the fashion that

NUMMI does here.  In *Inland Empire Paper Co.*, 88 LA 1096 (1987), the parties' practice of the

employer absorbing all health insurance premium increases shed light on an ambiguous provision

relating to premium costs.  *Id.* at 1102.  Arbitrator Levak unequivocally rejected the employer's

argument that it could unilaterally revoke its longstanding contractual obligation simply "through

pronouncements during negotiations":

> the Employer's notice to the Union at the conclusion of the 1984 negotiations of
> its construction of the Agreement is self-serving and non-probative.  Long before
> that belated and after-the-fact notice, the Employer's obligation to assume
> premium cost increases had become an established obligation under the then-
> existing, and thereafter continued, language.  Any change in obligation could, by
> then, only have come about through an Employer-initiated negotiated change in
> the HSM language.  With regard to that 1984 Employer announcement, the

9

> Employer may have been confusing its right to unilaterally revoke past practices not covered by the agreement through pronouncements during negotiations, with the instant situation.

*Id.* at 1103.

None of the past practice termination cases on which NUMMI relies (Co. Opening Brf. at 24-26) involved a past practice that was used as evidence of the parties' intent in adopting contract language. *See Cemex*, 120 LA 809, 810 (2004) ("The Company 'inducement policy' was never formally incorporated into the Collective Bargaining Agreement."); *Albertson's Inc.*, 106 LA 897, 899 (1996) (where contract provided detailed table of hourly wage rates for each classification of employee during the term of the contract, union sought to enforce practice of paying "across-the-board-wage increases" to janitors who were receiving wages "above-scale" set forth in wage table); *Penn Emblem Co.*, 101 LA 884, 886 (1993) ("[A] written contractual provision may be *amended by* a clear and unequivocal practice demonstrating the parties' mutual intent to modify the contractual language. Clearly, the parties [d]id just that during the previous contract period.") (emphasis in original); *Grand Haven Stamped Prods. Co.*, 107 LA 131, 137 (1996) (turning to past practice because of "absence of written agreement" on issue); *City of Anaheim*, 91 LA 579, 583 (1988) ("This is not a case in which we appeal to past practice to help us interpret ambiguous language."); *Standard Oil Co.*, 79 LA 1333, 1335 (1982) (past practice at issue "has no basis in the contract").[2]

---

[2] Although NUMMI attempts to describe *Grand Haven* as a case in which the employer had a past practice of "interpreting a leave provision" to allow the employer to require employees to exhaust vacation prior to taking leave (Co. Opening Brf. at 25), a review of the decision reveals that the past practice at issue in that case was freestanding and not used to interpret ambiguous contract language. Neither the vacation nor the leave provision even remotely addressed the issue of exhaustion. *Id.* at 134. Although the Union invoked the contract language

(continued...)

10

NUMMI is thus reduced to asserting that the cases and the commentators – other than Mittenthal – do not distinguish between different types of past practice when discussing the requisites for terminating a past practice. Co. Opening Brf. at 23-24. This point is irrelevant and incorrect. First, there would be no reason for an arbitrator faced with one type of past practice to opine hypothetically on the method of termination required for an entirely different type of past practice not at issue in the pending case. The absence of dictum in the cases NUMMI selectively cites proves nothing. Second, cases and commentators in addition to Mittenthal do indeed recognize and discuss the distinction in types of past practice and the corresponding distinction in method of termination for each such practice. *See* Un. Opening Brf. at 30-34 (citing National Academy of Arbitrators, *The Common Law of the Workplace* at 83-84 (BNA 1998); Elkouri & Elkouri, at 619 n.71; *Furniture Mfg.*, 122 LA 986 (2006); *School Dist. No. 25*, 121 LA 316 (2005); *Hydro Conduit Corp.*, 105 LA 964 (1995)); *see also Inland Empire Paper Co.*, 88 LA at 1103.

---

(...continued)
in support of its argument, *id.*, the employer – which was relying on the practice – did not even attempt to argue that contract language, ambiguous or otherwise, supported its position. *Id.* at 135 (position of employer: "The employer, for many years, has followed a policy and practice of requiring employees to exhaust accrued vacation benefits for certain leaves . . . .").

*Grand Haven* and *Cemex* are even further distinguishable because the collective bargaining agreements at issue contained a clause that expressly required past practices to be reduced to writing to be binding. *Grand Haven,* 107 LA at 134; *Cemex,* 120 LA at 811. No such comparable provision exists in the contract between NUMMI and the Union. In addition, *United Salt Corp.*, 72 LA 534 (1979), also cited by the Company, does not support its contention that one party may unilaterally extinguish a past practice. Co. Opening Brf. at 25. The arbitrator in that case held: "Absent *mutual agreement* to change this custom and practice, it must be adhered to under the current contract just as it was under earlier contracts." *United Salt*, 72 LA at 536 (emphasis added).

II.    **BECAUSE THE PAST PRACTICE IN THIS CASE PROVIDES EVIDENCE OF THE PARTIES' MUTUALLY AGREED UPON INTERPRETATION OF THE CONTRACT LANGUAGE, ANY ALTERATION OF THAT INTERPRETATION REQUIRES A MUTUALLY AGREED UPON CHANGE IN LANGUAGE**

The past practice at issue in this case is a critical piece – though not the only piece – of evidence that sheds lights on the parties' mutually agreed upon interpretation of the contract to provide ill or disabled team members the right to remain on sick leave for up to the full length of their time for time clock. That being so, NUMMI cannot unilaterally repudiate the parties' mutually agreed upon interpretation.

A.    **THE PARTIES' LONGSTANDING PAST PRACTICE SHEDS LIGHT ON THEIR INTENT WHEN THEY ORIGINALLY ADOPTED THE LANGUAGE OF ARTICLES XI AND XXIII**

1.    As set forth in the Union's opening brief, the contract language plainly states that ill or disabled employees have a right to remain on sick leave for up to the full length of their time for time clocks. Un. Opening Brf. at 12-29. NUMMI's incorrect argument regarding repudiation of the past practice in this case is therefore moot. *See, e.g.*, *Inland Empire*, 88 LA at 1102 ("well-established rule that where a collective bargaining agreement is clear and unambiguous on its face, it will be *enforced* as written"; past practice and other extrinsic evidence irrelevant).

2.    Even if the contract could be construed as ambiguous, the parties' actions speak louder than words. The parties have stipulated that for at least a decade and a half, the practice was to terminate a leave of absence for ill or disabled employees only when they had exhausted their time for time clocks – and not when their medical conditions became permanent. Tr. at 67:23-68:11. The practice is consistent with a harmonious reading of Article XXIII, Sections 9.1

12

and 9.3 and Article XI, Section 3(g), and provides important evidence of the parties' mutual interpretation of these provisions over many years.

Section 9.1 provides employees who are "ill or disabled" and who have satisfied the procedural eligibility requirements of providing timely medical documentation a *right* to sick leave. Un. Opening Brf. at 13-19. Section 9.3, the time for time provision, then sets forth the amount of time up to which employees have a right – as provided for in Section 9.1 – to remain on sick leave. If Section 9.3 did not appear in the contract at all, then there would be no limit on the amount of sick leave to which employees have a right, and employees would continue to have a right, pursuant to Section 9.1, to remain on sick leave as long as they satisfied the contractual eligibility requirements for such leave, *i.e.*, as long as they remained "ill or disabled" and continued to provide timely medical documentation. Section 9.3 thus provides important protections to *both* employees and the Company:  It provides to all employees sick leave for a guaranteed and contractually defined period of time (so long as they continue to satisfy section 9.1's contractual eligibility requirements during this period), and it provides to the Company an upper limit beyond which it is no longer obligated to provide sick leave – even if the employee continues to satisfy Section 9.1's contractual eligibility requirements.

This parallels the structure of other leave provisions in Article XXIII, which set forth a right to a particular type of leave and then also the duration of the leave. *See, e.g.*, Art. XXIII, Sec. 3.1 (right to bereavement leave, for up to 3 or 5 consecutive working days, depending on employee's relationship to decedent); Art. XXIII, Sec. 5.1 (right to short-term military leave, "for the length of call-up to a maximum of thirty (30) calendar days").

13

Further, Article XI, Section 3(g) provides that one of the circumstances under which the Company may terminate employment and break seniority is if an employee has "been on a sick leave *beyond* the leave period set forth in Paragraphs 9.3 and 9.4. Article XXIII, of this Agreement." (Emphasis added.)  To allow NUMMI to terminate a sick leave for an ill or disabled employee *before* she has "been on a sick leave beyond the leave period set forth in Paragraph 9.3 and 9.4" would negate an express provision of the contract.

NUMMI's contract interpretation arguments merely reinforce the conclusion that the past practice at issue here is interpretive – or there would be nothing to construe.  In any event, the Company's arguments are incorrect.

The Company contends that the contract's use of the term "automatically" in Section 9.4 (regarding sick leave for employees with temporary industrial medical conditions) means that the parties did not intend employees to have the right to remain on sick leave for up to the full length of their time for time clocks, as provided for in Section 9.3.  Co. Opening Brf. at 14, 21.  First, as we explained in our opening brief, there are logical reasons for the parties to have specifically chosen to use the word "automatically" in Section 9.4, and recognizing a right of employees to remain on sick leave for up to the full length of their time for time clocks does not render Section 9.4 "superfluous."  Un. Opening Brf. at 16-18.  Second, the Company's argument goes too far. Article XXIII does not use the term "automatically" with respect to the other kinds of leave, and yet it would be absurd to argue, nor does NUMMI even attempt to, that employees who are called to jury duty do not have a *right* to jury duty leave for up to the full period set forth in the contract, if they satisfy contractual eligibility requirements for such leave, and notwithstanding that the

14

parties did not use the term "automatically" in connection with jury duty leave. Un. Opening Brf. at 14.

NUMMI's arguments about the meaning of the phrase "leave of absence" are also unavailing. *See* Co. Opening Brf. at 15-17.

First, NUMMI creates a straw man by mischaracterizing the Union as advocating for an indefinite leave. The Union does not argue that employees have a right to sick leave in perpetuity. Instead, the Union contends that employees have a right to remain on sick leave for up to the full length of the period set forth in Section 9.3. Section 9.3 indisputably sets forth the duration of the sick leave. That the duration of the sick leave is longer than NUMMI would now like does not mean that the period it sets forth is not of defined duration, or that it is not the one to which NUMMI agreed.[3] Recognizing that the right to sick leave provided in the contract would be illusory if there were no minimum period during which ill or disabled employees have a right to remain on sick leave, NUMMI attempts to argue that all employees have a right to remain on sick leave as long as their conditions are permanent. But the "substitute" minimum

---

[3] NUMMI also contends that giving to effect employees' right to remain on leave for up to the full length of the time for time clock would "eviscerate[] the central premise of the *Staudohar* case." Co. Opening Brf. at 17. NUMMI is attempting to relitigate the issue it already lost in the prior stage of these arbitration proceedings. Contrary to NUMMI's assertion, Arbitrator Staudohar did not hold that NUMMI has "the right to end leave of absences notwithstanding Section 9.3" or "that the Company need not extend a leave of absence for long periods of time where the employee is permanently disabled." Co. Opening Brf. at 17. As this Arbitrator has already ruled, "*Staudohar* did *not* constitute a binding arbitral ruling concerning the entitlement of permanently disabled employees who may have accrued separate leave entitlement under Section 9.3. It is further concluded that the Employer's implemented policy of terminating employees whose Section 9.4 leave rights have expired because they have permanent and stationary injuries or medical conditions, without granting such employees accrued rights to sick leave as provided in Section 9.3, is not consistent with the actual rulings in *Staudohar*." Jt. Exh. A at 20 (emphasis in original).

15

period that NUMMI offers has no basis in the contract language. *See* Un. Opening Brief at 21 n. 6.

Second, NUMMI seeks to import a definition of "leave of absence" from a miscellaneous collection of authority, including 65-year old out of state cases, Co. Opening Brf. at 15 – even though the parties expressly defined the term "leave of absence." Art, XXIII, Sec. 1. That definition – "approved time off from work . . . for a specific period of time" – nowhere includes the additional limitations that NUMMI now seeks to impose and is entirely consistent with the Union's interpretation of the time for time clause. Un. Opening Brf. at 25-26. There is no justification for superseding the parties' own definition of the term with the definition ventured in cases, none of which construe the contract in this case, and where even the cases upon which NUMMI relies acknowledge that there is no absolute rule that a leave of absence is always "temporary." *See, e.g., Smith v. Hartford Ins. Group*, 6 F.3d 131, 138 (3d Cir. 1993) ("leave of absence is *typically* temporary") (emphasis added).

In short, the stipulated practice of terminating sick leave only when employees exhausted their time for time clocks, rather than at the point at which their conditions became permanent, is well grounded in – indeed commanded by – the language of Article XXIII, Sections 9.1 and 9.3, and Article XI, Section 3(g).

3.    Moreover, NUMMI introduced evidence that it pays approximately $12,000 per year in health insurance benefits for each employee on a leave of absence and that in 2005 the leave of absence rolls had grown to approximately 600 employees. Tr. at 217:6-12. At the same time, NUMMI's "Basic Management Philosophy" is predicated on the concept of eliminating "muda" or waste in Japanese and keeping "productions costs . . . at the lowest level possible."

16

Un. Exh. W at 15; Un. Exh. Q at 1 (encouraging "[c]omplete elimination of muda (waste) in our jobs [as] the most efficient way to build vehicles with the highest level of quality at the lowest possible cost."). In an effort to achieve " to the fullest extent possible, economy of operations," the Company in negotiations for prior contracts has proposed changes to leave of absence rights. Un. Exh. U at 5, 36. And on a daily basis, NUMMI is constantly engaged in cost-reduction campaigns, encouraging employees to submit cost-saving suggestions. *See, e.g.,* Un. Exh. Q at 4, R at 4, T at 1.

In light of NUMMI's consistent efforts to reduce costs through everything from major bargaining proposals to day-to-day measures such as encouraging employees to turn lights "off during non-production hours," Un. Exh. S at 2, it is utterly implausible that NUMMI would have allowed employees to remain on sick leave – at a cost of thousands of dollars per year per employee – if it did not recognize itself to be contractually obligated to do so. "If the Company had determined to provide the subsidy as a gratuity 'like a Christmas bonus or a Thanksgiving Turkey,' as is suggested in its brief, it surely would have made some formal announcement of its beneficence, notifying employees that the Company hand voluntarily and unilaterally offered this subsidy." *US Airways*, 122 LA 815, 826 (2006) (rejecting employer's effort to characterize past practice as freestanding rather than interpretive, and finding that because practice was grounded in contract language, it could not be unilaterally repudiated).

4.    Finally, the parties' practice is not the only evidence of their mutual interpretation. NUMMI consistently, repeatedly, and expressly acknowledged that employees are *entitled* to remain on sick leave for up to the full length of their time for time clocks and that it remains

17

contractually *obligated* to continue a sick leave of absence until the employee exceeds that clock. *See* Un. Opening Brf. at 5-7 (citing Company statements).

### B.   NUMMI CANNOT UNILATERALLY REPUDIATE THE PARTIES' MUTUALLY ADOPTED INTERPRETATION OF THE CONTRACT

NUMMI's self-serving, belated, and unilateral statements at the bargaining table do not change the longstanding interpretation of the contract that the parties themselves have mutually agreed upon – as evidenced by NUMMI's own statements and the parties' conduct over many years.

The relevant provisions of the contract have remained unchanged and been carried forward in each of the seven collective bargaining agreements executed by the parties since their collective bargaining relationship commenced in 1985. Jt Exh. 1 (2005 CBA) at p. 27, 65; Jt. Exh. 2 (2001 CBA) at p. 29, 69-70; Jt. Exh. 3 (1988 CBA) at p. 19, 42; Co. Exh. 1 at 102:4-12.

NUMMI first articulated a new "interpretation" of the contract in the year leading up to the 2005 negotiations, but even then, offered shifting interpretations. *See* Un. Opening Brf. at 7-8. Prior to that time, and during bargaining over the *six* prior contracts – in which the parties initially adopted and then repeatedly re-adopted the relevant contract provisions – NUMMI never articulated the interpretation on which it now relies. Because NUMMI did not articulate its new interpretation until 2004 at the earliest, has offered two different new interpretations since 2004,[4] acted upon an entirely different interpretation for at least the last decade and a half, and cannot

---

[4] As the Arbitrator previously found, the Company first took the position in 2004 that it "had the right to terminate employees with *industrial* injuries" once their conditions became permanent. Jt. Exh. A at 10:24-25 (emphasis in original). It then expanded its position and now asserts that it has a right to terminate *all* employees, *i.e.*, employees with personal or industrial conditions, once the condition becomes permanent. *Id.* at 11:18-20.

18

even explain why it waited so long to implement its belatedly announced interpretation,[5] it is highly doubtful that its current interpretation reflects NUMMI's actual intent. Even if it did, however, "the true intent of the party is irrelevant," as NUMMI itself concedes, "if it is unexpressed." Co. Opening Brf. at 18. That being so, the prevailing interpretation mutually adopted by the parties when they entered into the *first six* collective bargaining agreements – an interpretation evidenced by NUMMI's express statements and the parties' conduct during this period – "bec[a]me a formal part of the contract between the parties" and is now binding. *Motor Wheel Corp.*, 102 LA 922, 930 (1994).

Although NUMMI places great reliance on its statements at the bargaining table in 2005, it is well-established that the relevant intent question is the parties' mutual intent at the time they *originally* adopted the contract provision at issue – not a revisionary and unilateral statement of that intent years later. *Flathead Valley Community College*, 116 LA 1659, 1661, 1663 (2002) (where same language carried over from prior contract, relevant question is "mutual intent of the parties *at the time the language . . . was drafted*") (emphasis added); *Martin Marietta Materials Co.*, 115 LA 1327, 1331 (2001) ("self-evident" that employer's statements at bargaining table in 1998 characterizing language adopted by parties in 1974 was "not relevant"). "Obviously, the 'plain meaning' of the words either *per se* or in context are preferable to *post hoc* attempts to create self-serving interpretations." *See Ohio Dept. of Transp.*, 103 LA 225, 229 (1994).

---

[5] The Union asked the Company why, if it believed it had the right to terminate sick leave once the medical condition became "permanent," the Company "waited so long to implement" that interpretation of the contract. Tr. at 152:10. Bob McCullough, Vice-President of NUMMI's Legal and Human Resource Departments, responded, "I don't know why we didn't." Tr. at 152:12, 207:16-17.

If NUMMI's belated and unilateral interpretation could determine the meaning of the contract originally adopted in 1985, a party could "alter or amend [its] contractual obligations" through "self-serving unilaterally issued" statements. *Crane Plumbing*, 95 LA 942 (1990) (company could not alter contractual obligation to provide maternity benefits by unilaterally issuing insurance booklet that excluded such benefits). Such an approach would completely undermine "the stability of the parties' relationship . . . , contrary to the recognized purpose of collective bargaining agreements." *Del Monte Foods*, 121 LA 835, 840 (2005) ("meaning of collective bargaining" agreements does not turn on "self-serving testimony"). "In the framework of a Labor Contract, there would be little stability or much purpose in a collective bargaining relationship if the Company had the power to excuse itself from the economic obligations set out therein." *Teledyne Monarch Rubber*, 89 LA 565, 569 (1987).

As discussed above, the past practice in this case is evidence of the parties' mutual intent in adopting the contract language to provide employees with a right to remain on sick leave for up to the full length of their time for time clock. NUMMI cannot now repudiate that evidence. That being so, NUMMI had the burden of obtaining agreement from the Union to change the language of the contract, if it now wishes to have the authority to terminate sick leave prior to the expiration of the time for time clock. *See* Mittenthal, "Past Practice in Contract Administration," 59 Mich. L. Rev. at 1041; *Adjutant General of Michigan*, 77 LA at 207; *Community Mental Health Center of Linn County*, 76 LA at 1240-41; *Mason and Hangersilas Mason Co., Inc.*, 75 LA at 109; *A.O. Smith Corp.*, 23 LA at 32; *Webster Tobacco Co.*, 5 LA at 166.

Even if repudiation of this evidence were permissible – which it is plainly not – there is no argument whatsoever, and NUMMI does not even assert, that it can repudiate the evidence of

20

its intent as reflected in its repeated and express statements acknowledging its contractual obligation to provide leave for up to the full length of the time for time period. *See* Un. Opening Brf. at 5-7.

NUMMI's unilateral statements at the bargaining table in 2005 – in the absence of any agreement from the Union to change the contract language – does not alter the longstanding, mutually accepted meaning of the contract language. As Arbitrator Levak explained in language directly on point: "Long before that belated and after-the-fact notice, the Employer's obligation . . . had become an established obligation under the then-existing, and thereafter continued, language. Any change in obligation could, by then, only have come about through an Employer-initiated negotiated change in the [contract] language." *Inland Empire*, 88 LA at 1103. NUMMI is "confusing its right to unilaterally revoke past practices not covered by the agreement through pronouncements during negotiations, with the instant situation." *Id.*[6]

Indeed, NUMMI is simply seeking "to give new meaning to old contract language. But that approach is essentially no different from proposing a change in the language of the contract in order to effect a change in the terms of the contract. However, . . . it is well-established that a

---

[6] *See also School District No. 25*, 121 LA 316, 320 (2005) (parties' practice over 17 years revealed what "[t]he early retirement provision came to mean: "The District's obligation to amend the contract by negotiating a change in its language remained intact. Its practice could not be repudiated unilaterally."); *Hydro Conduit Corp.*, 105 LA 964, 967 (1995) (where "twenty years of a consistent practice" is grounded in contract language and that language "was not changed in the current agreement," the practice is "not 'somehow eliminated' by the Union's merely 'raising the issue at the table'"); *Standard Furniture Manufacturing*, 122 LA 986, 993 (2006) ("If the past practice in this case" "of permitting foremen or supervisors to do bargaining unit work" under particular contract clause "is to be changed, the Parties need to negotiate a change in the language of [the contract] to reflect their mutual wishes and/or agreement in clear and unambiguous language.").

21

party may not gain through arbitration what it was unable to achieve in negotiations." *Hydro*

*Conduit Corp.*, 105 LA at 967 (internal quotation marks, citations omitted).

The zipper clause on which NUMMI relies actually underscores this point. The clause

provides:

> This Agreement constitutes the entire Agreement between the parties, *except as modified by written side letters to this Agreement* and signed by the Company's Vice President, Human Resources and the UAW Vice President. During the negotiations which resulted in this Agreement, each party had the right and opportunity to make demands and proposals on any subject or matter not removed by law from the area of collective bargaining. The understandings and agreements arrived at by the parties after the exercise of that right and opportunity are set forth in this Agreement. Furthermore, for the term of this Agreement or any extension thereof, each party waives all statutory rights to bargain collectively over the subject matter of this Agreement.

Art. XXX, Sec. 1 (emphasis added).

It is undisputed that prior to the 2005 negotiations, the parties had never mutually

interpreted the agreement to authorize NUMMI to terminate sick leave as soon as an employee's

medical condition becomes permanent. It is also undisputed that the "letter" presented by the

Company to the Union during the 2005 negotiations announced a radical *new* interpretation of

the collective bargaining agreement that the parties had never previously mutually adopted. To

secure the change sought by NUMMI in the parties' longstanding, mutual interpretation of the

existing contract language, NUMMI either needed to obtain a change in the language itself or at a

minimum – pursuant to the zipper clause – Union consent to NUMMI's proposed side letter.

NUMMI failed to obtain any such agreement.[7]

---

[7] NUMMI put a package of proposals across the bargaining table in 2005 that included the letter which it now contends sufficed to alter its longstanding contractual obligations, even though the Union never agreed to that letter. Un. Exh. 21 at 4. NUMMI's package of proposals

(continued...)

The Company's own conduct demonstrates that it does not really believe that it can repudiate its contractual obligations merely by putting a side letter across the bargaining table and failing to obtain the Union's agreement to that side letter. *Cf. City of Indian Harbour Beach,* 103 LA 634, 636 (1994) (Union's conduct at bargaining demonstrated that it "does not really interpret the present contract language" in the fashion it was arguing at arbitration). Another of the side letters that the Company proposed at the 2005 negotiations, but as to which the Company did not secure Union consent and which was not incorporated into the current contract, would have eliminated health care for employees on a leave of absence. The Company continues under the current contract to provide health care benefits to employees on leave. *See* Un. Exh. 21 at 5; Tr. 149:21-150:15; Un. Opening Brf. at 9.

## III.    NUMMI'S REMAINING ARGUMENTS ARE ALL MERITLESS

NUMMI makes various additional arguments, all of which are meritless.

### A.    NEITHER ALLEGED "ABUSE" NOR "CHANGED CIRCUMSTANCES" RELIEVE NUMMI OF ITS CONTRACTUAL OBLIGATIONS

Neither alleged "abuse" nor "changed circumstances" empower NUMMI to terminate unilaterally the parties' mutually agreed upon interpretation of the contract language. This is so because arbitrators only permit unilateral repudiation on these grounds when the past practice at issue is freestanding.

---

[7] (...continued)
also included several other proposed side letters to the contract. Un. Exh. 21 at 2-3. The Union agreed to several *other* side letters. The parties signed off on those side letters, Un. Exhs. 47, 48, and the agreed-upon content was incorporated into the collective bargaining agreement. Tr. at 145:23-149:19, Jt. Exh. 1 (2005 CBA) at p. 154 at ¶14, 194. Unlike these other Company-proposed side letters, the sick leave letter never was agreed to by the Union, and was not incorporated into the current contract. Tr. at 150:16-151:8.

23

NUMMI relies on *Mechanical Products*, 91 LA 977 (1988), to argue that it may terminate employees' right to time for time leave based on "abuse." But unlike this case, *Mechanical Products* involved a freestanding past practice. The company had a longstanding policy of allowing employees to use vending machines at any time during the work day, although the parties had never negotiated such a provision in their contract, and the contract itself was "silent on the issue of vending machine usage." *Id.* at 977-78, 980. During bargaining for a new contract, the company expressed its concern about employee productivity and announced that it would prospectively permit trips to vending machines only during breaks and lunch. *Id.* at 979. The arbitrator found that the employer was not bound by the prior practice. As a threshold matter, the arbitrator explained that even though the contract was "silent" on vending machine usage, the past practice became "binding" because the parties "by their mutually accepted practice, fill[ed] the 'gap.'" *Id.* at 980. But once the Company "made the Union aware during bargaining" that "abuse" of the vending machine usage policy "would not be tolerated," "the parties' mutually accepted practice was no longer a part of the parties' agreement." *Id.* at 981-82.

The rationale for terminating the past practice in *Mechanical Products* is identical to the rationale for terminating freestanding past practices in general: Where the contract itself is "silent" on the issue, the practice can nevertheless become binding based on an inference from the parties' mutual acquiescence in the practice. Yet once one party expressly states that it does not acquiesce in the practice – for reasons of "abuse" or otherwise – there is no longer any basis for the inference that the parties have mutually agreed to the practice. *See supra* at 4-6. By contrast in this case, there is much more than an "inference" that the parties mutually agreed to be bound: The contract language (Article XXIII, Sections 9.1 and 9.3 and Article XI, Section

24

3(g)) demonstrates that the parties agreed to be bound, and the parties' longstanding past practice and NUMMI's express statements over many years provide evidence of their mutual interpretation of that contract language. Under these circumstances, NUMMI had the burden of obtaining the Union's agreement to change the contract language. *See supra* at 6-9.

NUMMI also asserts, without any explanation or citation, that it may repudiate past practice based on "changed circumstances." Co. Opening Brf. at 31. The only circumstance that has changed is that NUMMI no longer wishes to live up to its contractual obligations. As arbitrators have made clear, a Company's financial concerns about the cost of a practice does not warrant termination of an interpretive practice. *US Airways*, 122 LA at 826. Indeed, in *US Airways*, the Company recognized and the arbitrator affirmed that although a *freestanding* past practice is subject to unilateral discontinuance based on changed circumstances, an employer cannot do so with an interpretive past practice. *Id.* at 825-26. "Whether the Company's assumption" of the obligation to provide sick leave to ill or disabled employees for up to the full length of their time for time clocks "was imprudent, or has unforeseeably become so," NUMMI cannot now "relieve itself of this Contractual obligation merely because it has become financially burdensome. And, by the same token, whether or not it may be in the long run best interest of the Association to waive this benefit to avoid further staffing reductions, cannot weigh upon the Decision." *Id.* at 826.[8]

---

[8] Moreover, nothing as a factual matter has changed. NUMMI contends "at the time the parties negotiated the Agreement and even for the intervening years between the Agreement and later contracts, the seniority of employees was modest. Thus, it was much less of an issue for NUMMI to allow a team member to remain on leave for the full period of seniority . . . . Now the seniority of many team members is more than 20 years." Co. Opening Brf. at 16 n.8. The argument is not that circumstances have changed, but that NUMMI did not understand the full implications of the contractual bargain to which it had agreed. But given the plain language of

(continued...)

**B.    THE UNION DOES NOT CONTEND THAT THE CONTRACT PROVIDES FOR MULTIPLE SICK LEAVES**

NUMMI devotes a portion of its brief to mischaracterizing the Union's interpretation and then refuting that interpretation. NUMMI asserts that the Union interprets the contract to create "a new Section 9.3 leave" after "a team member's Section 9.4 leave ends per *Staudohar*" and that the Union's alleged interpretation of the contract to create "multiple" leaves renders Section 9.4 of the contract superfluous. Co. Opening Brf. at 19. The Union does not interpret the contract to create "multiple" sick leaves and its interpretation does not render any portion of the contract superfluous.

As the Union previously stated, the Union contends that all employees have the right to sick leave as long as they are ill or disabled and fulfill the contract's procedural eligibility requirements of submitting timely medical documentation. Un. Opening Brf. at 13-19. Section 9.3 sets forth the amount of time up to which employees have a right to remain on sick leave. *Id.* at 19-24. The plain language of the contract means, and the Company concedes, that Section 9.3 applies to all employees, regardless of whether the medical condition is personal or industrial. *Id.* at 24 (citing Tr. 263:23-25). The Union does not contend that Section 9.4 creates a sick leave separate or apart from Section 9.3, only that it defines "seniority," and thus provides a special

---

[8] (...continued)
Article XXIII, Section 9.3 – which on its face ties the length of a leave of absence to the employee's seniority – it was entirely foreseeable at the time the parties originally negotiated the agreement that the length of an employee's allowable leave of absence would grow as the plant matured and average seniority increased. Indeed, the record further shows that the parties fully understood the financial implications of the leave provisions when they negotiated the contract. Just two years after the first contract in 1985, the parties met and the Company expressed concern about the high number of employees on a long-term leave of absence. Union Exh. V at 4-5. At that meeting, the Company expressed concerns "about many employees being on a long-term leave of absence" and that this was "very expensive." Tr. 470:5-15.

26

methodology for calculating the length of the time for time clock, for an employee with an

industrial medical condition.[9] For the reason's set forth in the Union's Opening Brief, this

interpretation does not render Section 9.4 of the contract "superfluous." *Id.* at 16-18.

## CONCLUSION

For the foregoing reasons, the grievance should be sustained.


Dated:  October 19, 2007

                            Respectfully submitted,

                            Jonathan Weissglass
                            Linda Lye
                            ALTSHULER BERZON LLP

                            by:                           
                                Linda Lye

                            Attorneys for the Union

---

[9] The Union's view regarding the interaction of Section 9.3 and 9.4 in determining the proper methodology for calculating the length of the time for time clock for employees with industrial medical conditions was set forth in the Union's opening statement at the hearings in 2006, and in the Union's opening brief in the prior stage of this arbitration. Tr. at 25:3-16, 38:7-43:15; Un.'s Opening Brief (dated September 28, 2006) at 35-38.  But the Union has not specifically addressed the methodology in this stage of the proceedings based on the Arbitrator's framing of the issue at the outset of the hearing.  Tr. at 304:22-306:18.